# NO. 24-2201

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

NATHANIEL SILVA and PHIL ROTHKUGEL,

Plaintiffs-Appellants (Petitioners),

v.

SCHMIDT BAKING DISTRIBUTION, LLC and SCHMIDT BAKING COMPANY, INC.

Defendants-Appellees (Respondents),

INTERLOCUTORY APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT
Honorable Michael P. Shea, Presiding
District Court Case No. 3:23-CV-01695-MPS

## RESPONDENTS' BRIEF IN OPPOSITION TO
## PETITION FOR LEAVE TO APPEAL PURSUANT TO 28 U.S.C. § 1292(b)

LITTLER MENDELSON, P.C.
William J. Anthony, Esq.
900 Third Avenue
New York, NY 10022
Tel: 212.583.9600
wanthony@littler.com

Joshua B. Waxman
815 Connecticut Avenue, NW, Suite 400
Washington, DC 20006
Tel: 202.789.3406
jwaxman@littler.com
***Attorneys for Defendant-Appellees (Respondents)***

# TABLE OF CONTENTS

PAGE

INTRODUCTION.................................................................................1

RELEVANT PROCEDURAL HISTORY ........................................3

I.   COMPLAINT AND ARBITRATION DEMAND ......................................3

II.  MOTION TO COMPEL ARBITRATION ....................................3

LEGAL STANDARDS........................................................................5

ARGUMENT .......................................................................................6

I.   PLAINTIFFS WAIVED BELOW ALL BUT ONE OF THEIR
PETITION'S SECTION 1 "CONTRACT OF EMPLOYMENT"
ARGUMENTS AND THAT ARGUMENT CANNOT PREVAIL ..............6

II.  PETITIONERS FAIL TO PRESENT A PURE QUESTION OF LAW
THAT CAN BE DECIDED QUICKLY AND CLEANLY WITHOUT
STUDYING THE RECORD....................................................................12

III. PETITIONERS FAIL TO ESTABLISH A SUBSTANTIAL
GROUND FOR DIFFERENCE OF OPINION .........................................16

IV. PETITIONERS FAIL TO ESTABLISH AN IMMEDIATE APPEAL
WILL MATERIALLY ADVANCE THE ULTIMATE
TERMINATION OF THE LITIGATION.................................................18

CONCLUSION .................................................................................21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Aggrenox Antitrust Litig.*,
    No. 3:14-md-02516 (SRU), 2018 WL 834228 (D. Conn. Feb. 12,
    2018) ................................................................................................1

*Amos v. Amazon Logistics, Inc.*,
    74 F.4th 591 (4th Cir. 2023) ............................................................10

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec.*
    *Act (ERISA) Litig.*,
    No. 09 MD 2058 (PKC), 2010 WL 4237304, at \*3 (S.D.N.Y. Oct.
    8, 2010) ............................................................................................6

*In re Belton*,
    No. 15 CV 1934 (VB), 2016 WL 164620 (S.D.N.Y. Jan. 12, 2016) ...............18

*Bissonnette v. LePage Bakeries Park St., LLC*,
    601 U.S. 246 (2024)........................................................................*passim*

*United States v. Braunig*,
    553 F.2d 777 (2d Cir. 1977) ............................................................6

*Brock v. Flowers Foods, Inc.*,
    673 F. Supp. 3d 1180 (D. Colo. 2023)............................................10, 11, 16, 17

*Canales v. C.K. Sales Co.*,
    67 F.4th 38 (1st Cir. 2023)..............................................................10, 11, 16, 17

*Davarci v. Uber Techs, Inc.*,
    No. 20-CV-9224 (VEC),2021 WL 5326412 (S.D.N.Y. Nov. 15,
    2021) ................................................................................................19, 20

*Dill v. JPMorgan Chase Bank, N.A.*,
    No. 19 Civ. 10947 (KPF), 2021 WL 3406192 (S.D.N.Y. Aug. 4,
    2021) ................................................................................................20

*Fed. Trade Comm'n v. Surescripts, LLC*,
    No. 19-1080 (JDB), 2020 WL 2571627 (D.D.C. May 21, 2020) ........................6

*Minnesota v. Fleet Farm LLC*,
No. 22-2694 (JRT/JFD), 2024 WL 22102 (D. Minn. Jan. 2, 2024) .................... 6

*Fli-Lo Falcon, LLC v. Amazon.com, Inc.*,
97 F.4th 1190 (9th Cir. 2024) ............................................................ 4, 9, 10, 12

*In re Flor*,
79 F.3d 281 (2d Cir. 1996) ...................................................................... 5, 6, 17

*Flores v. Nat'l Football League*,
No. 22-CV-0871 (VEC), 2024 WL 50238 (S.D.N.Y. Jan. 4, 2024) ........... 12, 19

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
No: 10 Civ. 3461(PAC), 2014 WL 5002090 (S.D.N.Y. Oct. 7,
2014) ............................................................................................................... 20

*Gray v. Schmidt Baking Co., Inc.*,
No. 22-cv-00463 (LKG), 2023 WL 9285466 (D. Md. Oct. 16,
2023) ....................................................................................................... 7, 9, 10

*Islam v. Lyft*,
524 F. Supp. 3d 338 (S.D.N.Y. 2021) ........................................................... 21

*Islam v. Lyft*, Inc.,
No. 20-CV-3004 (RA), 2021 WL 2651653, at *5 (S.D.N.Y. June
28, 2021) ................................................................................................... 19, 20

*Islam v. Lyft, Inc.*,
No. 20-CV-3004 (RA), 2021 WL 5762211 (S.D.N.Y. Dec. 3,
2021) ............................................................................................................... 19

*James v. Ventura Home Solar, LLC*,
--- F. Supp. 3d --, 2024 WL 446085 (D. Conn. Feb. 6, 2024) ........................ 21

*Johnson v. Nat'l Collegiate Athletic Ass'n*,
108 F.4th 163, 183 n.1 (3d Cir. 2024) ........................................................... 12

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave
Achille Lauro In Amministrazione*,
921 F.2d 21 (2d Cir. 1990) ............................................................................. 5

*Koehler v. Bank of Bermuda Ltd.*,
101 F.3d 863 (2d Cir. 1996) ........................................................................... 5

iii.

*Murray v. UBS Secs., LLC*,
      No. 12 Civ. 5914 (KPF), 2014 WL 1316472 (S.D.N.Y. Apr. 1,
      2014) ...................................................................................16, 21

*New Prime Inc. v. Oliveira*,
      586 U.S. 105 (2019).........................................................*passim*

*Oliveira v. New Prime, Inc.*,
      857 F.3d 7 (1st Cir. 2017)..........................................................8

*Rodriguez v. Procter & Gamble Co.*,
      499 F. Supp. 3d 1202 (S.D. Fla. 2020) ...................................6

*Whyte v. WeWork Cos., Inc.*,
      No. 20-cv-1800 (CM), 2020 WL 4383506 (S.D.N.Y. July 31,
      2020) .......................................................................................18

*Williston v. Eggleston*,
      410 F. Supp. 2d 274, 276 (S.D.N.Y. 2006) .........................12

**Statutes**

9 U.S.C. § 1 ...................................................................*passim*

9 U.S.C. § 16(a) ...................................................................18

9 U.S.C. § 16(b) .....................................................................1

28 U.S.C. § 1292(b) ...........................................................*passim*

Conn. Civ. L Rule 7© .............................................................9

Federal Arbitration Act (FAA) .......................................*passim*

Maryland Uniform Arbitration Act (MUAA)..................34, 21

## **Table of Respondents' Exhibits**

| Exhibit No. | District Court ECF No. | Exhibit Description |
|---|---|---|
| 1 | 24 | 2-9-2024 Pls.' Opp'n to Mot. to Compel Arbitration |
| 2 | 1 | First Amended Class Action Complaint |
| 3 | 11 | 1-5-2024 Defs.' Mem. ISO Mot. to Compel Arbitration (w/o Exhibits) |
| 4 | 11 | 6-24-2020 Silva Baked Goods Distribution Agreement |
| 5 | 28 | 3-1-2024 Defs.' Reply ISO Mot. to Compel (w/o Exhibits) |
| 6 | 38 | 6-17-2024 Defs.' Opp'n to Pls. Mot. to Certify Order for Interlocutory Appeal |
| 7 | 33 | 6-3-2024 Pls.' Mot. to Certify Order for Interlocutory Appeal |
| 8 | 28-1 | 3-1-2024 M. Torres Decl. ISO Defs' Reply ISO Mot. to Compel Arbitration (w/o Decl. Exhibits) |

## INTRODUCTION

Respondents Schmidt Baking Distribution, LLC ("SBD") and Schmidt Baking Company, Inc. ("SBC") (collectively "Defendants" below) respectfully submit this memorandum opposing the Petition for leave, pursuant to 28 U.S.C. § 1292(b), to appeal the District Court's Order (ECF 32, **Pet. Exhibit A**), compelling Petitioners Nathaniel Silva and Phillip Rothkugel (collectively "Plaintiffs" below) to arbitrate their claims on an individual basis.

While the Federal Arbitration Act ("FAA"), 9 U.S.C. § 16(b), recognizes that Petitioners may seek an interlocutory appeal under 28 U.S.C. § 1292(b), they bear a "heavy burden of demonstrating that the case is an exceptional one in which immediate appeal is warranted,"[1] and must show all three criteria for an interlocutory appeal are satisfied. Their bid falls woefully short—not a single criterion is satisfied.

As a preliminary matter, Petitioners waived most of their Petition arguments by not presenting them in opposition to Defendants' motion to compel arbitration. Numerous courts have recognized Section 1292(b) is not a vehicle for raising new arguments on appeal. When those impermissible arguments are pared away, Petitioners' only remaining argument is that the Supreme Court in *New Prime Inc.*

---

[1] *In re Aggrenox Antitrust Litig.*, 2018 WL 834228, at *1 (D. Conn. Feb. 12, 2018) (cleaned up).

*v. Oliveira*, 586 U.S. 105 (2019), "squarely addressed" the question presented here—namely, whether the FAA's Section 1 exemption for certain "contracts of employment"[2] applies to business-to-business agreements—and "held that where the plaintiff-worker is asserting claims for unpaid wages arising from his work pursuant to an alleged 'independent contractor' agreement signed by his corporate entity, the agreement constitutes a contract 'to perform work' that is exempt from the FAA." (**Resps. Exhibit 1**, ECF 24, Pls.' Opp'n to Mot. to Compel 17.) But *every court* to consider that argument, including the District Court here, has rejected this reading of *New Prime*. (*See* ECF 32 at 7-8 (collecting cases).) Thus, the Petition should be dismissed without reaching the Section 1292(b) factors.

But even if this Court reaches those factors, it should conclude: (1) the question presented is not a "pure question" of law but requires this Court, as the District Court did, to examine the factual content of the Parties' Distribution Agreements and other contextual facts (some of which are disputed); (2) the only "difference of opinion" is between Petitioners and every court that has considered the question to date; and (3) an interlocutory appeal will not materially advance the termination of the litigation and the more prudent course is to wait until at least one Second Circuit district court actually holds that Section 1 of the FAA encompasses business-to-business contracts. The Petition should be denied.

_____

[2] *See* 9 U.S.C. § 1.

2

## RELEVANT PROCEDURAL HISTORY[3]

### I.    Complaint And Arbitration Demand

Plaintiffs alleged they were misclassified as independent contractors rather than employees. (*See* **Resps. Exhibit 2**, ECF 1, Ex. A.) Plaintiffs' Complaint centers around Distribution Agreements ("DAs") between SBD and corporate entities created, owned, and controlled by Plaintiffs, whereby the corporate entities purchased rights to sell and distribute fresh-baked Schmidt bread products in specific Connecticut sales areas. (*See, e.g.,* Compl. ¶¶ 4-26; **Resps. Exhibit 3**, ECF 11, Defs.' Mem. ISO Mot. to Compel 3-4.) For purposes of the motion to compel and FAA Section 1 issue, it is undisputed the Plaintiffs' DAs are materially identical. (*See, e.g.*, **Resps. Exhibit 4**, Silva Baked Goods DA.) After Defendants filed arbitration demands with JAMS, the Parties stayed the arbitrations pending resolution of the motion to compel.

### II.    Motion To Compel Arbitration

Of relevance here, Defendants argued: (1) the FAA required the Court to compel arbitration (ECF 11 at 21-23); and (2) alternatively, the Court should compel arbitration under the Maryland Uniform Arbitration Act ("MUAA") (*id*. at 31-32).

---

[3] This section cites to the District Court docket. Only documents critical to resolution of the Petition (and not already submitted by Petitioners) are attached as exhibits.

3

Plaintiffs responded: (1) they were exempt from the FAA's coverage by the "transportation worker" exclusion contained in Section 1 of the FAA (ECF 24 at 15-19); and (2) the MUAA does not apply because the DAs provided the arbitration provisions were exclusively governed by the FAA (*id*. 19-20).

In Reply, Defendants argued: (1) Plaintiffs failed to establish the arbitration provision was within a "contract of employment," (**Resps. Exhibit 5**, ECF 28, Defs.' Reply ISO Mot. to Compel. at 4);[4] (2) the Supreme Court has ***never*** had occasion to determine whether the Section 1 exclusion applies to arbitration provisions within contracts between business entities, (*id*. 4-5 & n.26), and courts that have actually reached that issue have ***uniformly*** found that Section 1 does ***not*** apply to arbitration agreements where the parties are both business entities (*id*. 5-6 & n.27); and (3) the MUAA still applies because courts within this circuit have found that contracts with similar provisions still permit application of state arbitration law when the FAA is not applicable (*id*. at 7 & nn. 37-40).  After close of briefing, both Parties submitted supplemental authority: Plaintiffs regarding *Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246 (2024) (ECF 30), and Defendants concerning *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, *supra*, (ECF 31) and other Circuit decisions discussed therein, and the lack of relevance of the *Bissonnette* decision. Plaintiffs did not respond to Defendants' Notice of

---

[4] Plaintiffs bear the burden of establishing the Section 1 exclusion applies. *See, e.g., Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.th 1190, 1194 (9th Cir. 2024).

Supplemental Authority or file a notice of intent to do so before the District Court issued its ruling.

## LEGAL STANDARDS

"Section 1292(b) provides a means of appealing from interlocutory orders that are otherwise non-appealable, upon consent of ***both*** the district court and the court of appeals." *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro In Amministrazione*, 921 F.2d 21, 23 (2d Cir. 1990) (emphasis added). "Before deciding whether [it] should exercise [its] discretion under [section 1292(b)] to accept the appeal, [the court of appeals] must first determine whether the district court properly found that the requisites for section 1292(b) certification have been met." *Id*. (citation omitted)). Those requisites include that the interlocutory order "'involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation.'" *In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996) (quoting Section 1292(b)).

"It is a basic tenet of federal law to delay appellate review until a final judgment has been entered," and Section 1292(b) "is a rare exception to the final judgment rule that generally prohibits piecemeal appeals." *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865-66 (2d Cir. 1996) (citations omitted). The Second Circuit has "repeatedly cautioned" that "use of this certification procedure

5

should be strictly limited because only exceptional circumstances [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *In re Flor*, 79 F.3d at 284 (cleaned up).

## ARGUMENT

I. **Plaintiffs Waived Below All But One Of Their Petition's Section 1 "Contract Of Employment" Arguments And That Argument Cannot Prevail.**

"The law in this Circuit is clear that where a party has shifted his position on appeal and advances arguments *available but not pressed below*, … and where that party has had *ample opportunity* to make the point in the trial court in a timely manner, waiver will bar raising the issue on appeal." *United States v. Braunig*, 553 F.2d 777, 780 (2d Cir. 1977) (citations omitted) (emphasis added). "'Section 1292(b) is not a vehicle for raising new arguments on appeal,' as numerous courts have recognized." *Fed. Trade Comm'n v. Surescripts, LLC*, 2020 WL 2571627, at *5 (D.D.C. May 21, 2020) (quoting *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 2010 WL 4237304, at *3 (S.D.N.Y. Oct. 8, 2010)) (collecting cases).[5] As such, this Court should deny the Petition because

---

[5] *See, e.g.*, *Minnesota v. Fleet Farm LLC*, 2024 WL 22102, at *5 n.2 (D. Minn. Jan. 2, 2024) (declining to consider new argument in request to certify interlocutory appeal "because the Eighth Circuit would likely not consider it on appeal") (citations omitted); *Rodriguez v. Procter & Gamble Co.*, 499 F. Supp. 3d 1202, 1209 (S.D. Fla. 2020) ("because courts have consistently rejected attempts to raise new arguments in a motion for interlocutory appeal, [defendant's] new arguments will not be considered at this juncture") (collecting cases).

it relies on numerous arguments that were not raised in opposition to Defendants' motion to compel arbitration, such arguments should not have been considered in the District Court's motion for certification ruling, and ***the only possible argument presented here <u>and</u> raised in opposition to the motion to compel is not viable***.

Here, Plaintiffs pressed ***just two*** arguments below concerning FAA Section 1 in opposing Defendants' motion to compel arbitration: (1) in the then-pending *Bissonnette* matter the Supreme Court was "on the verge of resolving … whether delivery drivers who transport goods to retail locations are transportation workers" under Section 1 (*see* ECF 24 at 15-16); and (2) the court in *Gray v. Schmidt Baking Co., Inc.*, 2023 WL 9285466 (D. Md. Oct. 16, 2023), "erroneously assumed that the Supreme Court had never 'addressed whether this exemption applies when the parties to an agreement are both businesses,'" when, in Petitioners' view, the Supreme Court in *New Prime* "***squarely*** addressed this question and ***held*** that where the plaintiff-worker is asserting claims for unpaid wages arising from his work pursuant to an alleged 'independent contractor' agreement signed by his corporate entity, the agreement constitutes a contract 'to perform work' that is exempt from the FAA." (ECF 24 at 16.)

The first argument below, which Petitioners correctly abandon, is irrelevant, since *Bissonnette* only addressed whether a worker needs to work in a "transportation industry" to be exempt from the FAA under Section 1, and not

7

whether a business-to-business agreement constitutes a "contract of employment" for purposes of Section 1. *See Bissonnette*, 601 U.S. at 248-49; ECF 32 at 10 n.2 (explaining why *Bissonnette* "does not help Plaintiffs here").

Petitioners' second argument concerning the ***"holding"*** of *New Prime*, has been rejected by ***every*** court to consider it,[6] and is plainly ***not true***. If this Court agrees with that judicial consensus, there is no other ***preserved*** path for Plaintiffs' appeal, interlocutory or otherwise. The Supreme Court did not and could not have addressed the impact of the agreement in question being a business-to-business contract because the First Circuit expressly noted the defendant in *New Prime* treated the contract as one between the worker and the trucking company. *See Oliveira v. New Prime, Inc.*, 857 F.3d 7, 17 (1st Cir. 2017). As a result, the First Circuit "limit[ed] its focus to the issue of whether an agreement ***between a trucking company and an individual transportation worker*** cannot be a 'contract of employment' within the meaning of § 1 if the agreement establishes or purports to establish an independent-contractor relationship." *Id*. (emphasis added). Indeed, the Supreme Court never mentioned that "the parties' contracts" were, in fact, between New Prime and plaintiff's corporate entity. *See, e.g.*, *New Prime*, 586 U.S. at 108, 109, 113.

---

[6] *See, e.g.*, ECF 32 at 7-8 ("But, contrary to Plaintiffs' assertions, *New Prime* did not address the issue raised by the Distribution Agreements, *i.e.*, whether a contract between two business entities could constitute a 'contract[] of employment' within the meaning of § 1.") (collecting four cases finding same).

8

In their motion to compel Reply, Defendants also explained that "[t]he courts that actually reached" the issue of business-to-business contracts "have uniformly found" that Section 1 does not apply to contracts between businesses. (ECF 28 at 5-6 n.27.) In the two months between that Reply and the District Court's ruling, Plaintiffs could have requested leave for a sur-reply to address those cases, but did not. When Defendants submitted *Fli-Lo Falcon*, Plaintiffs could have filed a response, but did not.[7] And when the Court granted the motion to compel, Plaintiffs could have sought reconsideration within seven days per D. Conn. Civ. L. Rule 7(c), but did not. Instead, they waited over a month to seek certification of the District Court's order while lining up two *amici curiae* to support their cause.

In filing their Section 1292(b) certification motion, Plaintiffs shifted gears (in the mode of an untimely motion for reconsideration) and, over Defendants' objection, raised ***new arguments and new evidence*** not presented in connection with the motion to compel arbitration. For example, as noted in Defendants' opposition to Plaintiffs' certification motion, despite being aware of the line of cases relied upon by the District of Maryland in *Gray*, Plaintiffs did not seek to

---

[7] It is no answer that Plaintiffs only had four business days to do so, as they could have just given notice of their intent to do so. Given that Plaintiffs encouraged the District Court to wait on the Supreme Court *Bissonnette* decision, it is unsurprising the District Court's decision came down just under three weeks after its issuance. Time was surely of the essence.

9

distinguish them until requesting interlocutory appeal (*i.e.*, only **after** the District Court had already relied upon them in compelling arbitration. (**Resps. Exhibit 6**, ECF 38, Defs.' Opp'n to Mot. for Cert. at 23.) Similarly, Plaintiffs' Section 1292(b) certification motion below also attempted, for the first time, to distinguish the Fourth Circuit's decision in *Amos v. Amazon Logistics, Inc.*, 74 F.4th 591 (4th Cir. 2023),[8] and *Fli-Lo Falcon*. (*See id.* at 23-24.) The instant Petition similarly raised for the first time two other Section 1 cases, *Canales v. C.K. Sales Co.*, 67 F.4th 38 (1st Cir. 2023),[9] and *Brock v. Flowers Foods, Inc.*, 673 F. Supp. 3d 1180 (D. Colo. 2023), which both had been decided before Defendants' motion to compel. (*See* ECF 38 at 24.)[10]

For the first time, Plaintiffs' Section 1292(b) certification motion drew a connection between their Section 1 argument and "caselaw holding that employers

---

[8] *Amos* is not mentioned in the Petition, most likely because Defendants pointed out the Fourth Circuit compelled arbitration of not just the claims of Mr. Amos's corporate entity, but also his individual overtime claims. (*See* ECF 38 at 23 n.19.)

[9] While Plaintiffs did cite *Canales* (but not *Brock*) in their motion to compel opposition brief, they did so only to point out that this Court's *Bissonnette* decision "is also contrary to a far better reasoned First Circuit opinion involving the same defendants and the same **class of workers**." (ECF 24, Pls.' Opp'n to Mot. to Compel at 16 (emphasis added).) It was not cited as contrary authority to *Gray*.

[10] Those cases are inapposite, however, as *Canales* specifically declined to address the business-to-business contract issue because it had been waived below, *see Canales*, 67 F.4th at 43, 44-45, and *Brock* (as *Canales* did) focused on "to what class of workers Mr. Brock belongs" and did not address whether his arbitration agreement resided in a "contract of employment," *see Brock*, 673 F. Supp. 3d at 1186.

cannot deprive individual workers of employment status by requiring them to form corporate entities and to sign so-called independent contractor or business agreements." (*See* **Resps. Exhibit 7**, ECF 33, Pls.' Mot. for Cert. at 6-9.)  Despite this issue not being raised in the motion to compel briefing, the District Court relied upon it, in part, in its certification decision (**Pet. Exhibit B**, ECF 47 at 6) and Plaintiffs rely upon it here (Pet. 1).[11]

Similarly, to bolster *New Prime*'s purported reach, Plaintiffs' Section 1292(b) certification motion offered new evidence (*i.e.*, the agreement between New Prime and Oliveira's corporate entity) to establish the *New Prime* contract at issue there "is legally indistinguishable" from the instant DAs "with respect to the incorporation issue." (*See* ECF 33 at 11 & Ex. 1). However, as discussed in Argument Section II, *infra*, the DAs are significantly and materially different from that contract.

The instant Petition repeats some of these waived arguments–*e.g.*, identifying *Canales* and *Brock* as cases that "have considered facts nearly identical to the facts of this case and have held that delivery drivers are exempt from the FAA, even where they were required to incorporate and signed contracts on behalf of the corporate entities" (Pet. 10); presenting cases "holding that companies may

---

[11] In addition to being untimely, that argument is also unpersuasive with regard to the instant petition because those cases go to the **merits** of their misclassification claims, ***not their arbitrability***. (*See* ECF 38 at 28 n.25.)

not insulate themselves from application of the law by forcing their workers to incorporate" (Pet. 11-12); and attempting to distinguish *Fli-Lo Falcon* and a Sixth Circuit decision discussed therein (Pet. 12-13). The Petition also introduces new arguments regarding the history of the Section 1 exemption and how the DAs "[c]ertainly … would have constituted a contract of employment' in 1925." (Pet. 14-15.) Each of these arguments, however, was waived by not being presented in opposition to Defendants' motion to compel, should not have been considered by the District Court in permitting an interlocutory appeal, and should be disregarded by this Court.

## II.  Petitioners Fail To Present A Pure Question Of Law That Can Be Decided Quickly And Cleanly Without Studying The Record.

The Parties agree, for the "controlling question of law" element of Section 1292(b) to be satisfied, "the issue presented must be 'a pure question of law that the reviewing court could decide quickly and clearly without having to study the record.'" Pet. 15-16 (citing *Williston v. Eggleston*, 410 F. Supp. 2d 274, 276 (S.D.N.Y. 2006) (citation omitted).[12] Try as they might, Petitioners' question does not "raise[] 'an abstract legal issue.'" *See Flores v. Nat'l Football League*, 2024 WL 50238, at *3 (S.D.N.Y. Jan. 4, 2024). Rather, as the District Court did in its motion to compel ruling, this Court must look closely at the DAs, as well as other

---

[12] "At least eight [] circuits have acknowledged the limitation of 28 U.S.C. § 1292(b) to pure questions of law." *Johnson v. Nat'l Collegiate Athletic Ass'n*, 108 F.4th 163, 183 n.1 (3d Cir. 2024) (Porter, J., concurring).

12

facts in the record, to resolve the question presented.

The District Court's analysis of the "contract of employment" issue is intensely *fact-based*. After stating that "[the DAs] contain none of the characteristic elements of employment contracts, such as terms regarding salaries or benefits," but "[i]nstead read like what they are—agreements between businesses," the District Court recited numerous *factual* features in the DAs that "are not terms typically seen in contracts between a business and its workers; they are, instead, terms that suggest a supplier-distributor relationship between two companies." (ECF 32 at 9-10.) Those features included the corporate entities: (1) buying baked goods from SBD "with title passing at the time of delivery"; (2) having "'the right to operate the business as [they] choose[]'"; (3) bearing "'all risks and costs of operating [their] businesses'"; and (4) being "responsible for hiring and firing their own employees."[13] Further, the corporate entities were "free to both distribute merchandise for other firms, unless those firms compete with SDB or joint carriage of the products would contaminate SBD baked products, and to sell their distribution rights, provided SBD approves (which approval may not

---

[13] Section 4.5 of the DAs is far broader than the District Court recognized, providing, *inter alia*, that the "DISTRIBUTOR" (*i.e.*, the corporate entity) (1) is permitted "to engage such persons as DISTRIBUTOR deems appropriate to discharge DISTRIBUTOR'S responsibilities" under the DA, and (2) has "the exclusive right to select, fix the compensation of, set work hours, work schedules, and vacations for, discharge and otherwise to manage, supervise and control all persons engaged by DISTRIBUTOR[S]." (*See* DA, § 4.5 (quoted in ECF 11 at 5-6).) Notably, under the DAs, *the Plaintiffs set their own rates of pay/salaries*.

13

be unreasonably withheld). (ECF 32 and 9-10 (citations omitted).)

In another part of its opinion, the District Court found Plaintiffs "create[ed] and profitably r[an] their corporate entities," with Silva selling "the distribution rights to many of his company's customers for approximately double the financed price," while his company "made hundreds of thousands of dollars in pre-tax net revenue over the course of his company's ownership of the distribution rights," and Rothkugel selling "the distribution rights to his sales area for nearly double its financed price, and his company [making] nearly a hundred thousand dollars in pre-tax net revenue over the course of his company's one-year ownership of the distribution rights." (*Id*. at 21 n.6.) In other words, Plaintiffs "profitably operate[d] their businesses" and "engage[d] in transactions to sell their distribution rights at considerable profits." (*Id*.)

Put another way, the District Court's analysis is based on the ***unique terms of these contracts***, not just the fact they are between two corporate entities. Further, the essential differentiating element of the DAs from the *New Prime* contract is the ***sale of distribution rights*** – it is not a gimmick or sham to avoid an employer-employee relationship but something which, as the record demonstrates, has enormous tangible (and actually realized) re-sale value to Plaintiffs. (*See* ECF 32 at 21 n.6.) In this way, the DAs vary materially from the *New Prime* contractual relationship, which did not allow sale of its contract rights for profit and did not

14

otherwise create a franchisor-franchisee type relationship. (*See* ECF 33, Ex. 1.)

Further, Plaintiffs' own briefing, both before the District Court and this Court, is replete with "facts" directed at whether the DAs are "contracts of employment." For instance, the Petitioners contend "[a]fter working for several months as admitted 'employees,' they were then required to form corporate entities and execute a so-called 'Distributor Agreement' with Schmidt to continue to perform the same work," and signed a "personal guarantee of all obligations under the Agreement." (Pet. at 4 & n.2.) In addition, Plaintiffs assert, "[t]hough the District Court noted that the contract formally states that Defendants sell products to Plaintiff to be resold to stores, Plaintiffs do not actually engage in 'sales' activity;" rather, "Defendants' managers and sales representatives are responsible" for such sales activities. (*Id*. at 4-5.)

These are not just facts, but in some cases *disputed* facts – for instance, the record shows that Plaintiffs were *never* W-2 employees of the Defendants, but rather worked for and were paid by a third-party vendor in whom the Schmidt entities had no ownership interest. (**Resps. Exhibit 8**, ECF 28-1, Ex. 1, ¶¶ 9-10 (Torres Decl.).) And these are important facts, as Plaintiffs' central thesis is that "many companies utilizing delivery drivers whom they classify as independent contractors (thereby seeking to avoid compliance with any state or federal wage acts) have required drivers to form corporate entities to work for them." (Pet. 10.)

15

Defendants dispute that factual premise, and an examination of facts bears that out.

In short, the question presented requires a deeper factual exploration than the surface observation that the DAs are between two corporate entities. Because these types of facts are essential to resolving the question at issue here, it is not a pure question of law, as is required to grant interlocutory review.

### III. Petitioners Fail To Establish A Substantial Ground For Difference Of Opinion.

For the "substantial ground for difference of opinion" criterion, the Parties agree that Plaintiffs must show that "(1) there is conflicting authority on an issue or (2) the case is particularly difficult and of first impression within this Circuit." (*See* Pet. 17.) Here, however, *the only difference of opinion is between Petitioners and every court* (including the District Court below) that has *actually* addressed whether a business-to-business contract constitutes a "contract of employment" under Section 1. That is insufficient to satisfy the second criterion.

With respect to the first prong, Second Circuit district courts "have repeatedly found that disagreement among courts outside the Second Circuit does not establish a substantial ground for difference of opinion." *Murray v. UBS Secs., LLC*, 2014 WL 1316472, at *6 (S.D.N.Y. Apr. 1, 2014). Here, the only "conflict of authority" identified is between two lines of cases that do not include a single Second Circuit district court case. (*See* Pet. 17-18.) Further, the first line (*New Prime*, *Bissonnette*, *Canales*, and *Brock*) is a *false line*—none of those cases

16

actually decided whether a business-to-business contract could be a Section 1 "contract of employment." The truth is, as the District Court acknowledged, "[w]hile the Supreme Court has not decided whether § 1 applies to contracts between two business entities, several lower courts have reached this question and have *uniformly* answered it in the negative." (ECF 32 at 8 (collecting cases).) Thus, the "conflict of authority" avenue is closed to Petitioners.

So too is the "particularly difficult" question of first impression route. As the Second Circuit has noted, "the mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." *In re Flor*, 79 F.3d at 284. Petitioners quickly run aground by arguing they "have advanced a highly plausible interpretation of New Prime that they contend has been accepted by a number of courts." (Pet. at 19, citing *Brock* and *Canales*.) Again, no matter how often Petitioners repeat that tale, neither *Brock* nor *Canales* addressed the question presented.

Finally, Petitioners' argument that the "scope of the transportation worker exemption is a hotly contested issue, as evidenced by the large number of cases" addressing it and that acceptance of their interlocutory appeal "would provide valuable guidance to a great number of litigants and lower court judges," (*id.* at 16), misses the mark – in the five-plus years since *New Prime* was decided, there have been just a *handful* of courts that have ruled upon the business-to-business

17

"contract of employment" question presented here, as opposed to the "transportation worker"/"class of workers" aspect of Section 1 (for which there are indeed numerous cases).

Here, *where not a single case nationwide has adopted Petitioners' position and few courts have even reached the issue*, the more prudent course is for this Court to allow its district courts to address the presented question in the first instance and only address it *if and when an actual intra-Circuit conflict arises*. Indeed, if such a conflict arises, the defendant whose motion to compel will have been denied may file an *immediate* direct appeal to this Court under the FAA. *See* 9 U.S.C. § 16(a).

## IV. Petitioners Fail To Establish An Immediate Appeal Will Materially Advance The Ultimate Termination Of The Litigation.

The third criterion is only met if "if an immediate appeal … may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). That condition is "satisfied only if the interlocutory appeal promises to advance the time for trial or to shorten the time required for trial." *Whyte v. WeWork Cos., Inc.*, 2020 WL 4383506, at *2 (S.D.N.Y. July 31, 2020) (internal quotation marks and citation omitted). "[T]he mere possiblity that a reversal of the Court's order would [obviate the need for arbitration] is insufficient to meet this third element of Section 1292(b)." *In re Belton*, 2016 WL 164620, at *1 (S.D.N.Y. Jan. 12, 2016) (internal quotation marks and citation omitted) (second alteration in *In re Belton*); *accord*

18

*Davarci v. Uber Techs, Inc.*, 2021 WL 5326412, at *3 (S.D.N.Y. Nov. 15, 2021).

Petitioners set up a one-sided argument where if they prevail on appeal now, "it will have saved the  parties the expense and burden of arbitration" (Pet. 20 (quoting *Islam v. Lyft*, Inc., 2021 WL 2651653, at *5 (S.D.N.Y. June 28, 2021)), and if they do not succeed, then "they will proceed to arbitration for the ultimate termination of this case, and there would be no future appeal of the application of the FAA," (Pet. at 20-21.) The District Court mistakenly relied on the same *Islam* language in certifying its order for interlocutory appeal. (ECF 47 at 8.)

But a closer look at *Islam* and its history reveals that it actually supports denial of this Petition. In *Islam*, the district court's conclusion to certify an interlocutory appeal was "bolstered by the fact that Lyft has already taken an appeal … in *Haider v. Lyft*," which involved "the same conclusion as [the *Islam*] Court on the issue of the Section One exemption." *Islam*, 2021 WL 2651653, at *6; *see also Flores*, 2024 WL 50238, at *6 n.9 (distinguishing *Islam* because "a parallel interlocutory appeal regarding the identical issue was already pending before the Second Circuit"). After the *Islam* plaintiffs failed to file a timely interlocutory appeal, the district court subsequently denied their request to re-certify its order, in large part because the Second Circuit had held the *Haider* appeal in abeyance after the *Haider* district court compelled arbitration under state law. *See Islam v. Lyft, Inc.*, 2021 WL 5762211, at *3 (S.D.N.Y. Dec. 3, 2021). To

19

Respondents' knowledge, there is no other pending Second Circuit appeal on the business-to-business "contract of employment" issue.

Respondents respectfully submit that the *Davarci* Court's reasoning is more persuasive than *Islam* and the District Court's certification order:

> … Plaintiffs' argument is only correct if the Second Circuit determines Plaintiffs should not have been compelled to arbitrate. Should the Second Circuit agree with the Court's determination … then an interlocutory appeal would not advance the ultimate resolution of the dispute.

Plaintiffs' "one-sided argument fails to take into account the (just as likely) possibility that certification will delay the action further." *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 5002090, at *2 (S.D.N.Y. Oct. 7, 2014). It also ignores the obvious possibilities that Plaintiffs (1) could win on the merits in arbitration; or (2) settle during the arbitral process, thereby shortening the litigation. Thus, whether an appeal will eventually be taken if the Petition is denied is wholly speculative.

Further, Second Circuit district courts have recognized that "certification of [an] order compelling arbitration might lead to unnecessary delays as: (i) 'if the Second Circuit affirms the Court's decision … the result will be that this action will have been unnecessarily delayed by the interlocutory appeal,' and (ii) 'it is safe to assume that the appeal process will take longer than the arbitration, thereby extending the time in which a final decision on the merits is rendered.'" *Dill v.*

20

*JPMorgan Chase Bank, N.A.*, 2021 WL 3406192, at \*8 (S.D.N.Y. Aug. 4, 2021) (quoting *Murray*, 2014 WL 1316472, at \*7); *accord James v. Ventura Home Solar, LLC*, --- F. Supp. 3d --, 2024 WL 446085, at \*12 (D. Conn. Feb. 6, 2024).

Finally, Petitioners ignore that if this Court reversed the District Court's Order, the matter would be remanded to consider whether arbitration must be compelled under state law. The District Court's arbiration Order did not address that issue, and its certification order preview that it is "unlikely" that the MUAA would apply (ECF 47 at 8 n.3), fails to address the several Second Circuit district court cases applying state arbitration acts under contracts with similar language. (*See* ECF 28 at 7 & nn. 37-40; *e.g.*, *Islam v. Lyft*, 524 F. Supp. 3d 338, 356-360 (S.D.N.Y. 2021) (collecting cases within Second Circuit).)

Accordingly, the Court should find the third criterion is also not satisfied.

## CONCLUSION

For the reasons stated herein, the Court should deny the Petition for Interlocutory Appeal.

Dated:  Washington, DC
          August 26, 2024

LITTLER MENDELSON, P.C.

By:*/s/ William J. Anthony*
    900 Third Avenue
    New York, NY 10022
    Telephone:  212.583.9600
    wanthony@littler.com

    Joshua B. Waxman
    815 Connecticut Avenue, NW
    Suite 400
    Washington, DC 20006
    Telephone:  202.842.3400
    jwaxman@littler.com

Attorneys for Defendants-
Appellees (Respondents)

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 5, 29(d), and 32(a)(7)(B), I hereby certify that this brief contains 5,196 words, excluding the parts of the brief exempted by Rule 32(f), as established by the word count of the computer program used for preparation of this brief.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word Version 2407 14-point size Times New Roman font.

Dated:    August 26, 2024

By:*/s/ Joshua B. Waxman*
Joshua B. Waxman
815 Connecticut Avenue, NW
Suite 400
Washington, DC 20006
Telephone:  202.842.3400
Facsimile:  202.478.2623
jwaxman@littler.com

Attorneys for Defendants-
Appellees (Respondents)

23

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2024, I served the counsel listed below via the Court's electronic filing system and by email:

Harold L. Lichten
Matthew Thompson
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
hlichten@llrrlaw.com
mthompson@llrlaw.com

Zachary Rubin
Seppinni Law
40 Broad Street, 7th Floor
New York, NY 10004
917-397-2865
zach@seppinnilaw.com

Dated:    August 26, 2024

By:*/s/ Joshua B. Waxman*
    Joshua B. Waxman
    815 Connecticut Avenue, NW
    Suite 400
    Washington, DC 20006
    Telephone:  202.842.3400
    Facsimile:  202.478.2623
    jwaxman@littler.com

    Attorney for Defendants-Appellees
    (Respondents)

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| NATHANIEL SILVA and PHIL ROTHKUGEL, on behalf of themselves and all others similarly situated, | : <br> : <br> : <br> : |
| Plaintiffs, | : <br> : |
| v. | : <br> : |
| SCHMIDT BAKING DISTRIBUTION, LLC and SCHMIDT BAKING COMPANY, INC., | : <br> : <br> : |
| Defendants. | : <br> : <br> : |

C.A. No. 3:23-cv-01695-MPS

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION**

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................... 1

II.    BACKGROUND ................................................................................................. 4

III.   ARGUMENT .................................................................................................... 10

    A.    Plaintiffs are Not Parties to Any Arbitration Agreement with Defendants............. 10

    B.    Even assuming *arguendo* an agreement between the Parties, Plaintiffs are exempt from the Federal Arbitration Act and Cannot be Compelled to Arbitrate under State Law. .................................................................................. 15

        1.    The Anticipated Decision in Bissonnette v. Lepage Bakeries Will Likely Affect the Applicability of the Federal Arbitration Act ...................... 15

        2.    Even under the Second Circuit's Flawed Reasoning of *Bissonnette*, Plaintiffs are Exempt from the FAA ............................................................. 18

        3.    Plaintiffs cannot be compelled to arbitration under state law as the arbitration agreement is exclusively governed only by the FAA and precludes the application of state law ............................................................ 19

    C.    There is No Delegation Clause in the Contract and if a Delegation Clause is Construed in the Agreement, it is Unenforceable .................................................. 21

        1.    There is No Delegation Clause .................................................................... 21

        2.    Even if a Delegation Clause Were Included in the Agreement, it is Unenforceable ............................................................................................ 23

            a.    The Cost-Shifting and Fee-Shifting Provisions Are Substantively Unconscionable as Applied to the Delegation Clause. ................................................................................................ 25

            b.    The Delegation Clause Is Procedurally Unconscionable .................... 30

                i.    The Delegation Clause is Adhesive ............................................ 30

                ii.    The Delegation Clause Does Not Have an Opt-Out .................. 31

    D.    In the Absence of An Enforceable Delegation Clause, the Court Must find the Wage-And-Hour Claims are Outside the Scope of the Arbitration Agreement .................................................................................................... 31

    E.    The Arbitration Agreement as a Whole Is Unenforceable ..................................... 32

i

1.    Schmidt's Arbitration Agreement Is Permeated with Unconscionable Terms And Should Be Stricken ................................................................. 32

F.    Defendant Schmidt Baking Company, Inc. is Not a Party to the Agreement and Cannot Invoke the Arbitration Clause ............................................. 33

IV.    CONCLUSION ......................................................................................... 35

## I.   INTRODUCTION

This proposed class action is brought by delivery drivers who worked for Defendants Schmidt Baking Distribution, LLC and Schmidt Baking Company, Inc. Plaintiffs claim that they were misclassified as independent contractors, and that based on this misclassification, Defendants' practice of making deductions from their pay for various unauthorized "fines" and charges violated the Connecticut Wage Payment law. See Conn. Gen. Stat. § 31-71e. There is little doubt that Plaintiffs have a colorable claim that they were misclassified and were actually employees of Defendants under Connecticut's strict "ABC" employment test. Using this and similar tests, delivery drivers in numerous states have been held to be employees of the companies for which they work. See, e.g., Labor & Logistics Mgmt. v. Adm'r, Unemployment Comp. Act, 2012 WL 5205557 (Conn. Super. Ct. Oct. 3, 2012) (fifty-two truck drivers were employees under Connecticut "ABC" test); Costello v. BeavEx Inc., 303 F.R.D. 295, 311 (N.D. Ill. 2014) (plaintiff delivery drivers were employees as a matter of law under Illinois "ABC" test which is nearly identical to Connecticut's), subsequent history at Costello v. BeavEx, Inc., 810 F.3d 1045 (7th Cir. 2016); Martins v. 3PD, Inc., 2013 WL 1320454, at *13 (D. Mass. Mar. 28, 2013) (plaintiff delivery drivers were employees of delivery company under Massachusetts "ABC" test).

In an effort to prevent Plaintiffs and the class that they seek to represent from pursuing these wage claims under Connecticut law, Defendants have moved to compel individual arbitration and to enforce a class action waiver. In doing so, Defendants essentially ask the Court to rewrite the arbitration agreement that Defendants drafted and that they required Plaintiffs to sign as a condition of employment; however, the Court cannot rewrite the agreement to achieve Defendants' preferred result. See, e.g., Hammond v. Hammond, 145 Conn. App. 607, 613, 76 A.3d 688, 692 (2013) (a "court simply cannot disregard the words used by the parties or revise,

1

add to, or create a new agreement.") (citation omitted; internal quotation marks omitted). Specifically, there are three primary reasons why Defendants' motion to compel should fail: (1) Plaintiffs are not parties to the arbitration agreement and cannot be bound by the agreement for the reasons set forth in <u>Green v. XPO Last Mile, Inc.</u>, 504 F. Supp. 3d 60 (D. Conn. 2020); (2) even assuming *arguendo* that Plaintiffs were parties to the agreement, Plaintiffs are exempt from the Federal Arbitration Act, 9 U.S.C. § 1, and there is no basis to compel arbitration under state law; and (3) there is no clear, enforceable delegation clause that would prohibit the Court from ruling on the scope and enforceability of the arbitration agreement (and because that agreement is riddled with unconscionable terms and does not encompass the claims at issue in this case, the motion to compel arbitration must be denied).

First, as Judge Meyer held in resolving nearly identical issues in a wage-and-hour case brought by delivery drivers, the Plaintiffs here "are not parties to the Agreements and hence to the arbitration clauses in the Agreements" and they cannot be compelled to arbitrate. <u>Green</u>, 504 F. Supp. 3d at 73. This question of contract formation, i.e., the determination of whether any contract exists between Plaintiffs and Defendants, is one that must be decided by a court because courts and not arbitrators decide "the fundamental question of whether [the parties] formed the agreement to arbitrate in the first place." <u>Doctor's Assocs., Inc. v. Alemayehu</u>, 934 F.3d 245, 251 (2d Cir. 2019).

Second, Plaintiffs work as delivery drivers and therefore they are exempt from the Federal Arbitration Act ("FAA").[1] Likely recognizing this fact, Defendants alternatively argue

---

[1] The Federal Arbitration Act does not apply "to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. On February 20, 2024, the Supreme Court will hear oral argument in a similar case, <u>Bissonnette v. LePage Bakeries Park St.</u>, No. 23-51, which will address the question of the

that the Court can compel arbitration under state law. Yet again, Defendants ignore the text of the arbitration agreement that they seek to apply. Section 11.3 of the Agreement unambiguously states that the contract's Maryland choice-of-law provision applies to substantive law in the arbitration, "except that with respect to arbitration matters, the provisions of the Federal Arbitration Act shall be controlling." See Dkt. 11 at p. 69. Accordingly, Defendants have designated the FAA as the governing law concerning all issues "with respect to arbitration matters," and specifically excluded the law of Maryland from applying to that issue. Thus, if the FAA does not apply, there is no contractual basis for applying some other body of law to compel arbitration. See Rittmann v. Amazon.com, Inc., 383 F. Supp. 3d 1196, 1203 (W.D. Wash. 2019), aff'd, 971 F.3d 904 (9th Cir. 2020) (where arbitration provisions were expressly governed by the FAA, a state law choice of law provision elsewhere in an agreement "cannot be used to enforce the Arbitration Provision."); Peter v. Priority Dispatch, Inc., No. 1:22-CV-606, 2023 WL 4413969, at *2 (S.D. Ohio July 5, 2023) (denying motion to compel arbitration where plaintiff delivery drivers were exempt from the FAA and "the language of the arbitration clause at issue does not reflect that the parties unambiguously intended to displace the FAA with state rules of arbitration".) (internal quotation marks omitted), appeal pending at No. 23-3637 (6th Cir.). Indeed, "[b]ecause it is not clear what law to apply to the Arbitration Provision or whether the parties intended the Arbitration Provision to remain enforceable in the event that the FAA was found to be inapplicable, the Court [should] fin[d] that there is not a valid agreement to arbitrate." Rittman, 383 F. Supp. 3d at 1203.

---

appropriate test to use when determining whether the Plaintiffs are exempt from the Federal Arbitration Act.

Third, there is no clause in the contract designating that questions of arbitrability or enforceability of the arbitration agreement will be resolved by the Arbitrator. Indeed, even if one were to read a so-called delegation clause into the agreement, it would be unenforceable. Further, because Defendants' arbitration agreement contains numerous unconscionable provisions and the wage claims at issue in this case are not covered by the arbitration provision, Defendants' motion must be denied.

## II.    BACKGROUND

The Plaintiffs filed their First Amended Class Action Complaint on November 20, 2023 in Connecticut Superior Court. See First Amended Complaint ("FAC") (Dkt 1 at p. 27). On December 29, 2023, Defendants removed Plaintiffs' action to the District Court of Connecticut. Id. at 1.

Plaintiffs allege that they were misclassified as independent contractors and were actually employees of Schmidt entitled to the protections of the Connecticut wage laws. Employee status, for purposes of Connecticut's wage laws, is determined under the "ABC" test set forth in Tianti, ex rel. Gluck v. William Raveis Real Estate, Inc., 231 Conn. 690, 698, 651 A.2d 1286, 1290 (1995). Under this framework, service performed by an individual shall be deemed to be employment unless the alleged employer, or the entity claiming the exemption, can establish that:

(I)     such individual has been and will continue to be free from control and direction in connection with the performance of such service, both under his contract for the performance of service and in fact; and

(II)    such service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed; and

(III)   such individual is customarily engaged in an independently established trade occupation, profession or business of the same nature as that involved in the service performed...."

4

See Id. at 698 (interpreting Conn. Gen. Stat. § 31-71a).[2]

This test is conjunctive. "Accordingly, unless the party claiming the exception to the rule that service is employment shows that all three prongs of the test have been met, an employment relationship will be found." Latimer v. Administrator, Unemployment Compensation Act, 216 Conn. 237, 246–47, 579 A.2d 497 (1990). The fact that workers may have "signed an agreement that they were 'independent contractors' is of no moment." Latimer, 216 Conn. at 251, 579 A.2d at 505. "Language in a contract that characterizes an individual as an independent contractor rather than an employee is not controlling. The primary concern is what is done under the contract and not what it says." Id. (internal quotations omitted). For that same reason, a putative employer cannot place itself out of reach of the "ABC" test by entering into a "franchise agreement," or similar arrangement with a worker, or by requiring the worker to incorporate. See, e.g., Jason Roberts, Inc. v. Adm'r, 127 Conn. App. 780, 787, 15 A.3d 1145, 1149 (2011) (rejecting employer's argument that because it executed "franchise agreements" with workers, it fell outside of the application of the "ABC" test under Connecticut law).

Importantly, the fact that Plaintiffs are not parties to the Distributor Agreements under common law principles does not affect their statutory claims for unpaid wages. Workers are often required to incorporate in order to work as delivery drivers, commercial cleaners, and in various other professions. Companies use this tactic to create the illusion that workers are "independent contractors," as opposed to employees. There is nearly universal support for the proposition that an employer may not circumvent the wage laws by requiring workers to

---

[2]     Connecticut has also enacted a statute creating a Joint Enforcement Commission on Employee Misclassification, which reviews "the problem of employee misclassification by employers for the purposes of avoiding their obligations under state and federal labor, employment and tax laws," and coordinates prosecution of misclassification violations with the state Attorney General's Office. See Conn. Gen. Stat. § 31-57h.

incorporate in this fashion. See, e.g., Ruiz v. Affinity Logistics Corp., 754 F.3d 1093, 1103 (9th Cir.) cert. denied, 135 S. Ct. 877 (2014) ("While 'purporting to relinquish' some control to the drivers by making the drivers form their own businesses and hire helpers, [defendant] 'retained absolute overall control' over the key parts of the business."); see DaSilva v. Border Transfer of MA, Inc., 296 F. Supp. 3d 389, 402 (D. Mass. 2017) ("incorporation cannot be a shield to prevent liability under the Wage Act"); Parilla v. Allcom Constr. & Install. Svcs., LLC, 2009 WL 2868432 (M.D. Fla. 2009) (plaintiff who incorporated was an employee; incorporation was a "façade"); Depianti v. Jan-Pro Franchising Intern., Inc., 465 Mass. 607, 619-21 (2013) ("Limiting the [Wage Act's] applicability to circumstances where the parties have contracted with one another would undermine the purpose of the statute … as such limitation would permit misclassification where a putative employer, otherwise liable under the statute, is insulated from such liability by virtue of an arrangement permitting it to distance itself from its employees.").

As one court observed regarding New York's wage laws, if businesses could avoid their obligations under labor and employment laws simply by requiring their workers to incorporate and paying workers through corporations rather than paying them directly, the law "would be rendered useless." Padovano v. FedEx Ground Package Sys., Inc., 2016 WL 7056574, at *4 (W.D.N.Y. Dec. 5, 2016).

Under the so-called "ABC test," countless courts have found that delivery drivers like the Plaintiffs are employees. See Labor & Logistics Mgmt. v. Adm'r, Unemployment Comp. Act, 2012 WL 5205557 (Conn. Super. Ct. Oct. 3, 2012) (fifty-two truck drivers were employees under Connecticut "ABC" test); Costello v. BeavEx Inc., 303 F.R.D. 295, 311 (N.D. Ill. 2014) (plaintiff delivery drivers were employees as a matter of law under Illinois "ABC" test, which is

nearly identical to Connecticut's), *subsequent history at* <u>Costello v. BeavEx, Inc.</u>, 810 F.3d 1045

(7th Cir. 2016)

Once Plaintiffs are found to be an employee, any deductions from his wages are unlawful

and recoverable. <u>See</u> Conn. Gen. Stat. § 31-71e; Conn. Gen. Stat. § 31-73; <u>Andrade v. Kwon</u>,

2012 WL 3059616, at *7 (D. Conn. Mar. 26, 2012) (awarding damages in private suit for illegal

"kickbacks" required to be paid to employer to secure employment in violation of Conn. Gen.

Stat. § 31-73); Conn. Gen. Stat. Ann. § 31-72 ("When any employer fails to pay an employee

wages in accordance with [Connecticut's wage laws] … such employee… may recover, in a civil

action, twice the full amount of such wages, with costs and such reasonable attorney's fees as

may be allowed by the court").

The FAC describes in detail how Plaintiffs' work consists primarily of picking up

products at the Defendants' warehouse and operating a commercial motor vehicle to deliver

those products to stores and other retail outlets within a specified geographical territory assigned

by Defendants. For example, Plaintiffs' FAC contains the following assertions:

- The Plaintiffs performed delivery of baked goods products on behalf of Defendants in Connecticut. FAC at ¶¶ 1-2, 4-6, 10-11.

- "Distributors use vehicles to transport the products from Defendants' warehouses to their customers, which include large grocery stores and other retailers." FAC at ¶ 9.

When Plaintiffs first began working for Schmidt in 2020, they were classified as W-2

employees who were working for Schmidt as delivery drivers via a staffing agency that Schmidt

used to recruit drivers. Silva Decl. at ¶ 6 (Exhibit 1); Rothkugel Decl. at ¶5 (Exhibit 2). A few

months after each Plaintiff began working as a Schmidt delivery driver, Defendants informed

them that if they wished to continue working as deliver drivers, they needed to form corporate

entities and sign Defendants' Distributor Agreement, which purported to classify them as

independent contractors. Silva Decl. at ¶¶ 7-8; Rothkugel Decl. at ¶¶ 6-7. Plaintiffs were not permitted to sign the agreements in their individual capacities – Defendants would only allow a corporate entity to sign the contract and Schmidt assisted Plaintiffs in forming corporate entities that did not previously exist. Silva Decl. at ¶ 9-10; Rothkugel Decl. at ¶ 8. Neither Plaintiff had ever formed a corporation before this. Silva Decl. at ¶ 9; Rothkugel Decl. at ¶ 9. Mr. Silva has a high school education, and Plaintiff Rothkugel has never studied business. Silva Decl. at ¶ 20; Rothkugel Decl. at ¶ 9.

Plaintiffs' work for Schmidt primarily consisted of driving a truck to Defendants' warehouse in East Haven, Connecticut. At the warehouse, Plaintiffs were required to pick up bread and baked good products that had been delivered to the East Haven warehouse from outside of Connecticut. Silva Decl. at ¶ 14; Rothkugel Decl. at ¶ 13. Plaintiffs then drove a truck with Schmidt's products to retail stores (including large nationwide and regional grocery stores) where they unloaded the products from the truck and loaded them onto retail shelves. Silva Decl. at ¶ 15; Rothkugel Decl. at ¶ 13. They performed this work on a full-time basis. Silva Decl. at ¶ 16; Rothkugel Decl. at ¶ 13. All or most of Schmidt's products are manufactured in Maryland, and according to Schmidt's website, it is "a family-owned and operated business raised in Baltimore, MD." Silva Decl. at ¶ 18. Delivery drivers would see long-haul trucks or large freight trucks from out of state deliver products to the East Haven warehouse that would then get loaded on to Plaintiffs' trucks for the final delivery to retail locations. Rothkugel Decl. at ¶ 14.

Defendants' managers and sales representatives (not Distributors) are responsible for negotiating with the retailers regarding the pricing, sale, and promotion of particular Schmidt products. Distributors have virtually no role in negotiating any sales with retailers and instead are

primarily responsible for safely delivering the out-of-state products to Connecticut retailers. Silva Decl. at ¶ 19; Rothkugel Decl. at ¶ 15.

Schmidt's Distributor Agreement (at p. 1) states that "Schmidt [Baking Distribution, LLC] has heretofore developed and/or acquired the exclusive rights to distribute and sell various fresh baked products throughout a large part of the eastern United States". Dkt. 11 at p. 46. Schmidt has no manufacturing facilities in the State of Connecticut. As Plaintiffs have declared, Schmidt's products are all transported from out-of-state to warehouses in Connecticut where Plaintiffs and other delivery drivers pick them up and transport them to their final retail destination in Connecticut. Silva Decl. at ¶ 18. Rothkugel Decl. at ¶ 14.

Though the Distributor Agreement that Plaintiffs signed purports to make them business owners who operate their own delivery businesses, this is not the reality of the relationship. Plaintiffs and similar delivery drivers are unsophisticated wage earners who drive commercial vehicles for a living. Silva Decl. at ¶ 17 (describing his commercial vehicle and its DOT number); id. at ¶¶ 20-24 (describing his high school education, lack of business experience, and personal finances). For example, Plaintiff Silva has a high school education, has never attended college nor obtained any business training, and had never formed a corporation until Schmidt required him to do so in order to continue working for them in 2020. See Silva Decl. at ¶¶ 9, 20-24. Neither Plaintiff even knew what arbitration was when they signed their Distributor Agreements, let alone what it would mean for "JAMS" to administer the arbitrations. Silva Decl. at ¶ 12; Rothkugel Decl. at ¶ 12. If Plaintiffs were required to pay thousands of dollars in arbitrator's fees to pursue their claims, they would likely drop their cases. Silva Decl. at ¶¶ 25-26; Rothkugel Decl. at ¶ 16.

## III.    ARGUMENT

### A.    Plaintiffs are Not Parties to Any Arbitration Agreement with Defendants

Defendants recognize that issues of contract formation must be decided by the Court and not an arbitrator, and that the Court cannot compel arbitration if it finds that there is no agreement between the parties. See Dkt. 11 at p. 14, citing Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 296 (2010) ("It is similarly well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide.").[3] "The Second Circuit has explained that while parties may 'agree to arbitrate ... whether the arbitration clause applies to a particular dispute, or whether it is enforceable, parties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place.'" Green v. XPO Last Mile, Inc., 504 F. Supp. 3d 60, 67 (D. Conn. 2020), quoting Doctor's Assocs., Inc. v. Alemayehu, 934 F.3d 245, 251 (2d Cir. 2019).

Here, the relevant contract containing the arbitration provision explicitly states that it is "by and between SCHMIDT BAKING DISTRIBUTION, LLC … and SILVA'S BAKED GOODS." See Dkt. 11 at p. 46. Silva's Baked Goods is defined as the "DISTRIBUTOR." Id. The Agreement is signed by Plaintiff Silva as "President" of Silva's Baked Goods. See Dkt. 11 at 75. The Agreement signed by Plaintiff Rothkugel is identical, except that it signed by him as President of Trout Slayers Baked Breads, Inc. and that entity is defined as the DISTRIBUTOR in

---

[3]    In their Brief, Defendants also refer to the agreement's purported adoption of the JAMS Rules, and argue that only the Arbitrator may determine "who are the proper Parties to the Arbitration" under these Rules. See Dkt. 11 at 24. However, this does not divest the Court of its authority and obligation to first determine whether an agreement to arbitrate exists between Plaintiffs and Defendants in the first instance. One of the "predicate issues of contract formation" that must be decided by the Court is the question of "the identity of the parties to th[e] agreement." Green v. XPO Last Mile, Inc., 504 F. Supp. 3d 60, 68 (D. Conn. 2020). The question of who may be a proper party to an arbitration proceeding is distinct from the legal question of whether Plaintiffs are *contracting parties to the agreement*.

the relevant agreement. See Dkt. 11 at p. 115. The Agreements contains a section titled "dispute

resolution," which states that "[a]ny dispute between SCHMIDT and DISTRIBUTOR arising out

of the relationship created by this Agreement shall be subject to the dispute resolution provisions

set forth herein." Dkt. 11 at 68. There is nothing in the Agreement to suggest that Plaintiff Silva

or Plaintiff Rothkugel are parties to the relevant agreements in their individual capacity. Nor is

there any language in the Agreement suggesting that any individual or entity other than

DISTRIBUTOR is subject to the dispute resolution provision.

Defendants concede that the two agreements are between 1) Silva's Baked Goods and

Defendant Schmidt Baking Distribution, LLC and 2) Trout Slayers Baked Breads, Inc. and

Defendant Schmidt Baking Distribution, LLC. See Dkt. 11 at p. 4 (explaining that Defendants

"entered into Distribution Agreements with corporate entities controlled by Plaintiffs Silva and

Rothkugel"). Thus, neither of the Plaintiffs are parties to the relevant contracts.

Having agreed that Plaintiffs are not themselves parties to the Agreements, Defendants

argue that Plaintiffs Silva and Rothkugel are nonetheless bound to arbitrate under the

Agreements. According to Defendants, the Second Circuit has recognized "five theories for

binding non-signatories [non-parties] to arbitration agreements: 1) incorporation by reference; 2)

assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." Dkt. 11 at 13, quoting

Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995).

Defendants do not make any argument under the first, second, fourth, or fifth theories.[4]

Instead, Defendants merely rely on the general proposition that a non-party to an arbitration

---

[4]    Though Defendants make no arguments under these four theories, the decision in Green
v. XPO Last Mile, Inc., 504 F. Supp. 3d 60 (D. Conn. 2020) considers each theory under
virtually identical circumstances and thoroughly explains why none of these theories would
apply to bind non-signatory delivery drivers to arbitrate their claims pursuant to agreements
entered into exclusively by their corporate entities. See id. at 69-72.

agreement *may sometimes* be covered by the arbitration clause under traditional principles of agency law. See Dkt. 11 at 25-26. Defendants do not identify which principles of agency law would allegedly dictate such a result in this case. This is unsurprising, because all relevant agency principles require a finding that Plaintiffs are not personally parties to the contract, and thus cannot be compelled to arbitrate.

"It is hornbook law that the fact that a corporate owner or agent may sign a contract on a company's behalf does not mean—without more—that the owner or agent is *personally* a party to the contract." Green, 504 F. Supp. 3d at 68, citing Rich-Taubman Assocs. v. Comm'r of Revenue Servs., 236 Conn. 613, 619, 674 A.2d 805 (1996) (quoting Restatement (Second) of Agency § 320) ("Unless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract.").[5] Numerous federal appeals courts have acknowledged that "[i]t is common ground that '[s]igning an arbitration agreement as agent for a disclosed principal is not sufficient to bind the agent to arbitrate claims against him personally.'" McCarthy v. Azure, 22 F.3d 351, 361 (1st Cir. 1994); (quoting Flink v. Carlson, 856 F.2d 44, 46 (8th Cir. 1988)); see also Usina Costa Pinto S.A. Acucar E Alcool v. Louis Dreyfus Sugar Co., Inc., 933 F. Supp. 1170, 1178 (S.D.N.Y. 1996)

---

[5]    Though Defendants argue that Maryland law applies pursuant to a contractual choice-of-law clause, the issue of whether an agreement was ever formed between the workers the Defendants is governed by the law of the forum state, i.e., Connecticut. See Langley v. Prudential Mortg. Cap. Co., LLC, 546 F.3d 365, 368 (6th Cir. 2008). This is because if there is no contract, there can be no contractual choice of law. See also Wallace Hardware Co. v. Abrams, 223 F.3d 382, 391 (6th Cir.2000) (applying the choice-of-law rules of the forum state to determine whether to enforce a contract containing a choice of law clause). Regardless, "Maryland courts have cited with approval the Restatements of Agency." See Wood v. Walton, 855 F. Supp. 2d 494, 499 (D. Md. 2012). And Defendants concede that "Connecticut law does not materially vary from Maryland law regarding the relevant contract formation issues." Dkt. 11 at 18 n.45. Thus, there does not appear to be any difference in the contract and agency law of Maryland and Connecticut.

("signing an arbitration agreement as an agent for a disclosed principal is not sufficient to render the agent a party to the arbitration clause"). The Fifth Circuit has concluded in <u>Covington v. Aban Offshore Ltd.</u>, 650 F.3d 556 (5th Cir. 2011) that a corporate officer who signed an arbitration agreement on behalf of his company is not bound to arbitrate any personal claims against the other contracting party, despite the fact that the contract required the corporate parties themselves to arbitrate any claims arising under or related to the work to be performed. <u>Id.</u> at 557-62.

Moreover, Defendants do not argue – nor could they – that Plaintiffs' corporations were themselves agents of Plaintiffs, nor that the corporations intended to bind any of their agents to the arbitration requirement, given that the arbitration agreement is explicitly limited to disputes "between SCHMIDT and DISTRIBUTOR" (where DISTRIBUTOR is defined to only refer to the corporate entity). <u>See</u> Dkt. 11 at P. 68 (Section 11.1). Defendants also repeatedly state that Plaintiffs were "guarantors" under the agreement, but they do not identify any rule or caselaw suggesting that one's status as a "guarantor" makes them subject to an arbitration clause.

Defendants also claim that they can bind non-signatory Plaintiffs to mandatory arbitration where the Class Action Waiver (Section 11.7) utilizes *permissive* language stating the owners of the DISTRIBUTOR "*may* be the parties to any proceeding described in this Section" without running afoul of the prohibition on consolidation or joinder contained in the class action waiver. <u>See</u> Dkt. 11 at p. 71 (Section 11.7). The language does not state that the owners *must* bring claims in arbitration and such an interpretation would be inconsistent with the more specific language that limits the dispute resolution process to disputes between "SCHMIDT and DISTRIBUTOR," (defined as Silva's Baked Goods). <u>See</u> Dkt. 11 at P. 68 (Section 11.1). Moreover, the contract's use of the term "DISTRIBUTOR" as distinct from the terms "owners,

13

officers, and directors" of DISTRIBUTOR in Section 11.7 shows that DISTRIBUTOR (Silva's Baked Goods) is separate and distinct from the "owner" of the DISTRIBUTOR (Plaintiff Silva). This distinction is significant given that only the claims of the DISTRIBUTOR are subject to mandatory arbitration. And even *assuming arguendo* that this language in Section 11.7 creates an ambiguity in the contract (which it does not), it must be construed against Defendants as the drafters of the form agreements that they required all drivers to sign. See Cantonbury Heights Condo. Ass'n, Inc. v. Loc. Land Dev., LLC, 273 Conn. 724, 735, 873 A.2d 898, 904 (2005) ("Where the [contract] language is ambiguous, however, we must construe those ambiguities against the drafter.").

There are countless ways in which Defendants could have written their arbitration agreement to require the Plaintiffs -- as the owners of their corporate entities-- to bring their individual claims in arbitration rather than in court. For example, in Bissonnette v. Lepage Bakeries, the relevant arbitration agreement stated that "any claim, dispute, and/or controversy… that … DISTRIBUTOR (including its owner or owners) may have against COMPANY … shall be submitted to … binding arbitration…." Bissonnette, No. 19-965 (D. Conn.), Dkt. 31-2 a p. 41. It is not uncommon for arbitration agreements to expressly state that the owners or officers of corporate entities, by signing this agreement on the corporate entities' behalf, also agree that they will bring any claims that they may have in arbitration. See generally Andreoli v. Comcast Cable Commc'ns Mgmt., LLC, 2020 WL 1242919, at *2 (D. Conn. Mar. 16, 2020) (discussing language in arbitration agreement by which CEO agreed to arbitrate disputes despite that she signed agreement on behalf of corporate entity). However, Defendants did not include any similar language in the arbitration agreement that they required Plaintiffs' entities to sign in order to work.

14

In sum, the decision in Green v. XPO Last Mile, Inc., supra, is directly on point. Although Defendants cite the Green decision, they do not attempt to distinguish it from the facts of this case. Just like in Green, the Plaintiffs "are not parties to the Agreements and hence to the arbitration clauses in the Agreements." 504 F. Supp. 3d at 73.[6]

**B.** **Even assuming *arguendo* an agreement between the Parties, Plaintiffs are exempt from the Federal Arbitration Act and Cannot be Compelled to Arbitrate under State Law.**

1. The Anticipated Decision in Bissonnette v. Lepage Bakeries Will Likely Affect the Applicability of the Federal Arbitration Act

As a preliminary matter, Plaintiffs emphasize that the U.S. Supreme Court is on the verge of resolving the specific question raised in this case, i.e., whether delivery drivers who transport baked goods to retail locations are transportation workers exempt from the Federal Arbitration Act. See Bissonnette v. LePage Bakeries Park St., LLC, 216 L. Ed. 2d 1312 (Sept. 29, 2023) (granting certiorari). Plaintiffs' counsel is also counsel in Bissonnette, and oral argument will be held on February 20, 2024. A decision is expected before the Court recesses in late-June.

At issue is Bissonnette is a determination of the types of employment contracts that are exempt from the Federal Arbitration Act ("FAA"). The FAA generally provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA, however, exempts certain contracts from its scope, specifically the employment contracts of "seamen, railroad employees, [and] any other class of workers engaged in foreign or interstate commerce." 9

---

[6]     Though Defendants cite extensively to the decision in Gray v. Schmidt Baking Company, Inc. in support of their Motion to Compel Arbitration, inexplicably the plaintiffs in that case did not argue that they were not parties to the agreement, and therefore the Court did not address whether the owners of the corporate entities were parties to the arbitration agreements. Thus, the Gray decision provides no guidance on the threshold issue that has been squarely raised in this case.

U.S.C. § 1; Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 118–19 (2001). The residual clause of "any other class of workers engaged in… interstate commerce" exempts from the FAA "contracts of employment of transportation workers…." Circuit City, 532 U.S. at 119. This exemption applies with equal force to "independent contractor" agreements of transportation workers. See New Prime Inc. v. Oliveira, -- U.S. --, 139 S. Ct. 532 (2019).

In Bissonnette, a divided panel of the Second Circuit held that bread delivery drivers who indisputably delivered goods in the flow of interstate commerce throughout Connecticut were somehow not transportation workers merely because they worked for a bakery, and not a "transportation company." See Bissonnette v. LePage Bakeries Park St., LLC, 49 F.4th 655, 661 (2d Cir. 2022), cert. granted, 216 L. Ed. 2d 1312 (Sept. 29, 2023). As the late Judge Pooler explained in dissent, the majority's opinion runs plainly afoul of the Supreme Court's instruction that courts must look at what the worker actually does to determine if they are engaged in "interstate commerce," "not what [the employer] does generally." Bissonnette, 49 F.4th at 668 (Pooler, J., dissenting), cert. granted sub nom. Bissonnette v. LePage Bakeries Park St., 216 L. Ed. 2d 1312 (Sept. 29, 2023), quoting Southwest Airlines Co. v. Saxon, — U.S. —, 142 S. Ct. 1783, 1788 (2022). In other words, the exemption is focused on whether the plaintiffs fit within the "class of workers" who transport goods in the flow of interstate commerce, not the line of business the company they work for is in. The Bissonnette decision is also contrary to a far better reasoned First Circuit opinion involving the same defendants and the same class of workers involved in Bissonnette. See Canales v. CK Sales Co., LLC, 67 F.4th 38, 45 (1st Cir. 2023).

Though the court in Gray v. Schmidt Baking reached the issue of the Section 1 exemption on a motion for reconsideration, that decision did not address the "industry" requirement at issue in Bissonnette. However, Plaintiffs respectfully submit that the analysis in Gray is inconsistent

16

with binding Supreme Court precedent in another regard. The <u>Gray</u> court held that the Schmidt

Distributor Agreements cannot be "contracts of employment" exempt from the FAA because

"agreements between two business entities are not 'contracts of employment' within the context

of Section 1 of the FAA." <u>Gray v. Schmidt Baking Co., Inc.</u>, 2023 WL 9285466, at *3 (D. Md.

Oct. 16, 2023). The <u>Gray</u> court erroneously assumed that the Supreme Court had never

"addressed whether this exemption applies when the parties to an agreement are both business

entities." <u>Id.</u> This is incorrect. In <u>New Prime v. Oliveira</u>, 139 S. Ct. 532 (2019), the Court held

that the Section 1 exemption excludes all "agreement[s] to perform work," not just those

between a traditional employee and employer. <u>Id.</u> at 544. In that case, a contract between the

plaintiff's corporation, Hallmark Trucking LLC, and the defendant, New Prime, Inc. (that

purported to create an independent contractor relationship between Hallmark and New Prime)

was held to be a contract of employment exempt from the FAA. <u>See</u> <u>Oliveira v. New Prime, Inc.</u>,

141 F. Supp. 3d 125, 128 (D. Mass. 2015) (district court decision describing that the "intent of

the agreement is to establish an independent contractor relationship between New Prime and

Hallmark Trucking LLC"), <u>aff'd in part, dismissed in part</u>, 857 F.3d 7 (1st Cir. 2017), <u>aff'd</u>, 139

S. Ct. 532, 202 L. Ed. 2d 536 (2019). Thus, the Supreme Court has squarely addressed this

question and held that where the plaintiff-worker is asserting claims for unpaid wages arising

from his work pursuant to an alleged "independent contractor" agreement signed by his

corporate entity, the agreement constitutes a contract "to perform work" that is exempt from the

FAA. <u>See</u> <u>New Prime v. Oliveira</u>, 139 S. Ct. 532, 544. Here, the Distributor Agreement closely

resembles the contracts at issue in New Prime, and therefore the agreements in this case are

"contracts of employment" as that term is used in the FAA.

17

Here, it is not necessary for the Court to reach the question of whether the Plaintiffs are exempt from the Federal Arbitration Act because, as discussed above, Plaintiffs are not parties to any arbitration agreement with Defendants. See Section III., A, supra.

However, in the event that the Court reaches the question of whether Plaintiffs are exempt from the Federal Arbitration Act, Plaintiffs believe that such a determination should await the anticipated decision from the Supreme Court in Bissonnette.

        2.      Even under the Second Circuit's Flawed Reasoning of *Bissonnette*, Plaintiffs are Exempt from the FAA

Again, though it is not necessary for the Court to reach the issue (and any analysis of the Section 1 exemption should likely await the Supreme Court's Bissonnette decision), even under the Second Circuit's decision, Plaintiffs are exempt from the FAA. Under the majority opinion in Bissonnette, a group of commercial truck drivers would be exempt from the FAA if they work for a transportation company. See Bissonnette v. LePage Bakeries Park St., LLC, 49 F.4th 655, 662, cert. granted, 216 L. Ed. 2d 1312.

In this case, Defendant Schmidt Baking Distribution, LLC has defined itself as a company that has "developed and/or acquired the exclusive rights to distribute and sell various fresh baked products throughout a large part of the eastern United States." See Distributor Agreement at p. 1. The "distribution" company does not purport to be a bakery or a manufacturer. The company exists solely to contract with and employ delivery drivers to transport goods, and this entity is the only entity named and identified in Plaintiffs' employment agreements. Simply put, Schmidt Baking Distribution is a transportation company. To the extent Defendants argue otherwise, the Court would need to permit discovery on the manner in which Schmidt Baking Distribution generates revenue as well as its connection (if any) to the manufacturing or sale of baked goods, as the Second Circuit's decision defines a transportation

company as one whose "predominant source of commercial revenue" is generated by the movement of goods. See Bissonnette v. LePage Bakeries Park St., LLC, 49 F.4th 655, 661 (2d Cir. 2022), cert. granted, 216 L. Ed. 2d 1312 (Sept. 29, 2023).

3. Plaintiffs cannot be compelled to arbitration under state law as the arbitration agreement is exclusively governed only by the FAA and precludes the application of state law

Finally, Defendants incorrectly argue that Plaintiffs can be compelled to arbitration under state law. In so arguing, the Defendants fail to explain that their arbitration agreement is expressly controlled by the Federal Arbitration Act alone and prohibits the application of state law to arbitration matters. See Section 11.3, Arbitration ("The arbitrator shall apply the substantive law specific in Section 12.8 of this agreement [i.e., Maryland law], *except that with respect to arbitration matters, the provisions of the Federal Arbitration Act shall be controlling*.") (emphasis added).

To the extent Defendants are now arguing that the Court should construe the agreement as allowing state law to govern "arbitration matters" if Plaintiffs are found to be exempt from the FAA, nothing in the plain language of the agreement says anything remotely along the lines needed to support that. At most, Defendants could argue that the language is ambiguous regarding what law (if any) should apply to arbitration matters in the absence of the FAA; however, that ambiguity must be construed against them. Cantonbury Heights Condo. Ass'n, Inc. v. Loc. Land Dev., LLC, 273 Conn. at 735 ("Where the [contract] language is ambiguous, however, we must construe those ambiguities against the drafter.").

In Rittmann v. Amazon, the Court was faced with a similar arbitration agreement that was expressly governed by the FAA. See Rittmann v. Amazon.com, Inc., 971 F.3d at 908.  When the court found that the Plaintiffs were exempt from arbitration under the FAA, Amazon argued that the Court could nonetheless compel arbitration under state law. That argument was rejected

19

because Amazon, as the drafter of the arbitration agreement, could have made it expressly clear that if the workers were found to be exempt under the FAA, the arbitration agreement could be alternatively governed by a state law. Rittmann v. Amazon.com, Inc., 971 F.3d 904, 920 (9th Cir. 2020) ("Because it is not clear that the parties intended to apply Washington law to the arbitration provision in the event the FAA did not apply, we construe ambiguity in the contract against Amazon to avoid that result."). The Rittman agreement, like the one here, said the opposite, and precluded the application of state law to the arbitration issues. See Rittmann v. Amazon.com, Inc., 383 F. Supp. 3d at 1203 ("Here, if the parties intended [state] law to apply if the FAA was found to be inapplicable, they would have said so or even remained silent on the issue. Instead, they did the opposite—in the Governing Law Provision, the parties explicitly indicated that [state] law is not applicable to the Arbitration Provision.").

Similarly in Peter v. Priority Dispatch, Inc., 2023 WL 4413969, at *2, a group of delivery driver plaintiffs were held to be exempt from the FAA and the court denied the motion to compel arbitration on state law grounds where "the language of the arbitration clause at issue does not reflect that the parties unambiguously intended to displace the FAA with state rules of arbitration." Id. at *2 n.3 (internal quotation marks omitted), appeal pending at No. 23-3637 (6th Cir.).

At bottom, there is simply no agreement, let alone an unambiguous one, to permit consideration of the "arbitration matter" under any state law. To the contrary, Defendants, as the drafter, expressly selected the Federal Arbitration Act as the sole and controlling law governing their arbitration agreement and excluded application of its Maryland choice-of-law provision to that portion of the agreement. And since under the Federal Arbitration Act, Plaintiffs are exempt from being compelled to arbitration, Defendants' motion to compel should be denied.

**C.** **There is No Delegation Clause in the Contract and if a Delegation Clause is Construed in the Agreement, it is Unenforceable**

       1.    <u>There is No Delegation Clause</u>

Defendants have argued that any issues regarding interpretation or enforceability of the arbitration agreement have been delegated to an arbitrator, and the Court cannot reach these issues. First and foremost, there is no delegation clause in the agreement. "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." <u>AT&T Techs., Inc. v. Commc'ns Workers of Am.</u>, 475 U.S. 643, 649 (1986). And when "the question is *who* should decide arbitrability, there is a presumption that the question should be resolved by the court." <u>DDK Hotels, LLC v. Williams-Sonoma, Inc.</u>, 6 F.4th 308, 317 (2d Cir. 2021). The only relevant language that Defendants reference is that the agreement states that a covered dispute *"shall be decided by a neutral, binding arbitration conducted in accordance with the Judicial Arbitration and Mediation Services, Inc. ("JAMS")*. Dkt 11 at 69 (Section 11.3).

Though the Second Circuit has held that incorporation of an ADR provider's rules "***may*** serve as clear and unmistakable evidence of the parties' intent to delegate arbitrability to an arbitrator," <u>DDK Hotels, LLC v. Williams-Sonoma, Inc.</u>, 6 F.4th 308, 318 (2d Cir. 2021) (emphasis added),[7] there has been no incorporation of any particular set of rules here, so no evidence of an intent to delegate arbitrability exists. The agreement only says that the arbitration will be done through JAMS as the arbitration provider. In order for the JAMS rule regarding delegation to apply, one would have to believe that Plaintiffs, as unsophisticated truck drivers,

---

[7]      Though the Second Circuit in <u>DDK Hotels</u> held that a specific reference to the AAA Commercial Arbitration Rules constituted incorporation of those rules and delegation, the difference here is that the agreement does not reference the JAMS Rules at all. Moreover, here, Plaintiffs are unsophisticated truck drivers, not sophisticated business entities like those in <u>DDK Hotels</u>, who had contracted to develop a line of boutique hotels.

first understood that the reference to JAMS as the administrator for the arbitration required that

the JAMS Rules would apply (which is not always the case),[8] and then Plaintiffs would need to

have such familiarity with the JAMS Rules to intend that issues of arbitrability would be decided

by an arbitrator under those Rules. One court recently held that an unsophisticated plaintiff could

not have intended to delegate issues of arbitrability to an arbitrator:

> …[I]it is highly unlikely that a foreign nurse unfamiliar with United States law, let
> alone caselaw surrounding the interpretation of arbitration agreements, would see
> a reference to the AAA Commercial Rules in the contract and … understand that
> such incorporation would in any way reflect an actual intent to delegate the question
> of arbitrability to the arbitrator.

Vidal v. Advanced Care Staffing, LLC, 2023 WL 2783251, at *10 (E.D.N.Y. Apr. 4, 2023)

(internal quotation marks omitted). Here, Defendants' reasoning is even more flawed, as

Defendants ask the Court to assume that by merely referencing JAMS (and not a specific set of

JAMS Rules), Plaintiffs (as unsophisticated truck drivers) **first** knew *which* Rules that JAMS

would apply in its role administering the arbitration, and then, **second,** knew that those Rules

allowed arbitrability issues to be delegated to the arbitrator. See also Stone v. Wells Fargo Bank,

N.A., 361 F. Supp. 3d 539, 555 (D. Md. 2019) (refusing to compel an unsophisticated consumer

to arbitrate arbitrability even though agreement stated "[e]ach arbitration … shall be

administered … according to the [AAA Rules]," because it "strains credulity" to conclude that

---

[8]    Just because JAMS is chosen as the administrator does not mean that JAMS Rules would
always apply. Contracting Parties may utilize JAMS for its administrative services but allow for
a different set of Rules to apply. For example, JAMS will not apply its Rules "if other Rules are
prescribed" in the agreement, see JAMS Rule 1 (Dkt. 11 at p. 153), and here the agreement
purports to set out its own rules on several issues such as mandatory mediation, filing deadlines,
limitations on damages, fee-splitting, and mandatory fee awards to prevailing parties, all of
which are inconsistent with the JAMS Rules. See Dkt. 11 at pp. 102-105. Moreover, JAMS has a
number of different sets of Rules, such as Comprehensive Rules, Streamlined Rules,
International Arbitration Rules, and Construction Rules. Thus, even a sophisticated party could
not be sure that agreeing to arbitrate at JAMS required a particular set of JAMS Rules to govern
arbitration.

was clear and unmistakable evidence of the consumer's intent). Thus, although there are some

cases holding that incorporation of an ADR provider's rules may constitute a "clear and

unmistakable" delegation clause in a contract between sophisticated parties, given that no rules

were specifically incorporated or referenced in this agreement and Plaintiffs are commercial

truck drivers with no prior "business" experience, then there is no delegation clause.

2.    Even if a Delegation Clause Were Included in the Agreement, it is
       Unenforceable

If the Court were to construe the vague reference to JAMS in Defendants' agreement as a

delegation clause, it would find that the delegation clause is unconscionable and unenforceable,

and therefore, the Court must decide the enforceability of the agreement. "The question of

unconscionability is a matter of law to be decided by the court based on all facts and

circumstances of the case." Cheshire Mortg. Serv., Inc. v. Montes, 223 Conn. 80, 87 (1992).

(citations omitted). The doctrine of unconscionability as a contract defense requires a showing

that the contract was both procedurally and substantively unconscionable. Bender v. Bender, 292

Conn. 696, 731–32, 975 A.2d 636, 658 (2009) (citations omitted). For example, "some showing

of an absence of meaningful choice on the part of one of the parties together with contract terms

which are unreasonably favorable to the other party…" Id. Connecticut courts have held that

procedural and substantive unconscionability will invalidate an agreement to arbitrate, though

they need not be present to the same degree. Thomas v. CM Sec., LLC, No. CV095033527S,

2010 WL 3038503, at *8 (Conn. Super. Ct. July 7, 2010). However, in certain circumstances, a

showing of substantive unconscionability alone will make a contract unenforceable. See Smith v.

Mitsubishi Motors Credit of Am., Inc., 247 Conn. 342, 353 (1998); Petroleum & Franchise

Capital LLC v. Tejany Petroleum Naperville LLC, No. 3:15-CV-00156 (JCH), 2016 WL

4099026, at *4-5 (D. Conn. Aug. 2, 2016). A contract or clause is unconscionable when there is

23

an "absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc., 191 F.3d 198, 207 (2d Cir. 1999). "The determination of unconscionability is to be made on a case-by-case basis, taking into account all of the relevant facts and circumstances." Cheshire Mortg. Serv., Inc., 223 Conn. at 89.

Procedural unconscionability focuses on unfair surprise. Smith, 247 Conn. at 349 ("practice, we have come to divide this definition into two aspects of unconscionability, one procedural and the other substantive, the first intended to prevent unfair surprise and the other intended to prevent oppression"). The factors taken into consideration, among other things, are the party's familiarity and comfort with the subject matter, their commercial circumstances, whether they were represented by counsel, and the setting that the contract was formed within. See generally Edart Truck Rental Corp. v. B. Swirsky & Co., 23 Conn. App. 137, 143 (1990) ("[u]nder our test for unconscionability, the plaintiff's actions must be weighed against the defendant's business experience, the business practices of the community, and the relatively equal bargaining power of the parties"); Emigrant Mortg. Co. v. Crismara, No. CIV.A.3:05-CV-1772(J, 2008 WL 2551039, at *9 (D. Conn. June 23, 2008); Bankers Tr. Co. v. Ellis, No. CV010811511, 2002 WL 1370604, at *1 (Conn. Super. Ct. May 22, 2002). "A clause is procedurally unconscionable when a party lacks a meaningful opportunity to agree to the clause terms either because of unequal bargaining power, as in an adhesion contract, or because the clause and its effects are not readily ascertainable upon a review of the contract. Procedural unconscionability often involves the use of fine print or complicated, incomplete or misleading language that fails to inform a reasonable person of the contractual language's consequences." Thomas, 2010 WL 3038503 at *9.

24

Substantive unconscionability looks at whether the terms of a contract are oppressive. Smith, 247 Conn. at 349. Terms that are unreasonably imbalanced or favorable to one party may be invalidated as substantively unconscionable. See Emeritus Senior Living v. Lepore, 183 Conn. App. 23, 29 (2018); Hottle v. BDO Seidman, LLP, 268 Conn. 694, 719 (2004).

The Connecticut Supreme Court and Connecticut's appellate courts have largely declined to address the unconscionability of arbitration agreements under Connecticut contract law. See Beaulieu v. United Parcel Serv., No. CV155036003, 2016 WL 3912306, at *8 (Conn. Super. Ct. June 14, 2016); Horrocks v. Keepers, Inc., No. CV156054684S, 2016 WL 353252, at *6 (Conn. Super. Ct. Jan. 4, 2016). Connecticut courts therefore look to guidance from federal courts on the issue, with a deference to decisions from the Second Circuit. Horrocks, 2016 WL 353252 at *6 n. 9; see also C.R. Klewin Ne., LLC v. City of Bridgeport, 282 Conn. 54, 73 (2007) ("Thus, when there is no Connecticut case law directly on point, we may turn for guidance to the applicable federal law").[9] Here, as set forth further below, the delegation clause itself is both procedurally and substantively unconscionable. Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 73 (2010) (holding that unconscionability challenge to a delegation clause must be specific to the delegation clause).

### a.  The Cost-Shifting and Fee-Shifting Provisions Are Substantively Unconscionable as Applied to the Delegation Clause.

Courts have held that arbitration agreements are substantively unconscionable where they are cost prohibitive to the vindication of rights. Green Tree Fin. Corp.-Alabama v. Randolph, 531 U.S. 79, 92 (2000); Thomas, 2010 WL 3038503 at *11. Here, the arbitration agreement requires that if Plaintiffs are unsuccessful in arbitration, they are responsible for all arbitration

---

[9]     New York requires similar showings of substantive and procedural unconscionability. See Gillman v. Chase Manhattan Bank, N.A., 73 N.Y.2d 1, 10 (1988).

costs pursuant to what is often referred to as a "loser-pays-all" provision in the contract. See Dkt.

11 at 105 (Section 11.6). Although Plaintiffs do not agree they should have to pay for arbitration

costs under any circumstances and would contend that JAMS Rule 31(c) requires Defendants to

pay all arbitrators fees regardless of the outcome, Defendants may well oppose and seek to

litigate the fee-shifting issue in each arbitration. Thus, Plaintiffs would take on a serious risk of

an unconscionable financial burden just to get an arbitrator appointed to decide the cost-shifting

issue as well as the basic threshold issues of arbitrability has a significant chilling effect.

Plaintiffs are delivery drivers of modest means, and the costs associated with deciding threshold

issues of cost-shifting and arbitrability are prohibitive. See Silva Decl. ¶¶ 20-26 (Ex. 1);

Andresen v. IntePros Fed., Inc., 240 F. Supp. 3d 143, 159 (D.D.C. 2017) (finding that "a

potential multi-thousand-dollar expense is prohibitive" and demanding high costs just to

determine if "unpaid wages claims should be subject to judicial or arbitral resolution is, quite

simply, preposterous.").[10]

    These concerns are not hypothetical. For example, in a similar arbitration proceeding

litigated by a low-wage worker who challenged her classification as an independent contractor,

---

[10]    See also Mohamed v. Uber Techs., Inc., 109 F. Supp. 3d 1185, 1208 (N.D. Cal. 2015), aff'd in part, rev'd on other grounds, 2016 WL 7470557 (9th Cir. Dec. 21, 2016) (finding that the delegation clause required plaintiff to pay "substantial 'retainer fees' at the outset of an arbitration" of up to $5,000 and would need to "advance his pro rata portion of these fees just to get the arbitration started, and just to determine whether he needs to arbitrate his claims at all."); Shankle v. B-G Maint. Mgmt. of Colorado, Inc., 163 F.3d 1230, 1234–35 (10th Cir. 1999) (where plaintiff showed that he "would have had to pay an arbitrator between $1,875 and $5,000 to resolve his claims" and he "could not afford such a fee," the court concluded that "the prohibitive cost substantially limited use of the arbitral forum…"); Haro v. NCR Corp., 2006 WL 2990386, at *3 (S.D. Ohio Oct. 18, 2006) (finding that, according to AAA, average costs of employment arbitration ranged from $3,750 to $14,000); Giordano v. Pep Boys--Manny, Moe & Jack, Inc., 2001 WL 484360, at *6-7 (E.D. Pa. Mar. 29, 2001) (finding that "the initial filing fee [in arbitration] would likely amount to $2,000" with "daily fees anywhere near the range of $600 to $900").

the Arbitrator required that the Claimant pay a $2,500 deposit towards the Arbitrator's fees to obtain a finding that she was unable to pay $2,500. See Billie v. Coverall N. Am., 594 F. Supp. 3d 479, 484 (D. Conn. 2022), *vacated and remanded* Billie v. Coverall N. Am. Inc., No. 22-718-CV, 2023 WL 2531396, at *1 (2d Cir. Mar. 15, 2023). Similarly here, if Plaintiffs challenge the cost-shifting issue in front of an arbitrator and lose, they must pay thousands of dollars to have obtained a decision on the issue. Given these considerations and the risks of incurring substantial fees in the course of simply litigating the enforceability of the cost-shifting provision in arbitration, the delegation clause is substantively unconscionable and cannot be enforced.

Moreover, it is obvious that the cost-shifting provision of the agreement is unconscionable as applied to the delegation clause because it would have an undeniable "chilling effect" on Plaintiffs and other cleaning workers were they to have to pay thousands of dollars merely to arbitrate threshold questions of arbitrability pursuant to the delegation clause. See Brower v. Gateway 2000, Inc., 246 A.D.2d 246, 254, 676 N.Y.S.2d 569, 574 (1998) (finding "the excessive cost factor that is necessarily entailed in arbitrating before the ICC is unreasonable and surely serves to deter the individual consumer from invoking the process"); Morrison v. Circuit City Stores, Inc., 317 F.3d 646, 661 (6th Cir. 2003) ("The issue is not only whether an individual claimant would be precluded from effectively vindicating his or her rights in an arbitral forum by the risk of incurring substantial costs, but also whether other similarly situated individuals would be deterred by those risks as well); see also Nesbitt v. FCNH, Inc., 811 F.3d 371, 375, 378-79 (10th Cir. 2016) ("[i]n many cases, if not most, employees considering the consequences of bringing their claims in the arbitral forum will be inclined to err on the side of caution, especially when the worst-case scenario would mean not only losing on their substantive claims but also the imposition of the costs of the arbitration."); Delta Funding

Corp. v. Harris, 189 N.J. 28 (2006) ("fee-shifting provisions can deter a litigant from pursuing a claim" because "[t]he prospect of having to shoulder all the costs of arbitration could chill [plaintiffs] from pursuing their statutory claims through mandatory arbitration."

Defendants can easily bear the cost of arbitrating under its own arbitration agreement and should not be allowed to deter workers from asserting their rights by inserting language into the agreement requiring the low-wage employees to pay expensive arbitration fees if they lose in arbitration, even if those contractual provisions are later found to be unenforceable.[11]

The high costs of arbitration are prohibitive, and they are well-documented. In a recent delivery driver misclassification lawsuit litigated by Plaintiffs' counsel in which the driver asserted nearly identical claims to Plaintiffs, the Arbitrator's fee was $12,400 *solely for an initial determination of what state law would apply*. See Rubin Decl. at ¶ 2 (Exhibit 3). The American Arbitration Association has sent invoices to Plaintiffs' counsel in recent wage cases explaining that the Arbitrator's anticipated fees for an entire individual wage-and-hour case is as high as $87,400. See id. at ¶ 3. Similar invoices were sent that were routinely more than $50,000. See id. at ¶ 4. In a recent FLSA misclassification wage-and-hour arbitration at AAA in which Plaintiffs' counsel represented the prevailing party, the total arbitrator compensation at the time of the final award was $29,750. Id. at ¶ 5. The administrative fees and expenses charged by AAA in that same proceeding totaled $2,950. Id. In other cases, Arbitrators have charged between $10,000 and $30,000 to decide cross-motions for summary judgment in two separate independent contractor misclassification cases. See id. at ¶ 6. These substantial fees in similar arbitration

---

[11]     Relatedly, "[i]n considering the ability of plaintiffs to pay arbitration costs under an arbitration agreement, reviewing courts should not consider after-the-fact offers by employers to pay the plaintiff's share of the arbitration costs where the agreement itself provides that the plaintiff is liable, at least potentially, for arbitration fees and costs." Morrison v. Cir. City Stores, Inc., 317 F.3d 646, 676 (6th Cir. 2003).

proceedings indicate that if the arbitration costs were shifted to Plaintiffs in this case, it would require Plaintiffs to pay tens of thousands of dollars to litigate their claims. These estimates and recent invoices from similar cases are supported by the case law. See, e.g., Morrison v. Cir. City Stores, Inc., 317 F.3d 646, 669 (6th Cir. 2003) ("Minimal research will reveal that the potential costs of arbitrating the dispute easily reach thousands, if not tens of thousands, of dollars, far exceeding the costs that a plaintiff would incur in court."); Nesbitt v. FCNH, Inc., 811 F.3d 371, 375, 377-81 (10th Cir. 2016) (refusing to enforce arbitration agreement in light of cost-sharing provisions that could require worker to bear half the costs of pursuing her wage claim in arbitration, which she estimated at "between $2,320.50 and $12,487.50 in costs simply paying for the arbitrator's time"); Spinetti v. Service Corp. Intern., 324 F.3d 212, 217 (3rd Cir. 2003) (acknowledging that the arbitrator fees for the arbitration at issue would likely amount to thousands of dollars per day in addition to similarly sizeable fees to be paid up front).[12]

Likewise, the agreements each provide that the prevailing party recovers its "reasonable attorney's fees" in connection with the action. Dkt. 11 at 71 (Section 11.6). This aspect of the agreement also renders the delegation clause substantively unconscionable because it threatens to saddle Plaintiffs with thousands of dollars in attorneys' fees if their challenge to the threshold issue of arbitrability is unsuccessful and would have a severe chilling effect. See Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 126 (2d Cir. 2010) ("a fee shifting provision that requires fees be awarded to the prevailing party…would significantly diminish a litigant's rights under Title VII").

---

[12]    See also Haro v. NCR Corp., 2006 WL 2990386, at *3 (S.D. Ohio Oct. 18, 2006) (finding that average costs of employment arbitration ranged from $3,750 to $14,000 more than fifteen years ago).

29

      **b.**      **The Delegation Clause Is Procedurally Unconscionable**

The delegation clause in Defendant's arbitration agreement is also procedurally unconscionable.

      *i.*      *The Delegation Clause is Adhesive*

Here, to the extent that there is a delegation clause, it is contained within contracts of adhesion between parties of unequal bargaining power. The delegation clause was drafted by Defendants, with no opportunity for Plaintiffs, low-wage delivery drivers, to negotiate its terms. Plaintiffs were required to agree to the delegation clause in order to (unlawfully) buy a job from a sophisticated commercial enterprise. Plaintiffs had already been employed by Defendants as W-2 employees and relied on that income. They were then told that they had to sign the agreement and "buy" a delivery route, or they would no longer be employed, allowing for Defendants to exert extreme pressure on Plaintiffs to sign these contracts. Unbeknownst to Plaintiffs, the agreements contained an arbitration clause. "[I]n the case of preemployment arbitration contracts, the economic pressure exerted by employers on all but the most sought-after employees may be particularly acute, for the arbitration agreement stands between the employee and necessary employment, and few employees are in a position to refuse a job because of an arbitration requirement." Van Voorhies v. Land/home Fin. Servs., No. CV095031713S, 2010 WL 3961297, at *4 (Conn. Super. Ct. Sept. 3, 2010) (citations and quotations omitted).[13]

---

[13]     While the adhesive nature of the contract and the unequal standing of the parties is not enough to deem the delegation clause unconscionable, Connecticut courts have recognized that they are factors that may be taken into consideration. See Smith, 247 Conn. at 352 ("procedural unconscionability cannot be predicated *solely*" on the circumstances of a commercial party proffering a form contract to an individual) (emphasis added).

ii.    *The Delegation Clause Does Not Have an Opt-Out*

The delegation clauses also do not contain any opt-out provisions whereby Plaintiffs

could make a meaningful choice whether to arbitrate the validity of the arbitration agreement.

Courts within the Second Circuit and throughout the country have treated the existence of an opt-

out provision as an important factor in considering challenges to procedural unconscionability.

See Saizhang Guan v. Uber Techs., Inc., 236 F. Supp. 3d 711, 730–31 (E.D.N.Y. 2017) (the

existence of a 30-day opt provision in an arbitration agreement "substantially negates any

challenge of procedural unconscionability with respect to the delegation clause").[14] Plaintiffs'

inability to opt-out of the delegation clause again demonstrates its procedural unconscionability.

**D.    In the Absence of An Enforceable Delegation Clause, the Court Must find the Wage-And-Hour Claims are Outside the Scope of the Arbitration Agreement**

The narrow scope of the arbitration agreement indicates that Plaintiffs statutory wage

claims fall outside the scope of the arbitration agreement. The dispute resolution provision only

concerns disputes "between SCHMIDT and DISTRIBUTOR," where DISTRIBUTOR is defined

to only refer to the Plaintiff's corporate entity. See Dkt. 11 at pp. 46, 68 (Section 11.1). Here,

however, the claims at issue are not being asserted by Silva's Baked Goods, Inc., and this is not a

dispute between the DISTRIBUTOR and SCHMIDT. Plaintiffs' individual claims arise under

Connecticut's wage statutes, and these disputes are exclusively between Plaintiffs in their

individual capacity and Defendants. Indeed, the corporate entities by definition cannot have a

"dispute" with Defendants under the wage statutes, as they do not have standing to sue under

---

[14]      See also Lee v. Uber Techs., Inc., 208 F. Supp. 3d 886, 893 (N.D. Ill. 2016) (where there is an opt-out clause "a procedural unconscionability argument is doomed to fail"); Bruster v. Uber Techs., Inc., 188 F. Supp. 3d 658, 664 (N.D. Ohio 2016) (finding that the delegation clause was not procedurally unconscionable under Ohio law because of the 30–day opt out provision); Varon v. Uber Techs., Inc., No. CV MJG-15-3650, 2016 WL 1752835, at *5 (D. Md. May 3, 2016) (under Maryland law, an arbitration provision "with a clearly-stated opportunity to opt-out without retaliation, is not procedurally unconscionable").

31

state or federal wage statutes. See, e.g., Conn. Gen. Stat Sec. 31-71a (defining "employee" subject to the wage laws as a "person suffered or permitted to work").[15] Accordingly, Plaintiff's individual statutory wage claims cannot constitute "disputes" between the corporate entities and Schmidt, and therefore the disputes fall outside of the arbitration provision. See Moon v. Breathless Inc, 868 F.3d 209, 216 (3d Cir. 2017) ("because the arbitration clause at issue here[,] references contract disputes-not statutory rights" the agreement did not concern statutory wage-and-hour claims").

### E.   The Arbitration Agreement as a Whole Is Unenforceable

1.   Schmidt's Arbitration Agreement Is Permeated with Unconscionable Terms And Should Be Stricken

For some of the same reasons that the delegation clause is unconscionable, the agreement as a whole is likewise unconscionable and unenforceable. For example, like the delegation clause, the arbitration agreement is presented as an adhesion take-it-or-leave it contract with no opportunity for Plaintiffs to negotiate its terms. Likewise, the consequences of the arbitration agreements, each of which contain broad and sweeping language, were not explained in any manner to Plaintiffs, despite the magnitude of its substantive terms. Moreover, the agreement is substantively unconscionable because of the cost-shifting provisions and the provision requiring the losing party to pay the prevailing attorney's fees. The contract also contains a shortened statute of limitations. The Second Circuit casts a critical eye on arbitration agreements that limit a litigant's time to assert their statutory rights. See D'Antuono v. Serv. Rd. Corp., 789 F. Supp. 2d 308, 336 (D. Conn. 2011) ("The Second Circuit strongly indicated" that if an employer had not waived a shortened statute of limitations, "it might well have invalidated the arbitration

---

[15]      This is in contrast to the definition of an "employer," which includes "any individual, partnership, association, joint stock company, trust, corporation…." Conn. Gen. Stat Sec. 31-71a.

clause in the plaintiff's employment contract") (citing <u>Ragone</u>, 595 F.3d at 125-126). [16] A further provision purports to prohibit an arbitrator from "substituting" his or her "business judgment" for Schmidt's, a clause that could severely limit an arbitrator's authority to hold Schmidt accountable for its business decision to misclassify all delivery drivers as independent contractors. <u>See</u> Dkt. 11 at 70 (Section 11.4). The agreement also purports to waive any right under the Connecticut wage laws for "consequential, incidental, indirect, special, or punitive damages," despite the fact that the Connecticut wage law provides for special damages in twice the amount of a worker's unpaid wages, Conn. Gen. Stat. Ann. § 31-72.

### F. Defendant Schmidt Baking Company, Inc. is Not a Party to the Agreement and Cannot Invoke the Arbitration Clause

Finally, though the Court is unlikely to reach the issue because there is no enforceable agreement to arbitrate between Plaintiffs and any of the Defendants, even if Plaintiffs' claims against Schmidt Baking Distribution, LLC are compelled to arbitration, the second Defendant – Schmidt Baking Company, Inc. - is not a party to the agreement.

Defendants argue that Schmidt Baking Company may compel arbitration based on "estoppel," because according to Defendants the allegations against Schmidt Baking Company are "intertwined with the contract" containing the arbitration clause (even though Schmidt Baking Company is not a party to that contract). <u>See</u> Dkt. 11 at 28. However, this is not accurate. Plaintiffs' claims are that Defendants violated the Connecticut wage statutes, and these claims for unpaid wages are distinct and separate from any issues arising under the contract. A "number of cases have held that suits to recover payments due under the FLSA, such as overtime payments, are not dependent upon the plaintiff's employment agreement." <u>Pacheco v. St. Luke's</u>

---

[16]  <u>See also</u> <u>Alexander v. Anthony Int'l, L.P.</u>, 341 F.3d 256, 267 (3d Cir. 2003) (provision shortening a statute of limitations to 30 days is unconscionable because it makes it "unnecessarily burdensome for an employee to seek relief from the company's illegal conduct").

Emergency Associates, P.C., 879 F. Supp. 2d 136, 141 (D. Mass. 2012) (collecting cases). This is because statutory wage claims, by their very nature, do not seek to enforce or apply contracts, but are actually intended to negate the contractual arrangements of the parties. De Angelis v. Nat'l Ent. Grp., LLC, 2018 WL 4334553, at *4 (S.D. Ohio Sept. 11, 2018) ("the FLSA is designed to defeat rather than implement contractual agreements"). Thus, Plaintiffs claims are not in any way "intertwined" with the contract containing the arbitration clause.

Defendants also argue that because Plaintiffs alleged collectively that "Defendants" misclassified them and committed violations of the Connecticut wage laws, then the Court should not distinguish between the two entities when considering the arbitration agreement. However, arbitration is a matter of contract interpretation and discerning the intent of the parties. Solar & Env't Techs. Corp. v. Zelinger, 726 F. Supp. 2d 135, 142 (D. Conn. 2009) ("an agreement to arbitrate is a creation of contract"); Nadel v. Luttinger, 168 Conn. App. 689, 696, 147 A.3d 1075, 1080 (2016) ("A contract must be construed to effectuate the intent of the parties"). Neither Plaintiffs nor any other party may alter the meaning of the Distributor Agreement and its arbitration clause by their subsequent court pleadings. On the face of the Distributor Agreement itself, the only disputes that are subject to arbitration are those between SCHMIDT (defined as "Schmidt Baking Distribution, LLC") and DISRIBUTOR (defined as Plaintiff's corporate entity). If the parties had intended to arbitrate disputes between additional parties not identified in the contract, they certainly could have said so. However, the contract does not contain such a broad arbitration clause and therefore even if claims against Schmidt Baking Distribution are compelled to arbitration, there is no basis to compel arbitration of claims against the Schmidt Baking Company entity.

## IV.    CONCLUSION

In their motion to compel arbitration, Defendants attempt to paper over the serious flaws in its position by reciting the alleged "policies" favoring arbitration. See, e.g., Dkt. 11 at pp. 11-12. However, as the Supreme Court importantly clarified in a unanimous opinion, there is no unique set of rules governing arbitration agreements. See Morgan v. Sundance, Inc., 596 U.S. 411, 412, 142 S. Ct. 1708, 1709, 212 L. Ed. 2d 753 (2022) ("a court must hold a party to its arbitration contract just as the court would to any other kind. But a court may **not** devise novel rules to favor arbitration over litigation.") (emphasis added). Thus, Defendants still must satisfy their basic burden of showing as a matter of contract law that Plaintiffs are somehow bound by an agreement to which they are not parties, and a court cannot rewrite the agreement to "favor" arbitration any more than it could rewrite any contract to bind a non-party. Thus, Defendants cannot meet their burden of demonstrating the existence of a valid arbitration agreement, and their motion should be denied in full.

Dated: February 9, 2024

NATHANIEL SILVA and PHIL ROTHKUGEL, on behalf of themselves and all others similarly situated,

By their Attorneys,

/s/  *Zachary L. Rubin*
Zachary L. Rubin, (Juris No. 437846)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston St., Suite 2000
Boston, MA 02116
Tel: (617) 994-5800
Fax: (617) 994-5801
zrubin@llrlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on February 9, 2024, I caused this pleading to be filed via the Court's

ECF system, which served all counsel of record by email.

/s/ *Zachary L. Rubin*_____
Zachary L. Rubin

# EXHIBIT 2

**SUMMONS - CIVIL**
JD-CV-1  Rev. 2-22
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a, 52-48, 52-259;
P.B. §§ 3-1 through 3-21, 8-1, 10-13

| For information on ADA accommodations, contact a court clerk or go to: *www.jud.ct.gov/ADA.* |
|---|

STATE OF CONNECTICUT
**SUPERIOR COURT**
*www.jud.ct.gov*



**Instructions are on page 2.**

☐ Select if amount, legal interest, or property in demand, not including interest and costs, is LESS than $2,500.

☒ Select if amount, legal interest, or property in demand, not including interest and costs, is $2,500 or MORE.

☐ Select if claiming other relief in addition to, or in place of, money or damages.

**TO: Any proper officer**
By authority of the State of Connecticut, you are hereby commanded to make due and legal service of this summons and attached complaint.

| Address of court clerk *(Number, street, town and zip code)* | Telephone number of clerk | Return Date *(Must be a Tuesday)* |
|---|---|---|
| 95 Washington Street, Hartford, CT 06106 | ( 860 ) 548 – 2700 | December 26, 2023 |

| ☒ Judicial District | G.A. | At *(City/Town)* | Case type code *(See list on page 2)* | |
|---|---|---|---|---|
| ☐ Housing Session | Number: | Hartford | Major: **M** | Minor: **90** |

**For the plaintiff(s) enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented *(Number, street, town and zip code)* | Juris number *(if attorney or law firm)* |
|---|---|
| Zachary L. Rubin, Lichten & Liss-Riordan, P.C. 729 Boylston St. Suite 2000 Boston, MA 02116 | 437846 |

| Telephone number | Signature of plaintiff *(if self-represented)* |
|---|---|
| ( 617 ) 994 – 5800 | |

| The attorney or law firm appearing for the plaintiff, or the plaintiff if self-represented, agrees to accept papers (service) electronically in this case under Section 10-13 of the Connecticut Practice Book. | ☒ Yes ☐ No | E-mail address for delivery of papers under Section 10-13 of the Connecticut Practice Book *(if agreed)* zrubin@llrlaw.com |
|---|---|---|

| Parties | Name *(Last, First, Middle Initial)* and address of each party *(Number; street; P.O. Box; town; state; zip; country, if not USA)* | |
|---|---|---|
| **First plaintiff** | Name: **Silva, Nathaniel** <br> Address: **c/o Lichten & Liss-Riordan, P.C. 729 Boylston St. Suite 2000** | P-01 |
| **Additional plaintiff** | Name: **Rothkugel, Phil** <br> Address: **c/o Lichten & Liss-Riordan, P.C. 729 Boylston St. Suite 2000** | P-02 |
| **First defendant** | Name: **Schmidt Baking Distribution, LLC** <br> Address: **601 South Caroline St. Baltimore, MD 21231** | D-01 |
| **Additional defendant** | Name: **Schmidt Baking Company, Inc.** <br> Address: **601 South Caroline St. Baltimore, MD 21231** | D-02 |
| **Additional defendant** | Name: <br> Address: | D-03 |
| **Additional defendant** | Name: <br> Address: | D-04 |

| Total number of plaintiffs: 2 | Total number of defendants: 2 | ☐ Form JD-CV-2 attached for additional parties |
|---|---|---|

## Notice to each defendant

1. **You are being sued.** This is a summons in a lawsuit. The complaint attached states the claims the plaintiff is making against you.
2. To receive further notices, you or your attorney must file an *Appearance* (form JD-CL-12) with the clerk at the address above. Generally, it must be filed on or before the second day after the Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to appear.
3. If you or your attorney do not file an *Appearance* on time, a default judgment may be entered against you. You can get an *Appearance* form at the court address above, or on-line at https://jud.ct.gov/webforms/.
4. If you believe that you have insurance that may cover the claim being made against you in this lawsuit, you should immediately contact your insurance representative. Other actions you may take are described in the Connecticut Practice Book, which may be found in a superior court law library or on-line at https://www.jud.ct.gov/pb.htm.
5. If you have questions about the summons and complaint, you should talk to an attorney.
   **The court staff is not allowed to give advice on legal matters.**

| Date | Signed *(Sign and select proper box)* | ☒ Commissioner of Superior Court | Name of person signing |
|---|---|---|---|
| 11/20/2023 | | ☐ _____ Clerk | Zachary L. Rubin |

| If this summons is signed by a Clerk: | | For Court Use Only |
|---|---|---|
| a. The signing has been done so that the plaintiff(s) will not be denied access to the courts. | | File Date |
| b. It is the responsibility of the plaintiff(s) to ensure that service is made in the manner provided by law. | | |
| c. The court staff is not permitted to give any legal advice in connection with any lawsuit. | | |
| d. The Clerk signing this summons at the request of the plaintiff(s) is not responsible in any way for any errors or omissions in the summons, any allegations contained in the complaint, or the service of the summons or complaint. | | |

| I certify I have read and understand the above: | Signed *(Self-represented plaintiff)* | Date | Docket Number |
|---|---|---|---|
| | | | |

## Instructions

1. Type or print legibly. If you are a self-represented party, this summons must be signed by a clerk of the court.

2. If there is more than one defendant, make a copy of the summons for each additional defendant. Each defendant must receive a copy of this summons. Each copy of the summons must show who signed the summons and when it was signed. If there are more than two plaintiffs or more than four defendants, complete the Civil Summons Continuation of Parties (form JD-CV-2) and attach it to the original and all copies of the summons.

3. Attach the summons to the complaint, and attach a copy of the summons to each copy of the complaint. Include a copy of the Civil Summons Continuation of Parties form, if applicable.

4. After service has been made by a proper officer, file the original papers and the officer's return of service with the clerk of the court.

5. Use this summons for the case type codes shown below.

   Do *not* use this summons for the following actions:

   (a) Family matters (for example divorce, child support, custody, parentage, and visitation matters)

   (b) Any actions or proceedings in which an attachment, garnishment or replevy is sought

   (c) Applications for change of name

   (d) Probate appeals

   (e) Administrative appeals

   (f) Proceedings pertaining to arbitration

   (g) Summary Process (Eviction) actions

   (h) Entry and Detainer proceedings

   (i) Housing Code Enforcement actions

## Case Type Codes

| MAJOR DESCRIPTION | CODE Major/ Minor | MINOR DESCRIPTION |
|---|---|---|
| Contracts | C 00 | Construction - All other |
| | C 10 | Construction - State and Local |
| | C 20 | Insurance Policy |
| | C 30 | Specific Performance |
| | C 40 | Collections |
| | C 50 | Uninsured/Underinsured Motorist Coverage |
| | C 60 | Uniform Limited Liability Company Act – C.G.S. 34-243 |
| | C 90 | All other |
| Eminent Domain | E 00 | State Highway Condemnation |
| | E 10 | Redevelopment Condemnation |
| | E 20 | Other State or Municipal Agencies |
| | E 30 | Public Utilities & Gas Transmission Companies |
| | E 90 | All other |
| Housing | H 10 | Housing - Return of Security Deposit |
| | H 12 | Housing - Rent and/or Damages |
| | H 40 | Housing - Housing - Audita Querela/Injunction |
| | H 50 | Housing - Administrative Appeal |
| | H 60 | Housing - Municipal Enforcement |
| | H 90 | Housing - All Other |
| Miscellaneous | M 00 | Injunction |
| | M 10 | Receivership |
| | M 15 | Receivership for Abandoned/Blighted Property |
| | M 20 | Mandamus |
| | M 30 | Habeas Corpus (extradition, release from Penal Institution) |
| | M 40 | Arbitration |
| | M 50 | Declaratory Judgment |
| | M 63 | Bar Discipline |
| | M 66 | Department of Labor Unemployment Compensation Enforcement |
| | M 68 | Bar Discipline - Inactive Status |
| | M 70 | Municipal Ordinance and Regulation Enforcement |
| | M 80 | Foreign Civil Judgments - C.G.S. 52-604 & C.G.S. 50a-30 |
| | M 83 | Small Claims Transfer to Regular Docket |
| | M 84 | Foreign Protective Order |
| | M 89 | CHRO Action in the Public Interest - P.A. 19-93 |
| | M 90 | All other |

| MAJOR DESCRIPTION | CODE Major/ Minor | MINOR DESCRIPTION |
|---|---|---|
| Property | P 00 | Foreclosure |
| | P 10 | Partition |
| | P 20 | Quiet Title/Discharge of Mortgage or Lien |
| | P 30 | Asset Forfeiture |
| | P 90 | All other |
| Torts (Other than Vehicular) | T 02 | Defective Premises - Private - Snow or Ice |
| | T 03 | Defective Premises - Private - Other |
| | T 11 | Defective Premises - Public - Snow or Ice |
| | T 12 | Defective Premises - Public - Other |
| | T 20 | Products Liability - Other than Vehicular |
| | T 28 | Malpractice - Medical |
| | T 29 | Malpractice - Legal |
| | T 30 | Malpractice - All other |
| | T 40 | Assault and Battery |
| | T 50 | Defamation |
| | T 61 | Animals - Dog |
| | T 69 | Animals - Other |
| | T 70 | False Arrest |
| | T 71 | Fire Damage |
| | T 90 | All other |
| Vehicular Torts | V 01 | Motor Vehicles* - Driver and/or Passenger(s) vs. Driver(s) |
| | V 04 | Motor Vehicles* - Pedestrian vs. Driver |
| | V 05 | Motor Vehicles* - Property Damage only |
| | V 06 | Motor Vehicle* - Products Liability Including Warranty |
| | V 09 | Motor Vehicle* - All other |
| | V 10 | Boats |
| | V 20 | Airplanes |
| | V 30 | Railroads |
| | V 40 | Snowmobiles |
| | V 90 | All other |
| | | *Motor Vehicles include cars, trucks, motorcycles, and motor scooters. |
| Wills, Estates and Trusts | W 10 | Construction of Wills and Trusts |
| | W 90 | All other |

**RETURN DATE: DECEMBER 26, 2023**

NATHANIEL SILVA and PHIL ROTHKUGEL,
  on behalf of themselves and all others similarly
situated,

                          Plaintiffs,

    v.

SCHMIDT BAKING DISTRIBUTION, LLC and
SCHMIDT BAKING COMPANY, INC.,

                        Defendants.

SUPERIOR COURT

J.D. OF HARTFORD

AT HARTFORD

No. HHD-CV23-6175772-S

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Nathaniel Silva and Phil Rothkugel bring this class and collective action lawsuit against Schmidt Baking Distribution, LLC and Schmidt Baking Company, Inc. ("Defendants") for violations of the Connecticut Wage Laws, including Connecticut General Statutes ("C.G.S.") § 31-71a *et seq.*; C.G.S. § 31-76c. *et seq.*; and claims to recover for damages resulting from these breaches and violations under C.G.S. § 31-72.

### PARTIES

1.     Plaintiff Nathaniel Silva resides in Berlin, Connecticut. Plaintiff Silva has delivered baked goods for Defendant within the applicable statutory period.

2.     Plaintiff Phil Rothkugel resides in Little River, South Carolina. Plaintiff Rothkugel delivered baked goods for Defendant within the applicable statutory period.

3.     Defendants are headquartered at 601 South Caroline St., Baltimore, Maryland.

### FACTS

4.     Defendant Schmidt Baking Distribution, LLC is a distribution company that purports to sell "distribution rights" to delivery drivers such as Plaintiffs and class members in

1

Connecticut.

5.    Defendant Schmidt Baking Company, Inc., is the parent company and/or an affiliate of Defendant Schmidt Baking Distribution, LLC.

6.    Throughout the nation, Defendants enter into "Distribution Agreements" with delivery drivers by which they pay Defendants tens of thousands of dollars for the right to distribute breads and baked goods of Defendants' affiliates in a designated territory.

7.    Defendants then pay workers like Plaintiffs to deliver the products to retail stores and other customers within a specific geographic area.

8.    Defendants require these workers to form corporations as a condition of working for Defendants and refers to the workers such as Plaintiffs, known as "Distributors."

9.    Distributors use vehicles to transport the products from Defendants' warehouses to their customers, which include large grocery stores and other retailers.

10.    Plaintiffs Silva and Rothkugel have worked for Defendants as Distributors in Connecticut and in order to work they were required to form corporate entities.

11.    Defendants employ other Distributors in Connecticut and across the country to perform the same or similar work under the substantially same terms and identical or nearly identical Distributor Agreements.

12.    Defendants require all of these workers to pay a substantial sum of money for alleged "distribution rights" in a geographic territory (i.e., routes) prior to executing the Distributor Agreements.

13.    To finance these sizable payments for routes, Defendants assists drivers in securing substantial loans (with significant interest rates).

14.    Defendants deduct "route payments" from drivers' compensation each week to

2

service these loans.

15.     Defendants make a number of unauthorized and arbitrary deductions to Plaintiffs'

pay, including for alleged "fines" that cannot be disputed by the drivers.

16.     Although Defendants claim in its standardized Distributor Agreements that

Distributors are independent contractors, the Distributor Agreements are *de facto* employment

agreements.

17.     Through Defendants' Distribution Agreement and via its managerial discipline,

policies, and practices, Defendants extensively control the manner and means by which drivers

perform their work for Defendants.

18.     For example, Defendants requires that Plaintiffs and class members attend

meetings, and require Plaintiffs and other drivers to service stores and customers in their

territories at specific dates and times.

19.     If Plaintiffs fail to comply with these requirements, they can be fined hundreds of

dollars, or terminated.

20.     Defendants also retain unilateral control over the quantity and types of products

that are delivered to each customer, as well as the price of each product.

21.     The work of Plaintiffs and other drivers falls squarely within Defendants' usual

course of business. Indeed, Plaintiffs and other drivers are undeniably central to Defendants'

business as a distributor of breads and baked goods.

22.     Plaintiffs and other drivers are not engaged in independently established trades,

occupations, professions, or businesses. Rather, drivers overwhelmingly work exclusively for

Defendants; the associated corporate entities are formed and exist for the sole purpose of

working for Defendants.

23.     Each week, Defendants have agreed to pay the Plaintiffs and other drivers for their work. The weekly pay is comprised of the difference between the amount that Plaintiffs were "charged" by Defendants to take the product from Defendants' warehouse for delivery, and the price ultimately paid by Defendants' customer for the product.

24.     Defendants create the illusion that Distributors run businesses. However, since Distributors cannot control any of the prices, in reality they are simply paid wages based on the number of products delivered each week.

25.     Plaintiffs suffer significant damages each week due to deductions and withholdings from their wages and expenses paid out of pocket that benefit Defendants, all of which are unlawful where Plaintiffs are employees of Defendants.

26.     Further, Plaintiffs regularly worked more than forty hours per week for Defendants. Plaintiff Silva estimates working approximately 50 hours per week, on average. Plaintiff Rothkugel estimates working more than 50 hours per week, and often longer.

27.     Defendants do not pay either Plaintiff or any other driver an overtime premium for those hours worked over forty in a workweek.

## CONNECTICUT CLASS ALLEGATIONS

28.     Plaintiffs bring this action on behalf of themselves and other individuals who delivered products for Defendants pursuant to a Distributor Agreement in Connecticut from the two years preceding the filing of this Complaint.

29.     Class action treatment of this action appropriate because all of the requirements of Practice Book §§ 9-7 and 9-8 are satisfied. In particular:

        (a)     The class includes over 40 individuals, all of whom are readily ascertainable based on Defendants' records and are so numerous that joinder of all class members is impracticable.

4

(b)    Plaintiffs are class members, their claims are typical of the claims of other class members, and they have no interests that are antagonistic to or in conflict with the interests of other class members.

(c)    Plaintiffs and their lawyers will fairly and adequately represent the class members and their interests.

(d)    Questions of law and fact are common to all class members because this action concerns Defendants' identical violations of Connecticut law in regard to each class member. For example, the question of whether Plaintiffs and other drivers are employees of Defendants under the Connecticut ABC employment test will be determined through the application of generally applicable legal principles to common facts.

(e)    Class certification is appropriate because common questions of law and fact predominate over questions affecting only individual class members and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.

(f)    Defendants have acted on grounds generally applicable to the class, thereby making appropriate classwide relief.

## COUNT I

## CONNECTICUT WAGE LAW VIOLATIONS – UNLAWFUL DEDUCTIONS

### (On behalf of Connecticut Class)

30.    All previous paragraphs are incorporated as though fully set forth herein.

31.    Plaintiffs Silva and Rothkugel are employees entitled to the protections of Connecticut's wage statutes.

32.    Defendants are employers required to pay Plaintiffs in accordance with Connecticut law.

33. At all relevant times, Defendants were employers of Plaintiffs under Connecticut law. However, Defendants have misclassified Plaintiffs and other drivers as independent contractors.

34. As a result of Defendants' misclassification scheme, Plaintiffs were not paid all waged owned to them under C.G.S. § 31-71a *et seq.*

35. Defendants have unlawfully deducted hundreds of dollars from Plaintiffs' wages on a weekly basis for purported fines, fees, route payments, and other work-related expenses.

36. Defendants' practice of deducting various work-related expenses from Plaintiffs' wages also violates C.G.S. § 31-71e.

## COUNT II

## CONNECTICUT OVERTIME VIOLATIONS

### (On behalf of Connecticut Class)

37. Defendants have also failed to pay Plaintiffs overtime premiums for all hours worked in excess of forty hours per week, in violation of C.G.S. § 31-76c *et seq.*

38. Plaintiffs seek compensation resulting from Defendants' violations of C.G.S. § 31-71a *et seq.* and C.G.S. § 31-76c *et seq.* pursuant to C.G.S. § 31-72.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs seek the following relief on behalf of themselves and other Connecticut class members: (A) class certification; (B) payments equaling the value of all improper deductions; (C) unpaid overtime wages; (D) all available penalties/statutory damages available under Connecticut law; (E) pre-judgment interest and (F) any other relief the Court deems just and proper.

| | |
|---|---|
| NATHANIEL SILVA and PHIL ROTHKUGEL, on behalf of themselves and all others similarly situated, | : : : SUPERIOR COURT : : J.D. OF HARTFORD |
| Plaintiffs, | : : AT HARTFORD : |
| v. | : |
| SCHMIDT BAKING DISTRIBUTION, LLC and SCHMIDT BAKING COMPANY, INC., | : : : |
| Defendants. | : : : |

## STATEMENT OF AMOUNT IN DEMAND

The Plaintiffs claims damages in excess of $15,000.00.

Dated: November 20, 2023

NATHANIEL SILVA and PHIL ROTHKUGEL, on behalf of themselves and all others similarly situated,

By their Attorneys,

/s/  *Zachary L. Rubin*
Zachary L. Rubin, (Juris No. 437846)
Harold L. Lichten, *pro hac vice anticipated*
Matthew W. Thomson, *pro hac vice anticipated*
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston St., Suite 2000
Boston, MA 02116
(617) 994-5800

## JDNO NOTICE

**HHD-CV-23-6175772-S**     **SILVA, NATHANIEL Et Al v. SCHMIDT BAKING COMPANY DISTRIBUTION, LLC**

Notice Issued: **10/25/2023**

**Court Address:**
CLERK, SUPERIOR COURT
JUDICIAL DISTRICT OF HARTFORD
95 WASHINGTON STREET
HARTFORD, CT 06106
**Website:** www.jud.ct.gov

**Notice Content:**
Notice Issued: **10/25/2023**
Docket Number: **HHD-CV-23-6175772-S**
Case Caption: **SILVA, NATHANIEL Et Al v. SCHMIDT BAKING COMPANY DISTRIBUTION, LLC**
Notice Sequence #: **1**

JDNO NOTICE

10/26/2023 AT 5:00PM
The above-captioned case has been individually assigned to HD6.

The prefix "HD6" has been assigned to this case for assignment purposes and will appear on all short calendars.

This notice is for informational purposes only. No court appearance is required.

Please direct questions to the Civil Caseflow Office to at 860-548-2703.

# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **NATHANIEL SILVA and PHIL ROTHKUGEL, on behalf of themselves and all others similarly situated,**<br><br>Plaintiffs,<br><br>v.<br><br>**SCHMIDT BAKING DISTRIBUTION, LLC and SCHMIDT BAKING COMPANY, INC. ,**<br><br>Defendants. | **Civil Action No.: 3:23-cv-01695-MPS**<br><br><br>**January 5, 2024** |

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO COMPEL ARBITRATION

Pursuant to Federal Rule of Civil Procedure 12(b)(1) and Sections 3 and 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3, 4,[1] Defendants Schmidt Baking Distribution, LLC ("SBD") and Schmidt Baking Company, Inc. ("SBC") (collectively, "Schmidt Defendants"), respectfully submit this Memorandum of Law in support of their motion to compel individual arbitration of the claims of Plaintiffs Nathaniel Silva and Phil Rothkugel (collectively, "Plaintiffs") and to dismiss, or in the alternative, to stay this action pending arbitration.

---

[1] Motions to compel arbitration pursuant to the FAA are properly brought as motions to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). *See, e.g.*, *Orange County Choppers, Inc. v. Goen Techs. Corp.*, 374 F. Supp. 2d 372, 373 (S.D.N.Y. 2005) (accepting parties' position that 12(b)(1) motion should be construed as motion to compel arbitration and compelling claims to arbitration accordingly). Such a motion to compel arbitration may be filed in lieu of an answer to a complaint. *See Lamkin v. Morinda Properties Weight Parcel, LLC*, 440 Fed. Appx. 604, 607-08 (10th Cir. 2011); *see also, e.g.*, *MQDC, Inc. v. Steadfast Ins. Co.*, No. 12-cv-1424(ERK)(MDG), 2012 WL 6388624, at *6 (E.D.N.Y. Dec. 6, 2013) (adopted Magistrate Judge report and recommendation acknowledging that "[i]n lieu of answering, [defendant] has filed the instant motion to compel arbitration….").

## I.    INTRODUCTION

Plaintiffs, through corporate entities they created and owned, entered into written Distribution Agreements whereby they purchased rights to distribute and sell fresh-baked Schmidt bread products in specific sales areas. Despite being bound by arbitration clauses in those Distribution Agreements requiring them to proceed individually in arbitration with respect to any disputes arising out of their relationship with the Schmidt Defendants, Plaintiffs brought a putative Rule 23 class action in Connecticut Superior Court alleging they were misclassified as independent contractors.[2] In response, Schmidt Defendants filed individual arbitration demands with JAMS, seeking to have the claims raised in Plaintiffs' lawsuit resolved in arbitration. Plaintiffs, however, have refused to dismiss this action voluntarily or to allow the resolution of their disputes in individual arbitration in accordance with the mandatory arbitration provisions contained in their Distribution Agreements. Plaintiffs contend that their disputes are not covered by an arbitration provision and the provision is likely unenforceable. They are wrong on both accounts.

Indeed, in 2023, a Maryland federal court compelled arbitration of similar misclassification claims brought by two individuals who entered into identical Distribution Agreements on behalf of their corporate entities. *See Gray v. Schmidt Baking Co., Inc.*, No. 22-cv-00463-LKG, 2023 WL 2185778 (D. Md. Feb. 23, 2023), *motion for reconsideration denied by Gray*, ECF 71 (D. Md. Oct. 16, 2023) (slip op. attached hereto as **Exhibit 1**) ("*Gray* slip op.").[3] In compelling arbitration,

---

[2] On December 29, 2023, the Schmidt Defendants timely removed the First Amended Class Action Complaint to this Court. (*See* ECF 1, Notice of Removal).

[3] The *Gray* plaintiffs' motion for reconsideration involved the question of whether the "transportation worker" exclusion in Section 1 of the FAA applied, an issue for which the party resisting arbitration bears the burden. (*See Gray* slip op. at 5.) The *Gray* Court found that the Distribution Agreements were not "contracts of employment" within the meaning of Section 1, and did not reach defendants' other arguments regarding the applicability of Section 1. (*See id.* at 5-6.)

the *Gray* Court correctly found: (1) the parties had clearly and unmistakably delegated the threshold issue of arbitrability to arbitrators by incorporating JAMS' rules and procedures;[4] (2) the delegation clause was valid and enforceable because it was "supported by various promises by both parties regarding their rights and obligations related to the resolution of disputes," including a class action waiver;[5] and (3) the arbitration agreement and its delegation clause were not substantively unconscionable.[6] The Court should reach the same result here and compel both Plaintiffs to individual arbitration.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background[7]

#### 1.  The Parties

##### a.  Defendants

Defendant Schmidt Baking Company, Inc. ("SBC") is a Maryland corporation with its headquarters in Baltimore, Maryland. (Corp. Discl. 1, ECF 3.) It "develops, manufactures, and markets bread and bread-like products to retailers and foodservice outlets." (Declaration of Jeff Sobotta ¶ 2, attached as **Exhibit 2**.)

Schmidt Baking Distribution, LLC ("SBD") is a limited liability company organized and existing under the laws of Maryland with its principal place of business in Baltimore, Maryland. (Corp. Discl. 1.) Its sole member is SBC. (*Id.*) To coordinate the distribution of SBC's products, SBD enters into Distribution Agreements with independent operators, which give those companies

---

[4] *Gray*, 2023 WL 2185778 at *6-9.

[5] *Id*. at *9.

[6] *Id*. at *10.

[7] To the extent that the Schmidt Defendants refer to or cite complaint allegations, they do not admit the truth of such allegations except for the purposes of this motion, which is brought under Sections 3 and 4 of the FAA and is evaluated by the standards of Fed. Rule Civ. P. 56.

exclusive rights to distribute and sell various Schmidt fresh baked products to outlets within their designated territories, in accordance with the terms of those agreements. (Sobotta Decl. ¶ 3.) Consistent with this, SBD entered into Distribution Agreements with corporate entities controlled by Plaintiffs Silva and Rothkugel, which not only granted those corporate entities distribution rights in certain sales areas, but also govern the exercise of those distribution rights by the corporate entities. (Sobotta Decl. ¶ 4; First Amended Class Action Complaint ("FAC"), ¶ 6, ECF 1, Ex. A.)

### b.    Plaintiffs

On or about June 24, 2020, Plaintiff Silva, as President of Silva's Baked Goods, entered into a Distribution Agreement with SBD for the distribution rights to a sales area located in the region covered by the company's East Haven, Connecticut depot, as well as a second Distribution Agreement on October 28, 2020 for the distribution rights to a second sales area in that region. (FAC ¶ 6; Sobotta Decl. ¶¶ 4, 6, 8 & **Exhibit 2-A** attached thereto ("Silva Distribution Agreement").)[8] "As controlling shareholder" of Silva's Baked Goods, Plaintiff Silva "unconditionally guarantee[d] the full and complete performance by [his company] of all the obligations assumed by it" under the Distribution Agreement. (Silva Distribution Agreement at 30.)

On or about December 16, 2020, Plaintiff Rothkugel, President of Trout Slayers Baked Breads Inc., entered into a similar Distribution Agreement with SBD for the distribution rights to a sales area in the region covered by the company's East Haven, Connecticut depot. (FAC ¶ 6; Sobotta Decl. ¶¶ 4, 7, 9 & **Exhibit 2-B** attached thereto ("Rothkugel Distribution Agreement").) "As controlling shareholder" of Trout Slayers Baked Breads Inc., Plaintiff Rothkugel

---

[8] Plaintiff Silva entered into two Distribution Agreements for his two separate routes. The relevant provisions of those agreement for purposes of this motion are substantially similar.

4

"unconditionally guarantee[d] the full and complete performance by [his company] of all the obligations assumed by it" under the Distribution Agreement. (Rothkugel Distribution Agreement at 30.)

###### 2.     Relevant Provisions in the Distribution Agreements

The applicable Distribution Agreements are between SBD (identified as "SCHMIDT" in the contracts) and the corporate entities controlled by Plaintiffs ("DISTRIBUTOR" OR "DISTRIBUTOR CORPORATION" in the contracts). (*E.g.*, Silva Distribution Agreement at 1.) Each Distributor owns the distribution rights to Schmidt products within a specific geographic "Sales Area," as defined in attachments to the Distribution Agreement. (*E.g., id.,* Art. 1 & Schedule A.) "Distribution rights" means "the sole right to sell and distribute [SBC] Products to Outlets in the Sales Area by Direct Store Delivery, which right has been purchased by DISTRIBUTOR FROM SCHMIDT, or from DISTRIBUTOR'S predecessor." (*E.g., id.*, § 1.5.)

Section 2.3 of the Distribution Agreements expressly states the parties' mutual intent "to create an independent contractor relationship." (*E.g., id.,* § 2.3.)

> As an independent contractor, DISTRIBUTOR has the right to operate the business as it chooses, and shall bear all risks and costs of operating such business. DISTRIBUTOR has no authority to retain any person on behalf of SCHMIDT. It is expressly understood that neither DISTRIBUTOR nor any of its agents or employees have any claim or right against SCHMIDT under any circumstances, to any benefits, protection, or other compensation furnished to employees in the traditional employer/employee relationship . . . ."

(*E.g., id.*) Consistent with this, Section 4.5 of the Distribution Agreements permits each Distributor "to engage such persons as DISTRIBUTOR deems appropriate to discharge DISTRIBUTOR'S responsibilities" under the agreements. (*E.g., id.,* Art. 4, § 4.5.) That section further provides Distributors "the exclusive right to select, fix the compensation of, set work hours, work schedules, and vacations for, discharge and otherwise to manage, supervise and control all persons engaged by DISTRIBUTOR[S]," and requires each Distributor, "with respect to all such persons, [to]

5

perform all obligations and discharge all liabilities imposed upon DISTRIBUTOR under all government laws, rules or regulations ('Laws'), whether such Laws relate to labor, employment standards, worker's compensation, unemployment insurance, pay equity or any other government requirement; file all required tax information and reports and pay and/or withhold all applicable payroll-related taxes with respect to any employees of DISTRIBUTOR." (*E.g., id.*)

Importantly for the instant motion, Article 11 of the Distribution Agreements provides for dispute resolution through *optional* expedited mediation and *mandatory* final and binding arbitration under JAMS rules. (*E.g., id.,* Art. 11.) Section 11.1 sets forth the scope of the disputes covered by the Agreements' Dispute Resolution provisions, explaining that covered disputes broadly include "[a]ny dispute between SCHMIDT and DISTRIBUTOR arising out of the relationship created by this Agreement." (*E.g., id.,* § 11.1.)  Section 11.7 of the Distribution Agreements further clarifies that disputes involving other entities related to SCHMIDT and DISTRIBUTOR are also covered by the Dispute Resolution provisions. (*See*, *e.g.*, *id.* §11.7) (identifying as proper arbitration parties "affiliates and their respective owners, officers, directors, agents and employees" of SCHMIDT and "affiliates and their respective owners, officers and directors" of DISTRIBUTOR). Section 11.2 then goes on to set forth mediation procedures, providing that mediation may be initiated before JAMS by either party, and establishes expedited time frames for requesting mediation (5 days) and concluding mediation (10 days). (*E.g., id.,* § 11.2.)

Section 11.3 presents the arbitration agreement at issue here. It includes two separate clauses regarding arbitration of disputes covered by Section 11.1. (*E.g., id.,* § 11.3.) The first, presented in the initial sentence of Section 11.3, covers situations where the parties have previously entered mediation under Section 11.2 – it provides a time limit for seeking arbitration following

mediation (within 10 days) and limits the claims to be addressed in post-mediation arbitration to those within the "scope of the mediation" conducted under Section 11.2. (*E.g., id.*) The second clause, reflected in the second sentence of Section 11.3, is broader in scope and is not limited to arbitration of disputes that the parties chose to mediate under Section 11.2. Rather, it mandates arbitration, expansively providing that "*[a]ny dispute* between the parties subject to this *Article*" (*i.e.*, the entirety of the Distribution Agreement's "Dispute Resolution" provisions), "*shall be decided* by neutral, binding arbitration conducted in accordance with the Judicial Arbitration and Mediation Services, Inc. ('JAMS')" Rules. (*E.g., id.* (emphasis added)).

The JAMS Rules incorporated by reference in Section 11.3 empower the Arbitrator to resolve arbitrability disputes. Specifically, Rule 11(b) provides that:

> Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. Unless the relevant law requires otherwise, the Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

(*See* **Exhibit 3** at Rule 11(b).)[9] Section 11.3 also provides: "The arbitrator shall apply the substantive law specified in Section 12.8 of this Agreement, except that with respect to arbitration matters, the provisions of the Federal Arbitration Act shall be controlling." (*E.g.,* Silva Distribution Agreement, § 11.3.)

Article 11 of the Distribution Agreements further contain what is colloquially known as a "Class Action Waiver." Section 11.7 mutually requires the parties to bring any claims on an individual basis. Specifically, it explains that "[t]he parties agree that any proceeding in any forum

---

[9]   JAMS Comprehensive Arbitration Rules provide in nearly identical language: "Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter."

to resolve any dispute, including mediation, arbitration, litigation, and/or government action involving DISTRIBUTOR, shall be conducted on an individual basis only, and not on a class-wide basis or as a representative action, collective action or a collective governmental action." It goes on to explain that the "parties further agree that only SCHMIDT (*and its affiliates and their respective owners, officers, directors, agents and employees, as applicable*) and DISTRIBUTOR (*and its affiliates and their respective owners, officers and directors, as applicable*) may be the parties to any proceeding described in this Section, and that no such proceeding shall be consolidated, combined, or joined with any other proceeding involving SCHMIDT and/or any other persons without the written consent of all parties." (*E.g., id.,* § 11.7 (emphasis added).)

### B. Procedural History

#### 1. Complaint Service and Summary of Allegations

On November 30, 2023, Plaintiffs served upon the Schmidt Defendants their original October 24, 2023 Class Action Complaint, as well as their November 20, 2023 First Amended Class Action Complaint, both of which were filed in Hartford Superior Court. (*See* FAC ECF 1, Ex. A; Decl. of Joshua Waxman, ¶ 4 (attached as **Exhibit 4**).) The FAC dropped the original defendant "Schmidt Baking Company Distribution, LLC," and substituted SBD and SBC as named defendants. (*See* FAC, Preamble and ¶¶ 4-5.) The FAC alleges that "Defendant Schmidt Baking Company, Inc. is the parent company and/or an affiliate of Defendant Schmidt Baking Distribution, LLC." (FAC ¶ 6.)

Plaintiffs allege that "Defendants enter into 'Distribution Agreements' with delivery drivers" such as Plaintiffs (*i.e.*, "Distributors"), that pursuant to those agreements the Distributors "pay Defendants … for the right to distribute breads and baked goods of Defendants' affiliates in a designated territory," and Defendants pay "workers like Plaintiffs to deliver the products to retail stores and other customers within a specific geographic area." (FAC ¶¶ 6-7.) Plaintiffs further

allege that "Defendants require these workers to form corporations as a condition of working for Defendants." (FAC ¶¶ 8, 10.) Plaintiffs did in fact form corporate entities, and signed the Distribution Agreements in their roles as President of those entities. (*See, e.g.*, Silva Distribution Agreement at 30.) Additionally, Plaintiffs allege that their "Distributor Agreements" are "*de facto* employment agreements" and that Defendants have misclassified them as independent contractors. (FAC ¶¶ 16, 33.) Accordingly, Plaintiffs allege they were not paid all wages owed to them under state law and suffered unlawful deductions from their wages of various work-related expenses. (FAC ¶¶ 33-35.)

### 2. Defendants' Request for Mediation and Plaintiffs' Refusal to Mediate

On December 5, 2023, Defendants' counsel contacted Plaintiffs' counsel to determine if Plaintiffs were interested in mediating their disputes pursuant to Section 11.2 of the Distribution Agreements. (Waxman Decl. ¶ 5 & **Ex. 4-A**.) On that same day, Plaintiffs declined to participate in mediation. (*See id.* ¶ 6 &**Ex. 4-A.)**

### 3. Plaintiffs' Refusal to Arbitrate

Accordingly, on December 5, following Plaintiffs' declining to participate in mediation, Defendants' counsel contacted Plaintiffs' counsel again to determine whether Plaintiffs would voluntarily dismiss the FAC so the parties could proceed to resolve Plaintiffs' claims in individual JAMS arbitrations. (Waxman Decl. ¶ 7 & **Ex. 4-A**.) On December 11, 2023, Plaintiffs' counsel responded that Plaintiffs intended to pursue their claims in court and believed their disputes were not covered by an arbitration provision and the arbitration provision in their Distribution Agreements is unenforceable. (Waxman Decl. ¶ 8 & **Ex. 4-A**.)

### 4. Initiation of Arbitration

On December 15, 2023, Defendants filed with JAMS demands for individual arbitration of the claims raised by Silva and Rothkugel in the FAC. (Waxman Decl. ¶ 10 & **Exs. 4-B, 4-C**.))

III.    **LEGAL STANDARDS**

A.    **Review Of Motions To Compel Arbitration Under The FAA**

The Schmidt Defendants bring their motion to compel arbitration pursuant to sections 3 and 4 of the FAA, 9 U.S.C. §§ 3-4.[10] "The Second Circuit has clarified that a stay of all proceedings is mandatory 'after all claims have been referred to arbitration and a stay requested.'"[11]

"The party seeking to stay the case in favor of arbitration bears an initial burden of demonstrating the existence of an agreement to arbitrate."[12] "The moving party is not required to show that the agreement is *enforceable* but, rather, that an agreement merely exists."[13] "After the movant demonstrates the existence of an arbitration agreement, 'the burden shifts to the party opposing arbitration to put the making of that agreement 'in issue.'"[14]

"In the context of motions to compel arbitration brought under the [FAA], the court applies a standard similar to that applicable for a motion for summary judgment."[15] "Thus, [w]hile it is

---

[10] *See Medeiros v. Point Pickup Techs., Inc.*, No. 3:21-CV-1056 (OAW), 2023 WL 3022324, at *4 (D. Conn. Apr. 20, 2023) (Williams, J.) ("Under the FAA, a court may stay a federal lawsuit in order to enforce an arbitration agreement, 9 U.S.C. § 3, and to compel arbitration. *Id.* at § 4."); *Bissonette v. Lepage Bakeries Park St., LLC*, 460 F. Supp. 3d 191, 196 (D. Conn. 2020) (Dooley, J.), *aff'd sub nom. Bissonnette v. LePage Bakeries Park St.*, 33 F.4th 650 (2d Cir. 2022), *as amended and superseded on rehearing and rehearing en banc denied by* 49 F.4th 655 (2d Cir. 2022), *cert. granted*, No. 23-51, --- S. Ct. ----, 2023 WL 6319660 (Sept. 29, 2023) ("A party aggrieved by another party's failure or refusal to arbitrate may petition the district court for an order directing the arbitration commence in the manner provided for by the parties' agreement.") (citing 9 U.S.C. § 4).

[11] *See Reale v. Match Grp., LLC*, No. 3:21-cv-01571 (VAB), 2022 WL 4115660, at *8 (D. Conn. Sept. 9, 2022) (Bolden, J.) (quoting *Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015)).

[12] *Medeiros*, 2023 WL 3022324, at *5 (citing *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010)).

[13] *Id.* (citing *Hines*, 380 F. App'x at 24) (emphasis in original).

[14] *Id.* (citing *Hines*, 380 F. App'x at 24); *see also Bissonette*, 460 F. Supp. 3d at 196 ("[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration.") (quoting *Long v. Amway Corp.*, 306 F. Supp. 3d 601, 607 (S.D.N.Y. 2018) (quoting *Green Tree Fin. Corp.-Ala.*, 531 U.S. at 91).

[15] *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (citations omitted); *see, e.g., Williams,*

generally improper to consider documents not appended to the initial pleading or incorporated in that pleading by reference in the context of a Rule 12(b)(6) motion to dismiss, it is proper (and in fact necessary) to consider such extrinsic evidence when faced with a motion to compel arbitration.'"[16]

"A party opposing arbitration may not satisfy [their] burden through general denials of the facts on which the right to arbitration depends; instead, if the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried."[17] "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."[18]

**B.    The Federal Arbitration Act**

Section 2 of the FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements," which "create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act."[19] It declares a "statutory policy of rapid and unobstructed enforcement of arbitration agreements." *Id.* at 23. The FAA also

---

2023 WL 3022324, at *5; *Bissonette*, 460 F. Supp. 3d at 196.

[16] *Bissonette*, 460 F. Supp. 3d at 196 (quoting *Guida v. Home Sav. of Am., Inc.*, 793 F. Supp. 2d 611, 613 n.2 (E.D.N.Y. 2011)); *see also Long*, 306 F. Supp. 3d at 607 (in applying summary judgment standard to motion to compel, "the court considers all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and draws all reasonable inferences in favor of the non-moving party") (citing *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2016) (internal quotation marks, alterations, and citations omitted)).

[17] *Bissonette*, 460 F. Supp. 3d at 19 (quoting *Long*, 306 F. Supp. 3d at 607) (cleaned up and internal quotation marks and other citation omitted).

[18] *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

[19] *Id.*

11

"reflects the fundamental principle that arbitration is a matter of contract" and "places arbitration agreements on an equal footing with other contracts, and requires courts to enforce them according to their terms."[20] Under Section 2 of the FAA, an arbitration agreement is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for revocation of any contract." 9 U.S.C. § 2. Thus, "[w]hether an agreement to arbitrate governs a particular dispute is essentially a matter of contract interpretation."[21]

### 1. Binding Non-Signatories

"Arbitration is contractual by nature—'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'"[22] But while arbitration agreements "must not be so broadly construed as to encompass claims and parties that were not intended by the original contract," under the FAA, an obligation to arbitrate does not attach "'only to one who has personally signed the written arbitration provision.'"[23] Rather, "a nonsignatory may be bound to an arbitration agreement if so dictated by the 'ordinary principles of contract and agency.'"[24] Further, "[i]t is well-established []that a nonsignatory to an arbitration clause may, in certain

---

[20] *Rent-A-Center West, Inc. v. Jackson*, 561 U.S. 63, 67-68 (2010); *see also Carson v. Giant Food, Inc.*, 175 F.3d 325, 328 (4th Cir. 1999) ("While arbitration serves important public interests, an agreement to arbitrate—like any other contract—is fundamentally about private choice."); *Collins & Aikman Prods. Co. v. Building Sys.*, 58 F.3d 16, 19 (2d Cir. 1995) ("Federal arbitration policy respects arbitration agreements as contracts that are enforceable in the same way as any other contract.").

[21] *Caro v. Fidelity Brokerage Servs., LLC*, No. 3:12-CV-01066 (CSH), 2014 WL 3907920, at *6 (D. Conn. Aug. 11, 2014) (Haight, J.) (citing *Collins*, 58 F.3d at 19) (other citations omitted).

[22] *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).

[23] *Id.* (quoting *Fisser v. Int'l Bank*, 282 F.2d 231, 233 (2d Cir. 1960)).

[24] *Id.* (quoting *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980) (other citation omitted).

situations, compel a signatory to the clause to arbitrate the signatory's claims against the nonsignatory despite the fact that the signatory and nonsignatory lack an agreement to arbitrate."[25]

"The Second Circuit has recognized 'five theories for binding non-signatories [non-parties] to arbitration agreements: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel.'"[26] "A non-signatory to an arbitration agreement who attempts to compel a signatory to that agreement to arbitrate under a theory of equitable estoppel must demonstrate that (1) the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estoped party has signed, and (2) the relationship among the parties . . . justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement."[27] "[W]hen considering whether to apply equitable estoppel, courts properly may rely upon the allegations of a plaintiff's complaint."[28]

---

[25] *American Bankers Ins. Grp. v. Long*, 453 F.3d 623, 627 (4th Cir. 2006); *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) ("traditional principles of state law allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel"); *Lomax v. Weinstock, Friedman & Friedman, P.A.*, No. CCB-13-1442, 2014 WL 176779, at *3 (D. Md. Jan. 15, 2014) (recognizing federal courts and Maryland courts apply the same standard for requiring a signatory to submit claims against a nonsignatory to arbitration under the doctrine of equitable estoppel).

[26] *Green v. XPO Last Mile, Inc.*, 504 F. Supp. 3d 60, 69 (D. Conn. 2020) (Meyer, J.) (quoting *Thomson-CSF, S.A.*, 64 F.3d at 776 (alteration in original) (other citations omitted).

[27] *Scott v. Griswold Home Care*, No. 3:19-CV-527 (SRU), 2020 WL 2736020, at *9 (D. Conn. May 26, 2020) (Underhill, J.) (quoting *Medidata Sols., Inc. v. Veeva Sys., Inc.*, 748 F. App'x 363, 366 (2d Cir. 2018) (quoting *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 126 (2d Cir. 2010)) (cleaned up)).

[28] *Diaz v. Michigan Logistics Inc.*, 167 F. Supp. 3d 375, 382 (E.D.N.Y. 2016) (quoting *Ragone*, 595 F.3d at 126).

## 2. Contract Formation Issues and Delegation Clauses

"[W]here the dispute at issue concerns contract formation, the dispute is generally for courts to decide."[29] Thus, "issues over 'whether the [arbitration] clause was agreed to'—that is, issues over contract formation, as opposed to validity—are reserved to the courts and cannot be delegated."[30]

"[W]hile the FAA creates a 'body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act,' [] in evaluating whether the parties entered into a valid arbitration agreement, the court must look to state law principles."[31] "As a result, prior to compelling arbitration, the district court must first determine two threshold issues that are governed by state rather than federal law: (1) Did the parties enter into a contractually valid arbitration agreement? and (2) If so, does the parties' dispute fall within the scope of the arbitration agreement?"[32] A federal court "must compel arbitration if 'a valid agreement or obligation to arbitrate exists' and 'one party to the agreement has failed, neglected or refused to

---

[29] *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010); *see also Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019) (While parties may "'clearly and unmistakably' agree to arbitrate threshold questions such as whether the arbitration clause applies to a particular dispute, or whether it is enforceable, parties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place") (citing *Granite Rock Co.*, 561 U.S. at 299-301).

[30] *Doctor's Assocs., Inc. v. Alemayehu*, No. 18-cv-276 (JCH), 2020 WL 13538883, at *2 (D. Conn. May 29, 2020) (Hall, J.) (emphasis and alteration in original) (citing *Granite Rock Co.*, 561 U.S. at 297) (other citations omitted); *see also Rent-A-Center*, 561 U.S. at 71 n.2 ("The issue of the agreement's 'validity' is different from the issue whether any agreement between the parties 'was ever concluded'").

[31] *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 364 (2d Cir. 2003) (quoting *Moses H. Cone*, 460 U.S. at 24) (other citations omitted); *see, e.g.*, *Antollino v. Morgan Stanley & Co. LLC*, No. 17-CV-1777 (VLB), 2018 WL 10483434, at *2 (D. Conn. May 11, 2018) (Bryant, J.) ("Ordinary state law principles that govern the formation of contracts determine whether the parties have a valid agreement to arbitrate.") (citations omitted).

[32] *Nackel*, 346 F.3d at 365.

arbitrate.'"[33] "A valid agreement to arbitrate exists when 'the parties agreed to arbitrate' and 'the scope of that agreement encompasses the claims at issue.'"[34]

However, notwithstanding this principle, the Supreme Court has said "that parties may agree to have an arbitrator decide not only the merits of a particular dispute but also gateway questions of arbitrability."[35] "When an agreement 'clearly and unmistakably' delegates the issue of arbitrability to the arbitrator," the Second Circuit will enforce it.[36]

In *Henry Schein, Inc. v. Archer and White Sales, Inc.*, a case involving incorporation of an ADR provider's rules into an arbitration agreement, the Supreme Court stated, "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract."[37] Consistent with this Supreme Court guidance, courts (including in the District of Connecticut) repeatedly have found that an arbitration agreement's incorporation of JAMS rules and procedures by reference constitutes "clear and unmistakable

---

[33] *Antollino*, 2018 WL 10483434, at *2 (quoting *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 120 (2d Cir. 2003) (quotation marks and citations omitted)).

[34] *Id*. (quoting *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015) (quotation marks and citations omitted)).

[35] *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. ----, 139 S. Ct. 524, 529 (2019) (internal quotation marks omitted); *see also Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) ("Parties to an arbitration agreement can, of course, 'agree to arbitrate 'gateway' questions of 'arbitrability'") (quoting *Rent-A-Center*, 561 U.S. at 68-69)

[36] *Id*. (citing *Rent-A-Center*, 561 U.S. at 69 n.1); *see, e.g., Doctor's Assocs., Inc. v. Repins*, No. 17-CV-323 (JCH), 2017 WL 1745024, at *4 (D. Conn. May 4, 2017), *vacated on other grounds* (Nov. 21, 2017), *and incorporated in relevant part by* 2018 WL 513722, at *6 (Jan. 22, 2018) (Hall, J.) ("In the absence of any agreement dictating otherwise, a court would typically decide these questions of arbitrability," but "'the issue of arbitrability may be referred to the arbitrator if there is <u>clear and unmistakable</u> evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator'") (quoting *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005)) (emphasis in original) (other citation omitted).

[37] 139 S. Ct. at 531.

evidence" of the parties' intent to delegate to the arbitrator questions of arbitrability.[38] The Second

Circuit reached the same conclusion with respect to AAA rules, which do not differ materially

from the JAMS rules in this regard.[39]

### C. Choice-Of-Law

"As '[a] federal court sitting in diversity jurisdiction,' the District Court is obligated to

'apply the law of the forum state' in analyzing preliminary choice-of-law questions."[40] "Contract

---

[38] *See Deleon v. Dollar Tree Stores, Inc.*, No. 3:16-cv-00767, 2017 WL 396535, at *5-6 (D. Conn. Jan. 30, 2017) (Haight, J.) (finding arbitration agreement explicating incorporating JAMS then-current JAMS Employment Arbitration Rules & Procedures which "empower an arbitrator to decided gateways issues of arbitrability" were sufficient "to allow arbitrator to decide arbitrability disputes, including the current dispute over unconscionability"); *Sidell v. Structured Settlement Invs., LP*, No. 3:08-cv-00710 (VLB), 2009 WL 103518, at *2 (D. Conn. Jan. 14, 2009) (Bryant, J.) ("The Court finds there is clear and unmistakable evidence of intent to arbitrate arbitrability. In this case, there is both a broad arbitration clause and the incorporate by reference of the JAMS Rules. The Rules provide that arbitrators will determine their own authority. Either would suffice as evidence of the parties' intent to arbitrate arbitrability.") (citing *Shaw Grp., Inc.*, 322 F.3d at 121-23 (2d Cir. 2003)); *see also Simply Wireless, Inc. v. T-Mobile US, Inc.*, 877 F.3d 522, 528 (4th Cir. 2017), *abrogated on other grounds by Henry Schein, Inc.*, 139 S. Ct. at 528; *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1284 (10th Cir. 2017) ("[W]e conclude that by incorporating the JAMS Rules into the Agreement, [the parties] clearly and unmistakably agreed to submit arbitrability issues to an arbitrator"); *Cooper v. WestEnd Capital Mgmt., L.L.C.*, 832 F.3d 524, 546 (5th Cir. 2016) ("[T]he express adoption of [JAMS] rules presents clear and unmistakable evidence that the parties agreed to arbitrability"); *Gray*, 2023 WL 2185778 at *6-9 (finding incorporation of JAMS Rules constituted clear and unmistakable evidence of parties' intent to arbitrate arbitrability); *Atlantic Specialty Ins. Co. v. Anthem, Inc.*, No. 1:19-cv-03589-JRS-MJD, 2020 WL 2526000, at *6-7 (S.D. Ind. 2020) ("The overwhelmingly weight of authority" compelled conclusion that ADR provision which incorporated JAMS rules "clearly and unmistakably delegates questions of arbitrability to the arbitrator"); *Collins v. Discover Fin. Servs.*, 2018 WL 6434503, *2-3 (D. Md. Dec. 7, 2018) ("where the agreements explicitly incorporate JAMS or AAA rules, such provisions constitute 'clear and unmistakable evidence' of intent to arbitrate arbitrability"); *Amtax Holdings 463, LLC v. KDF Communities-Hallmark, LLC*, No. 8:17-cv-01899-JLS-AS, 2018 WL 4743386, at *5 (C.D. Cal. Jan. 9, 2018) ("the incorporation of the JAMS rules constitutes 'clear and unmistakable' evidence of the parties' intent to delegate arbitrability to the arbitrator") (citations omitted).

[39] *Contec v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005) (finding incorporation of AAA rules constitute clear and unmistakable evidence of parties' intent to arbitrate arbitrability).

[40] *Nackel*, 346 F.3d at 365 (quoting *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001)).

16

clauses which require the application of the laws of other states upon breach or dispute are recognized as proper in Connecticut."[41] "In applying contractual choice of law provisions, Connecticut courts routinely refer to the *Restatement* for guidance."[42] Under Section 187 of the *Restatement*, "the incorporation of one party in the state whose law is chosen under the contract is sufficient to satisfy any applicable contacts requirement" (if such requirement even exists) under the "substantial relationship" test.[43] "Connecticut law 'give[s] effect to an express choice of law by the parties to a contract provided that it was made in good faith."[44]

Here, because the Distribution Agreements' choice-of-law provision designates that "'[t]he validity, interpretation and performance of this Agreement shall be controlled by and construed in accordance with the laws of the state of Maryland, without regard to its choice of law provisions" (*see* Silva Distribution Agreement, § 12.8; Rothkugel Distribution Agreement, § 12.8), and SBD is incorporated in Maryland and has its principal office there (*see, e.g.,* Silva Distribution Agreement Preamble; FAC ¶ 3), Maryland law governs any contract formation issues relevant to this motion.

---

[41] *Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604, 608-09 (2d Cir. 1996) (quoting *Syncsort v. Indata Servs.*, 541 A.2d 543, 545 (Conn. App. 1988)) (other citations omitted).

[42] *Valley Juice Ltd., Inc.*, 87 F.3d at 609 (referring to *Restatement (Second) of Conflict of Laws* (1971 & rev. 1989)).

[43] *Id*. at 608 (discussing Massachusetts choice-of-law analysis); *see id*. at 609 (finding "Connecticut courts would abide by the parties' contractual choice" of New York law where defendant was domiciled in New York); *Restatement* § 187, cmt. f (substantial relationship test met "where performance by one of the parties is to take place or where one of the parties is domiciled or has his principal place of business").

[44] *Fieger*, 251 F.3d at 393 (quoting *Elgar v. Elgar*, 238 Conn. 839, 679 A.2d 937, 942 (1996)); *see also Elgar*, 670 A.2d at 942 (denial of effect of choice-of-law provision within contract "will only be done if the misrepresentation, undue influence or mistake was responsible for the complainant's adherence to the provision []. Otherwise, the choice-of-law provision will be given effect provided it meets the requirements of [*Restatement*] § 187.")

### D. Maryland Law On Contract Formation[45]

"In deciding whether parties agreed to arbitrate in accordance with the FAA, courts should generally apply ordinarily state law principles that govern the formation of contracts."[46] In Maryland, "An essential feature of every contract is the parties' mutual assent, which is crystallized in a certain and definite offer, and a knowing and sufficient acceptance." [47] "Maryland law presumes that parties read and understand the contracts they sign."[48]

Additionally, "[t]o be binding and enforceable, contracts ordinarily require consideration."[49] Under Maryland law, "consideration may be established by showing 'a benefit to the promisor or a detriment to the promise.'"[50] "Mutuality . . . does not require an exactly even

---

[45] Although Maryland law governs, as demonstrated in notes 46, 48, 54, 57-58, 60, *infra*, Connecticut law does not materially vary from Maryland law regarding the relevant contract formation issues. *See Reale*, 2022 WL 4115660, at *5 (Bolden, J.) ("The Court need not resolve this choice-of-law question because both Connecticut and Texas apply substantially similar rules for determining whether the parties have agreed to a contract term.") (citation omitted).

[46] *Morales v. Rent-A-Center, Inc.*, 306 F. Supp. 2d 15, 180 (D. Conn. 2003) (Burns, J.). Of course, the Court must also apply the "body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [FAA]." *Morales*, 306 F. Supp. 2d at 179 (quoting *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 76 (2d Cir. 1998), *abrogated on other grounds* by *Katz v. Cellco P'ship*, 794 F.3d 341 (2d Cir. 2015).)

[47] *Peer v. First Fed. Sav. and Loan Ass'n, of Cumberland*, 331 A.2d 299, 301 (Md. 1975) (citations omitted); *see also CTI/DC v. Selective Ins. Co. of Am.*, 392 F.3d 114, 123 (4th Cir. 2004) (In Maryland, "[t]he formation of a contract requires mutual assent (offer and acceptance), an agreement definite in its terms, and sufficient consideration.") (citing *Peer*, 331 A.2d at 301); *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 941 A.2d 1181, 1209 (Md. Ct. Spec. App. 2008) ("the validity of a contract depends upon the two prerequisites of mutual assent . . . namely, an offer and an acceptance."); *see also Antollino*, 2018 WL 10483434, at *2 (Bryant, J.) (quoting *Marinos v. Bldg. Rehabs., LLC*, 67 Conn. App. 86, 89 (2001)) ("'To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties,' as well as offer and acceptance of those terms.").

[48] *Rose v. New Day Fin., LLC.*, 816 F. Supp. 2d 245, 257 (D. Md. 2011) (citing *Walther v. Sovereign Bank*, 872 A.2d 735, 745 (Md. 2005)). Connecticut law also presumes that parties "read and understand" contracts before they sign them. *Rockstone Cap., LLC v. Caldwell*, 206 Conn. App. 801, 812, *cert. denied*, 339 Conn. 914 (2021).

[49] *Cheek v. United Healthcare*, 835 A.2d 656, 661 (Md. 2003) (citations omitted).

[50] *Id.* (quoting *Harford Cty. v. Town of Bel Air*, 704 A.2d 421, 430 (Md. 1998)).

exchange of identical rights and obligations between the two contracting parties before a contract will be deemed valid."[51] "It is well settled that the Courts of Law . . . will not inquire into the adequacy of the value exacted for the promise so long as it has some value."[52] "[T]he forbearance to exercise a right or pursue a claim can constitute sufficient consideration to support a contract under Maryland law."[53] "[M]utual promises to arbitrate act as 'an independently enforceable contract.' In an enforceable arbitration agreement, . . . each party has promised to arbitrate disputes arising from an underling contract, and 'each promise provides consideration for the other.'"[54]

Under Maryland law, an unconscionable contract is "one characterized by 'extreme unfairness,' which is made evident by '(1) one party's lack of meaningful choice, and

---

[51] *Walther*, 872 A.2d at 748.

[52] *Id.* at 748 (quoting *Harford County v. Town of Bel Air*, 704 A.2d 421, 431 (Md. 1998)) (internal quotation and citation omitted).

[53] *See, e.g., Bailey v. Thompson Creek Windows Co.*, No. 21-00844-LKG, 2021 WL 5053094, at *4 (D. Md. Nov. 1, 2021) (citing *Chernick v. Chernick*, 610 A.2d 770, 774 (Md. 1992)).

[54] *Cheek*, 835 A.2d at 665 (quoting *Holmes v. Coverall N. Am., Inc.*, 649 A.2d 365, 370 (Md. 1994)).

Similarly, in Connecticut, "[t]o be enforceable, a contract must be supported by valuable consideration." *Tedesco v. Agolli*, 182 Conn. App. 291, 303 (2018) (internal quotation marks omitted) (affirming judgment of the state trial court (Dooley, J.) enforcing agreement as supported by consideration). "Consideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." *Id.* at 304 (internal quotation marks omitted). "The doctrine of consideration does not require or imply an equal exchange between the contracting parties," and bargained-for consideration "is not required to be adequate in the sense of equality in value." *State v. Lex Assocs.*, 248 Conn. 612, 619 (1999) (internal quotation marks omitted). "The general rule is that, in the absence of fraud or other unconscionable circumstances, a contract will not be rendered unenforceable at the behest of one of the contracting parties merely because of an inadequacy of consideration." *Rockstone Cap.*, 206 Conn. App. at 815 (internal quotation marks omitted).

"[I]t is a general rule of law that forbearance to prosecute a cause of action . . . is a valuable consideration which will support a promise." *Kinity v. US Bancorp*, 212 Conn. App. 791, 829-30 (2022) (internal quotation marks omitted). As with other contracts, "mutual promises in arbitration agreements are sufficient to support consideration" when "the arbitration agreement confers an obligation on both [parties] . . . to litigate any disputes in arbitration. *Paltz v. All. Healthcare Servs., Inc.*, No. 3:21-CV-0020 (VAB), 2022 WL 633732, at *6 (D. Conn. Mar. 4, 2022) (Bolden, J.).

(2) contractual terms that unreasonably favor the other party.'"[55] "To be unconscionable, a contract must be both procedurally and substantively unconscionable."[56] "Substantive unconscionability involves those one-sided terms of a contract from which a party seeks relief . . . , while procedural unconscionability deals with the process of making a contract—bargaining naughtiness."[57]

In Maryland, contractual provisions requiring individual pursuit of claims arising under a contract are not substantively unconscionable. "[A]n express waiver of the right to collective action will be enforced, even if it increases the expense of pursuing a claim."[58]

---

[55] *Walther*, 872 A.2d at 743 (quoting Unconscionability, Black's Law Dictionary (8th ed. 2004)).

[56] *Bailey*, 2021 WL 5053094, at *5 (citing *Walther*, 872 A.2d at 744) (other citation omitted).

[57] *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 296 n.12 (4th Cir. 1990) (internal quotation marks omitted).
Under Connecticut law, a successful unconscionability defense generally requires a showing that the contract was both procedurally and substantively unconscionable when made—i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, 79 F.4th 206, 223 (2d Cir. 2023) (internal quotation marks omitted), *quoting Bender v. Bender,* 292 Conn. 696, 732 (2009). The doctrine of procedural unconscionability "relates to the process by which the allegedly offensive terms found their way into the agreement" and "is intended to prevent unfair surprise," whereas the doctrine of substantive unconscionability "relates to the content of the contract," and "is intended to prevent oppression." *Id.* at 223-24 (internal quotation marks omitted). The Second Circuit has explained that, under Connecticut law, "[p]revailing on unconscionability is generally difficult, and for good reason," since it "asks the court to step in and undo the allocation of risk in a contract." *Id.* at 224.

[58] *Rose v. New Day Fin., LLC*, 816 F. Supp. 2d 245, 254 (D. Md. 2011) (footnote omitted) (citing *Walther*, 872 A.2d at 750-51) (enforcing class action waiver in arbitration agreement); *see also Gilman v. Wheat, First Secs., Inc.*, 692 A.2d 454, 464, 465 (Md. 1997) (enforcing a forum-selection clause requiring the parties to litigate their disputes in Virginia, which did not provide a class-action procedure; "We are unaware of any case—and none has been cited to us—in which the unavailability of a class action procedure, either generically or in a particular case, has been regarded as sufficient to render an otherwise valid forum-selection clause unenforceable.").

Similarly, in Connecticut, contractual provisions requiring individual pursuit of claims arising under a contract are not substantively unconscionable. *E.g., D'Antuono v. Serv. Rd. Corp.*, 789 F. Supp. 2d 308, 329 (D. Conn. 2011). For example, the district court in *D'Antuono* enforced an arbitration clause containing "a collective action and class action waiver, a cost- and fee-shifting provision, and a provision shortening the statute of limitations," holding that the clause was not substantively unconscionable unless "no man in his senses, not under delusion would make, on the one hand, and which no fair and honest man would accept, on the other." *Id.* (internal quotation

### E. Maryland Arbitration Act

The Maryland Uniform Arbitration Act ("MUAA") provides: "A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy arising between the parties in the future is valid and enforceable, and is irrevocable, except upon grounds that exist at law or in equity for the revocation of a contract." Md. Cts. & Judicial Proceedings, § 3-206(a). The Maryland Court of Appeals (now Maryland Supreme Court) has explained, "[t]he Maryland Arbitration Act has been called the 'State analogue Maryland state courts … to the Federal Arbitration Act,' and that it relies on decisions interpreting the Federal Arbitration Act."[59]

## IV. ARGUMENT

### A. There Is An Agreement To Arbitrate And Thus The FAA Requires The Court To Compel Arbitration

It is indisputable that each Plaintiff signed and executed a Distribution Agreement with Schmidt. (Silva Distribution Agreement at 30; Rothkugel Distribution Agreement at 30.) In those agreements, the parties have express written contracts that contains terms related to, *inter alia*, the right to distribute Schmidt products, the nature of the parties' relationship, the obligations of each party, and a dispute resolution process.[60] (*E.g.*, Silva Distribution Agreement, Art. 2

---

marks omitted) (quoting *Smith v. Mitsubishi Motors Credit of Am., Inc.*, 247 Conn. 342, 349 (1998)).

[59] *Holmes v. Coverall N. Am.*, 336 Md. 534, 541 (1994) (quoting *Regina v. Envirmech*, 80 Md. App. 662, 667 (1989)); *see also Thompson v. Witherspoon*, 197 Md. App. 69, 80 (2011) ("when construing the MUAA, Maryland courts look to federal decisions interpreting the FAA") (citing *Walther v. Sovereign Bank*, 386 Md. 412, 424 (2005), and *Holmes*, 336 Md. at 541).

[60] "An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing." *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 114 A.3d 676, 688 (Md. 2015) (citation omitted).

In Connecticut, a "contract is express if its terms are stated by the parties, either orally or in writing, and it is implied if its terms are not so stated." *Schreiber v. Conn. Surgical Grp., P.C.*, 96 Conn.

("Relationship"); Art. 3 ("Sale of Products"); Art. 4 ("Distributor's Obligations"), & Art. 5 ("Schmidt Obligations"); Rothkugel Distribution Agreement (same Articles).) Under Maryland law, the executed Distribution Agreements clearly represent an offer and acceptance and thus mutual assent by the parties to be bound on the terms therein, including the Article 11 dispute resolution process and its arbitration provisions and class-action waiver .[61] The existence of these terms also cannot be denied.

"To be binding and enforceable under Maryland law, the arbitration agreement and delegation clause require mutual consideration."[62] Here, the arbitration clause is supported by both the above-described numerous mutual promises and consideration in the broader Distribution Agreements that set the parties' rights and obligations related to the sale and distribution of Schmidt products by Plaintiffs, as well as by the mutual promises within Article 11.[63]

In each Distribution Agreement, either party may avail itself of the Article 11 dispute resolution process. (*E.g.*, Silva Distribution Agreement, Art. 11, §§ 11.2, 11.3.)[64] Section 11.5 also provides that neither party shall be liable to the other for certain types of damages. (*E.g.*, Silva Distribution Agreement, § 11.5.) In addition, Section 11.7's Individual Action provision also reflects a mutual agreement, with each party agreeing disputes in any forum "shall be conducted

---

App. 731, 901 A.2d 1277, 1281 (2006) (quoting 17A Am.Jur.2d 48-49 Contracts § 12 (2004)).

[61] *Peer*, 331 A.2d at 301.

[62] *Gray*, 2023 WL 2185778, at *9 (citing *Cheek*, 835 A.2d at 661; *Chernick*, 610 A.2d at 774).

[63] *See id.* (finding "the arbitration agreement and its delegation clause are supported by various promises by both parties regarding their rights and obligations related to the resolution of disputes.").

[64] *See Cheek*, 835 A.2d at 665 ("[M]utual promises to arbitrate act as an 'independently enforceable contract' [i.e.], each party has promised to arbitrate disputes arising from an underlying contract, and 'each promise provides consideration for the other.'") (quoting *Holmes*, 649 A.2d at 370 (Md. 1994)); *see also Deleon,* 2017 WL 396535, at *3 ("Defendant is correct that mutual promises [to arbitrate] have been held sufficient to support consideration.") (collecting cases).

on an individual basis only, and not on a class-wide basis or as a representative action, collective action, or a collective governmental action." (*E.g., id.*, § 11.7.) In *Gray v. Schmidt Baking Co., Inc.*, the district court correctly found "these mutual promises evince a valid and enforceable agreement to arbitrate."[65]

Where, as here, there is a delegation clause, the Court's only inquiry is whether there is a "valid" agreement to arbitrate.[66] Accordingly, pursuant to Section 3 and 4 of the FAA, upon an application such as this, the Court is required to compel arbitration and stay the proceedings before it.[67]

**B.      Challenges To Arbitrability Have Been Delegated For The Arbitrators To Decide**

Any challenges by Plaintiffs as to whether the claims in their complaint are arbitrable, including because the arbitration provisions allegedly cannot be enforced with respect to all of the parties to this action, cannot defeat the Schmidt Defendants' request for an order compelling arbitration under the FAA, as such challenges must be decided by an arbitrator.

Section 11.3 of the Distribution Agreements—their arbitration provision—requires that any dispute between the parties be decided "by neutral, binding arbitration conducted in accordance with the Judicial Arbitration and Mediation Services, Inc. ("JAMS")." (*E.g.,* Silva

---

[65] 2023 WL 2185778, at *9.

[66] *Rent-A-Center*, 561 U.S. at 70 ("There are two types of validity challenges under §2 [of the FAA]: 'One type challenges specifically the validity of the agreement to arbitrate,' and '[t]he other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.,* the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid.'" [*Buckeye Cash Checking v. Cardegna*, 546 U.S. 440, 444 (2006)] . . . . Only the first type of challenge is relevant to a court's determination whether the arbitration agreement at issue is enforceable.")); *id.* at 470 n.2 ("The issue of the agreement's 'validity' is different from the issue whether any agreement between the parties 'was ever concluded,' and as in *Buckeye Cash Checking v. Cardegna*, 546 U.S. 440 [] (2006), we address only the former. *Id.* at 444, n.1.").

[67] *See* 9 U.S.C. §§ 3, 4; *Katz*, 794 F.3d at 347.

23

Distribution Agreement, Art. 11, § 11.3.) Importantly, JAMS' rules provide that "[j]urisdictional and arbitrability disputes, including disputes over the *formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator*." (**Exhibit 3**, Rule 11(b) (emphasis added).)

In *Gray v. Schmidt Baking Co., Inc.*, the Maryland district court considered the identical Section 11.3 provision and read it "to delegate threshold issues regarding the arbitrability of any dispute arising out of the independent contractor relationship created between SBD and Plaintiffs to the arbitrator."[68]

Finally, with regard to Plaintiffs' anticipated challenges as to who may arbitrate, the JAMS Rules make clear that disputes regarding "who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator." (**Exhibit 2**, Rule 11(b).) Accordingly, the Court must respect the parties' delegation of those issues to the arbitrators.

In summary, this Court should follow the well-reasoned opinion in *Gray v. Schmidt Baking Co., Inc.*, and find that the parties have delegated issues of arbitrability to the arbitrators assigned to the individual arbitrations pending before JAMS.

---

[68] 2023 WL 2185778, at *8. The *Gray* Court also turned aside plaintiffs' "argument that the absences of the word 'rules' in Section 11.3 clouds the parties' intent to delegate arbitrability issues" and "renders this delegation clause ambiguous." *Id.* The court correctly found, "[r]ather, the JAMS rules make clear that these rules apply whenever the parties have provided 'for arbitration by JAMS without specifying any particular JAMS Rules and the disputes or claims meet the criteria for the first paragraph of [JAMS] Rule 1.'" *Id.* Further, the court stated, "Plaintiffs' proposed reading of Section 11.3 to mean that the arbitration would be conducted by JAMS, but not actually subject to JAMS Rules, is also unreasonable," and specifically noted "the ordinary meaning of the word 'accordance,'" as used in Section 11.3's phrase "in accordance with [JAMS]," is "to follow a rule." *Id.* (citing Merriam-Webster Dictionary and Cambridge Dictionary definitions of "Accordance").

**C.     Even If The Court Were To Reach Any Arbitrability Issues, It Should Still Compel Arbitration**

Even if the Court were to find that it, rather than the arbitrators, should address issues of "procedural arbitrability" or other arbitrability issues clearly and unmistakably delegated to the arbitrators by the arbitration provisions in the parties' Distribution Agreements, those issues should be resolved in favor of the Schmidt Defendants and Plaintiffs should be compelled to arbitrate their claims in the current arbitral proceedings.

**1.     Plaintiffs Can Be Compelled To Arbitrate Their Claims Even Though They Signed The Distribution Agreements On Behalf Of Their Corporate Entities**

The Schmidt Defendants anticipate Plaintiffs will argue they are not bound by the arbitration provisions in the Distribution Agreements because they only signed in their capacity as the Presidents of their respective corporate entities. But the dispute resolution provisions *expressly* acknowledge that each Plaintiff's corporate entity "and its affiliates and their respective owners, officers and directors" may be parties to an arbitration proceeding under Section 11.3. (*E.g.*, Silva Distribution Agreement § 11.7.) That alone is sufficient to bind Plaintiffs to arbitrate covered disputes, including any dispute "arising out of the relationship created by [the Distribution Agreement]." (*See, e.g., id.* § 11.1.)

Alternatively, as a matter of agency law, there is no doubt that Plaintiffs, in their individual capacities, may both enforce the arbitration provisions and have those provisions enforced against them. It has been long recognized that "there is no strict requirement that only signatories to an agreement be susceptible to compelled arbitration," and a non-signatory "may also be bound" to a contract including an arbitration clause "by means of traditional principles of agency."[69] But

---

[69] *Alamria v. Telcor Intern.*, 920 F. Supp. 658, 669, 673-74 (D. Md. 1996) (citing *Thomson-CSF, S.A.*, 64 F.3d at 776 ("This Court has made clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by the 'ordinary principles of contract and agency'"));

"[w]here 'a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements.'"[70]

That is particularly appropriate here, where Plaintiffs formed corporate entities, served as those corporations' controlling shareholders and highest officers, expressed their intent to form an independent contractor relationship with Schmidt, had obligations to ensure such relationship was maintained, and were responsible for setting terms and conditions of employment for anyone performing work under the Distribution Agreements and complying with all relevant laws. (FAC ¶¶ 8, 10; *see also, e.g.*, Silva Distribution Agreement §§ 2.3, 4.5.) Indeed, pursuant to the express terms of the applicable Distribution Agreements, Plaintiffs served as the personal guarantors of the full and complete performance of all obligations of their respective corporations under those agreements. (*E.g.*, Silva Distribution Agreement at 30.)

Plaintiffs simply cannot escape arbitration of claims predicated on agreements they entered into on behalf of their corporate entities, and which established the "independent contractor" relationships they now disavow in their personal capacities, and which contain the arbitration provision that specifically name them as intended beneficiaries and parties to such arbitrations.

---

*McCarthy v. Azure*, 22 F.3d 351, 356 (1st Cir. 1994) ("To be sure, the law recognizes certain contract and agency principles under which nonsignatories sometimes can be obligated by, or benefit from, agreements signed by others, and these principles can apply to arbitration provisions."); *Barrowclough v. Kidder, Peabody & Co., Inc.*, 752 F.2d 923, 938 (3d Cir. 1985) ("[A] variety of non-signatories of arbitration agreements have been held bound by such agreements under ordinary common law contract and agency principles."), *overruled on other grounds by Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1115 & n.5 (3d Cir. 1993)) (parentheticals as in *Alamria*).

[70] *Dennie v. MedImmune, Inc.*, No. PX 16-3643, 2017 WL 2930462, at *4 (D. Md. July 10, 2017) (quoting *Pritzker*, 7 F.3d at 1121 (3d Cir. 1993)) (other citations omitted).

26

### 2. Non-Signatory Defendants May Enforce The Arbitration Provisions Against Plaintiffs

The Schmidt Defendants also anticipate Plaintiffs will argue SBC is not a party to the Distribution Agreements and thus cannot enforce the arbitration provisions. However, numerous legal theories support SBC's right to enforce the arbitration provisions.

First, SBC is a corporate "affiliate" of SBD and is thus *expressly* identified in Section 11.7 as a proper party to any arbitration. (*See, e.g.*, Silva Distribution Agreement § 11.7.) This provision also makes SBC an intended third-party beneficiary of the arbitration clause (as too are Plaintiffs),[71] because it is intended to benefit those named parties.[72] Indeed, the parties' independent contractor-employee misclassification dispute lies at the heart of "the relationship created by [the Distribution] Agreement" and thus is "central" to both the contract as a whole and specifically the arbitration provision, not merely "peripheral."[73] (*See, e.g.*, Silva Distribution Agreement § 11.1.)

---

[71] Notably, the Distribution Agreement identifies third-party beneficiaries on both sides of the agreement.

[72] *See CR-RSC Tower I, LLC v. RSC Tower 1, LLC*, 56 A.3d 170, 212 (Md. 2012) (under Maryland third-party beneficiary contract analysis, the "crucial fact" is "whether the pertinent provisions were 'inserted . . . to benefit' the third party," and a "factor to consider" is "whether the third party is named in the contract") (citing and quoting *Lovell Land, Inc. v. State Highway Admin.*, 969 A.2d 284, 296-298 (Md. 2009)).

Similarly, "[t]he law regarding the creation of contract rights in third parties in Connecticut is [] well settled." *Grigerik v. Sharpe*, 247 Conn. 293, 311 (1998). "[T]the ultimate test to be applied [in determining whether a person has a right of action as a third party beneficiary] is whether the *intent of the parties to the contract* was that the promisor should assume a direct obligation to the third party [beneficiary] and … that intent is to be determined from the terms of the contract read in the light of the circumstances attending its making, including the motives and purposes of the parties." *Id*. at 311-12 (quoting *Knapp v. New Haven Road Constr. Co.*, 150 Conn. 321, 325 (1963)) (emphasis added in Grigerik) (internal quotation marks omitted)). "[I]t is not in all instances necessary that there be express language in the contract creating a direct obligation to the claimed third party beneficiary." *Id*. at 312 (quoting *Knapp*, 150 Conn. at 326.)

[73] *CR-RSC Tower I, LLC*, 56 A.3d at 213.

27

Second, as provided in the Schmidt Defendants' Corporate Disclosures (ECF 3), SBC is a parent of signatory SBD and thus covered by the arbitration provision which expressly establishes the intent to create the independent contractor relationship Plaintiffs now disavow.[74] As the Fourth Circuit noted in *J.J. Ryan & Sons, Inc.*, "[i]f the parent corporation was forced to try the case, the arbitration proceedings would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted."[75]

Third, "[u]nder an alternative estoppel theory recognized by several circuits, courts have been willing to estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to arbitrate are intertwined with the contract" containing the arbitration provision.[76] "Thus, a signatory can be required to arbitrate with a non-signatory at the non-signatory's insistence because of 'the close relationship between the entities involved, . . . [and] the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract

---

[74] *See, e.g., Int'l Paper Co. v. Schwabedissen Maschinen & Analgen GMBH*, 206 F.3d 411, 416 (4th Cir. 2000) ("in *J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320-21 (4th Cir. 1988), we explained that when allegations against 'a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement.' We further explained that '[t]he same result has been reached under a theory of equitable estoppel.'") (citation omitted); *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757-58 (11th Cir. 1993), *abrogated on other grounds by Arthur Anderson LLP v. Carlisle*, 556 U.S. 624 (2009) (affirming order compelling arbitration of counterclaims against nonsignatory to a license agreement where the counterclaims were "intimately founded in and intertwined with" the license agreement containing an arbitration provision); *Pritzker*, 7 F.3d at 1122 (finding nonsignatory bound to arbitration agreement by its corporate sister where the nonsignatory's "interests [were] directly related to, if not predicated upon, [the signatory's] conduct").

[75] 863 F.2d at 321 (internal quotation marks and citation omitted).

[76] *Fluor Daniel Intercontinental, Inc. v. Gen. Elec. Co.*, No. 98 Civ. 7181 (WHP), 1999 WL 637236, at *6 (S.D.N.Y. Aug. 20, 1999) (citing *Thomson-CSF, S.A.*, 64 F.3d at 779; *Sunkist Soft Drinks, Inc.*, 10 F.3d at 757-58; and *McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co.*, 741 F.2d 342, 344 (7th Cir. 1984), *abrogated on other grounds by Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1171 (11th Cir. 2011)),

28

. . . and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations.'"[77]

Courts within the Second Circuit have found nonsignatory parents to be bound by arbitration agreements signed by their subsidiaries, or vice-versa, in situations similar to here.[78]

Compulsion of arbitration with a nonsignatory defendant also is appropriate when there are "allegations of coordinated behavior between a signatory and a nonsignatory defendant," the claims against both the signatory and nonsignatory defendants are "based on the same facts" and "inherently inseparable," and the claims "fall within the scope of the arbitration clause."[79] Here, the FAC's class allegations are indisputably "allegations of substantially interdependent and concerted misconduct by both a non-signatory and one or more signatories" to the contract

---

[77] *Fluor Daniel Intercontinental, Inc.*, 1999 WL 637236 at *6 (quoting *Sunkist Soft Drinks, Inc.*, 10 F.3d at 757-58) (alteration in *Fluor Daniel*).)

[78] *See, e.g.*, *Thixomat, Inc. v. Takata Physics Intern. Co., Ltd.*, No. 01-CIV. 54490(RO), 2001 WL 863566, at *3 (S.D.N.Y. July 30, 2001) (finding nonsignatory wholly-owned subsidiary of parent signatory could compel arbitration where "the issues the nonsignatory is seeking to arbitrate are intertwined with the underlying agreement"); *Fluor Daniel Intercontinental, Inc.*, 1999 WL 637236, at *6 (compelling  (S.D.N.Y. Aug. 20, 1999) (compelling arbitration where close relationship between defendant signatory and defendant non-signatories and alleged wrongs "intimately founded in and intertwined" with underlying contractual obligations); *Vitzethum v. Dominick & Dominick, Inc.*, No. 94 Civ 4938, 1996 WL 19062, at *7 (S.D.N.Y. Jan. 18, 1996) (where claims "founded in and intertwined with" the subscription agreement which incorporated the arbitration agreement, "Plaintiffs cannot escape enforcement of the arbitration agreement by simply suing the parent [], rather than [the subsidiary]," and finding nonsignatory parent can enforce the arbitration agreement against plaintiffs); *In Re Salomon Inc. Shareholders' Derivative Litig.*, No. 91 Civ. 55000 (RRP), 1994 WL 533595, at *5-6 (S.D.N.Y. Sept. 30, 1994) (finding parent was bound by arbitration agreement signed by its subsidiary, where plaintiffs claims were "largely predicated on the conduct of its subsidiary and agent") (citing *Pritzker*, 7 F.3d at 1122). *See also In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 849 (D. Md. 2013) (equitable estoppel doctrine applies "(1) when the signatory's claims 'arise out of and relate directly to the written agreement,' or (2) when the signatory raises allegations of 'substantially interdependent misconduct by both the non-signatory and one or more signatories to the contract.'") (quoting *Am. Bankers*, 453 F.3d at 627, and *Brantley v. Republic Mortg. Ins. Co.*, 424 F.3d 392, 395-96 (4th Cir. 2006)).

[79] *Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 374 (4th Cir. 2012) (internal citations and quotations omitted).

containing the arbitration provision.[80] The alleged "questions of law and fact common to all class members" include "whether Plaintiffs and other drivers are employees of Defendants under the Connecticut ABC employment test," which "will be determined through the application of generally applicable legal principles to common facts." (FAC ¶ 29(d).) The FAC further alleges "Defendants" (plural) enter into "Distribution Agreements" with delivery drivers; require them to "pay tens of thousands of dollars for the right to distribute breads and baked goods of Defendants' affiliates in a designated territory" and "form corporations as a condition of working for Defendants;" "deduct 'route payments' from drivers' compensation each week" to service loans Defendants assist them in obtaining; and "make a number of unauthorized and arbitrary deductions to Plaintiffs' pay." (*Id*. ¶¶ 6, 8, 13-15.) In addition, Plaintiffs allege they "have worked for Defendants as Distributors," and that Defendants (again, plural) "employ other Distributors in Connecticut and across the country to perform the same or similar work under the substantially same terms and identical or nearly identical Distribution Agreements. (*Id*. ¶¶ 10-11.) Further, they allege Defendants "extensively control the manner and means by which drivers perform their work for Defendants;" require that "Plaintiffs and class members attend meetings, and require Plaintiffs and other drivers to service stores and customers in their territories at specific dates and times;" and "retain unilateral control over the quantity and types of products that are delivered to each customer, as well as the price of each product." (*Id*. ¶¶ 17-18.) Simply put, Plaintiffs' factual allegations do not distinguish between the two Defendants, and neither should the Court when it comes to enforcing the arbitration provisions in Plaintiffs' Distribution Agreements.[81]

---

[80] *See In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d at 849.

[81] *See, e.g., Espinosa v. SNAP Logistics Corp.*, No. 17 Civ. 6383 (AT), 2018 WL 9563311, at *3, 4 (S.D.N.Y. Apr. 3, 2018) (finding "sufficient factual intertwinement to support the application of estoppel" where nonsignatory defendants allegedly "controlled the conditions of [plaintiff's] employment pursuant to the Agreement" and plaintiff "[brought] his FLSA and NYLL claims

**D.    If The FAA Does Not Apply, The Court Should Compel Arbitration Under The Maryland Uniform Arbitration Act.**

Defendants anticipate Plaintiffs will contend the FAA does not apply because the Distribution Agreements are "contracts of employment seamen, railroad employees, or any other class of workers," *i.e.*, "transportation workers," and that they are engaged in foreign or interstate commerce." *See* 9 U.S.C. § 1; *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001); *see also* note 2, *supra*. Even if that were true — and it is not[82] — the Maryland arbitration law does not contain an analogue to the "transportation worker" exclusion and, thus, the Distribution Agreements may be enforced under Maryland's Uniform Arbitration Act ("MUAA"). For example, after the Supreme Court determined in *Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783 (2022), that plaintiff belonged to a class of transportation workers excluded from the FAA coverage, the district court subsequently compelled arbitration of the named plaintiff on the basis of the Illinois Uniform Arbitration Act, "because she signed an enforceable contract under Illinois state law."[83] In compelling arbitration, the court noted, "the fact that the Federal Arbitration Act doesn't apply only means that its enforcement mechanisms aren't available, not that the whole dispute can't be arbitrated by enforcing the contract through another vehicle (like state law). … That's true even when the contract says the Federal Arbitration Act applies and mentions no other law."[84] Here, "[t]he detail arbitration provision clearly demonstrates the parties' intent to arbitrate

---

against all Defendants equally and seeks to hold each of them liable for the same conduct"); *Diaz*, 167 F. Supp. 3d at 382 (compelling arbitration by nonsignatory defendant in independent contractor misclassification case where plaintiffs alleged nonsignatory and signatory defendants were joint employers).

[82] *See Gray* slip op. at 5-6 (finding that the Distribution Agreements were not "contracts of employment" within the meaning of Section 1 of the FAA).

[83] *See Saxon v. Southwest Airlines Co.*, No. 19-cv-00403, 2023 WL 2456382, at *4 (N.D. Ill. Mar. 10, 2023).

[84] *Id*. at 4 n.5 (quoting *Atwood v. Rent-A-Center East Inc.*, No. 15-cv-1023-MJF-SCW, 2016 WL 2766656, at *3 (S.D. Ill. May 13, 2016)) (internal quotation marks omitted); *see also Diaz*, 167 F.

disputes, and thus, even if the Section 1 exclusion applies, "state arbitration law governs."

Accordingly, arbitration should be ordered under Maryland state law if the FAA does not apply.

## V.   CONCLUSION

For the reasons stated above, the Court should compel Plaintiffs to arbitrate their claims against all Defendants on an individual basis in the pending JAMS arbitrations.

---

Supp. 3d at 381 (rejecting argument where Section 1 exclusion raised that, "given the parties' explicit choice to apply the FAA, the FAA is the only law that the Court should consider in determining whether to compel arbitration"); *Valdes v. Swift Transp. Co.*, 292 F. Supp. 2d 524, 527 (S.D.N.Y. 2003) (where no apparent choice of law provision, finding New York law applied if FAA inapplicable because employment applications containing arbitration clause were executed in New York and any relevant circumstances surrounding contract formation occurred in New York).

Exceptions to or exclusions from the FAA do not preempt state law. *See, e.g., Sherwood v. Marquette Transp. Co., LLC*, 587 F.3d 841, 843 (7th Cir. 2009) (citing *Palcko v. Airborne Express, Inc.*, 373 F.3d 588, 595-96 (3d Cir. 2004) (Section 1 of the FAA does not preempt enforcement of arbitration agreement under Washington state law); *Davis v. EGL Eagle Global Logistics, L.P.*, 243 F. App'x 39, 44 (5th Cir. 2007)); *see also Oliveira v. New Prime, Inc.*, 857 F.3d 7, 24 (1st Cir. 2017), *aff'd*, --- U.S. ----, 139 S. Ct. 532 (2019) (explaining that FAA Section 1 exclusion "has not impact on other avenues (such as state law) by which a party may compel arbitration"); *Cole v. Burns Int'l Sec. Serv.*, 105 F.3d 1465, 1472 (D.C. Cir. 1997) ("[W]e have little doubt that, even if an arbitration agreement is outside the FAA, the agreement still may be enforced."); *Smith v. Allstate Power Vac., Inc.*, 482 F. Supp. 3d 40, 47 (E.D.N.Y. 2020) ("multiple courts" have rejected proposition that exemption from FAA means state arbitration law is preempted) (collecting cases); *Espinosa*, 2018 WL 9563311, at *2, 4 (where arbitration agreement had New York choice of law provision, finding arbitration enforceable under New York law if Section 1 exclusion applied); *Diaz*, 167 F. Supp. 3d at 381 (where Section 1 exclusion raised, "assuming that the FAA does not apply, state arbitration law governs") (collecting cases).

January 5, 2024

Respectfully submitted,

*/s/ William J. Anthony*
William J. Anthony (CT17865)
wanthony@littler.com

LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022.3298
Telephone:   212.583.9600
Facsimile:   212.832.2719

Joshua B. Waxman (*pro hac vice forthcoming*)
LITTLER MENDELSON, P.C.
815 Connecticut Avenue, NW, Suite 400
Washington, DC 20006
Telephone: 202.789.3406
Facsimile:  202.478.2623
jwaxman@littler.com

Michael McIntosh (*pro hac vice forthcoming*)
LITTLER MENDELSON, P.C.
1800 Tysons Boulevard, Suite 500
Tysons Corner, VA 22102
Telephone:  703.286.3118
Facsimile:   703.991.8016


*Attorneys for Defendants*
*Schmidt Baking Distribution, LLC and Schmidt*
*Baking Company, Inc.*

# EXHIBIT 4



## SCHMIDT BAKING DISTRIBUTION, LLC
## <u>DISTRIBUTION AGREEMENT</u>

**T**HIS AGREEMENT is made effective **June 24, 2020** by and between **SCHMIDT BAKING DISTRIBUTION, LLC,** a Maryland Limited Liability Company with its principal offices at 601 South Caroline Street, Baltimore, Maryland 21231 (herein referred to as "SCHMIDT") and **SILVA'S BAKED GOODS**, with its principal offices at **65 GRAPEVINE LANE, BERLIN, CONNECTICUT 06037** (herein referred to as "DISTRIBUTOR" or "DISTRIBUTION CORPORATION").

### W I T N E S S E T H :

WHEREAS, SCHMIDT has heretofore developed and/or acquired the exclusive rights to distribute and sell various fresh baked products throughout a large part of the eastern United States; and

**WHEREAS,** DISTRIBUTOR has the ability and experience necessary to sell and distribute those products successfully within a specific geographic area; and

**WHEREAS,** DISTRIBUTOR has purchased from DISTRIBUTOR's predecessor, or from SCHMIDT, the Distribution Rights in the Sales Area hereinafter described; and

**WHEREAS**, the parties desire to enter into a written agreement describing and setting forth the terms and conditions under which they will do business with each other;

**NOW THEREFORE,** in consideration of the premises, covenants and conditions set forth herein, and for other good and valuable consideration given and received, the parties mutually agree as follows:

## ARTICLE 1
## DEFINITIONS

§1.1 **SALES AREA:** shall mean that geographic area within which DISTRIBUTOR owns the Distribution Rights, as more specifically described in Schedule A attached hereto and made a part hereof.

§1.2 **OUTLETS:** shall mean those accounts to which DISTRIBUTOR owns the Distribution Rights, as more specifically described in Schedule B attached hereto and made a part hereof.

§1.3 **PRODUCTS:** shall mean all those bakery products as specifically defined and described in Schedule B attached hereto and made a part hereof.

Distribution Agreement 2018

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

<div style="text-align: left; writing-mode: vertical">DISTRIBUTION CONSULTANTS, INC.<br>2900 WESTCHESTER AVENUE<br>PURCHASE, NEW YORK 10577</div>

§1.4 **DIRECT STORE DELIVERY:** shall mean the DISTRIBUTOR's physical delivery and or merchandising of Products directly to the place of business where the Outlet (i) sells Products to the public, or (ii) buys Products for use and consumption at the Outlet.

§1.5 **DISTRIBUTION RIGHTS:** shall mean the sole right to sell and distribute Products to Outlets in the Sales Area by Direct Store Delivery, which right has been purchased by DISTRIBUTOR from SCHMIDT, or from DISTRIBUTOR'S predecessor, as evidenced by a bill of sale executed heretofore.

§1.6 **CHAIN:** shall mean a person or business entity that operates more than one Outlet, and makes decisions regarding the purchase of Products for its Outlets at a central office.

§1.7 **FORCE MAJEURE:** shall mean an act of God, war, fire, explosion, riot, looting, terrorism, civil commotion, failure of machinery or plant, restrictions by a government or any other competent authority, strikes or lock-outs at either party's premises or in any related trade or business, or any other similar circumstances of whatsoever kind beyond the control of the party affected, which affects either party's performance of its obligations under this Agreement.

## ARTICLE 2
## RELATIONSHIP

§2.1 **EXTENT AND DURATION:** SCHMIDT hereby recognizes DISTRIBUTOR'S ownership of the Distribution Rights, which

Distribution Agreement 2018

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

ownership will continue until the Distribution Rights are sold or transferred as provided herein.

§2.2 **TERMINATION OF THIS AGREEMENT:** The parties agree that the Distribution Rights must be exercised in compliance with the terms of this Agreement, and that any termination of this Agreement requires DISTRIBUTOR, or SCHMIDT for the account of DISTRIBUTOR, to sell such Distribution Rights as provided herein.

§2.3 **INDEPENDENT CONTRACTORS:** The parties intend to create an independent contractor relationship and it is of the essence of this Agreement that DISTRIBUTOR be an independent contractor for all purposes and DISTRIBUTOR shall only identify itself as such in all third party dealings. Any contrary final determination by any board, tribunal or court of competent jurisdiction shall require the amendment of this Agreement in any way necessary to establish an independent contractor relationship. As an independent contractor, DISTRIBUTOR has the right to operate the business as it chooses, and shall bear all risks and costs of operating such business. DISTRIBUTOR has no authority to retain any person on behalf of SCHMIDT. It is expressly understood that neither DISTRIBUTOR nor any of its agents or employees have any claim or right against SCHMIDT under any circumstances, to any benefits, protection, or other compensation furnished to employees in the traditional employer/employee relationship. No fiduciary relationship exists between the parties. However, at all times, if DISTRIBUTOR is not actually operating the route within its specific geographic area,

Page 4

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

DISTRIBUTOR shall properly train and fully train and educate any employee, agent or its contractor, who is in fact servicing the specific geographic area, in all aspects of complying with the terms of the Distribution Agreement in a proper manner using methods to maximize profit for both SCHMIDT and the "DISTRIBUTOR" or the "DISTRIBUTION CORPORATION" and operate said route in an orderly method that attracts new business sales and expands existing business volumes at existing and current stores within the Sales Area. The responsibility for the proper training, supervision, management, hiring, firing, and errors, lost profits, reduced revenue to SCHDMIT and reduced revenue to DISTRIBUTOR, any intentional or unintentional act on the part of said employees, agent or contractor of Distributor that constitutes either a criminal act or activity or in any way threatens to do significant harm to the commercial business reputation of SCHMIDT, in any way, directly or indirectly, then the responsible party at all times shall be DISTRIBUTOR who will be ultimately responsible for any loses and, in the event of a default of the terms of the Distribution Agreement because of the said employee, agent, or contractor's incomplete or improper training and/or appropriate education as to their responsibilities by or at the direction of DISTRIBUTOR, then DISTRIBUTOR and any guarantor, who executed this Distributor Agreement, shall insure the payment of any said monies required under the Distribution Agreement, and at all times, DISTRIBUTOR and all Guarantors, shall remain exclusively and solely liable and responsible for both the proper performance of

Page 5

Distribution Agreement 2018

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

all terms of this Distribution Agreement and any loses or damages or sanction as a result of any breach of any condition or terms of this Distribution Agreement.    This includes any and all losses and damages for SCHMIDT and/or breach in the terms of this Agreement and any sanctions, within the sole discretion of SCHMIDT, including a termination as the result of a non-curable breach, as well as, a curable breach as set out in Article 9, Sections 9.2 and 9.3.   Because of DISTRIBUTOR's qualifications, ability, and experience, DISTRIBUTOR was allowed to purchase the Sales Area as an Independent Contractor.    As such, DISTRIBUTOR is solely responsible for any and all matters related to the performance of the Distribution Agreement. At all times, DISTRIBUTOR remains solely liable for any and all losses or damages and/or breaches in the terms of Distribution Agreement regardless of who caused the losses or damages or who caused the breach including but not limited to who was/is physically operating the Sales Area or who was/is acting on behalf of DISTRIBUTOR in any way including any employee, agent, or any contractor  that caused the losses, or damages, and/or breach in the terms of the Distribution Agreement. Nothing in this Agreement shall be construed as authorizing DISTRIBUTOR to sublicense or subfranchise the SCHMIDT name, mark, or business methods.

Distribution Agreement 2018

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

## ARTICLE 3
## SALE OF PRODUCTS

**§3.1** **TITLE:** All Products will be sold to DISTRIBUTOR absolutely, and title to and risk of loss of, the Products shall pass to DISTRIBUTOR upon delivery in accordance with Section 3.2 below.

**§3.2** **DELIVERY:** Except as otherwise provided herein, SCHMIDT agrees to sell and deliver to DISTRIBUTOR, and DISTRIBUTOR agrees to buy and accept, at such location as SCHMIDT may from time to time reasonably designate or approve, sufficient quantities of the Products to adequately and properly supply the Outlets in the Sales Area. SCHMIDT agrees to use commercially reasonable efforts to fill DISTRIBUTOR'S orders in a reasonable and timely fashion. In case of strike, shortage of materials, breakdown or other cause, SCHMIDT reserves the right to fill orders on such reasonable basis as circumstances then permit. SCHMIDT and DISTRIBUTOR recognize that cuts and pluses and, on rare occasions, cancellations of deliveries, in whole or in part, are an unavoidable aspect of fresh baked goods production. In the event of pluses, DISTRIBUTOR agrees to use its best efforts to effect the sale of the additional product. SCHMIDT further agrees to repurchase at DISTRIBUTOR'S cost, any damaged or off code Product which is not damaged or off code by reason of DISTRIBUTOR'S negligence, and which has been promptly returned to a reasonable location designated by SCHMIDT in accordance with SCHMIDT'S then current off code and damage

Page 7

repurchase policy. SCHMIDT reserves the right to make reasonable amendments to such off code and damage repurchase policy from time to time.

§3.3 **TERMS:** Products will be sold to DISTRIBUTOR on terms and prices established by SCHMIDT from time to time. DISTRIBUTOR has the absolute right to set resale prices for Products, except that DISTRIBUTOR affirmatively acknowledges that because of the extremely competitive nature of the manufacture and sale of Products sold in non-trademarked wrapping or under any private labels owned by third parties, SCHMIDT reserves the right to negotiate the terms and conditions of private label sales and from time to time, establish varying Distributor Profit margins on those sales as required to maintain competitiveness in the market. SCHMIDT will use its best efforts to provide DISTRIBUTOR fair and reasonable profit margins on those sales.

§3.4 **SETTLEMENT OF ACCOUNT:** Subject to the approval by SCHMIDT of DISTRIBUTOR'S credit, and the execution of a Security Agreement by the parties, on or before Friday of each week, the parties agree to settle their accounts for all Products delivered to DISTRIBUTOR during the preceding week, all off code or damaged Products repurchased in accordance with Section 3.2 above, and all receivables purchased pursuant to Section 3.5, below.

§3.5 **PURCHASE OF RECEIVABLES:** In cases where the DISTRIBUTOR sells and distributes Products to Chains or Outlets whose credit has been approved by SCHMIDT, SCHMIDT shall, at

Page 8

the request and for the convenience of DISTRIBUTOR, purchase properly filled out and executed charge slips from the DISTRIBUTOR at their face value, net of all discounts, and credit DISTRIBUTOR'S account for that purchase. DISTRIBUTOR shall promptly remit all such slips to SCHMIDT, and sign such assignments and agreements as may be necessary to transfer to SCHMIDT all receivables and accounts evidenced by such charge slips. If any Chain elects to settle with DISTRIBUTOR on the basis of scan sale results, rather than charge slips, the credit to DISTRIBUTOR shall be periodically adjusted for any difference between the charge slip and the actual sales reflected by the scan sale data. Excessive gains or loses that occur as a result of this periodic adjustment will be considered a breach of this Agreement and will fall under Section 9.3, Curable Breach. "Excessive" is defined as plus (+) or minus (-) 3%.

§3.6 **PROMOTION PARTICIPATION PROGRAM:** In cases where DISTRIBUTOR wishes to sell Products to Outlets at prices which are less than those reflected on SCHMIDT'S then current suggested price list, and SCHMIDT, at the DISTRIBUTOR'S request, agrees to participate in such promotion or discount price, SCHMIDT will contribute to the promotion or discount in accordance with its Promotion Participation Policy as amended from time to time.

§3.7 **DEFAULT:** Nothing herein shall be deemed to require SCHMIDT to fill an order of DISTRIBUTOR during any time when

<div style="writing-mode: vertical">DISTRIBUTION CONSULTANTS, INC.<br>2900 WESTCHESTER AVENUE<br>PURCHASE, NEW YORK 10577</div>

Distribution Agreement 2018

DISTRIBUTOR is in default of any payment or other obligation to SCHMIDT.

## ARTICLE 4
## DISTRIBUTOR'S OBLIGATIONS

§4.1 **RESULTS:** DISTRIBUTOR agrees to use its best efforts to develop and maximize sales of Products to Outlets within the Sales Area, by maintaining an adequate and fresh supply of Products in all Outlets; rotating Products to promote their sale before they become off code; promptly removing all off code Products; cooperating with SCHMIDT'S marketing programs, maintaining a computer assisted record-keeping system compatible with the system maintained by SCHMIDT now or in the future; and providing service on a basis consistent with good industry practice to all Outlets in the Sales Area requesting service. DISTRIBUTOR is not required to service any Outlet that has proven consistently to be unprofitable, provided that where a Chain requires that such an Outlet be served as a condition for serving its other outlets, the profitability of any Outlet which is part of that Chain shall be judged on the basis of the profitability of the Chain as a whole.

§4.2 **OTHER ACTIVITIES:** Nothing herein shall be deemed to prohibit DISTRIBUTOR from carrying and distributing merchandise for other companies or otherwise engaging in any other business activity, unless and except to the extent that such other merchandise is competitive with products distributed by SCHMIDT, or could

Distribution Agreement 2018

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

contaminate the Products, or such other business activity is inconsistent with or interferes with the obligations of the DISTRIBUTOR hereunder

§4.3 **USE OF SCHMIDT EQUIPMENT:** SCHMIDT will provide DISTRIBUTOR with such racks, trays, dollies, displays, and other items as it deems appropriate to support the sale of Products, subject to SCHMIDT's current Equipment Use Policy as it may be amended from time to time. DISTRIBUTOR agrees that it will use any such company-provided equipment only for the purpose of delivering and selling products sold to DISTRIBUTOR by SCHMIDT.

§4.4 **COMPLIANCE: DISTRIBUTOR** shall operate the business in compliance with all federal, state and local laws, rules and regulations.

§4.5 **PERFORMANCE BY DISTRIBUTOR:** DISTRIBUTOR shall be free to engage such persons as DISTRIBUTOR deems appropriate to discharge DISTRIBUTOR'S responsibilities hereunder. DISTRIBUTOR shall have the exclusive right to select, fix the compensation of, set work hours, work schedules, and vacations for, discharge and otherwise to manage, supervise and control all persons engaged by DISTRIBUTOR and shall, with respect to all such persons, perform all obligations and discharge all liabilities imposed upon DISTRIBUTOR under all government laws, rules or regulations ("Laws"), whether such Laws relate to labor, employment standards, worker's compensation, unemployment insurance, pay equity or any other governmental requirement; file all required tax information and

Page 11

reports and pay and/or withhold all applicable payroll-related taxes with respect to any employees of DISTRIBUTOR. If DISTRIBUTOR uses independent contractors (as distinguished from employees) on a regular basis, DISTRIBUTOR must require that the independent contractors be incorporated.    DISTRIBUTOR may not use unincorporated independent contractors on a regular basis. DISTRIBUTOR in all events shall be and remain responsible for insuring that all persons engaged by DISTRIBUTOR comply fully with all the terms and conditions of this Agreement.  Any breach of this Agreement by any person engaged by DISTRIBUTOR shall be deemed to be a breach by DISTRIBUTOR.

§4.6    **NON-COMPLIANCE:** Failure to carry out the obligations listed in this Article or elsewhere in this Agreement shall be considered a breach of this Agreement and shall entitle SCHMIDT to terminate this Agreement as more specifically set forth in Article 8 and Article 9 hereof, except that DISTRIBUTOR shall not be responsible for failures caused by Force Majeure.

<div style="text-align:left; font-size:small;">

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

</div>

## ARTICLE 5
## SCHMIDT OBLIGATIONS

§5.1    **DELIVERY AND COOPERATION:** SCHMIDT shall use its best efforts to deliver to DISTRIBUTOR sufficient quantities of the Products to adequately and properly supply Outlets requesting service in the Sales Area, to assist in the development of new Outlets, to pursue the development of new Products, to preserve and develop the

Distribution Agreement 2018

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

quality and marketability of the Products, and to assist and cooperate with DISTRIBUTOR'S sales efforts, except that SCHMIDT shall not be responsible for failures caused by Force Majeure.

§5.2 **SALES TO CHAINS:** In order to enable DISTRIBUTOR to pursue business opportunities with Chains, which may require standard terms for all their outlets, SCHMIDT agrees to assist DISTRIBUTOR from time to time to arrange Chain account programs, promotions, delivery authorizations and purchasing and billing terms for the sale of Products to outlets of a Chain within DISTRIBUTOR'S Sales Area. Nothing herein shall be deemed to authorize SCHMIDT as DISTRIBUTOR'S agent or to create an agency relationship. DISTRIBUTOR is not obligated to accept or continue use of SCHMIDT'S assistance and may at any time make its own arrangements for terms and prices to its Outlets. Nothing herein shall require either party to pay slotting allowances or other similar fees or charges imposed by the Chains.

## ARTICLE 6
## CONFIDENTIALITY

§6.1 **CONFIDENTIAL INFORMATION**. As a result of this Agreement, DISTRIBUTOR may have access to or obtain certain information not available to the general public regarding SCHMIDT'S business ("Confidential Information"). DISTRIBUTOR acknowledges that the Confidential Information constitutes valuable trade secrets to SCHMIDT and DISTRIBUTOR agrees that it shall use SCHMIDT'S

Page 13

Confidential Information solely in accordance with the provisions of
this Agreement and it will not disclose, or permit the disclosure of
same, directly or indirectly, to any third party without SCHMIDT'S
prior written consent. DISTRIBUTOR agrees to exercise due care in
~~protecting the Confidential Information from unauthorized use and~~
disclosure.

## ARTICLE 7
## TRANSFER OF RIGHTS

§7.1  **CONDITIONS OF ASSIGNABILITY:** The Distribution Rights are
owned by the DISTRIBUTOR and may be sold or otherwise
transferred in whole or in part by DISTRIBUTOR, provided that any
such sale or transfer shall be subject to: (a) the prior written approval
of SCHMIDT, which approval will not be unreasonably withheld; and
(b) a right of first refusal on the part of SCHMIDT at the same terms
and conditions offered to DISTRIBUTOR (the "Offer") by a bona fide
purchaser or transferee (the "Offeror"). The right of approval and
right of first refusal referred to herein shall expire as to that particular
transfer unless DISTRIBUTOR is notified by SCHMIDT that it does
not approve the Offeror or that it wishes to exercise its right of first
refusal by notice given within ten (10) business days after the last to
occur of the following:

i.  receipt by SCHMIDT of written notice of intent to sell or
transfer to a named Offeror on terms and conditions fully set forth in
such notice; and

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

ii.  a personal interview of the Offeror's controlling shareholder by a designated SCHMIDT representative; and

iii.  receipt by SCHMIDT of the Offeror's and Offeror's controlling shareholder's current financial statements and such additional information as is relevant concerning the Offeror's and Offeror's controlling shareholder's financial condition, health, credit, driving record, and other matters reasonably appropriate to SCHMIDT'S determination.  If the contemplated sale or transfer is not a bona fide transfer for value, the price to be paid by SCHMIDT shall be the market value of the Distribution Rights at the time of receipt of such notice of intent.  If SCHMIDT'S right of approval and right of first refusal expire as provided above DISTRIBUTOR may consummate the transfer to the Offeror on the terms of the Offer.

§7.2  **SALE OF STOCK**: The transfer of a controlling interest in DISTRIBUTOR shall be deemed a transfer of the Distribution Rights and shall be subject to all of the terms and conditions of this Article 7.

§7.3  **PROCEEDS:** Any sale shall be for the account of DISTRIBUTOR, and the proceeds of the sale, after deducting therefrom any monies owed by DISTRIBUTOR to SCHMIDT, a reasonable reserve against open accounts, all reasonable costs and expenses in connection with the sale, the cost of removing any off code or damaged Products in DISTRIBUTOR'S Sales Area and the satisfying of any outstanding debts, liens, security interests, legal fees and similar expenses, shall be turned over to DISTRIBUTOR.

DISTRIBUTION CONSULTANTS, INC.
2000 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

Page 15

Distribution Agreement 2018

§7.4 **TRANSFER DOCUMENTS:** In the event of a sale or transfer by or for the account of DISTRIBUTOR as described in this Article 7, DISTRIBUTOR shall execute an appropriate bill of sale to the purchaser, and a general release terminating, canceling and surrendering DISTRIBUTOR'S rights under this Agreement and releasing any and all claims against SCHMIDT and its officers, directors, shareholders, employees, successors and assigns arising under or out of this Agreement, and SCHMIDT shall execute a new Distribution Agreement with the purchaser in the form of agreement then being used by SCHMIDT .

§7.5 **TRANSFER FEE:** In the event of a sale or transfer by DISTRIBUTOR, or by SCHMIDT for the account of DISTRIBUTOR, of all or any portion of the Distribution Rights, DISTRIBUTOR shall pay a Transfer Fee to SCHMIDT in an amount equal to TWO PERCENT (2%) of the sales price, in full consideration for the administrative activities undertaken by SCHMIDT in connection therewith.

**ARTICLE 8**
**SERVICE FAILURES AND CHANGES**

Distribution Agreement 2018

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

§8.1 **TEMPORARY SERVICE BY SCHMIDT** : If DISTRIBUTOR is not able to or does not perform the obligations imposed on DISTRIBUTOR by this Agreement, it shall make other adequate provision for such performance at its expense. If no such provision is made, SCHMIDT, within the limits of its ability to do so, may make arrangements to have these obligations performed for the account of DISTRIBUTOR, charging it its then-current fees, plus the reasonable expenses of such performance. Such temporary performance shall not relieve DISTRIBUTOR of any of the obligations imposed by this Agreement, constitute an assumption by SCHMIDT of any obligations of DISTRIBUTOR, nor act to cure any default that may exist on the part of DISTRIBUTOR by reason of such non performance.

§8.2 **CHANGE IN DELIVERY METHOD:** In the event any Outlet makes the determination to take delivery of any or all of the Products by any method other than Direct Store Delivery or through any means other than by DISTRIBUTOR, and so informs SCHMIDT or DISTRIBUTOR, SCHMIDT shall thereafter be permitted to make other arrangements to serve such Outlet, which service shall not be deemed to violate DISTRIBUTOR'S rights hereunder and DISTRIBUTOR shall not be entitled to any proceeds derived from such service.

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

Distribution Agreement 2018

## ARTICLE 9
## TERMINATION

§9.1 **BREACH:** Except as set forth in this Article, or upon the sale or transfer of all of the DISTRIBUTOR'S Distribution Rights, this Agreement shall not be terminated or canceled, provided DISTRIBUTOR carries out the terms hereof. In the event DISTRIBUTOR breaches any obligations or covenants under this Agreement, SCHMIDT may terminate the Agreement as set forth below.

§9.2 **NON-CURABLE BREACH:** If the breach by DISTRIBUTOR involves criminal activity of DISTRIBUTOR or anyone else who is performing any duties related to or derived out of the performance of the terms and conditions of this Distribution Agreement including but not limited to any employee, agent or contractor employed or engaged by DISTRIBUTOR and includes any violation of a local, State or Federal law, statute, public ordinance, or regulation related thereto, threatens public health or safety, constitutes an abandonment of any portion of the Sales Area, or threatens to do Significant Harm to SCHMIDT, its trademarks or commercial reputation, SCHMIDT may terminate this Agreement immediately upon written notice and DISTRIBUTOR shall have no right to cure. "Significant Harm" includes but is not limited to either any intentional or negligent loss of revenue payable to SCHMIDT as a result of this Distribution Agreement and includes any credits requested to which DISTRIBUTOR is not entitled or taking a credit for Product that has

not been returned or being convicted of any criminal/traffic offense or receiving probation before judgment therefore in which said offense adversely affects the image or reputation of SCHMIDT in the community within the sole exclusive discretion of SCHMIDT, or commits any other act that, in any way, adversely affects the image or reputation of SCHMIDT in the community within the sole exclusive judgment of SCHMIDT."

§9.3 **CURABLE BREACH:** In the event of a breach by DISTRIBUTOR other than under Section 9.2, SCHMIDT shall give DISTRIBUTOR three (3) business days written notice within which DISTRIBUTOR may cure the breach. If DISTRIBUTOR fails to cure such breach within said three (3) business day period, SCHMIDT may thereafter terminate this Agreement and DISTRIBUTOR shall have no further right to cure. The parties agree that repeated violations constitute a chronic breach and threaten Significant Harm (as defined in Section 9.2 above) to SCHMIDT, its trademarks or commercial reputation, and in such event SCHMIDT shall be entitled to terminate this Agreement pursuant to Section 9.2.

§9.4 **ACTIONS FOLLOWING TERMINATION:** Termination shall entitle SCHMIDT to operate the business for the account of the DISTRIBUTOR, deducting from the revenues generated its then-current fees, plus the reasonable expenses of such performance and delivering the balance, if any, to DISTRIBUTOR. Termination shall require DISTRIBUTOR to sell the Distribution Rights, and in the event that DISTRIBUTOR has not consummated a sale to a qualified

Page 19

Distribution Agreement 2018

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

purchaser within 60 days of the date of termination, SCHMIDT shall be authorized to sell DISTRIBUTOR'S Distribution Rights to such a purchaser at the best price which can be obtained after proper notice and advertisement.    Said sale shall be for the account of the DISTRIBUTOR, and the provisions of Sections 7.3, 7.4 and 7.5 hereof shall apply.

<div align="center">

## ARTICLE 10
## TRADEMARKS, TRADE NAMES
## AND COMPUTER SOFTWARE USAGE

</div>

§10.1 **PERMISSION FOR USE:**  Subject to the terms of this Agreement, SCHMIDT hereby grants to DISTRIBUTOR a limited, non transferable and non-exclusive right, in the Sales Area only, to use the trademarks set forth on Schedule B and any other trademarks, trade names or graphical designations on the packaging of the Products sold to DISTRIBUTOR by SCHMIDT (the "Marks"), solely to identify the Products and to identify DISTRIBUTOR as a distributor of the Products. DISTRIBUTOR agrees not to sell or distribute the Products, either directly or indirectly, outside of the Sales Area and shall take commercially reasonable steps to prevent the distribution of the Products outside of the Sales Area by its respective agents or employees. DISTRIBUTOR agrees not to solicit  outside of the Sales Area.  DISTRIBUTOR may not use alternate channels of distribution, including the internet, catalog sales, telemarketing, or other direct marketing, either within or outside your Sales Area. DISTRIBUTOR acknowledges that the Marks are the exclusive property of

<div align="center">Page 20</div>

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

SCHMIDT, or its affiliates, or, if applicable, the licensor(s) thereof, as the case may be. DISTRIBUTOR agrees that it shall not use any of the Marks in any title or trade name of any business entity of the DISTRIBUTOR, or with which it may become affiliated or related through ownership or otherwise. DISTRIBUTOR agrees that it shall not tamper with any of the Marks or other written matter or graphical designations on the packaging of the Products supplied by SCHMIDT or its affiliates to DISTRIBUTOR hereunder and shall not otherwise modify or change the packaging thereof in any way. Any marketing or promotional material proposed to be used by DISTRIBUTOR which references or uses the Marks (other than marketing or promotional material supplied by SCHMIDT or any of its affiliates) shall be submitted to SCHMIDT for approval, and said material shall not be used without the prior written consent of SCHMIDT. DISTRIBUTOR acknowledges that the limited rights to use any particular marks as granted under this Section 10.1 shall continue only so long and to the extent that SCHMIDT holds rights to those particular Marks.

§10.2 **QUALITY ASSURANCES**. SCHMIDT or its authorized representatives, shall have access, upon reasonable notice and during regular business hours, to the DISTRIBUTOR'S facilities in order to inspect the Products bearing the Marks and take samples of any Products, packaging wrappers, boxes, or labels being used by DISTRIBUTOR to distribute the Products. In the event SCHMIDT finds any deficiencies in the quality of the Products or the packaging,

<div style="text-align:center">Page 21</div>

Distribution Agreement: 2018

<div style="writing-mode: vertical; transform: rotate(180deg)">DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577</div>

labels or other materials used for or on the Products at SCHMIDT'S option, DISTRIBUTOR shall, at its expense and without compensation to DISTRIBUTOR, destroy such items, or return such items to SCHMIDT to be destroyed.

§10.3 **SOFTWARE SYSTEM**.   Subject to the terms of this Agreement, SCHMIDT grants a limited, non transferable and, non-exclusive license to load and use the object code version of any proprietary software system and program developed by or licensed to SCHMIDT for Distributorship sales operations,  as same may be amended for time to time.  DISTRIBUTOR shall acquire no other interest or right in the software, other than this limited use and shall not attempt to modify, decompile, disassemble or otherwise reverse engineer the software or request or authorize any other person to do so for any reason whatsoever.  DISTRIBUTOR expressly agrees that it will not transfer to any third party the subject software.

§10.4 **RETURN UPON TERMINATION:** Upon the termination of this Agreement or of DISTRIBUTOR'S right to use any of the Marks, DISTRIBUTOR shall immediately cease its use of the Marks  and shall not thereafter use any trademarks, trade names or other designations associated with or confusingly similar to said Marks, or make any representations, directly or indirectly, that it continues to distribute products bearing said Marks.

§10.5 **ENFORCEMENT OF MARKS:**  DISTRIBUTOR agrees to notify SCHMIDT of any apparent infringement of or challenge to any of the Marks in the Sales Area and to fully cooperate with SCHMIDT in any

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

Distribution Agreement 2018

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

legal action relating to enforcement of rights in the Marks. SCHMIDT shall have the exclusive right to control any legal action regarding enforcement of rights in the Marks and SCHMIDT will bear the cost and expense of any legal action and be entitled to any recovery associated with such legal action.

## ARTICLE 11
## DISPUTE RESOLUTION

§11.1 **RESOLUTION OF DISPUTES:** Any dispute between SCHMIDT and DISTRIBUTOR arising out of the relationship created by this Agreement shall be subject to the dispute resolution provisions set forth below.

§11.2 MEDIATION: In the event of any dispute, either party may initiate a mediation procedure within five (5) days of the date on which facts respecting the dispute first come to such party's attention, by submitting a written request for mediation to the Judicial Arbitration & Mediation Services, Inc. ("JAMS) according to its procedures, or any other mediation service mutually agreed to by the parties according to such mediator's procedures. The mediation process shall begin promptly and shall be concluded within ten (10) business days of the day the request for mediation is made, unless the parties mutually otherwise agree. Any and all discussions, negotiations, findings or other statements by the mediator and/or the parties made in connection with the mediation shall be privileged and confidential and shall not be admissible into evidence in any arbitration or

Distribution Agreement 2018

litigation. All mediation proceedings shall take place in Baltimore, Maryland. The expenses of the mediation service shall be borne equally by both parties, and all other expenses relating to such mediation shall be borne by the party incurring them. Each party shall pay its own Attorneys' fees, costs, and expenses related to the mediation. The commencement of any dispute resolution procedure shall not act to prevent SCHMIDT from instituting or proceeding with any action, which may be the subject of the dispute, including the operation of DISTRIBUTOR'S route, except that SCHMIDT agrees that it will not sell, nor require DISTRIBUTOR to sell, the Distribution Rights, provided in Section 9.4 above, until the dispute resolution process has been concluded or the time for either party to further proceed with dispute resolution has expired.

§11.3 **ARBITRATION:** If the parties are unable to resolve the dispute through mediation, either party may avail itself of the right to seek relief from an arbitrator, by filing a complaint within ten (10) days following the conclusion of the mediation process, which period shall constitute an agreed time limitation, and such complaint shall be limited to the cause(s) of action within the scope of the mediation conducted in accordance of Section 11.2 above. Any dispute between the parties subject to this Article shall be decided by neutral, binding arbitration conducted in accordance with the Judicial Arbitration and Mediation Services, Inc. ("JAMS"). The arbitration shall be conducted by one arbitrator and shall be held in Baltimore, Maryland. The arbitrator shall apply the substantive law specified in Section 12.8

Distribution Agreement 2018

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

of this Agreement, except that with respect to arbitration matters, the provisions of the Federal Arbitration Act shall be controlling. Judgment upon the award rendered by the arbitrator shall be final and binding and may be entered in any court having jurisdiction thereof.

§11.4 **BUSINESS JUDGMENT**: The parties hereto recognize, and any mediator, arbitrator or judge is affirmatively advised, that this Agreement reserves to SCHMIDT the right to take (or refrain from taking) certain actions in the exercise of its business judgment based on its assessment of the overall best interests of the network and/or Distribution Program. Where such discretion has been exercised, and is supported by the reasonable business judgment of SCHMIDT, neither a mediator nor an arbitrator nor a judge shall substitute his or her judgment for the judgment so exercised by SCHMIDT.

§11.5 **DAMAGES AND LIMITATION OF AWARDS:** IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES AND ALL CLAIMS TO SUCH DAMAGES ARE HEREBY WAIVED.

SCHMIDT and DISTRIBUTOR agree that no form of action or proceeding permitted hereby will be maintained by any party to enforce any liability or obligation of the other party, whether arising from this Agreement or otherwise, except in accordance with the provisions hereof, and unless the proceeding is brought within the time periods set forth.

Page 25

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

§11.6 **ATTORNEY'S FEES**. Except as specifically provided in Section 11.2, the prevailing party in any arbitration or other action to enforce this Agreement will be entitled to recover its reasonable attorney's fees, expert fees, costs and expenses in connection with such action.

§11.7 **INDIVIDUAL ACTION**. The parties agree that any proceeding in any forum to resolve any dispute, including mediation, arbitration, litigation, and/or government action involving DISTRIBUTOR, shall be conducted on an individual basis only, and not on a class-wide basis or as a representative action, collective action, or a collective governmental action. The parties further agree that only SCHMIDT (and its affiliates and their respective owners, officers, directors, agents and employees, as applicable) and DISTRIBUTOR (and its affiliates and their respective owners, officers and directors, as applicable) may be the parties to any proceeding described in this Section, and that no such proceeding shall be consolidated, combined, or joined with any other proceeding involving SCHMIDT and/or any other person without the written consent of all parties.

## ARTICLE 12
## MISCELLANEOUS

§12.1 **NOTICES:** Any notice required or permitted under this Agreement shall be deemed properly given when personally received, or one (1) day after delivery to an overnight courier service for first day delivery, or five (5) days after deposit in the mails, return receipt requested, first class postage pre-paid. All notices shall be addressed to

Page 26

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

DISTRIBUTOR at the address stated above and to SCHMIDT, at the address indicated in Schedule B attached hereto. Either party may designate another address for receipt of notices by written notice duly given in accordance with this Section 12.1.

§12.2 **SURVIVAL; SCHMIDT AFFILIATES, ASSIGNMENT BY SCHMIDT.** This Agreement shall be binding upon, the successors or assigns of the parties hereto. The parties recognize and agree that any obligations of SCHMIDT hereunder may from time to time be undertaken by affiliates or related entities of SCHMIDT, but SCHMIDT shall remain responsible for its obligations under this Agreement. This Agreement is assignable by SCHMIDT at any time upon notice to DISTRIBUTOR. Upon assignment by SCHMIDT of this Agreement to a third party who expressly assumes SCHMIDT's obligations under this Agreement, SCHMIDT no longer will have any performance or other obligations under this Agreement. In addition, upon assignment by SCHMIDT of this Agreement to a third party assignee, DISTRIBUTOR will release and hold the SCHMIDT harmless from any obligations, causes or actions, or claims DISTRIBUTOR may have against SCHMIDT, except to the extent prohibited under applicable state and/or federal franchise law.

§12.3 **INCORPORATION BY REFERENCE:** This Agreement is subject to and affected by the terms and conditions of a certain Bill of Sale executed immediately prior hereto and said Bill of Sale is incorporated herein by reference as though fully set forth in this Agreement.

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

§12.4 **ENTIRE AGREEMENT:** This Agreement, together with the Bill of Sale referred to above and any other agreements executed between the parties on even date herewith, sets forth the entire agreement between the parties and supersedes all prior agreements, discussions, negotiations, understandings, representations, conditions, warranties and covenants between them with respect to this subject matter. Provided, however, nothing in this Agreement or in any related agreement is intended to disclaim SCHMIDT'S representations made in the Franchise Disclosure Document. This Agreement may be amended or modified only by a writing signed by both parties.

§12.5 **INDEMNIFICATION:** Each party hereby agrees to defend, indemnify and hold the other harmless against a third party as to any costs, charges or claims including, without limitation, reasonable attorneys' fees, expert fees and costs of settlement, which may arise out of such party's direct or indirect failure to perform any obligation and/or discharge any liability arising under this Agreement or arising out of such party's negligence.

§12.6 **DESIGNATION AS AGENT:** DISTRIBUTOR hereby irrevocably grants SCHMIDT a limited power of attorney with full and complete authority to transfer DISTRIBUTOR'S Distribution Rights, or perform any of DISTRIBUTOR'S obligations hereunder for DISTRIBUTOR'S account in accordance with the terms of this Agreement. This appointment shall survive the termination of this Agreement.

Distribution Agreement 2018

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

§12.7 **ACQUISITIONS:** Notwithstanding anything to the contrary contained herein, this Agreement shall not apply to any products or product lines obtained by SCHMIDT through acquisition after the date hereof.

§12.8 **CONTROLLING LAW:** The validity, interpretation and performance of this Agreement shall be controlled by and construed in accordance with the laws of the state of Maryland, without regard to its choice of law provisions.

§12.9 **NECESSARY MODIFICATION:** In the event any provision of this Agreement is found to be invalid, contrary to, or in conflict with any applicable present or future law or regulation in a final ruling by any court, agency or tribunal possessing competent jurisdiction, this Agreement shall be deemed modified to the extent necessary to conform with any such ruling, law or regulation. The remainder of this Agreement shall not be affected thereby and shall remain in full force and effect.

§12.10 **COUNTERPARTS:** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument.

§12.11 **TIME CALCULATION:** In computing the number of days for purposes of this Agreement, all days shall be counted, including Saturdays, Sundays, and holidays; provided, however, that if the final day of any time period falls on a Sunday, or holiday, then the final day shall be deemed to be the next day which is not a Sunday or holiday.

Distribution Agreement 2018

**IN WITNESS WHEREOF**, SCHMIDT and DISTRIBUTOR have caused this Agreement to be duly executed as of the day and year first above written.

SCHMIDT BAKING DISTRIBUTION, LLC

By: _Stephen J. Paterakis_

**Stephen J. Paterakis, Member**

SILVA'S BAKED GOODS

By: _[signature]_

**NATHANIEL J. SILVA, President**

PERSONAL GUARANTEE

The undersigned, as controlling shareholder of **SILVA'S BAKED GOODS,** hereby unconditionally guarantees the full and complete performance by **SILVA'S BAKED GOODS** of all the obligations assumed by it hereunder.

_[signature]_

NATHANIEL J. SILVA, GUARANTOR

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

Distribution Agreement 2018

# SCHEDULE A
## SALES AREA DESCRIPTION
### SALES AREA #17

**DEPOT: #40**

Unless otherwise indicated, only the inside (side facing the interior of the territory) of all the city, town, county or state lines, rivers or other natural boundaries or border streets and highways is included in the Sales Area. The location of any Outlet shall be determined by its street address. There are no additions or exceptions unless noted.

- **BEGINNING AT A POINT** where I-91 intersects with the U.S. 202.
- Then proceeding Southwest on U.S. 202 to the intersection of CT-20.
- Then proceeding Southeast CT-20 to the intersecting point of the Bradley Field Connector (CT 20).
- Then proceeding Southeast on the Bradley Field Connector to the intersection of I-81.
- Then proceeding North on I-91 to the intersecting point of Post Office Road.
- Then proceeding East on Post Office Road, which turns into Town Farm Road, to the intersection of Broad Brook Road.
- Then proceeding North on Broad Brook Road to the intersection of Hazard Ave. (CT-190).
- Then proceeding East on Hazard Ave to the intersection of Taylor Road.
- Then proceeding North on Taylor Road, which turns into Shaker Road, to the intersection of Elm Street.
- Then proceeding North on Elm Street, which turns into Cooley Street, which turns into Parker Street (RT-21), to the intersection of Main Street (RT-141).
- Then proceeding East on Main Street to the intersection of Center Street.
- Then proceeding North on Center Street, which turns into Chauncey Walker Street, which turns into Turkey Hill Road, to the intersection of U.S. 202.
- Then proceeding Southwest on U.S. 202 the intersection of I-91to the **POINT AND PLACE OF THE BEGINNING**.

## ADDITIONS:
This Sales Area also includes the Outlet(s) located at the following address now or in the future and presently known as:
No Additions

## EXCEPTIONS:

BILL OF SALE 4/9/20     Page 1

This Sales Area also excludes the Outlet(s) located at the following address now
or in the future and presently known as:
No Exceptions

## SCHEDULE "B"
CONTRACTUAL DEFINITIONS
### Depot: East Haven        SALES AREA 17

The following definitions shall apply for the purposes of this Distribution Agreement:

**OUTLETS:** As referred to in §1.2, Outlets shall mean all retail stores and all restaurant and institutional accounts which purchase Products by direct store door delivery. Outlets shall not be deemed to include, street vendors or any Outlets or parts thereof, including concessions and vending machines therein, serviced by methods other than store door delivery, or bakery thrift stores established or operated by, or contracted with SCHMIDT or its affiliates for the primary purpose of selling damaged, stale, off code products, although such bakery thrift stores may also sell any products, fresh or otherwise, which SCHMIDT or its affiliates, in their sole discretion, deem appropriate to support that purpose. Specifically excluded are all Restaurant and Institutional] accounts serviced by H&S Bakery and Ottenberg's Bakery as of the Effective Date of this Agreement, for so long as so serviced. Notwithstanding the above, Distributor is authorized and affirmatively agrees to service certain Outlets with saleable returns product removed from other Outlets, such as Dollar Tree and similar Outlets authorized by Schmidt from time to time.

**DISTRIBUTOR AFFIRMATIVELY ACKNOWLEDGES THAT CERTAIN OWNERS OF SCHMIDT DIRECTLY OR INDIRECTLY HOLD OWNERSHIP INTERESTS IN H&S BAKERY, INC., NORTHEAST FOODS, INC., AND OTTENBERG'S BAKERY, INCORPORATED AND OTHER AFFILIATES (COLLECTIVELY, "RELATED ENTITIES") AND THAT EMPLOYEES OR INDEPENDENT DISTRIBUTORS ASSOCIATED WITH THE RELATED ENTITIES MAY SELL SIMILAR OR COMPETING PRODUCTS IN THE SALES AREA AND THAT ACTIVITY AND/OR SALES DO NOT AND WILL NOT CONSTITUTE A VIOLATION OF THIS AGREEMENT.**

**PRODUCTS:** As referred to in §1.3, Products shall mean all fresh baked breads, rolls, bagels, muffins, cakes, pies, bread stuffings, packaged croutons and similar fresh baked products intended to be sold as fresh and produced or distributed by SCHMIDT and sold under the names and trademarks:

**SCHMIDT        BLUE RIBBON        OLD TYME**

and under the licensed names and trademarks:

so long as SCHMIDT retains the license for their use; together with other names and trademarks SCHMIDT may add from time to time; and also any similar products manufactured or distributed by SCHMIDT in non-trademarked wrapping or under any private labels owned by third parties; provided that Distributor agrees that any such private label products shall only be purchased by Distributor and resold as approved by the third party owner of that label. Such rights shall continue only so long as Schmidt has the right to manufacture under those names.

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

Products shall <u>not</u> include products marketed or sold by SCHMIDT or its affiliates under any trade name or mark other than those listed above, or intended to be sold as frozen or refrigerated, or damaged, stale, or off code products or product produced to supplement bakery thrift store inventory to facilitate a thrift recovery system.

**ADDRESS FOR NOTICE:** As referred to in §11.1, notices to SCHMIDT shall be addressed to:

VP of Sales
601 South Caroline Street
Baltimore, Maryland

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

# EXHIBIT 5

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **NATHANIEL SILVA and PHIL ROTHKUGEL, on behalf of themselves and all others similarly situated,** | |
| Plaintiffs, | **Civil Action No.: 3:23-cv-01695-MPS** |
| v. | |
| **SCHMIDT BAKING DISTRIBUTION, LLC and SCHMIDT BAKING COMPANY, INC. ,** | **March 1, 2024** |
| Defendants. | |

## DEFENDANTS' REPLY MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO COMPEL ARBITRATION

Defendants Schmidt Baking Distribution, LLC ("SBD") and Schmidt Baking Company, Inc. ("SBC") respectfully submit this Reply in support of their motion to compel individual arbitration of claims by Plaintiffs Nathaniel Silva and Phil Rothkugel (collectively, "Plaintiffs").

**I.     The Arbitration Provision May Be Enforced Against Plaintiffs.**

The pertinent issue here is not whether Plaintiffs are *parties* to the Distribution Agreements ("DAs"), but whether they may be a *party to an arbitration* in a dispute "arising out of the relationship created by" the DAs.[1] Sections 11.3 and 11.7 make clear they can be.[2]

*First*, in offering "hornbook law that the fact that a corporate owner or agent may sign a contract on a company's behalf does not mean—*without more*—that the owner or agent is *personally* a party to that contract,"[3] Plaintiffs overlook that "the law of contract interpretation … militates against interpreting a contract in a way that renders a provision superfluous," and eschew basic contract law principles requiring the Court, "when interpreting a contract," to "look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result."[4]

Here, the "without more" lies in Section 11.7's class action waiver, which specifies that "only SCHMIDT and its *affiliates* and their respective *owners*, officers, directors, agents and

---

[1] There is no dispute that Plaintiffs' corporate entities formed contracts with SBD containing an arbitration provision, and thus *no contract formation issue* exists for the Court to decide. Indeed, their signatures as Presidents of their corporate entities is "conclusive evidence" of contract formation. *See D'Antuono v. Serv. Rd. Corp.*, 789 F. Supp. 2d 308, 323 (D. Conn. 2011) (Kravitz, J.).

 Defendants agree "[t]he question of who may be a proper party to an arbitration proceeding is distinct from the legal question of whether Plaintiffs are *contracting parties to the agreement*," and stand by their argument that, under the delegation clause, *only the arbitrator may decide who are the proper parties to the arbitration*. *See* ECF 24, Pls.' Opp'n 10 & n.3.

[2] Plaintiffs note the *Gray v. Schmidt Baking Co., Inc.* plaintiffs "inexplicably … did not argue that they were not parties to the agreement." Pls.' Opp'n 15 n.6. Sections 11.3 and 11.7 explain why.

[3] *See* Pls.' Opp'n 12 (quoting *Green v. XPO Last Mile, Inc.*, 504 F. Supp. 3d 60, 68 (D. Conn. 2020) (Meyer, J.)) (bold italic emphasis added).

[4] *Afkari-Ahmadi v. Fotovat-Ahmadi*, 294 Conn. 384, 391 (2009) (internal quotation marks and citations omitted); *see also Owens-Illinois, Inc. v. Cook*, 386 Md. 468, 497 (2005).

employees as applicable") and DISTRIBUTOR (and its affiliates and their respective **owners**, **officers** and directors, as applicable) may be **parties** to any proceeding in this Section."[5] Plaintiffs fail to explain what else this provision can mean besides they can be "parties" to an arbitration under the DAs. Instead, they misdirect, by focusing on the word "*may*" to say that "owners" may, but not "*must* bring claims in arbitration."[6] But this admits too much because the class action waiver covers "arbitration." Thus, the **only** way to give "operative effect" and not render this clause "superfluous" is to recognize Plaintiffs (**and SBC**) can be proper arbitration parties. As such, there is no ambiguity and the *contra proferentem* doctrine is inapplicable.[7] Section 11.3 reinforces this reading by stating "[a]ny dispute between the **parties** subject to this Article" (*i.e.*, Article 11) "shall be decided by neutral, binding arbitration" – with **Section 11.7 supplying who the parties may be**. Whether Plaintiffs demanded arbitration is irrelevant because Defendants did so.[8]

Second, *Green v. XPO Last Mile, Inc.* is easily distinguishable because that contract stated it was only "binding on the Parties and their respective successors and assigns," and the arbitration clauses applied only "to any existing or future dispute brought by *either* Contract Carrier *or* XPO Last Mile arising out of or related to the Agreement."[9] The DAs are not nearly so limited here, and thus Section 11.7 **alone** resolves whether Plaintiffs are proper parties to an arbitration.

---

[5] *See, e.g.*, Silva Baked Goods Inc. DA ("Silva DA"), § 11.7 (emphasis added).

[6] Pls.' Opp'n 13 (discussing Section 11.7's "*permissive* language") (emphasis in original).

[7] *See* Pls.' Opp'n 14 (citing *Cantonbury Heights Condo. Ass'n, Inc.*).  Moreover, Plaintiffs ignore that the Supreme Court made clear in *Lamps Plus* that the *contra proferentem* doctrine does not apply in arbitration, because it is inconsistent with the FAA, since "ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration." *Lamps Plus, Inc. v Varela*, 587 U.S. --, 139 S. Ct. 1407, 1418 (2019).

[8] *See* Pls.' Opp'n 13 (noting lack of language stating owners must bring claims in arbitration).

[9] 504 F. Supp. 3d at 66, 68 (emphasis in original); *see also* Pls.' Opp'n 15. The Court must only interpret the language of these DAs and not compare that language to "countless" other ways it **could** have been written. *See* Pls.' Opp'n 14. And while the *Bissonnette* language is different in form, it is far closer to the DA language than the *Green* language and of similar effect. *See id*.

2

*Third*, Plaintiffs misapprehend the effect of the guarantor clause.[10] Here, the corporate entities are the principals and the owners/Presidents the agents. As *Green* explained, "an agent will not be personally bound unless there is clear and explicit evidence of the agent's intention to substitute his personal liability for, or to, that that of his principal."[11] Unlike in *Green*, Plaintiffs, as "controlling shareholder … ***unconditionally guarantee[d] the full and complete performance by [the principal] of all obligations assumed by it hereunder***."[12] That necessarily includes Section 2.3's independent contractor relationship provisions and Article 11 dispute resolution.

## II.    SBC May Enforce The Arbitration Provision.

As stated above, Section 11.7 directly provides that SBC, as the "owner" (*i.e.*, sole member) of SBD, may be a party ***to an arbitration*** and thus may invoke the arbitration clause.[13]

## III.    Plaintiffs Are Not Excluded From FAA Coverage.[14]

"[T]he Supreme Court has emphasized that the 'transportation worker' exemption must be given a narrow construction."[15] By a preponderance of the evidence,[16] "the party seeking to avoid arbitration under the FAA bears the burden of establishing that the exemption under Section 1 applies, by showing that: (1) the agreement at issue is a 'contract of employment;' (2) the party

---

[10] *See* Pls.' Opp'n 13.

[11] 504 F. Supp. 3d at 68 (quoting *Joseph Gen. Cont., Inc. v. Couto*, 317 Conn 565, 582 (2015)) (internal quotation marks omitted) (emphasis added).

[12] *See, e.g.*, Silva DA, p. 30 (emphasis added). In rejecting an agency theory, the *Green* court noted "traditional agency principles preclude holding [plaintiffs] to be parties on the basis of their signatures in a corporate representative or agency capacity on behalf of their LLCs." 504 F. Supp. 3d at 68. Here, the "personal guarantee" made by Plaintiffs further distinguishes *Green*.

[13] As a result, whether SBC is a party to the agreement is irrelevant. *See* Pls.' Opp'n 33.

[14] Because Plaintiffs bear the burden of showing Section 1's exclusion applies, Defendants were not obligated to address that issue in its opening brief. Nor should Plaintiffs be entitled to a sur-reply because Defendants' arguments are "strictly confined to a discussion of matters raised by the responsive brief." *See Corpes v. Walsh Constr. Co.*, 130 F. Supp. 3d 638, 644 (D. Conn. 2015) (quoting L. Civ. R. 7(d)).

[15] *Amos v. Amazon Logistics, Inc.*, 74 F.4th 591, 596 (4th Cir. 2023) (citing *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118 (2001)).

[16] *See, e.g., Rutter v. Darden Rests., Inc.*, No. CV 08-6106 AHM (SSX), 2008 WL 4949043, at *3 (C.D. Cal. Nov. 18, 2008).

belongs to a class of 'seamen, railroad employees, or any other class of workers;' and (3) the class
of workers is frequently engaged in foreign or interstate commerce."[17] The FAA's text makes clear
the "contract in question must be both a 'contract of employment' and one entered into with a
'worker' of the type described in 9 U.S.C. § 1."[18] Here, the DAs are unquestionably contracts
between **corporate entities**, and "contain[] none of the hallmarks of a traditional employment
contract, such as provisions regarding salary, benefits, and leave time."[19] Indeed, nothing requires
Plaintiffs **personally** to service their sales areas.[20] Plaintiffs' corporate entities are not "workers"
of any kind and thus the DAs fall outside of Section 1's ambit.

     *First*, Plaintiffs fail to establish the arbitration provision is within a "contract of
employment." Indeed, they extensively argue ***the opposite***—that they are ***not*** parties to the DAs
and thus cannot be compelled to arbitrate, and that their wage claims are not covered by the DAs.[21]
***They point to no other "contract of employment" supporting Section 1 coverage***. Instead, while
acknowledging that the Schmidt Defendants successfully argued *in Gray v. Schmidt Baking Co.,
Inc.* that identical DAs were not "contracts of employment,"[22] Plaintiffs contend the *Gray* analysis
"is inconsistent" with *New Prime Inc. v. Oliveira*.[23] More specifically, they claim *New Prime*
"squarely addressed" the "question" of whether the Section 1 exclusion applies when the parties

---

[17] *Gray v. Schmidt Baking Co., Inc.*, No. 22-cv-00463-LKG, 2023 WL 9285466, at *2 (D. Md. Oct. 16,
2023) (citations omitted); *see, e.g., Singh v. Uber Techs., Inc.*, 571 F. Supp. 3d 345, 355 (D.N.J. 2021),
*aff'd*, 67 F.4th 550 (3d Cir. 2023, as amended May 4, 2023).

[18] *Amos*, 74 F.4th at 596.

[19] *Id*.

[20] *See, e.g.*, Silva DA. § 2.3 ("DISTRIBUTOR has the right to operate the business as it chooses" and
requiring it to "properly train and fully train and educate any employee, agent or its contractor, who is in
fact servicing the specific geographic areas").

[21] *See* Pls.' Opp'n 2, 5, 8, 10-15, 18, 31-32.

[22] 2023 WL 9285466, at *4 (collecting post-*New Prime* cases finding Section 1 inapplicable to business-to-
business contracts); *see* Pls.' Opp'n 16-17.

[23] 586 U.S. ----, 139 S. Ct. 532 (2019); *see* Pls.' Opp'n 16-17.

to an agreement are both business entities, and "held that where the plaintiff-worker is asserting claims for unpaid wages arising from his work pursuant to an alleged 'independent contractor' agreement signed by his corporate entity, the agreement constitutes a contract 'to perform work' that is exempt from the FAA."[24] Not true. As explained below, because Plaintiffs' counsel also represent the plaintiffs in the *Bissonnette v. LePage Bakeries Park St, LLC* FAA Section 1 case argued in the Supreme Court on February 20, 2024, they should know better.

In *New Prime Inc. v. Oliveira*, the Supreme Court determined Section 1's phrase "contracts of employment" includes not just "contracts that reflect an employer-employee relationship," but also "encompasses contracts that require an independent contractor to perform work."[25] However, just like the *Gray* court, Judge Dooley explained in *Bissonnette*, "[t]he Supreme Court has never had occasion to determine whether the FAA Section 1 exemption would apply to an alleged 'transportation worker' that is in fact a legal entity such as a corporation and not a person."[26] The courts that actually reached that issue have *uniformly* found the answer is "no."[27] And because

---

[24] Pls.' Opp'n 17.

[25] 139 S. Ct. at 539.

[26] *Bissonette v. Lepage Bakeries Park St., LLC*, 460 F. Supp. 3d 191, 194 n.2 (D. Conn. 2020), *aff'd sub nom. Bissonnette v. LePage Bakeries Park St., LLC*, 49 F.4th 655 (2d Cir. 2022), *cert. granted* 144 S. Ct. 479 (Sept. 29, 2023); *accord Gray,* 2023 WL 9285466, at *2 ("While the Supreme Court has not addressed whether Section 1 of the FAA applies when the parties to the agreement are both business entities …"); *Fli-Lo Falcon, LLC v. Amazon.com Inc.*, No. C22-441-RSM-MLP, 2022 WL 4451273, at *5 (W.D. Wash. Sept. 8, 2022), *adopted by* 2022 WL 4448654 (W.D. Wash. Sept. 23, 2022), *appeal filed* (9th Cir. Oct. 17, 2022) ("The Supreme Court was not tasked with, and has not yet addressed, the issue instead posed in this matter—whether an LLC or a corporate entity itself can qualify as a "class of worker" engaged in foreign or interstate commerce."); *see also Oliveira v. New Prime, Inc. v. Oliveira*, 857 F.3d 7, 17 (1st Cir. 2017) (noting it was not addressing whether an LLC or other corporate entity can itself qualify for as a transportation worker because the defendant treated the contract as one between the worker and the trucking company); *Carter O'Neal Logistics, Inc. v. FedEx Ground Package Sys., Inc.*, No. 2:17-cv-02799-JTF-cgc, 2020 WL 13111153, at *3 (W.D. Tenn. Mar. 19, 2020) (stating "*New Prime* . . . does not stand for the proposition that the FAA exception for transportation workers applies to corporate entities," and finding Section 1 exemption did not apply).

[27] *See Amos v. Amazon Logistics, Inc.*, 74 F.4th 591, 596 (4th Cir. 2023) ("the Agreement at hand simply is not a 'contract of employment' – it does not promise work and compensation to an individual employee, and it contains none of the hallmarks of a traditional employment contract, such as provisions regarding salary, benefits, and leave time."); *Gray,* 2023 WL 9285466, at *4; *Fli-Lo Falcon, LLC,* 2022 WL 4451273,

neither the district court nor the Second Circuit reached that issue in *Bissonnette*, neither will the

Supreme Court. Thus, if this Court follows the uniform body of precedent, it need not wait on

*Bissonnette*'s fate before the Supreme Court, as Plaintiffs have requested.[28]

    *Second*, Plaintiffs' attempt to distinguish the Second Circuit's binding *Bissonnette* decision

on the basis that SBD is a "distribution" company, rather than a bakery or manufacturer, is also

unpersuasive.[29] Plaintiffs omit that the DAs involve both ***sale*** and distribution of products, and

title to baked products passes to Distributors upon delivery.[30] The same was true in *Bissonnette*,

and thus *Bissonnette* controls the result here.[31] Indeed, SBD is the functional equivalent of CK

Sales, the wholly owned subsidiary of Flowers Foods that contracted with the *Bissonnette*

plaintiffs' corporate entities. Plaintiffs simply cannot escape *Bissonnette*'s "decisive fact" that their

---

at \*5 (stating "since *New Prime*, no court to this Court's knowledge has found that a business entity properly belongs to the relevant 'class of workers' or that a commercial contract between such entities can otherwise be construed as a 'contract of employment' for the 1 exemption to apply," and finding Section 1 did not apply) (citations omitted); *ShaZor Logistics v. Amazon.com, LLC*, No. 2:22-cv-11458, 2022 WL 4277190, at \*2 (E.D. Mich. Sept. 15, 2022) ("Section 1 is inapplicable to contracts between businesses, because businesses do not sign employment contracts with one another"); *R&C Oilfield Servs., LLC v. Am. Wind Transp. Grp., LLC*, 447 F. Supp. 3d 339, 347 (W.D. Pa. 2020) (agreement between two business entities "cannot reasonably be construed as a contract of employment governing 'work by workers.'"); *Carter O'Neal Logistics, Inc.*, 2020 WL 13111153, at \*3 (Section 1 not apply to contract between corporate entities).

[28] *See* Pls.' Opp'n 18.

[29] *See* Pls.' Opp'n 18-19.

[30] *See, e.g.*, Silva DA, p.2 ("**WHEREAS**, DISTRIBUTOR has the ability and experience necessary to sell and distribute those products …;"); § 1.5 (**DISTRIBUTION RIGHTS**: shall mean the sole right to sell and distribute Products to Outlets in the Sales Area …"); § 3.1("All Products will be sold to DISTRIBUTOR absolutely, and title to and risk of loss of, the Product shall pass to DISTRIBUTOR upon delivery …"), § 3.3 ("DISTRIBUTOR has the absolute right to set resale prices for Products, except …"); § 4.1 ("DISTRIBUTOR agrees to use its best efforts to develop and maximize sales of Products to Outlets within the Sales Area …").

[31] *See Bissonnette*, 49 F.4th at 658 (individuals purchased "exclusive distribution rights for the baked goods within specified geographic areas" and "market, sell, and distribute Flowers baked goods"); *Bissonnette*, 460 F. Supp. 3d at 194 ("Plaintiffs' respective companies are franchisees that each entered into a 'Distribution Agreement' with CK Sales" and "[i]n essence, Plaintiffs purchase Defendants' products from CK Sales and resell them to their customers at a higher price.").

customers "are not buying the movement of the baked goods, so long as they arrive."[32]

## IV.   If The FAA Does Not Apply, Then Maryland's Uniform Arbitration Act Does.

Plaintiffs contends if the FAA does not apply, then the arbitration agreement cannot be enforced.[33] Plaintiffs fail to address the post-Supreme Court application of the Illinois arbitration act in *Saxon v. Southwest Airlines Co.* and ample other authority applying state arbitration acts, even when arbitration agreements mention no other law.[34] Instead, Plaintiffs only challenge the meaning of the phrase "except that with respect to arbitration matters, the provisions of the Federal Arbitration Act shall be controlling."[35] But that phrase may reasonably be construed to mean the federal law of arbitrability applies and in no way changes the default rule of turning to a choice-of-law analysis.[36]

Within this Circuit, other contracts with provisions stating arbitration "is governed by the Federal Arbitration Act,"[37] and arbitration will be "in accordance with the FAA,"[38] have still been found to permit application of state arbitration acts under a choice-of-law analysis.[39] Indeed, state arbitration law generally applies when the FAA is not applicable.[40] This Court should follow suit.

---

[32] *Bissonnette*, 49 F.4th at 661.

[33] *See* Pls.' Opp'n 19-20.

[34] ECF 11, Defs.' Mem. 31-32 & nn. 83-84; *see also Atwood v. Rent-A-Center East Inc.*, No. 15-cv-1023-MJF-SCW, 2016 WL 2766656, at *3 (S.D. Ill. May 13, 2016) (finding arbitration agreement to be enforceable under state arbitration act is "true even when the contract says that the Federal Arbitration Act applies and mentions no other law.") (internal citation omitted).

[35] *See* Pls.' Opp'n 19.

[36] As noted above, Plaintiffs' reliance on the *contra proferentem* doctrine (*see id.* 19), is foreclosed by *Lamps Plus, Inc. v. Varela*, 139 S. Ct. at 1418-19, which explained "ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration."

[37] *Diaz v. Mich. Logistics Inc.*, 167 F. Supp. 3d 375, 380-81 (E.D.N.Y. 2016) (cited at Defs.' Mem. 31-32 n.84); *see also Islam v. Lyft*, 524 F. Supp. 3d 338, 356-360 (S.D.N.Y. 2021) (collecting cases within Second Circuit).

[38] *Espinosa v. SNAP Logistics Corp.*, 2018 WL 9563311, at *2, 4 (S.D.N.Y. Apr. 3, 2018) (cited at Defs.' Mem. 32 n.84).

[39] Plaintiffs do not assert that Connecticut's, rather than Maryland's arbitration act should be used.

[40] *Valdes v. Swift Transp. Co.*, 292 F. Supp. 2d 525, 527-30 (S.D.N.Y. 2003) (cited at Defs.' Mem. 32 n.84). *Peter v. Priority Dispatch, Inc.*, 2023 WL 4413969 (S.D. Ohio July 5, 2023) (cited at Pls. Opp'n 3), is

**V.  Plaintiffs Fail To Address The *Gray* Court's Holding That The DA Contains A Delegation Clause.**

Plaintiffs do not challenge a Maryland federal court's finding that an identical DA clearly and unmistakably delegated arbitrability issues to an arbitrator, but rather merely rehash arguments turned aside in *Gray*. This Court should follow Judge Griggsby's well-reasoned analysis.

*First*, Plaintiffs persist in arguing the arbitration clause does not incorporate JAMS rules, yet only offer essentially the same interpretation found "unreasonable" by the *Gray* court—namely that JAMS would provide "administrative services," but a "different set of Rules" might apply.[41] Importantly, Plaintiffs do not and cannot challenge the *Gray* court's assertion that "[t]he ordinary meaning of the word 'accordance' is to follow a rule," and thus concede this critical point.[42]

*Second*, Plaintiffs contend they are "unsophisticated truck drivers" unable to understand the meaning of a delegation clause or which JAMS Rules would apply.[43] However, under Connecticut contract law, "it is the party's responsibility to delay the signing of an agreement that is not understood…[C]ontracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodies reasonable or good bargains."[44] Maryland contract law is no different.[45]

---

inconsistent with the weight of district court decisions in this Circuit. *Rittman v. Amazon.com, Inc.*, 383 F. Supp. 3d 1196, 1203 (W.D. Wash. 2019) (cited at Pls. Opp'n 3), is inapposite because there the parties did not "remain silent on the issue," but rather "explicitly indicated that Washington law is not applicable to the Arbitration Provision."

[41] Pls. Opp'n 21-22 & n.8; *Gray v. Schmidt Baking Co., Inc.*, No. 22-cv-00463-LKG, 2023 WL 2185778, at *8 (D. Md. Feb. 23, 2023), *motion for reconsideration denied by Gray*, ECF 71 (D. Md. Oct. 16, 2023).

[42] *Gray*, 2023 WL 2185778, at *8 (citing Merriam-Webster and Cambridge Dictionary definitions).

[43] Pls.' Opp'n 22. The JAMS Comprehensive Rules, Employment Rules and Construction Rules (R. 11(b)), and Streamlined Rules (R. 8(b)), each provide "[j]urisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator." The International Rules are plainly inapplicable.

[44] *Friezo v. Friezo*, 281 Conn. 166, 199 (2007), *overruled in non-relevant part by Bedrick v. Bedrick*, 300 Conn. 691 (2011).

[45] *See, e.g., Dashiell v. Meeks*, 396 Md. 149, 167 (2006) ("a party who signs a contract is presumed to have

8

Plaintiffs offer no excuse from that requirement,[46] and most courts apply the "same rule" of incorporation "even to unsophisticated parties."[47] Neither Plaintiff claims he could not or did not read the DA; did not have time to read it; was prohibited from seeking legal counsel; or did not seek legal or professional advice. Indeed, **on the first page** of disclosures made more than 14 days before the DAs were signed, SBD directed Plaintiffs in writing to "[r]ead all of your contract carefully" and **[s]how your contract and this Disclosure document to an advisor, like a lawyer or accountant.**[48] Further, a simple Google search of "JAMS" yields its website at the top of the results, and the rules are easily accessible from there. And while Silva claims only a high school education, Rothkugel only states that he "never studied business."[49] In any event, every Circuit that has addressed the issue has found incorporation of JAMS or AAA Rules is a proper clear and unmistakable delegation to the arbitrator—Plaintiffs' claim that they did not understand the delegation clause would upend this body of caselaw,[50] as well as basic contract law principles..

---

read and understood its terms and … the party will be bound by them when that document is executed.").

[46] *See* Pls.' Opp'n 21-23. *Vidal v. Advanced Care Staffing, LLC*, 2023 WL 2783251, at *10-11 (E.D.N.Y. Apr. 4, 2023), is unpersuasive because the plaintiff was a "foreign nurse unfamiliar with United States law," and the agreement "explicitly" provided for "judicial intervention in issues of enforceability." So too is Plaintiffs' reliance on *Stone v. Wells Fargo Bank, N.A.*, 361 F. Supp. 3d 539, 555 (D. Md. 2019), which did not discuss Maryland contract law principles regarding the presumption a party has read and understood a contract he signs. *See Dashiell*, 396 Md. at 167.

[47] *Peni v. Daily Harvest, Inc.*, No. 22cv5443 (DLC), 2022 WL 16849451, at *7 (S.D.N.Y. 2022) ("[a]lthough the Second Circuit has not addressed whether the import of rule incorporation differs based on the parties' sophistication, other circuits appear to apply the same rule even to unsophisticated parties.") (consumer contract with incorporation of JAMS Rules) (collecting cases).

[48] *See* Mark Torres Decl. (attached as **Exhibit 1), ¶¶ 16-17** and **Exhibits 1-A to 1-D** (emphasis added). Silva also fails to inform the Court that he incorporated Silva's Baked Goods Inc. **more than two months** before he claims he was approached by Schmidt to sign his first DA and, in 2023, created another business entity. *See* Joshua Waxman Decl., **Exhibit 2-A** (Apr. 16, 2020 Cert. of Incorp.); **Exhibit 2-B** (Feb. 23, 2023 Cert. of Incorp.).

[49] *See* ECF 24-1, Silva Decl. ¶ 20; ECF 24-2, Rothkugel Decl. ¶ 9. Upon information and belief, Rothkugel attended Central Connecticut State University for at least three years. *See* https://www.thebaseballcube. com/content/player/ 34353/leaders/ (last accessed Feb. 26, 2024).

[50] *See Patrick v. Running Warehouse, LLC*, --- F.th ----, 2024 WL 542831, at *7-8 (9th Cir. Feb. 12, 2024) (noting "[v]irtually every circuit to have considered the issue has determined that incorporation of the [AAA's] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate

9

## VI.     The Delegation Clause Is Enforceable.

Plaintiffs attack both the "delegation clause" and the "arbitration agreement as a whole" as procedurally and substantive unconscionable.[51] But in challenging the delegation clause, they apply the wrong substantive law and improperly rely on provisions beyond the delegation clause.

*First*, Plaintiffs rely upon Connecticut law, but this is not a contract formation issue, so the Maryland choice-of-law provision applies.[52] "Maryland courts require ***both*** procedural ***and*** substantive law unconscionability before they will refuse to enforce an arbitration agreement."[53]

*Second*, Plaintiffs acknowledge the "unconscionability challenge to a delegation clause must be specific to the delegation clause,"[54] yet point to nothing "specifically and expressly" substantively unconscionable ***about the delegation clause***.[55] Accordingly, their challenge must be denied ***on that basis alone***.

*Third*, the JAMS designation actually moots Plaintiffs' substantive arbitrability concerns because, as they were informed by JAMS on January 3, JAMS determined that its Policy on Employment Arbitration Minimum Standards "will apply notwithstanding any contrary provisions in the parties' pre-dispute arbitration agreement."[56] That Policy requires "[a]ll remedies that would

---

arbitrability," and finding the same for JAMS rules) (internal quotation marks and citation omitted) (collecting cases); *Emilio v. Sprint Spectrum L.P.*, 508 F. App'x 3, 5 (2d Cir. 2013) (finding incorporation of JAMS rules was clear and unmistakable delegation of arbitrability issues); *Deleon v. Dollar Tree Stores, Inc.*, No. 3:16-cv-00767 (CSH), 2017 WL 396535, at *5 (D. Conn. Jan. 30, 2017 (Haight, J.) (same).

[51] *See* Pls.' Opp'n 23-31 (delegation clause), 32-33 (whole arbitration provision).

[52] *See Hottle v. BDO Seidman LLP*, 268 Conn. 694, 706 & n.7, 719-22 (2004) (applying New York unconscionability law per contract choice-of-law clause). *See* Pls.' Opp'n 23-23 (reciting Connecticut law).

[53] *Felix v. Richard D. London & Assocs., P.C.*, 2020 WL 4933632, at *6 (D. Md. Aug. 24, 2020) (citation omitted) (emphasis added).

[54] Pls.' Opp'n 25 (Pls.' parenthetical to citation of *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 73 (2010)).

[55] *See, e.g., Doctor's Assocs., Inc. v. Kirksey*, No. 3:18-cv-963 (JCH), 2018 WL 6061573, at *5 (D. Conn. Nov. 20, 2018) (Hall, J.) ("when the agreement contains a delegation provision, *Rent-A-Center* instructs that the arbitrator must decide all validity challenges to that agreement's arbitration provisions, except for those directed <u>specifically and expressly</u> towards the delegation provision itself.'") (delegation clause based on incorporation of AAA rules).

[56] *See* Waxman Decl., **Exhibits 2-C** (JAMS Rothkugel Notice to all Parties) & **2-D** (JAMS Silva Notice to

be available in a court proceeding, including attorneys fees and exemplary damages, as well as statutes of limitation, must remain available in the arbitration."[57] It further provides that "[t]he only fee that an employee may be required to pay is the initial JAMS Case Management Fee. All other costs must be borne by the company, including any additional JAMS Case Management Fees and all professional fees for the arbitrator's services."[58] Here, Defendants paid the initial fee.

*Fourth*, Plaintiffs' reliance on a "effective vindication of rights" theory in *Green Tree Financial Corp.-Alabaman v. Randolph* to attack this delegation clause, is misplaced.[59] Indeed, the *Andresen v. IntePros Federal, Inc.* case Plaintiffs cited correctly limited *Green Tree* to "<u>federal statutory claims</u>" in "<u>a primary arbitration agreement,</u>" and declined to apply it to a delegation clause with respect to non-federal statutory and common law claims.[60] Further, the *Andresen* court severed the cost- and fee-shifting provisions and compelled arbitration,[61] and this Court may do the same.[62] Plaintiffs' argument also fails because they "ha[ve] not provided evidence or argument about the value of [their] claim[s], which is a critical factor in a 'prohibitive costs' analysis."[63] Nor do they disclose whether Plaintiffs' counsel are working on contingency.

*Fifth*, Plaintiffs compare themselves to "low-wage workers" and "other cleaning

---

all Parties).

[57] *See, e.g.*, Waxman Decl. **Exhibit 2-C,** JAMS Policy Standard No. 1.

[58] *See, e.g. id.*, JAMS Policy Standard No. 6. As Plaintiffs point out, JAMS Employment Rule 31(c) provides the same. *See* Pls.' Opp'n 26. *See also Muriithi v. Shuttle Exp., Inc.*, 712 F.3d 173, 182-83 (4th Cir. 2013) (considering defendant's agreement to pay costs in finding plaintiff failed to show prohibitive arbitration costs); *Lillard v. Tech USA, Inc.*, No. ADC-20-308, 2020 WL 4925661, at *5 (D. Md. Aug. 21, 2020) (finding incorporated AAA rules foreclosed possibility of plaintiff having to bear arbitrator compensation and costs); *Farnsworth v. PublishAmerica, LLLP*, No. L-07-241, 2009 WL 10682047, at *3 (D. Md. Feb. 17, 2009) (finding AAA rules "are designed to accommodate parties of lesser means").

[59] 531 U.S. 79, 92 (2000). *See* Pls.' Opp'n 25-26.

[60] 240 F. Supp. 3d 143, 152-53, 155 (D.D.C. 2017) (emphasis in original); *accord Billie v. Coverall N. Am., Inc.*, 444 F. Supp. 3d 332, 350 & nn.5, 10 (D. Conn. 2020) (Hall, J.).

[61] 240 F. Supp. 3d 143, 161-63.

[62] *See, e.g.*, Silva DA, § 12.9 ("Necessary Modification").

[63] *Muriithi*, 712 F.3d at 183 (citing *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 503 (4th Cir. 2002).

workers,"[64] but provide no information about their earnings and investment gains under their DAs. In fact, Rothkugel's and Silva's pre-tax weekly payments averaged $1,780.16 (**over $92,000 annualized**) and $4,659.19 (**over $242,000 annualized**), respectively.[65] Further, both Plaintiffs profited from the ownership of their distribution rights, with Rothkugel realizing over $30,000 in equity gain in just 56 weeks, and Silva realizing over $51,000 in equity gain on his second sales area and receiving, in a partial sale, 1.84 times the total financed price for his first sales area.[66]

*Sixth*, Plaintiffs concede "the adhesive nature of the contract alone and the unequal standing of the parties is not enough to deem the delegation clause unconscionable."[67] Section 11.3 is clearly titled "__**ARBITRATION**__" (emphasis in original).[68] Their claim that "[u]nbeknownst to [them], the agreements contained an arbitration clause," is implausible and not supported by their declarations.[69] Plaintiffs also turn the relevance of an opt-out clause on its head – an opt-out clause can save an otherwise procedurally unconscionable agreement, but is not required to avoid such a finding.[70] As discussed in Section V, *supra*, more than 14 days prior to signing their DAs, Plaintiffs were provided written disclosures concerning the DA and other aspects of their purchase, and directed to "[s]how your contract and this Disclosure document to an advisor, like a lawyer or accountant."[71] Plaintiffs' declarations omit receipt of these disclosures and are silent on whether

---

[64] *See* Pls.' Opp'n 26, 27.

[65] *See* Torres Decl. ¶¶ 28, 37, 46 & Exs. 1-E, 1-F, 1-G.) Notably, Silva claims he made just $1200/week as a contract driver. (Silva Decl. ¶ 21,) Arguably, even "$62,400 in annual salary" is not a "low-wage" worker.

[66] *See id*. ¶¶ 22, 33, 44.

[67] Pls.' Opp'n 30 (citing *Smith v. Mitsubishi Motors Credit of Am., Inc.*, 247 Conn. 342, 352 (1998)); *accord Walther v. Sovereign Bank*, 386 Md. 412, 430 (2005) ("A contract of adhesion is not automatically deemed per se unconscionable."). Further, neither Plaintiff avers "he attempted to negotiate the Agreement but was denied the opportunity to do so." *Brown v. Brown's Md. Motrors, Inc.*, 607 F. Supp. 3d 620, 631 (D. Md. 2022) (citing *Walther, supra*).

[68] *See Felix*, 2020 WL 4933632, at *5 (noting "the word "arbitration" is capitalized and bolded).

[69] *See* Pl.'s Opp'n 30.

[70] *See* Pls.' Opp'n 31 (citation omitted).

[71] *See Gray*, 2023 WL 2185778, at *10 (finding no procedural unconscionability based on franchise

they sought professional advice. In short, there is no "bargaining naughtiness" here.[72]

For all these reasons, the Court should enforce the delegation clause and not reach questions regarding whether the claims fall within the purview of the arbitration provision or the enforceability of the arbitration agreement as a whole.

## VII. Plaintiffs' Claims Are Plainly Covered By The Arbitration Provision.

Plaintiffs' only argument that their statutory wage claims fall outside the scope of arbitration is that the dispute resolution provision only concerns disputes between their corporate entities and SBD.[73] This ignores other DA provisions that make clear their claims are covered and the "heavy presumption" that "'[a]n order to arbitrate a particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'"[74]

Section 2.3 of the DA, which spans nearly three full pages, recites: (1) the parties' express intent in the DA to "*create an independent contractor relationship*;" (2) a declaration that "it is of the essence of this Agreement that DISTRIBUTOR be an independent contractor for all purposes;" (3) a proviso for "amendment of this Agreement in any way necessary to establish an independent contractor relationship" upon "[a]ny contrary final determination by any board, tribunal or court of competent jurisdiction;" and (4) an express understanding "that neither DISTRIBUTOR nor any of its agents or employees have any claim or right against SCHMIDT

---

disclosure documents and being advised to seek advice of attorney or accountant); Torres Decl., ¶¶ 12-16 and **Exhibits 1-A to 1-D**.

[72] *Walther*, 386 Md. at 427 ("procedural unconscionability deals with the process of making a contract— 'bargaining naughtiness' (for instance, "Just sign here; the small print on the back is only our standard form.").") (citations omitted).

[73] *See* Pls.' Opp'n 31 (citing Section 11.1).

[74] *AT&T Technologies Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)); *see also Cummings & Lockwood, P.C. v. Simses*, No. CIV. 301CV422PCD, 2001 WL 789313, at *3 (D. Conn. July 5, 2011) (Dorsey, J.) (discussing "heavy presumption of arbitrability").

under any circumstances, to any benefits, protection, or other compensation furnished to employees in the traditional employer/employee relationship."[75] It is inconceivable that the arbitration provision does not cover Plaintiffs' employee misclassification claims—it is not just a "significant" but an **essential feature** of the "relationship created by the" DAs. Section 11.7 makes Plaintiffs potential "parties" to any dispute arising out of that relationship.

Plaintiffs' Amended Complaint alleges the DAs are "*de facto* employment agreements" that are part of on an alleged "misclassification scheme" resulting in unlawful deductions and unpaid wages.[76] Further, Plaintiffs accuse Defendants of requiring incorporation "to create the illusion that workers are 'independent contractors,' as opposed to employees."[77] All of this is another way of saying the **relationship created by the DA** is the basis for their wage-related claims. "Employee" and "independent contractor" status are "opposite sides of the same coin."[78]

For example, in *Sanders v. Swift Transp. Co. of Ariz., LLC*, the defendants filed a motion to compel arbitration of California labor law claims by a truck driver with an independent contractor agreement ("ICOA").[79] The defendants "argue[d] that all claims in [the plaintiff's] amended complaint are covered by the arbitration clause in the ICOA **because they arise out of the relationship created by** the ICOA." In agreeing with defendants, the Court explained:

> [Plaintiff's] claims are based on the theory that Defendants acted jointly in treating him and the putative class members as independent contractors when they should have [been] treated and paid as employees. **As [Plaintiff's] claims against Defendants are aimed**

---

[75] *See, e.g.*, Silva DA § 2.3 (emphasis added).

[76] *See, e.g.*, ECF 1 (pp. 27-40), First Am. Class Action Compl., ¶¶ 16, 34.

[77] Pls.' Opp'n 5.

[78] *See Jessop v. Bairco Constr., Inc.*, No. 22-CV-165, 2023 WL 7220975, at *10 (D. Wyo. Sept. 5, 2023) (discussing master-servant and independent contractor relationships).

[79] 843 F. Supp. 2d 1033, 1035 (N.D. Cal. 2012) (quoting amended complaint and summarizing Plaintiff's wage and hour class claims).

14

*directly at the independent contractor relationship created by the ICOA*, the Court finds that the claims are covered by the arbitration clause in the ICOA.[80]

The same is true here.[81]

## VIII.   The Arbitration Agreement Is Enforceable.

Although the Court should not reach this issue, the arbitration provision "as a whole" is enforceable because Plaintiffs cannot establish procedural unconscionability for the reasons stated in Section VI, *infra*.[82] And even if the agreement were procedurally unconscionable, Plaintiffs cannot establish substantive unconscionability because, by incorporating the JAMS Rules, Defendants have already waived enforcement of the fee-shifting and cost-shifting provisions. In any event, those provisions are not substantively unconscionable.[83] Alternatively, under the severability provision, the Court can and should excise those provisions and compel arbitration.[84]

## IX.   Conclusion

For the reasons stated above and in Defendants' opening brief, the Court should compel Plaintiffs to arbitrate their claims against all Defendants on an individual basis in the pending JAMS arbitrations.

---

[80] *Id*. at 1037 (emphasis added).

[81] While the ICOA's arbitration clause was more detailed than the T.M.J. DA, the *Sanders* court's analysis focused exclusively on the "arising out of … the relationship created by the Agreement" language to reach its conclusion. That is the same language in the T.M.J. DA.

[82] *See* Pls.' Opp'n 32-33.

[83] *See, e.g.*, *Klein v. Sinclair Broad. Grp., Inc.*, No. 8:21-cv-00476-PX, 2021 WL 5326467, at *5 (D. Md. Nov. 16, 2021) (finding fee- and cost-shifting clause not unconscionable where limited to "reasonable fees" and clause was "not a one-sided condition but is mutually applicable regardless of which party prevails"); *D'Antuono,* 789 F. Supp. 2d at 329 (finding exotic dancer clause with "collective and class action waiver, a cost- and fee-shifting, and a provision shortening the statute of limitation," when "taken together, and even assuming Defendants had not agreed to waive enforcement of two of the three features," did not "render the arbitration clause so unfair that no sensible person would make it and that no fair and honest person would accept it."); *see Walther*, 386 Md. at 426 (stating same test, quoting RESTATEMENT (SECOND) OF CONTRACTS § 208 cmt. b (1981)).

[84] *See, e.g., D'Antuono*, 789 F. Supp. 2d at 340-41 (court would likely sever offending provisions if defendants had not conceded they would not seek to enforce them).

March 1, 2024                              Respectfully submitted,

                                          */s/ William J. Anthony*
                                          William J. Anthony (CT17865)
                                          wanthony@littler.com

                                          LITTLER MENDELSON, P.C.
                                          900 Third Avenue
                                          New York, NY  10022.3298
                                          Telephone:   212.583.9600
                                          Facsimile:    212.832.2719

                                          Joshua B. Waxman (*pro hac vice*)
                                          LITTLER MENDELSON, P.C.
                                          815 Connecticut Avenue, NW, Suite 400
                                          Washington, DC 20006
                                          Telephone: 202.789.3406
                                          Facsimile:   202.478.2623
                                          jwaxman@littler.com

                                          Michael McIntosh (*pro hac vice*)
                                          LITTLER MENDELSON, P.C.
                                          1800 Tysons Boulevard, Suite 500
                                          Tysons Corner, VA 22102
                                          Telephone:  703.286.3118
                                          Facsimile:   703.991.8016


                                          *Attorneys for Defendants*
                                          *Schmidt Baking Distribution, LLC and Schmidt*
                                          *Baking Company, Inc.*

Case 3:23-cv-01695-MPS   Document 28   Filed 03/01/24   Page 18 of 18

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2024, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all counsel and pro se parties of record by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

Zachary L. Rubin, Esq.
Harold L. Ritchen, Esq.
Matthew W. Thompson, Esq.
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston St., Suite 2000
Boston, MA 02116

*/s/ William J. Anthony*
William J. Anthony (CT17865)

# EXHIBIT 6

## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| **NATHANIEL SILVA and PHIL ROTHKUGEL, on behalf of themselves and all others similarly situated,**<br><br>            Plaintiffs,<br><br>    v.<br><br>**SCHMIDT BAKING DISTRIBUTION, LLC and SCHMIDT BAKING COMPANY, INC. ,**<br><br>        Defendants. | **Civil Action No.: 3:23-cv-01695-MPS**<br><br><br>**June 17, 2024** |

### DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CERTIFICATION OF AN INTERLOCUTORY APPEAL

# TABLE OF CONTENTS

<div align="right">PAGE</div>

I.   INTRODUCTION ................................................................................................. 1

II.  SUMMARY OF LITIGATION HISTORY AND COURT'S ORDER
     COMPELLING INDIVIDUAL ARBITRATION OF THEIR WAGE AND
     HOUR CLAIMS ................................................................................................. 3

     A.   Class Action Complaint And Removal To Federal Court ..................... 3

     B.   Defendants' Motion To Compel Individual Arbitration ........................ 3

     C.   Plaintiffs' Opposition To Defendants' Motion To Compel ................... 5

     D.   Defendants' Reply In Support Of Motion To Compel .......................... 7

     E.   The Parties' Post-Briefing Activity ...................................................... 8

     F.   The Court's May 2, 2024 Ruling .......................................................... 9

III. SUMMARY OF SUPREME COURT'S BISSONNETTE DECISION AND
     CURRENT STATUS IN THE SECOND CIRCUIT ...................................... 13

IV.  SECTION 1292(B) LEGAL STANDARDS ................................................... 14

     A.   Controlling Question Of Law ............................................................. 18

     B.   Substantial Ground For Difference Of Opinion .................................. 19

     C.   Materially Advance The Ultimate Termination Of The Litigation ..... 21

V.   ARGUMENT ................................................................................................... 22

     A.   The Court Should Not Certify The Question Of Whether The Distribution
          Agreements Are "Contracts Of Employment" For Purposes Of The FAA
          Section 1 Exclusion ............................................................................. 22

          1.   Plaintiffs Present Several New Arguments That They Could Have
               Raised Before The Court's Ruling Or Even In A Motion For
               Reconsideration ........................................................................... 22

          2.   Plaintiffs Cannot Meet Any of the Three Criteria for Certification
               of an Interlocutory Appeal, Much Less All of Them .................. 26

               a.   Plaintiffs fail to present a "controlling question of law" ............. 26

## TABLE OF CONTENTS
(CONTINUED)

<div align="right">PAGE</div>

        b.    Plaintiffs fail to show a "substantial ground for a difference of opinion" .................................................................. 29

        c.    Plaintiffs fail to show that an immediate appeal "may materially advance the ultimate termination of the litigation" ..................................................................... 30

  B.    The Court Should Not Certify The Question Of Whether There The Level Of Plaintiffs' Sophistication Is Relevant To The Analysis Of The Delegation Clause In The Distribution Agreements ............................................ 35

VI.    CONCLUSION ............................................................................................ 37

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Aggrenox Antitrust Litig.*,
    No. 3:14-md-02516 (SRU), 2018 WL 834228 (D. Conn. Feb. 12, 2018) ...........................1, 15

*Aleksanian v. Uber Technologies, Inc.*,
    No. 22-98-CV, 2023 WL 7537627 (2d Cir. Nov. 14, 2023) ....................................................27

*Amos v. Amazon Logistics, Inc.*,
    74 F.4th 591 (4th Cir. 2023) ..........................................................................................9, 23, 24

*AT&T Mobility LLC v. Concepcion*,
    [563 U.S. 333] (2011) ...............................................................................................................35

*In re Belton*,
    No. 15-CV-1934 (VB), 2016 WL 164620 (S.D.N.Y. Jan. 12, 2016) ................................21, 35

*Bissonette v. Lepage Bakeries Park St., LLC*,
    460 F. Supp. 3d 191 (D. Conn. 2020) ..........................................................................2, 7, 33

*Bissonnette v. LePage Bakeries Park St., LLC*,
    216 L. Ed. 2d 1312 (Sept. 29, 2023) ..........................................................................................5

*Bissonnette v. LePage Bakeries Park St., LLC*,
    49 F.4th 655 (2d Cir. 2022) ........................................................................................................5

*Bissonnette v. LePage Bakeries Park St., LLC*,
    601 U.S. 246 (2024)...........................................................2, 6, 7, 9, 10, 13, 14, 27, 32, 33

*Brock v. Flowers Food, Inc.*,
    673 F. Supp. 3d 1180 (D. Colo. 2023) ...................................................................24, 25, 29

*Cal. Pub. Employees' Ret. Sys. v. WorldCom, Inc.*,
    368 F.3d 86 (2d Cir. 2004)........................................................................................................18

*Canales v. CK Sales Co., LLC*,
    67 F.4th 38 (1st Cir. 2023)................................................................................................24, 25, 29

*Carpenter v. Pepperidge Farm, Inc.*,
    No. 23-2372, 2024 WL 2103257 (3d Cir. May 10, 2024) ....................................................28

*Century Pac., Inc. v. Hilton Hotels Corp.*,
    574 F. Supp. 2d 369 (S.D.N.Y. 2008).....................................................................................14

1

*Cerrato v. Solomon & Solomon*,
No. 3:11-cv-623 (JCH), 2013 WL 12286084 (D. Conn. Jan. 4, 2013) ............................21, 30

*Coinbase, Inc. v. Bielski*,
599 U.S. 736 (2023)....................................................................................................1, 31

*Davarci v. Uber Techs., Inc.*,
No. 20-CV-9224 (VEC), 2021 WL 5326412 (S.D.N.Y. Nov. 15, 2021) .........................21, 34

*Dill v. JPMorgan Chase Bank, N.A.*,
No. 19 Civ. 10947 (KPF), 2021 WL 3406192 (S.D.N.Y. Aug. 4, 2021) ...................17, 34, 35

*In re Facebook, Inc. IPO Secs. & Derivative Litig.*,
986 F. Supp. 524, 529 (S.D.N.Y. 2014).......................................................................18, 21

*Fairbank Reconstruction Corp. v. Greater Omaha Packing Co.*,
No. 13-CV-907S, 2020 WL 7427025 (W.D.N.Y. Dec. 18, 2020) ..................................18, 28

*Fli-Lo Falcon, LLC v. Amazon.com, Inc.*,
97 F.4th 1190 (9th Cir. 2024) ....................................................2, 9, 22, 23, 24, 28

*Flores v. National Football League*,
No. 22-CV-0871 (VEC), 2024 WL 50238 (S.D.N.Y. Jan. 4, 2024)..........18, 19, 20, 22, 32, 36

*Goldfarb v. Channel One Russia*,
No. 18-CV-8128 (JPC), 2021 WL 1392850 (S.D.N.Y. Apr. 13, 2021) ...........................19, 36

*In re Goldman Sachs Grp., Inc., Secs. Litig.*,
No. 10 Civ. 3461(PAC), 2014 WL 5002090 (S.D.N.Y. Oct. 7, 2015)...................................34

*Gray v. Schmidt Baking Co., Inc.*,
No. 22-CV-00463-LKG, 2023 WL 2185778 (D. Md. Feb. 23, 2023)...................................11

*Gray v. Schmidt Baking Co.*,
No. 22-CV-00463-LKG, 2023 WL 9285466 (D. Md. Oct. 16, 2023)............10, 11, 23, 26, 29

*Harris v. TD Ameritrade, Inc.*,
No. 17 CV 6033-LTS-BCM, 2019 WL 10945228 (S.D.N.Y. July 9, 2019).........19, 21, 22, 36

*Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*,
No. 3:11-CV-292 (JCH), 2012 WL 13027294 (D. Conn. Dec. 27, 2012) ......................20, 30

*Islam v. Lyft, Inc.*,
2021 WL 5762211 (S.D.N.Y. Dec. 3, 2021) .........................................................31, 32, 33

*James v. Venture Home Solar, LLC*,
--- F. Supp. 3d ---, 2024 WL 446085 (D. Conn. Feb. 6, 2024).........................................15, 34

*Kinkead v. Humana, Inc.*,
No. 3:15-cv-01637(JAM), 2016 WL 9453808 (D. Conn. Oct. 13, 2016) ............................15

*Klinghoffer v. S.N.C. Achille Lauro*,
921 F.2d 21 (2d Cir. 1990)........................................................................15, 17, 18

*Kumaran v. Nat'l Futures Ass'n*,
No. 1:20-cv-3668-GHW, 2023 WL 3160116 (S.D.N.Y. Apr. 28, 2023) ........................17, 18

*Kuzinski v. Schering Corp.*,
614 F. Supp. 2d 247 (D. Conn. 2009) ............................................................16, 17

*Lee v. Postmates Inc.*,
2019 WL 1864442 (N.D. Cal. 2019) .......................................................................31

*Lee v. Postmates*,
No. 19-80055, Dkt. 3 (9th Cir. July 30, 2019).........................................................31

*Morrison v. Ocean State Jobbers, Inc.*,
290 F.R.D. 347 (D. Conn. 2013) ...........................................................................32

*Murray v. UBS Secs., LLC*,
No. 13-CV-5914 (KPF), 2014 WL 1316472 (S.D.N.Y. Apr. 1, 2014) ..........................21, 35

*In re NASDAQ Mkt. Makers Antitrust Litig.*,
938 F. Supp. 232 (S.D.N.Y. 1996) ....................................................................21, 30

*New Prime v. Oliveira*,
586 U.S. 105 (2019).........................................................................................2, 7

*Oliveira v. New Prime, Inc.*,
857 F.3d 7 (1st Cir. 2017)............................................................................2, 25, 29

*Pal v. Canepari*,
No. 3:20cv13(MPS), 2021 WL 8362143 (D. Conn. May 27, 2021) ...............................16, 17

*Rochester Drug Co-Op., Inc. v. Hiscox Ins. Co., Inc.*,
No. 6:20-CV-06024 EAW, 2021 WL 671603 (W.D.N.Y. Feb. 22, 2021).............................16

*Rodriguez v. Procter & Gamble Co.*,
499 F. Supp. 3d 1202 (S.D. Fla. 2020) ...............................................................19, 22

*Sacchi v. Verizon Online LLC*,
No. 14-CV-423 (RA), 2015 WL 1729796 (S.D.N.Y. Apr. 14, 2015) .............................16, 17

*Saxon v. Sw. Airlines Co.*,
No. 19-cv-00403, 2023 WL 2456382 (N.D. Ill. Mar. 10, 2023) .......................................8

*SEC v. Straub*,
    No. 11 Civ. 9645 (RJS), 2013 WL 4399042 (S.D.N.Y. Aug. 5, 2013) ..................................17

*Shah v. Wilco Sys.*,
    No. 99 Civ. 12054, 2000 WL 1876913 (S.D.N.Y. Dec. 22, 2000)........................................21

*Silva v. Schmidt Baking Distrib., LLC*,
    No. 3:23-v-01695-MPS, 2024 WL 1932635 (D. Conn. May 2, 2024).......9, 10, 11, 12, 13, 20,
    23, 24, 25, 27, 28, 36

*Smith v. Spizzirri*,
    144 S. Ct. 1173 (2024)....................................................................................................27

*Southwest Airlines Co. v. Saxon*,
    596 U.S. 450 (2022)........................................................................................................27

*Stone v. Wells Fargo Bank, N.A.*,
    361 F. Supp. 3d 539 (D. Md. 2019) .............................................................................11, 37

*Tantaros v. Fox News Network, LLC*,
    465 F. Supp. 3d 385 (S.D.N.Y. 2020).....................................................................18, 19, 21

*Tarpon Bay Partners LLC v. Zerez Holdings Corp.*,
    No. 3:17-cv-579 (SRU), 2019 WL 10984250 (D. Conn. Oct. 29, 2019) ....................1, 15, 16

*In re Teva Sec. Litig.*,
    No. 3:17-CV558 (SRU), 2021 WL 1197805 (D. Conn. Mar. 30, 2021) ..............16, 17, 20, 29

*Tillman Transportation, LLC v. MI Business Inc.*,
    95 F.4th 1057 (6th Cir. 2024) ...........................................................................................9

*In re Trilegiant Corp., Inc.*,
    No. 3:12-CV-396 (VLB), 2015 WL 13901228 (D. Conn. Mar. 26, 2015).......................20, 29

*Vidal v. Advanced Care Staffing, LLC*,
    No. 1:22-CV-05535, 2023 WL 2783251 (E.D.N.Y. Apr. 4, 2023) ...................................11, 36

*Weber v. U.S.*,
    484 F.3d 154 (2d Cir. 2007).............................................................................................15

*Whyte v. WeWork Cos., Inc.*,
    No. 20-cv-1800 (CM), 2020 WL 4383506 (S.D.N.Y. July 31, 2020) .......................19, 21, 37

*Williston v. Eggleston*,
    410 F. Supp. 2d 274 (S.D.N.Y. 2006)................................................................................15

*In re World Trade Ctr. Disaster Site Litig.*,
    469 F Supp. 2d 134 (S.D.N.Y. 2007)................................................................................16

4

**Statutes**

9 U.S.C. § 1 .................................................................................................... *passim*

9 U.S.C. § 16(a) ...............................................................................................31

9 U.S.C. § 16(b)(1) .......................................................................................1, 15

28 U.S.C. § 1292(b) ............................................1, 3, 14, 15, 16, 18, 21, 31, 37

28 U.S.C. § 1332(a) ...........................................................................................3

Maryland Uniform Arbitration Act .................................................3, 4, 5, 7, 32

Pennsylvania's Wage Payment and Collection Law ......................................28

**Other Authorities**

Local Civ. R. 7(a)(1)-(2), 7(d) ..........................................................................8

Local Civ. R. 7(c)(1) .........................................................................................2

Defendants Schmidt Baking Distribution, LLC ("SBD") and Schmidt Baking Company, Inc. ("SBC") (collectively the "Schmidt Defendants") respectfully submit this memorandum in opposition to Plaintiffs' Motion for Certification of an Interlocutory Appeal (ECF 33, Pls.' Mot.)) of the Court's May 2, 2024 Ruling (ECF 32) compelling Plaintiffs Nathaniel Silva and Phil Rothkugel (collectively, "Plaintiffs") to arbitrate their claims against the Schmidt Defendants on an individual basis.

## I.  INTRODUCTION

"Congress provided for immediate interlocutory appeals of orders denying—but not of orders granting—motions to compel arbitration." *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023). While the Federal Arbitration Act ("FAA"), 9 U.S.C. § 16(b), recognizes that a plaintiff compelled to arbitrate may request that the district court certify its order for interlocutory appeal under 28 U.S.C. § 1292(b), that party bears a "***heavy burden*** of demonstrating that the case is an ***exceptional*** one in which immediate appeal is warranted."[1] That burden includes showing that ***each*** of the three criteria for an interlocutory appeal is satisfied. And even if each criterion is satisfied, this Court has "unfettered discretion" to deny certification of its order for interlocutory appeal.[2] Plaintiffs' bid falls woefully short—indeed, ***not even one of the three Section 1292(b)*** ***criteria*** are satisfied for ***either*** of the two questions for which they seek certification.

As such, much of Plaintiffs' motion reads more like (1) a sur-reply addressing the uniform set of business-to-business "contract of employment" cases raised in the Schmidt Defendants' Reply in support of their motion to compel (ECF 28); (2) a response to Defendants' April 25, 2024,

---

[1] *In re Aggrenox Antitrust Litig.*, No. 3:14-md-02516 (SRU), 2018 WL 834228, at *1 (D. Conn. Feb. 12, 2018) (Underhill, J.) (as cleaned up in *In re Teva Sec. Litig.*, No. 3:17-CV558 (SRU), 2021 WL 1197805, at *7 (D. Conn. Mar. 30, 2021) (Underhill, J.)) (emphasis added).

[2] *See Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, No. 3:17-cv-579 (SRU), 2019 WL 10984250, at *1 (D. Conn. Oct. 29, 2019) (Underhill, J.).

Notice of Supplemental Authority (ECF 31) concerning the Ninth Circuit's decision in *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190 (9th Cir. 2024); and (3) a motion for reconsideration of the Court's ruling that the Supreme Court did not address in *New Prime v. Oliveira*, 586 U.S. 105 (2019), whether a contract between business entities can be a "contract of employment" under Section 1 of the FAA, 9 U.S.C. § 1. But all these arguments come too late – a motion for certification of an order for interlocutory appeal is simply not the time to lob arguments and additional case authority which could have been raised before the Court's May 2, 2024 Ruling, or within seven days after its issuance in a motion for reconsideration. *See* L. Civ. R. 7(c)(1).

In doing so, Plaintiffs continue to misrepresent what the Supreme Court did and did not decide in *New Prime Inc.*, and then further mislead the Court as to what remains at stake before the Second Circuit following remand in *Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246 (2024). Multiple courts, including this one, have correctly found that the issue of whether a business-to-business contract is a "contract of employment" for purposes of Section 1 ***was not*** addressed in *New Prime Inc.*, and Judge Dooley left no doubt that issue was never raised in the district court in *Bissonnette*. *See Bissonette v. Lepage Bakeries Park St., LLC*, 460 F. Supp. 3d 191, 194 n.2 (D. Conn. 2020) (Dooley, J.). Consequently, Plaintiffs' misdirection falls flat.

As a result, Plaintiffs fail meet any of the criteria to support an interlocutory appeal under Section 1292. With respect to the first question of whether the parties' Distribution Agreements ("DAs") entered into by SBD and corporate entities formed by Plaintiffs for the purpose of purchasing rights to distribute Schmidt baked goods within specific geographic sales areas constitute "contracts of employment" for purposes of the Section 1 exclusion from FAA coverage, Plaintiffs fail to: (1) present a "pure question of law" that can be decided by the Second Circuit without resort to the factual record; (2) identify an intra-Circuit split of authority on the question

2

(or really any split of authority), thus making irrelevant whether this is an issue of first impression for the Second Circuit; and (3) show that interlocutory consideration of the question "may materially advance the ultimate termination of the litigation," particularly where the Court has not yet decided whether, in the alternative, arbitration can be compelled under the Maryland Uniform Arbitration Act and where the class action waiver in the DAs' arbitration provisions prohibits class actions in any forum, whether in arbitration or in court.

Finally, Plaintiffs' half-hearted request to certify the second question of whether the sophistication of the parties affects whether the DA's reference to JAMS constitutes adoption of specific rules requiring delegation of contract enforceability questions is completely devoid of any analysis of the three Section 1292(b) criteria. Further, the Court's alternative finding that Plaintiffs failed to demonstrate that they were sufficiently "unsophisticated" renders this question particularly ill-suited for interlocutory appeal.

Accordingly, Plaintiffs' motion should be denied in its entirety.

## II. SUMMARY OF LITIGATION HISTORY AND COURT'S ORDER COMPELLING INDIVIDUAL ARBITRATION OF THEIR WAGE AND HOUR CLAIMS

### A. Class Action Complaint And Removal To Federal Court

On October 24, 2023, Plaintiffs filed a two-count putative class action in Hartford County Superior Court alleging that they and others had been misclassified under Connecticut state law as independent contractors rather than employees. (*See* ECF 1, Ex. A.) On December 29, 2023, the Schmidt Defendants timely removed the complaint to this Court based on complete diversity under 28 U.S.C. § 1332(a). (*See* ECF 1.) Plaintiffs did not seek to remand this action to state court.

### B. Defendants' Motion To Compel Individual Arbitration

On January 5, 2024, the Schmidt Defendants moved to compel Plaintiffs to arbitrate their claims on an individual basis. (*See* ECF 10-12.) The motion was based on Distribution Agreements

("DAs") entered into between SBD and corporate entities created, owned, and controlled by Plaintiffs, whereby the corporate entities purchased rights to distribute and sell fresh-baked Schmidt bread products in specific sales areas. (*See* ECF 11, Defs.' Mem. ISO Mot. to Compel 3-4.) More specifically, Plaintiff Silva, as President of Silva's Baked Goods, entered into two separate DAs, on June 24, 2020, and October 28, 2020, to obtain distribution rights for two different Schmidt sales areas in Connecticut. (*Id*. at 4.) Similarly, Plaintiff Rothkugel, as President of Trout Slayers Baked Breads Inc., entered into a DA on December 16, 2020, to obtain distribution rights for another Schmidt sales area. (*Id*.)

Article 11 of each DA provided for resolution of "[a]ny dispute between [SBD] and [Plaintiff's corporate entity] arising out of the relationship created by this [DA]" through optional mediation and mandatory final and binding arbitration under JAMS rules. (*Id*. at 6.) Section 11.7 of the DAs further identified as proper arbitration parties "affiliates and their respective owners, officers, directors, agents, and employees" of SBD and "affiliates and their respective owners, officers and directors" of Plaintiffs' corporate entities. (*Id*.) That section also included what is colloquially known as a "Class Action Waiver," which requires any claims to be brought on an individual basis. (*Id*. at 7.) After being served with Plaintiffs' class action complaint, the Schmidt Defendants timely sought mediation (Plaintiffs declined) and timely filed demands for individual arbitration with JAMS.[3] (*Id*. at 9.)

Of particular relevance to Plaintiffs' request that this Court certify its May 2, 2024 Ruling for interlocutory appeal,[4] the Schmidt Defendants argued in their motion to compel: (1) there was

---

[3] The JAMS arbitrations were stayed pending resolution of the Schmidt Defendants' motion to compel arbitration.

[4] The summary of the parties' briefing on the motion to compel arbitration is limited to the specific questions of law Plaintiffs seek to raise on interlocutory appeal. Defendants' alternative argument for compelling under the Maryland Uniform Arbitration Act is also discussed because, since the

an agreement to arbitrate and thus the FAA required the Court to compel arbitration (*id*. at 21-23); (2) alternatively, the Court should compel arbitration under the Maryland Uniform Arbitration Act ("MUAA") (*id*. at 31-32); and (3) challenges to arbitrability issues were delegated to the arbitrators as a result of the incorporation of JAMS rules in Section 11.3 of the DAs (*id*. at 23-24).[5]

### C.     Plaintiffs' Opposition To Defendants' Motion To Compel

On February 9, 2024, Plaintiffs filed their opposition to the motion to compel arbitration. Of relevance to the instant motion, Plaintiffs contended, *inter alia*, (1) they were exempt from the FAA's coverage by the "transportation worker" exclusion contained in Section 1 of the FAA, 9 U.S.C. § 1 (ECF 24, Pls.' Opp'n to Mot. to Compel 15-19); (2) the MUAA does not apply because the DAs provided the arbitration provisions were exclusively governed by the FAA (*id*. 19-20); and (3) the DA's delegation clause was unenforceable because they were not sophisticated enough to understand that incorporation of JAMS rules meant that arbitrability issues would be decided by the arbitrator instead of the Court (*id*. 21-23).

With respect to Section 1 exclusion, Plaintiffs argued that (1) the Supreme Court was poised to decide in *Bissonnette v. LePage Bakeries Park St., LLC*, 216 L. Ed. 2d 1312 (Sept. 29, 2023) (granting petition for writ of certiorari involving Second Circuit's ruling in *Bissonnette v. LePage Bakeries Park St., LLC*, 49 F.4th 655 (2d Cir. 2022)), "whether delivery drivers who

---

Court did not reach that argument, a Second Circuit ruling favorable to Plaintiffs on either question presented would not guarantee that Plaintiffs remain in court.

[5] Plaintiffs identify numerous purported "uncontested facts" in their Procedural History. (*See* Pls.' Mot. 3-5 (citing ECF 24-1, Silva Decl. ISO Opp'n to Mot. to Compel).) This description is misleading because the Schmidt Defendants were not required to contest such facts in their motion to compel arbitration.  Moreover, the very first sentence of Plaintiffs' filing is inaccurate, as it claims a fact to be "indisputably" true when it is anything but. *Id.* at 1 ("Plaintiffs, individuals who indisputably worked as delivery drivers for Defendants …"). The term "worked" implies "employed," and the Schmidt Defendants maintain that Plaintiffs worked for their own corporate entities and were not employed by SBD.

transport baked goods to retail locations are transportation workers exempt from the Federal Arbitration Act" (*id*. 15); (2) a Maryland U.S. district court, in a case involving Schmidt distribution agreements, "erroneously assumed that the Supreme Court had never 'addressed whether [the FAA Section 1] exemption applies when the parties are both business entities," (*id*. 17, quoting *Gray v. Schmidt Baking Co.*, No. 22-CV-00463-LKG, 2023 WL 9285466, at *3 (D. Md. Oct. 16, 2023)); (3) "the Supreme Court has squarely addressed this question and held that where the plaintiff-worker is asserting claims for unpaid wages arising from his work pursuant to an alleged 'independent contractor' agreement signed by his corporate entity, the agreement constitutes a contract 'to perform work' that is exempt from the FAA" (*id*., citing *New Prime v. Oliveira*, 586 U.S. 105, 139 S. Ct. 532, 544 (2019)); and (4) even under the Second Circuit's *Bissonnette* decision, the transportation worker exclusion applied because SBD was a distribution company, not a bakery or manufacturer (*id*. at 18-19).

With regard to the "unsophisticated plaintiff" argument, Plaintiffs relied only upon an Eastern District of New York case and a District of Maryland case to argue that "by merely referencing JAMS (and not a specific set of JAMS rules) in the DAs)," that "Plaintiffs (as unsophisticated truck drivers)," would not have understood which JAMS rules would apply or that those rules "allowed arbitrability issues to be delegated to the arbitrator." (*Id*. at 22-23.) Plaintiffs also offered ***evidence*** claiming that they "and similarly situated delivery drivers are unsophisticated wage earners who drive commercial vehicles for a living," in the form of declarations from both Plaintiffs regarding their education and purported lack of business training. (*See id*. at 9 & ECF 24-1 & 24-2.) More specifically, Plaintiff Silva averred that he had "a high school diploma but [] never attended college," "[did] not have any formal business training," and "never attended business school" (ECF 24-1 at ¶ 20). Plaintiff Rothkugel attested that he had

"never studied business," (ECF 24-2 at ¶ 9). Both Plaintiffs also recited their lack of familiarity with arbitration and JAMS at the time they signed their DAs. (*See* ECF 24-1 at ¶ 12, ECF 24-2 at ¶ 12.)

### D. Defendants' Reply In Support Of Motion To Compel

On March 1, 2024, Defendants filed their reply in support of the motion to compel. (*See* ECF 28, Defs.' Reply ISO Mot. to Compel.) Of relevance to the issues presented in Plaintiffs' motion, Defendants responded as follows:

*First*, Plaintiffs failed to establish the arbitration provision was within a "contract of employment" and, in fact, argued extensively that they were ***not*** parties to the DAs and their wage claims were ***not*** covered by the DAs. (*Id*. 4.)

*Second*, as explained by Judge Dooley in the *Bissonnette* district court decision,[6] three other district court decisions, and the First Circuit's opinion in *New Prime*, the Supreme Court has ***never*** had occasion to determine whether the FAA Section 1 exclusion applies to arbitration provisions within contracts between business entities. (*Id*. 4-5 & n.26.) Further, the courts that had actually reached that issue have ***uniformly*** found that Section 1 does not apply to arbitration agreements where the parties are both business entities, like here. (*Id*. 5-6 & n.27 (collecting Fourth Circuit and three district court decisions)). The Schmidt Defendants also predicted (correctly as it turned out) that Supreme Court's forthcoming ruling in *Bissonnette* would not address the issue presented here of whether business-to-business contracts are "contracts of employment" because neither the district court nor the Second Circuit had reached that issue. (*Id*. 6.)

*Third*, the MUAA applies to Plaintiffs' DAs if the FAA does not and Plaintiffs failed to

---

[6] *Bissonette v. Lepage Bakeries Park St., LLC*, 460 F. Supp. 3d 191, 194 n.2 (D. Conn. 2020), *aff'd sub nom. Bissonnette v. LePage Bakeries Park St., LLC*, 49 F.4th 655 (2d Cir. 2022), *rev'd*, 601 U.S. 246 (2024).

address the ample authority, including the post-Supreme Court application of the Illinois arbitration act in *Saxon v. Southwest Airlines Co.*, applying state arbitration acts, even when arbitration agreements do not specifically mention such state arbitration laws.[7] (*Id.* 8.)

    *Fourth*, in response to Plaintiffs' "unsophisticated truck drivers" argument, the Schmidt Defendants pointed to Connecticut and Maryland contract law principles placing responsibility for understanding a contract on the contracting parties, even when a party is "unsophisticated." (*Id.* 8-9.) Further, Defendants offered additional facts, including: (1) the directives in the DA disclosure documents provided to Plaintiffs stating that they should "[r]ead all of your contract carefully" and "[s]how your contract and this Disclosure document to an advisor, like a lawyer or accountant;" (2) the ease with which the JAMS website could be found by a simple Google search; (3) evidence that Plaintiff Silva had created his Silva Baked Goods entity more than four months before signing his first DA (and more than two months earlier than he claimed he ever discussed purchasing a distribution route from Schmidt) and later created an unrelated business entity (Silva Logistics LLC) in 2023; and (4) evidence that Plaintiff Rothkugel had attended Central Connecticut State University for *at least* three years. (*Id.* at 9 & nn. 48-49). The Schmidt Defendants also highlighted what was noticeably *absent* from the Plaintiffs' declarations – statements that they did not read their DAs, were not given time to read them, were prohibited from seeking legal counsel or professional advice and did not seek such advice. (*Id.* at 9.)

    **E.**    **The Parties' Post-Briefing Activity**

    Neither party requested oral argument in their briefs and Plaintiffs never sought leave to file a sur-reply, as permitted by this Court's Local Rules. *See* L. Civ. R. 7(a)(1)-(2), 7(d).

---

[7] In *Saxon*, the arbitration agreement provided "this Agreement is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq*.," yet the court there still looked to state arbitration law. *Saxon v. Sw. Airlines Co.*, No. 19-cv-00403, 2023 WL 2456382, at *1 n.1 (N.D. Ill. Mar. 10, 2023).

On April 24, 2024, Plaintiffs filed a notice of supplemental authority regarding the Supreme Court's decision in *Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246 (2024). (*See* ECF 30.) Plaintiffs argued that the decision confirmed that, for the Section 1 exclusion, "a court's focus is on the delivery work actually performed by the workers, not the industry of the employer." (*Id.* at 2.) Notably, Plaintiffs did not argue the decision had relevance to the issue of whether the DAs were "contracts of employment." (*See generally id.*)

On April 25, 2024, the Schmidt Defendants filed a notice of supplemental authority regarding the Ninth Circuit's April 10, 2024, affirmance of a case cited in Defendants' Reply in support of the motion to compel arbitration. (*See* ECF 31.) In *Fli-Lo Falcon, LLC*, 97 F.4th at 1195, the Ninth Circuit held that Section 1 of the FAA "does not extend to business entities like plaintiffs." In reaching that decision, the court of appeals relied upon the Circuit decisions in *Amos v. Amazon Logistics, Inc.*, 74 F.4th 591, 596-97 (4th Cir. 2023), and *Tillman Transportation, LLC v. MI Business Inc.*, 95 F.4th 1057, 1061 (6th Cir. 2024). The Ninth Circuit further held that "'contracts of employment' in the transportation worker exemption do not extend to commercial contracts," such as the Delivery Service Partner agreements at issue. "In other words, for a contract to *be* a contract of employment covered by § 1, it must have a *qualifying* worker as one of the parties." 97 F.4th at 1196-97.

*Plaintiffs did not file a response to Defendants' notice of supplemental authority or seek leave to do so*.

### F. The Court's May 2, 2024 Ruling

On May 2, 2024, the court granted the Schmidt Defendants' motion to compel arbitration and stayed the case pending arbitration. (ECF 32, reported as *Silva v. Schmidt Baking Distrib.,*

*LLC*, No. 3:23-v-01695-MPS, 2024 WL 1932635 (D. Conn. May 2, 2024) (Shea, J.).)[8]

*First*, the Court rejected Plaintiffs' argument that the Supreme Court's decision in *New Prime Inc. v. Oliveira* "squarely addresses" the circumstances in this case. *Silva*, 2024 WL 1932635 at *4 (collecting cases). It also agreed with the Schmidt Defendants that "[w]hile the Supreme Court has not decided whether § 1 applies to contracts between two business entities, several lower courts have reached this question and have uniformly answered it in the negative." *Id*. at *5 (collecting cases). The Court then expressly agreed with the holding of those cases and noted that the DAs "contain none of the characteristic elements of employment contracts, such as terms regarding salaries or benefits. Instead, they read like what they are—agreements between businesses." *Id*. After reciting several provisions, including the responsibility for Plaintiffs' entities to hire and fire their own employees," the Court concluded, "These are not terms typically seen in contracts between a business and its workers; they are, instead, terms that suggest a supplier-distributor relationship between two companies." *Id*. In addition, the Court observed that corporations and limited liability companies are not "workers" under the FAA. *Id*. Finally, the Court concluded that the Supreme Court's *Bissonnette* decision "does not help Plaintiffs here" because it did not address the issue of "whether a contract between two businesses can constitute a 'contract[] of employment' under § 1 of the FAA." *Id*. at *5 n.2 (citations omitted). For those reasons, as the District of Maryland had done in *Gray*, 2023 WL 9285466, at *3-4, when considering materially **identical** DAs, the Court found that Plaintiffs are not exempt from arbitration under Section 1. *Id*. at *6.

*Second*, the Court rejected Plaintiffs' arguments that they are not bound by the arbitration provisions because they are not parties to the DAs and that SBC, as a non-party, cannot enforce

---

[8] Herein, Westlaw citations to the Court's May 2, 2024 Ruling are used.

the arbitration provisions. *Id*. at *6-7.  After determining Maryland law applied to the analysis, the Court relied upon Section 11.7 of the DAs to find "the language of the Distribution Agreements evinces an intent to bind both" Plaintiffs (as both "owners" and "officers" of the corporate entity signatories) and SBC (as an "affiliate" of signatory SBD) "to arbitrate their disputes." *Id*. at *7-8.

*Third*, the Court found that the arbitration provisions sufficiently incorporate JAMS rules, and expressly agreed with the same conclusion drawn in *Gray v. Schmidt Baking Co., Inc.*, No. 22-CV-00463-LKG, 2023 WL 2185778, at *8 (D. Md. Feb. 23, 2023). *Silva*, 2024 WL 1932635 at *9-10. The Court further noted that, under JAMS rules, "invoking JAMS as the arbitrator is enough to incorporate the applicable rules." *Id*. at *10.

*Fourth*, the Court rejected Plaintiffs' argument that "they are unsophisticated parties and should not be bound by delegation via incorporation of the JAMS rules." *Id*. It distinguished the only two supporting cases cited by Plaintiffs,[9] identified three Second Circuit district court decisions rejecting that argument and noted that "while the Second Circuit has not yet addressed this issue, every Circuit to consider it has declined to distinguish between sophisticated and unsophisticated parties (citing Third, Fifth, and Sixth Circuit decisions). *Id*. The Court concluded that "[t]he question whether incorporation provides 'clear[ ] and unmistakabl[e]' evidence should not turn on the sophistication of the parties." *Id*.

**More importantly for purposes of Plaintiffs' instant motion**, the Court also concluded, in the alternative, "Plaintiffs here have not done enough to show that they are, in fact, unsophisticated parties." *Id*. at *10 n.6. After summarizing Plaintiffs' profits earned from the sale of their distribution rights and their revenues, the court stated, "Plaintiffs were sophisticated enough to

---

[9] *See id*. n.5 (distinguishing *Vidal v. Advanced Care Staffing, LLC*, No. 1:22-CV-05535, 2023 WL 2783251, at *9 (E.D.N.Y. Apr. 4, 2023), and *Stone v. Wells Fargo Bank, N.A.*, 361 F. Supp. 3d 539, 555 (D. Md. 2019)).

profitably operate their businesses and to engage in transactions to sell their distribution rights at considerable profits. In light of these facts, Plaintiffs purportedly limited formal education and their status as 'truck drivers' is not sufficient to demonstrate that they are 'unsophisticated.'" *Id*. The Court's express recognition that "Silva, as President of Silva's Baked Goods, sold the distribution rights to many of his company's customers for approximately double the financed price, and his company made hundreds of thousands of dollars in pre-tax net revenue over the course of his company's ownership of the distribution rights," and "Rothkugel, as President of Trout Slayer, sold the distribution rights to his sales area for nearly double its financed prices, and his company made nearly a hundred thousand dollars in pre-tax net revenue over the course of his company's one-year ownership of the distribution rights" (*see id*. at *10 n.6), lays bare Plaintiffs' myth, ***at least in this case***, for needing an immediate appeal, *i.e.*, supporting "unsophisticated," "low-wage" workers who cannot afford arbitration and must have their claims addressed as soon as possible. (*See* Pls.' Opp'n to Mot. to Compel 9, 26-28.)

After finding Plaintiffs were not exempt from arbitration under Section 1 of the FAA, the Court found "the language of the Distribution Agreements evinces an intent to bind both Plaintiffs and SBC to arbitrate their disputes. *Id*. at *7. It also concluded that that the parties delegated arbitrability issues to the arbitrator by incorporating JAMS rules, and specifically rejected Plaintiffs' argument that (1) the reference to JAMS in the DAs did not incorporate a particular set of rules; and (2) Plaintiffs were "unsophisticated parties and so, should not be bound by delegation via incorporation of the JAMS rules. *See id*. at *8-10. On the second issue, the Court noted, "while the Second Circuit has not yet addressed this issue, every Circuit to consider it has declined to distinguish between sophisticated and unsophisticated parties." *Id*. at *10 (collecting cases).

Finally, the Court rejected all of Plaintiffs' substantive and procedural unconscionability

challenges to the delegation clause. *Id*. at *11-13.

*Following the Court's ruling, Plaintiffs did not file a motion for reconsideration of any aspect of the decision*. Instead, Plaintiffs waited nearly a month to file their motion for an order certifying the Court's ruling for interlocutory appeal, even though their motion reads repeatedly like an untimely motion for reconsideration or improper sur-reply.

## III.   SUMMARY OF SUPREME COURT'S *BISSONNETTE* DECISION AND CURRENT STATUS IN THE SECOND CIRCUIT

As they did in their briefing on the motion to compel arbitration, Plaintiffs contend that the Supreme Court's decision in *Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246 (2024), is relevant to this case and their motion to certify the Court's ruling for interlocutory appeal. More specifically, Plaintiffs argue: (1) the *Bissonnette* case involves "identical facts to the instant matter" and if the Second Circuit decides to hear an interlocutory appeal in this matter, it can be consolidated "with the *Bissonnette* appeal already pending" (following remand from the Supreme Court) to preserve judicial resources (Pls.' Mot. 17); and (2) *Bissonnette* involved a "franchise agreement" and "[o]ne would think that if the contracts at issue in that case were so obviously outside the Section 1 exemption, the Court would not have engaged in an unnecessary and purely academic discussion of the other contours of the Section 1 exemption," *id*. at 2 n.1. Accordingly, the litigation history in *Bissonnette* is relevant to Plaintiffs' motion.

In *Bissonnette*, 601 U.S. at 252 (emphasis added), the "***only question*** before [the Supreme Court] [was] whether a transportation worker must work for a company in the transportation industry to be exempt under § 1 of the FAA," and it concluded that "there is no such requirement."[10] The Supreme Court expressly stated that "[t]he Second Circuit did not address

---

[10] The *Bissonnette* plaintiffs' petition for writ of certiorari presented **only one question**: "To be exempt from the Federal Arbitration Act, must a class of workers that is actively engaged in interstate transportation also be employed by a company in the transportation industry?" *See*

whether [the named plaintiffs] qualify as a transportation worker based on the work that they perform, or whether they are 'engaged in … interstate commerce' even though they do not drive across state lines," and that it also "[does] not decide those issues." *Id*. at 252 n.2; *see also id*. at 256 ("We express no opinion on any alternative grounds in favor of arbitration raised below, including that petitioners are not transportation workers and that petitioners are not 'engaged in foreign or interstate commerce' within the meaning of § 1 because they deliver baked goods only in Connecticut."). The Supreme Court vacated the Second Circuit's decision and "remanded for further proceedings consistent with this opinion." *Id*.

Upon remand, on May 24, 2024, the Second Circuit recalled its mandate, reinstated the plaintiffs' appeal, and ordered the parties to "submit briefing … addressing the impact of the Supreme Court's decision and any remaining issues, including the two issues the [Supreme] Court explicitly preserved." *Bissonnette v. LePage Bakeries Park St., LLC*, No. 20-1681 (2d Cir.), Dkt. 214, 215, 219 (citing *Bissonnette*, 601 U.S. at 252 n.2). The post-Supreme Court briefing is set to be completed on July 31, 2024. *Id*. Dkt. 219. As discussed in Section V.A.2.d, *infra*, the Second Circuit is unlikely to decide the issue of whether a business-to-business contract is a "contract of employment" because the argument was not made in the district court.

## IV.    SECTION 1292(b) LEGAL STANDARDS

"Litigants are generally required to wait for a final judgment to appeal." *Century Pac., Inc. v. Hilton Hotels Corp.*, 574 F. Supp. 2d 369, 370 (S.D.N.Y. 2008) (citing *Klinghoffer v. S.N.C.*

---

*Bissonnette v. LePage Bakeries Park St., LLC*, No. 23-51, 2023 WL 4680058, at *I (U.S. July 17, 2023).

That question does not implicate the business-to-business "contracts of employment" issue presented in Plaintiffs' instant motion, and the Court should not infer otherwise from the mere fact that the Supreme Court decided that Section 1 exemption question without pausing to consider whether the contract containing the arbitration provision was a "contract of employment" in the first place.

14

(194 of 218), Page 194 of 218   Case: 24-2201, 08/27/2024, DktEntry: 7.1, Page 194 of 218
Case 3:23-cv-01695-MPS   Document 38   Filed 06/17/24   Page 23 of 47

*Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990)); *see also Tarpon Bay Partners LLC*, 2019 WL 10984250, at *1 (Underhill, J.) (same). "However, 28 U.S.C. § 1292(b) allows a district judge to certify an order for interlocutory appeal when the judge is 'of the opinion that such order [1] involves a controlling question of law [2] as to which there is a substantial ground for difference of opinion and [3] that an immediate appeal from the order may materially advance the ultimate termination of the litigation.'"[11] *Tarpon Bay Partners LLC*, 2019 WL 10984250, at *1 (quoting 28 U.S.C. § 1292(b)) (as quoted in *Tarpon Bay Partners LLC*).[12] However, "Congress did not intend 28 U.S.C. § 1292(b) to serve an error-correction function." *Weber v. U.S.*, 484 F.3d 154, 159 n.3 (2d Cir. 2007) (citation omitted).

"The party that seeks certification under section 1292(b) bears the **heavy burden** of demonstrating that the case is an exceptional one in which immediate appeal is warranted." *In re Aggrenox Antitrust Litig.*, 2018 WL 834228, at *1 (Underhill, J.) (as cleaned up in *In re Teva Sec. Litig.*, 2021 WL 1197805, at *7 (Underhill, J.)) (emphasis added).

"Because the statute is strictly construed, all three criteria must be met for the district court to certify an order." *James*, 2024 WL 446085, at *10 (Haight, J.) (citations omitted).[13] Thus, "[t]he

---

[11] Section 16(b) of the FAA "provides generally that 'an appeal may not be taken from an interlocutory order … granting a stay of any action under section 3 of this title,' 9 U.S.C. § 16(b)(1), or 'compelling arbitration under section 206 of this title,' *id*. § 16(b)(3)." *James v. Venture Home Solar, LLC*, --- F. Supp. 3d ---, 2024 WL 446085, at *10 (D. Conn. Feb. 6, 2024) (Haight, J.). "However, Section(b) [of the FAA] permits appellate review of orders that a district court certifies for interlocutory appeal pursuant to 28 U.S.C. § 1292(b)." *Id*. (citing 9 U.S.C. § 1292(b)).

[12] "Even if a district court certifies an order for appeal under § 1292(b), the party seeking review 'still has the burden of persuading the court of appeals' to take the appeal, and '[t]he appellate court may deny the appeal for any reason, including docket congestion.'" *Kinkead v. Humana, Inc.*, No. 3:15-cv-01637(JAM), 2016 WL 9453808, at *2 (D. Conn. Oct. 13, 2016) (Meyer, J.) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 (1978), *superseded by statute on other grounds*))).

[13] *See also Klinghoffer*, 921 F.2d at 25 ("the power [to grant an interlocutory appeal] must be strictly limited to the precise conditions stated in the law") (citation omitted); *Williston v.*

proponents of an interlocutory appeal have the burden of showing that all three of the substantive criteria are met." *Sacchi v. Verizon Online LLC*, No. 14-CV-423 (RA), 2015 WL 1729796, at *2 (S.D.N.Y. Apr. 14, 2015) (quoting *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 524, 529 (S.D.N.Y. 2014)) (internal quotation marks omitted).

"[W]hether to certify a question of law for interlocutory review is entirely a matter of discretion for the District Court.'" *Pal v. Canepari*, No. 3:20cv13(MPS), 2021 WL 8362143, at *2 n.2 (D. Conn. May 27, 2021) (Shea, J.) (quoting *In re Teva Sec. Litig.*, 2021 WL 1197805, at *10 (Underhill, J.)) (internal quotation marks omitted) (alternation in *In re Teva Sec. Litig.*); *accord Tarpon Bay Partners LLC*, 2019 WL 10984250, at *1 (Underhill, J.). Indeed, "[d]istrict courts have 'unfettered discretion to deny certification … even when a party has demonstrated that the criteria of 28 U.S.C. § 1292(b) are met.'" *Tarpon Bay Partners LLC*, 2019 WL 10984250, at *1 (quoting *In re World Trade Ctr. Disaster Site Litig.*, 469 F Supp. 2d 134, 144 (S.D.N.Y. 2007));[14] *see also Rochester Drug Co-Op., Inc. v. Hiscox Ins. Co., Inc.*, No. 6:20-CV-06024 EAW, 2021 WL 671603, at *3 (W.D.N.Y. Feb. 22, 2021)("'[d]istrict courts do have independent and unreviewable authority to deny certification even where the three statutory criteria are met.'") (quoting *Nat'l Asbestos Workers Med. Fund v. Phillip Morris, Inc.*, 71 F. Supp. 2d 139, 146 (E.D.N.Y. 1999)).

"Interlocutory appeal 'is a rare exception' where, in the discretion of the district judge, it 'may avoid protracted litigation.'" *In re World Trade Ctr. Disaster Site Litig.*, 469 F Supp. 2d at 144 (quoting *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865-66 (2d Cir. 1996), *abrogation*

---

*Eggleston*, 410 F. Supp. 2d 274, 276 (S.D.N.Y. 2006) ("The criteria are conjunctive, not disjunctive.") (quoting *Ahrenholz v. Bd. of Trs. of the Univ. of Ill.*, 219 F.3d 674, 676 (7th Cir. 2000) (other citation omitted)).

[14] *See also In re Teva Sec. Litig.*, 2021 WL 1197805, at *7; *Kuzinski v. Schering Corp.*, 614 F. Supp. 2d 247, 249 (D. Conn. 2009) (Arterton, J.).

*on other grounds recognized by Yousef v. Al Jazeera Media Network*, No. 16-cv-6416 (CM), 2018 WL 1665239, at * (S.D.N.Y. Mar. 22, 2018)). "Interlocutory appeals are disfavored, and, because the procedure 'was not intended as a vehicle to provide early review of difficult rulings in hard cases,' a party seeking appeal must demonstrate 'exceptional circumstances' justifying it." *Kuzinski*, 614 F. Supp. 2d at 249 (Arterton, J.) (quoting *Williston*, 410 F. Supp. 2d at 276 (collecting cases)); *see also Klinghoffer*, 921 F.2d at 25 ("it continues to be true that only 'exceptional circumstances [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.'") (quoting *Livesay*, 437 U.S. at 475 (1978), *superseded by statute on other grounds*); *Kumaran v. Nat'l Futures Ass'n*, No. 1:20-cv-3668-GHW, 2023 WL 3160116, at *3 (S.D.N.Y. Apr. 28, 2023) ("Leave to appeal an interlocutory order should be granted 'only in exceptional circumstances that overcome the general aversion to piecemeal litigation and justify departing from the basic policy of postponing appellate review until after the entry of a final judgment.'") (quoting *Picard v. Estate of Madoff*, 464 B.R. 578, 582-83 (S.D.N.Y. 2011)); *Dill v. JPMorgan Chase Bank, N.A.*, No. 19 Civ. 10947 (KPF), 2021 WL 3406192, at *4 (S.D.N.Y. Aug. 4, 2021) ("federal practice strongly disfavors discretionary interlocutory appeals [as they] prolong judicial proceedings, add delay and expense to litigants, burden appellate courts, and present issues for decisions on uncertain and incomplete records, tending to weaken the precedential value of judicial opinions.") (quoting *SEC v. Straub*, No. 11 Civ. 9645 (RJS), 2013 WL 4399042, at *2 (S.D.N.Y. Aug. 5, 2013)) (alteration in *Straub*).[15]

---

[15] *See also Pal*, 2021 WL 8362143, at *2 n.2 (Shea, J.) (party seeking an interlocutory appeal must show "exceptional circumstances") (quoting *In re O'Neil*, No. 3:13MC00176(SRU), 2014 WL 169872, at *2 (D. Conn. Jan. 15, 2014) (Underhill, J.)); *In re Teva Sec. Litig.*, 2021 WL 1197805, at *7 (same); *Sacchi*, 2015 WL 1729796, at *2 ("Interlocutory appeals are presumptively disfavored.") (quoting *Garber v. Office of the Comm'r of Baseball*, No. 12-CV-3704 (SAS), 2014 WL 4716068, at *1 (S.D.N.Y. Sept. 22, 2014)) (internal quotation marks omitted).

17

"Accordingly, district courts must 'exercise great care in' choosing to grant a party leave to file an interlocutory appeal." *Kumaran*, 2023 WL 3160116, at *3 (quoting *In re Facebook, Inc. IPO Secs. & Derivative Litig.*, 986 F. Supp. 2d at 530).

## A.      Controlling Question Of Law

"[A] question of law is controlling if reversal of the district court's order would terminate the action." *Klinghoffer*, 921 F.2d at 24. "A question of law can also be controlling if reversal of the district court's order 'could significantly affect the conduct of the action' or if 'the certified issue has precedential value for a large number of cases.'" *Tantaros v. Fox News Network, LLC*, 465 F. Supp. 3d 385, 389 (S.D.N.Y. 2020) (quoting *Glatt v. Fox Searchlight Pictures Inc.*, No. 11-CV-6784, 2013 WL 5405696, at *2 (S.D.N.Y. Sept. 17, 2013) (other citation omitted)).

"[A] controlling question of law 'must refer to a 'pure' question of law that the reviewing court could decide quickly and cleanly without having to study the record.'" *Fairbank Reconstruction Corp. v. Greater Omaha Packing Co.*, No. 13-CV-907S, 2020 WL 7427025, at *4 (W.D.N.Y. Dec. 18, 2020) (quoting *Retail Pipeline, LLC v. JDA Software Grp., Inc.*, No. 2:17-CV-00067, 2018 WL 2298355, at *2 (D. Vt. May 21, 2018) (citing *Youngers v. Virtus Inv. Partners Inc.*, 228 F. Supp. 3d 295, 298 (S.D.N.Y. 2017))) (other citation omitted).[16]

"A 'pure' question of law is not 'synonymous with 'an issue that might be free from a factual contest.'" *Flores*, 2024 WL 50238, at *3 (quoting *In re Belton*, No. 15-CV-1934 (VB), 2016 WL 164620, at *1 n.1 (S.D.N.Y. Jan. 12, 2016)). "Rather, a question of law is only suitable

---

[16] *Accord, e.g., Flores v. National Football League*, No. 22-CV-0871 (VEC), 2024 WL 50238, at *1 (S.D.N.Y. Jan. 4, 2024); *In re Facebook, Inc. IPO Secs. & Derivative Litig.*, 986 F. Supp. 2d at 536 ("mixed questions of law and fact are not appropriate for certification under § 1292(b)") (citation and internal quotation marks omitted); *see also Cal. Pub. Employees' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 96 (2d Cir. 2004) ("By its plain terms, Section 1292(b) may only be used to challenge legal determinations.").

for certification if it raises 'an abstract legal issue.'" *Id.* (quoting *In re Worldcom, Inc.*, No. M-47 HB, 2003 WL 21498904, at *10 (S.D.N.Y. June 30, 2003)). "Simply 'refram[ing] the factual issues in [the] case as questions of law' by 'turning them into hypotheticals' is insufficient." *Id.* (quoting *Bishop v. Best Buy, Co. Inc.*, No. 08-CV-8427 (LBS), 2011 WL 4011449, at *13 (S.D.N.Y. Sept. 8, 2011)) (other citation omitted) (alteration in *Flores*); *see also Goldfarb v. Channel One Russia*, No. 18-CV-8128 (JPC), 2021 WL 1392850, at *10 (S.D.N.Y. Apr. 13, 2021) ("[D]isputes concerning the application of the law to the specific facts of a case typically are not appropriate for an interlocutory appeal."). Thus, where an issue presented for certification requires assessment of an issue "based on the unique facts of [the] case, such as "mixed factual and legal analysis is not suitable for interlocutory appeal." *Flores*, 2024 WL 50238, at *3 (collecting cases).

Moreover, to the extent that a motion "seeks to certify questions involving new arguments … which were not presented" in prior briefing, "those arguments are not properly considered in connection with a motion for certification of an interlocutory appeal." *Harris v. TD Ameritrade, Inc.*, No. 17 CV 6033-LTS-BCM, 2019 WL 10945228, at *2 (S.D.N.Y. July 9, 2019); *see also Rodriguez v. Procter & Gamble Co.*, 499 F. Supp. 3d 1202, 1209 (S.D. Fla. 2020) ("because courts have consistently rejected attempts to raise new arguments in a motion for interlocutory appeal, [defendant's] new arguments will not be considered at this juncture") (collecting cases).

### B.  Substantial Ground For Difference Of Opinion

"A substantial ground for difference of opinion exists where '(1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit.'" *Tantaros*, 465 F. Supp. 3d at 391 (quoting *In re Enron Corp.*, No. 01-CV016034, 2007 WL 2780394, at *1 (S.D.N.Y. Sept. 24, 2007)).

"[T]he possibility of a different outcome on appeal is not sufficient to show a substantial ground for difference of opinion, nor is the mere presence of a disputed issue that is a question of

first impression." *Whyte v. WeWork Cos., Inc.*, No. 20-cv-1800 (CM), 2020 WL 4383506, at *2 (S.D.N.Y. July 31, 2020) (as cleaned up in *In re Teva Sec. Litig.*, 2021 WL 1197805, at *7); *accord Flores*, 2024 WL 50238, at *5 ("It is well established that '[s]imply because' a question of law has 'not yet been directly addressed by the Supreme Court or the Second Circuit' does not mean that it raises a reasonable ground for difference of opinion.") (quoting *Williston*, 410 F. Supp. 2d at 277) (alteration in *Flores*); *Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*, No. 3:11-CV-292 (JCH), 2012 WL 13027294, at *3 (D. Conn. Dec. 27, 2012) (Hall, J.) ("the Second Circuit has held that 'the mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion'") (quoting *In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996)). "Indeed, 'it is the duty of the district judge to analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a substantial ground for dispute.'" *In re Teva Sec. Litig.*, 2021 WL 1197805, at *7 (quoting *In re Flor*, 79 F.3d at 284) (as cleaned up by *In re Teva Sec. Litig.*).

Further, "***[d]isagreement among courts outside the Second Circuit does not establish a substantial ground for difference of opinion***." [17] *Id.* (quoting *Ryan, Beck & Co., LLC v. Fakih*, 275 F. Supp. 2d 393, 398 (E.D.N.Y. 2003) (quoting *Colon ex rel. Molina v. BIC USA, Inc.*, No. 00 CIV. 3666(SAS), 2001 WL 88230, at *2 (S.D.N.Y. Feb. 1, 2001))) (emphasis added); *accord Healthcare Strategies, Inc.*, 2012 WL 13027294, at *3 (Hall, J.).[18]

---

[17] While the Schmidt Defendants maintain the case authority on the issue of whether business-to-business contracts are "contracts of employment" for purposes of Section 1 is uniform (and this Court agreed, *see Silva*, 2024 WL 1932635 at *5), Plaintiffs cite to **no case** within the Second Circuit in support of their argument that there is a split in authority. (*See* Pls.' Mot. 15-16 (citing First Circuit and District of Colorado cases).)

[18] *See, e.g., In re Trilegiant Corp., Inc.*, No. 3:12-CV-396 (VLB), 2015 WL 13901228, at *3 (D. Conn. Mar. 26, 2015) (Bryant, J.) ("To the extent that Plaintiffs try to cull opposition to the Court's

Finally, "[d]isagreement as to the interpretation of persuasive authority, or a claim that the district court's decision is incorrect, will generally be insufficient to establish a substantial ground for a difference of opinion." *Harris*, 2019 WL 10945228, at *2 (citing *Aspen Ford, Inc. v. Ford Motor Co.*, No. CV-01-4677 (CPS), 2008 WL 163695, at *2 (E.D.N.Y. Jan. 15, 2008)).

## C.    Materially Advance The Ultimate Termination Of The Litigation

"Although the last of the three factors for 1292(b) certification for interlocutory appeal, '[c]ourts place particular weight on … whether immediate appeal will materially advance the ultimate termination of the litigation.'" *In re Facebook, Inc. IPO Secs. & Derivative Litig.*, 986 F. Supp. 2d at 531 (quoting *Florio v. City of New York, N.Y.*, No. 06 Civ. 6473(SAS), 20018 WL 3068247, at *1 (S.D.N.Y. Aug. 5, 2008)) (other citations omitted) (alteration in *In re Facebook, Inc. IPO Secs. & Derivative Litig.*); *see, e.g., Tantaros*, 465 F. Supp. 3d at 389 (same); *Murray*, 2014 WL 1316472, at *7 (same). That condition is "satisfied only if the interlocutory appeal 'promises to advance the time for trial or to shorten the time required for trial.'" *Whyte*, 2020 WL 4383506, at *2 (quoting *Youngers*, 228 F. Supp. 3d at 302). "'[T]he mere possibility that a reversal of the Court's order would [obviate the need for arbitration] is insufficient to meet this third element' of Section 1292(b)." *In re Belton*, 2016 WL 164620, at *1 (quoting *In re Goldman Sachs Grp., Inc., Secs. Litig.*, No. 10 Civ. 3461(PAC), 2014 WL 5002090, at *2 (S.D.N.Y. Oct. 7, 2015))

---

rulings from district courts within other circuits, Defendants rightly assert that '[c]ourts have repeatedly found that disagreement among courts outside the Second Circuit does not establish a substantial ground for difference of opinion.'" (quoting *Murray v. UBS Secs., LLC*, No. 13-CV-5914 (KPF), 2014 WL 1316472, at *6 (S.D.N.Y. Apr. 1, 2014)); *Cerrato v. Solomon & Solomon*, No. 3:11-cv-623 (JCH), 2013 WL 12286084, at *2 (D. Conn. Jan. 4, 2013) (Hall, J.) (denying certification, in part, because the cases cited by the defendant were outside the Second Circuit); *Shah v. Wilco Sys.*, No. 99 Civ. 12054, 2000 WL 1876913, at *2 (S.D.N.Y. Dec. 22, 2000) (same); *In re NASDAQ Mkt. Makers Antitrust Litig.*, 938 F. Supp. 232, 235 (S.D.N.Y. 1996) ("opinions in other districts do not control in this Circuit and do not in themselves create 'substantial grounds for a difference of opinion.'").

21

(second alteration in *In re Belton*); *accord Davarci v. Uber Techs., Inc.*, No. 20-CV-9224 (VEC), 2021 WL 5326412, at *3 (S.D.N.Y. Nov. 15, 2021) ("A 'mere possibility that a reversal of the Court's order would end the case is insufficient' to meet the third requirement to certify an appeal.") (quoting *In re Goldman Sachs Grp., Inc., Secs. Litig.*, 2014 WL 5002090, at *2).

Finally, where a court finds "it is more likely that the Second Circuit would affirm the Court's decision or decline to hear the appeal, resulting in '[unnecessary[y] delay," the court should deny certification of an order for interlocutory appeal. *Flores*, 2024 WL 50238, at *6 (quoting *Murray*, 2014 WL 1316472, at *7) (other citations omitted).

## V.    ARGUMENT

For the reasons stated below, the Court's May 2, 2024 Ruling should not be certified for interlocutory appeal.

### A.    The Court Should Not Certify The Question Of Whether The Distribution Agreements Are "Contracts Of Employment" For Purposes Of The FAA Section 1 Exclusion

#### 1.    Plaintiffs Present Several New Arguments That They Could Have Raised Before The Court's Ruling Or Even In A Motion For Reconsideration

Throughout their motion, Plaintiffs raise multiple arguments that were not made in opposition to the Schmidt Defendants' motion to compel arbitration. Some could have been addressed affirmatively in their opposition, while others could have been raised by (1) seeking leave to file a sur-reply; (2) filing a response to Defendants' April 25, 2024, Notice of Supplemental Authority (ECF 31, Defs.' Notice of Supp. Authority), or (3) filing a motion for reconsideration. But a motion to certify an order for interlocutory appeal is neither the time nor place to raise new arguments. *See, e.g., Rodriguez*, 499 F. Supp. 3d at 1209 (collecting cases); *Harris*, 2019 WL 10945228, at *2.

*First*, Plaintiffs seek to distinguish "the two appellate cases which this Court chiefly relied

22

on" (*i.e.*, the Ninth Circuit's 2024 *Fli-Lo Falcon, LLC v. Amazon.com Inc.* decision and the Fourth Circuit's 2023 *Amos v. Amazon Logistics, Inc.* decision), "as well as most of the District Court decisions" relied upon by the Court on the basis that those cases purportedly "emphasized that had the cases been brought by individual workers, such as in this case, the result would likely have been different."[19] (*See* Pls.' Mot. 1.)

But at the time they filed their Opposition to the motion to compel arbitration, Plaintiffs were well aware that a District of Maryland court had found that the identical DAs at issue there were not "contracts of employment" within the meaning of Section 1 because they were agreements between business entities, yet their entire Opposition argument directed at that issue was limited to whether the Supreme Court had addressed in *New Prime Inc. v. Oliveira* whether the Section 1 exclusion applies where the parties to an agreement are both business entities.[20] Of course, the District of Maryland cited the same district court decisions cited by this Court and in the Ninth Circuit's *Fli-Lo Falcon, LLC* case. *See Gray*, 2023 WL 9285466, at *2 (citing *ShaZor Logistics v. Amazon.com, LLC*, 2022 WL 4277190 (E.D. Mich. 2022), and *R&C Oilfield Servs., LLC v. Am. Wind Transp. Grp., LLC*, 447 F. Supp. 3d 339 (W.D. Pa. 2020)); *compare Fli-Lo Falcon, LLC*, 97 F.4th at 1197 (same); *Silva*, 2024 WL 1932635 at *5 (same and also citing *Gray*, 2023 WL 9285466, at *2). Yet Plaintiffs did not address those cases in their Opposition brief. Plaintiffs neither sought leave to file a sur-reply when the Schmidt Defendants specifically cited

---

[19] In fact, in *Amos v. Amazon Logistics, Inc.*, one of the named plaintiffs was "Ahaji Amos" (an individual) and the Complaint pled an FLSA overtime claim, as well individual statutory and tort claims, on behalf of the plaintiff in her individual capacity. *See Amos et al. v. Amazon Logistics, Inc.*, No. 1:22-cv-00055-CCE-JEP, ECF 1 (M.D.N.C. filed Jan. 24, 2022). at ¶¶ 195-214, 232-294. Further, the district court's arbitration order compelled arbitration of the claims of both the individual plaintiff and her corporate entity. *See Amos v. Amazon Logistics, Inc.*, 74 F.4th 591, 594 (4th Cir. 2023).

[20] (*See* Defs.' Mem. ISO Mot. to Compel 2 n.3 (citing attached D. Md. slip opinion on motion for reconsideration in *Gray v. Schmidt Baking Co.*); Pls.' Opp'n to Mot. to Compel 16-17).

those cases, nor sought leave to file a response to Defendants' Notice of Supplemental Authority drawing the Court's attention to the *Fli-Lo Falcon, LLC* Ninth Circuit decision (and two Circuit cases relied upon therein). ***Now is too late to present these new arguments***.

Even if the Court considered these new arguments, they are not persuasive. For instance, Plaintiffs claim the *Shazor* court "distinguished the case from instances in which the plaintiff was an actual worker (as opposed to a corporation)" (Pls.' Mot. 13), but they omit the relevant legal conclusion: "Section 1 is inapplicable to contracts between businesses, because businesses do not sign employment contracts with one another." *Shazor Logistics, LLC*, 628 F. Supp. 3d at 712. It is undisputed that the DAs here are ***contracts between business entities***. Further, as in *Shazor*, the DAs "only contemplated a business-to-business relationship." *Id*. In fact, as this Court noted, in Section 2.3, the parties expressly agreed that each of Plaintiffs' corporate entities had "the right to operate the business as it chooses, and shall bear all risks and costs of operating such business," and will be responsible for hiring and firing its own employees. *Silva*, 2024 WL 1932635, at *5.

*Second*, Plaintiffs for the first time rely upon two other Section 1 cases, *Canales v. CK Sales Co., LLC*, 67 F.4th 38 (1st Cir. 2023), and *Brock v. Flowers Food, Inc.*, 673 F. Supp. 3d 1180, 1186 (D. Colo. 2023). (*See* Pls.' Mot. 12, 14, 15-16.) Obviously, both were decided before Plaintiffs filed their Opposition to the motion to compel arbitration, but neither was raised therein.[21] Again, it is too late.

But in any event, in *Canales*, the First Circuit declined to address the argument that "plaintiffs do not themselves have 'contracts of employment' with defendants, as that term is used in section 1 [of the FAA], because the Distribution Agreements were signed on behalf of [a corporate entity] and not plaintiffs personally," ***finding the defendant there had waived that***

---

[21] The same is true of *Amos*, *supra*.

***argument by not raising it in the district court***. *Canales*, 67 F.4th at 43, 44-45. And the *Brock*

opinion does not mention any "contract of employment" having been made and does not address

the issue at all. *See Brock*, *supra*. In short, while the "facts" in those case may be similar to the

facts here in terms of involving agreements signed between corporate entities, neither case actually

decided the issue for which Plaintiffs seek interlocutory appeal. Accordingly, those cases are

irrelevant and have no bearing on the central question at issue here.

      *Third*, Plaintiffs extensively ***re-argue*** that the Supreme Court has already addressed the

"contracts of employment" issue in *New Prime Inc. v. Oliveira*. (Pls.' Mot. 2, 10-12.) Beyond

repeating prior arguments from their Opposition to the motion to compel, they offer new evidence

in the form of the "agreement that was before the Supreme Court" to show that the agreement

containing the arbitration provision in that case was "also between plaintiff's company and New

Prime, not with [the individual named plaintiff]," and thus was "legally indistinguishable from the

contract here with respect to the incorporation issue." (*Id.* at 11.) Yet again, this argument and new

evidence was not previously presented to the Court and, therefore, comes too late. ***But more***

***importantly, Plaintiffs do not address the only issue that matters*** – whether the Supreme Court

(or *Canales* or *Brock*) ever ***actually decided*** whether an individual covered by an arbitration

agreement between a corporate entity it owns and controls and another corporate entity is a

"contract of employment" for purposes of Section 1. As this Court correctly concluded, that answer

is no—indeed, Plaintiffs cite no case contrary to the four cases cited by this Court finding that the

*New Prime Inc.* does not address that issue. *See Silva*, 2024 WL 1932635 at \*4 (collecting cases).

Put another way, while *New Prime Inc.* may have addressed ***a "contracts of employment" issue***,

it did not have occasion to address ***the business-to-business "contracts of employment" issue***

***presented here***—that is because the parties "both below and on appeal, treated the contract as one

25

between [an individual] and [a corporation]." *Oliveira v. New Prime, Inc.*, 857 F.3d 7, 17 (1st Cir. 2017).

### 2. Plaintiffs Cannot Meet Any of the Three Criteria for Certification of an Interlocutory Appeal, Much Less All of Them

#### a. Plaintiffs fail to present a "controlling question of law"

With respect to the "contracts of employment" issue, Plaintiffs implicitly concede that reversal of this Court's decision would not result in dismissal, and instead focus on whether such a reversal "could significantly affect the conduct of the action" or whether their proposed issue for certification "has precedential value for a large number of cases." (Pls.' Mot. 14 (quoting *Murray*, 2014 WL 1316472 at *3 (other citation omitted)).) Both points miss the mark.

*First*, there is no guarantee that Plaintiffs' action would proceed as a "putative class action" because the DAs contain an enforceable class action waiver that is expressly applicable in "litigation," as well as in "arbitration"—meaning that the entire underlying argument made by Plaintiffs (*i.e.*, needing to preserve their right to proceed on a class-wide basis) is based upon an incorrect premise. More specifically, Section 11.7 provides that "any proceeding **in any forum** to resolve any dispute, including mediation, arbitration, **litigation**, and/or government action involving DISTRIBUTOR, shall be conducted on an individual basis only, and not on a class-wide basis or as a representative action, collective action, or a collective governmental action."[22] (*See* ECF 11, Ex. 2-A, § 11.7 (Silva Baked Goods DA) & Ex. 2-B, , § 11.7 (Trout Slayers Baked Breads DA) (emphasis added.) Plaintiffs concede that currently the case will be proceeding as "two individual arbitrations"—that is because of Section 11.7. If the action remains in this Court, it still

---

[22] In *Gray*, the Schmidt Defendants contemporaneously filed with their motion to compel arbitration a motion to dismiss that, *inter alia*, challenged the class allegations based on the class action waiver contained in the DAs. The Maryland district court did not rule on the motion to dismiss since it compelled individual arbitration of the plaintiffs' claims.

will proceed as two individual claims for the same reason.  In other words, certification of an interlocutory appeal will not preserve any class action rights, since those have already been waived by all parties in any future proceeding.

*Second*, Plaintiffs assert there is "a large number of cases that have addressed [the transportation worker exemption] in the past several years." (Pls.' Mot. 15.) But the number of cases that have addressed whether a business-to-business contract can qualify as a "contract of employment" is quite small. Indeed, none of the three cases cited by Plaintiffs involved such a challenge. (*See id*.) As this Court found, the Supreme Court's *Bissonnette* decision "does not help Plaintiffs here" because the Supreme Court "did not address the question at issue here—*i.e.*, whether a contract between businesses can constitute a 'contract[] of employment' under § 1 of the FAA."  *Silva*, 2024 WL 1932635 at \*5 n.2.  Of course, *Southwest Airlines Co. v. Saxon*, 596 U.S. 450 (2022) (addressing whether plaintiff was a "transportation worker"), also did not address whether business-to-business agreements can constitute "contracts of employment," nor did *Aleksanian v. Uber Technologies, Inc.*, No. 22-98-CV, 2023 WL 7537627, at \*1 (2d Cir. Nov. 14, 2023) (unpublished) (finding additional discovery was required "to determine whether the 'class of workers' are 'engaged in … interstate commerce' within the meaning of the [FAA]").[23] Plaintiffs' attempt to graft the specific issue presented here onto the wider range of transportation worker exemption cases and issues should be rejected, particularly when they ignore that another district court dealing with the same DAs reached the exact same ruling as this Court.

Finally, even if the Court accepts either of Plaintiffs' points above, they have still failed to

---

[23] Because the *Aleksanian* district court dismissed the action when it compelled arbitration (rather than stay it, as is now required under *Smith v. Spizzirri*, 144 S. Ct. 1173 (2024)), the route to the Second Circuit was via direct appeal of a final judgment rather than by certification of the order for interlocutory appeal. *See Aleksanian*, 2023 WL 7537627 at \*1.

present a "'pure' question of law that the reviewing court could decide quickly and cleanly without having to study the record.'" *Fairbank Reconstruction Corp.*, 2020 WL 7427025, at *4 (quoting *Retail Pipeline, LLC*, 2018 WL 2298355, at *2). If nothing else, the Second Circuit must consider Plaintiffs' allegation that they "were required to form corporate entities" and other facts set forth in their instant motion and in the Court's analysis (*see Silva*, 2024 WL 1932635 at *5),[24] in order to resolve the "contracts of employment" issue.[25] (*See* Pls.' Mot. 3-5 (citing ECF 24-1, Silva Decl.

---

[24] While irrelevant here, the merits issues are not as clear cut as Plaintiffs assert. Plaintiffs were not mere "delivery drivers," as they claim. Rather, through the corporate entities they controlled they purchased distribution rights, providing them with the exclusive right to sell and distribute Schmidt product within specific geographic sales areas. (ECF 11, Ex. 2-A, § 1.5 & Ex. 2-B, § 11.5.) And under Section 4.5 of their DAs, Plaintiffs, through their corporate entities, had the right "to engage such persons as [they] deemed appropriate to discharge [the distributor's] responsibilities," including "the exclusive right to select, fix the compensation of, set work hours, work schedules, and vacations for, discharge and otherwise manage, supervise and control all persons engaged by [the distributor[s]." (*See* Defs.' Mot. to Compel 5; *see also Silva*, 2024 WL 1932635 at *5 (describing how Plaintiffs' corporate entities had "'the right to operate the business as [they] choose[ ]; 'shall bear all risks and costs of operating [their] business[es]'; and will be responsible for hiring and firing their own employees".) In addition, the corporate entities were "free both to distribute merchandise for other firms," with some conditions. *See Silva*, 2024 WL 1932635 at *5. They also had the ability to, and in fact did, profit from the expansion of their sales areas and sold some or all of their distribution rights "at considerable profits." *See id.* at *5, 10 n.6.

As this Court correctly found, "[t]hese are not terms typically seen in contracts between a business and its workers; they are, instead, terms that suggest a supplier-distributor relationship between two companies." *Id.* at *5. Further, as the Ninth Circuit noted in *Fli-Lo Falcon, LLC*, nothing in the law bars a company from choosing "to contract only with business entities." 97 F.4th at 1197.

[25] Plaintiffs discuss at length "a common practice of companies like Defendants to require delivery drivers and other workers to incorporate and sign agreements purporting to create an 'independent contractor' or 'business' relationship," and that "[t]ime and again, those workers have nonetheless been held to be employees under various state and federal wage and hours laws." (*See* Pls.' Mot. 6-9.) This is not true, as a recent Third Circuit decision demonstrates. *See Carpenter v. Pepperidge Farm, Inc.*, No. 23-2372, 2024 WL 2103257 (3d Cir. May 10, 2024) (unpublished op.) (affirming summary judgment against plaintiff-owners of distribution routes for food products with agreements designating them as "self-employed independent contractor[s]" who claimed to be employees under Pennsylvania's Wage Payment and Collection Law). But all of that goes to the merits of their claims, and not the questions for which Plaintiffs seek certification for interlocutory appeal. ***Whether Plaintiffs prevail on the merits (in arbitration or litigation) is irrelevant to the instant motion, as is their likelihood of success on the merits***. (*See id.* at 9 ("Plaintiffs Silva and Rothkugel have filed this action as presumed employees under the Connecticut wage laws, and

ISO Opp'n to Mot. to Compel).) Thus, this first required criterion for justifying an interlocutory appeal has not been satisfied.

### b. Plaintiffs fail to show a "substantial ground for a difference of opinion"

Plaintiffs acknowledge there are two paths to satisfy the "substantial ground for difference of opinion" criterion, *i.e.*, "(1) there is conflicting authority on an issue or (2) the case is particularly difficult and of first impression within this Circuit." (Pls.' Mot. 15 (quoting *U.S. ex rel. Drake v. NSI, Inc.*, 736 F. Supp. 2d 489, 503 (D. Conn. 2010)). ***However, they only argue the "conflicting authority" route.*** (*See id.* at 16 ("A resolution of this conflict has significant ramifications for the purposes of the FAA and interstate commerce.").)

More specifically, Plaintiffs rely upon a purported conflict between, on the one hand, *New Prime Inc.*, *Canales*, and *Brock* (none of which arise from within the Second Circuit and the latter two of which were never raised by Plaintiffs in their Opposition to the motion to compel), and, on the other hand, *Gray* and this Court's decision. (*Id.* at 15-16.) But it is well-settled that "[d]isagreement among courts outside the Second Circuit does not establish a substantial ground for difference of opinion." *In re Teva Sec. Litig.*, 2021 WL 1197805, at *7 (Underhill, J.) (quoting *Ryan, Beck & Co., LLC*, 275 F. Supp. 2d at 398); *see, e.g. In re Trilegiant Corp., Inc.*, 2015 WL 13901228, at *3 (Bryant, J.) ("To the extent that Plaintiffs try to cull opposition to the Court's

---

they are likely to succeed on their claims to recovery unpaid wages unless Defendants can carry their burden on all three elements of the Connecticut ABC test.").) ***All that matters now is which forum those claims are litigated***.

Further, Plaintiffs' argument that "there is an abundance of caselaw holding that employers cannot deprive individual workers of employment status by requiring them to form corporate entities and to sign so-called independent contractor or business agreements" also goes to the merits of whether they are employees, not whether the DAs are "contracts of employment" within the meaning of Section 1 of the FAA. (*See id.* 7-9). The Schmidt Defendants note that many of the cases cited for that proposition were not cited in Plaintiffs' Opposition to the motion to compel arbitration, and is contrary to the finding of this Court in reaching its decision here.

29

rulings from district courts within other circuits, Defendants rightly assert that '[c]ourts have repeatedly found that disagreement among courts outside the Second Circuit does not establish a substantial ground for difference of opinion.'") (quoting *Murray*, 2014 WL 1316472, at *6); *Cerrato*, 2013 WL 12286084, at *2 (Hall, J.) (denying certification, in part, because the cases cited by the defendant were outside the Second Circuit); *In re NASDAQ Mkt. Makers Antitrust Litig.*, 938 F. Supp. at 235 (opinions in other districts "do not control in this Circuit and do not in themselves create 'substantial grounds for a difference of opinion.'").

In any event, none of these cases reached the question of whether a ***business-to-business*** contract is a "contract of employment" for purposes of the Section 1 exclusion. Thus, there is no possible conflict of authority to be the basis for a "substantial ground for a difference of opinion."

Finally, ***even if*** Plaintiffs had raised in the instant motion the argument that cases raises a matter of first impression in the Second Circuit, "the Second Circuit has held that "the mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion" *Healthcare Strategies, Inc.*, 2012 WL 13027294, at *3 (Hall, J.) (quoting *In re Flor*, 79 F.3d at 284).

Accordingly, Plaintiffs also fail to satisfy the second criterion for certification of an order for interlocutory appeal.

### c.   Plaintiffs fail to show that an immediate appeal "may materially advance the ultimate termination of the litigation"

Plaintiffs also argue that an interlocutory appeal will materially advance the litigation because "'[i]f the Supreme Court hears the appeal and holds that Plaintiff[s] cannot be compelled to arbitrate, it will have saved the parties the expense and burden of arbitration, and allow the case to proceed to resolution in district court.'" (Pls.' Mot. 16 (quoting *Islam*, 2021 WL 2651653, at *5 (S.D.N.Y. June 28, 2021), and citing *Lee v. Postmates Inc.*, 2019 WL 1864442, at *4 (N.D. Cal.

2019) (granting permission for interlocutory appeal to preserve "the needless expense and delay of litigating an entire case in a forum that has no power to decide the matter.")) (*Lee* parenthetical from Pls.' Mot. at 16).) But that reasoning is ordinarily true of any order granting a motion to compel and would result in near-universal certification of such orders for interlocutory appeal. Such a result is at odds with the FAA and Congress's ***deliberate choice to permit interlocutory appeal of all orders <u>denying</u> motions to compel arbitration, but only permitting interlocutory appeals of orders <u>granting</u> motions to compel if they meet all three criteria under Section 1292(b)***. *See Coinbase, Inc.*, 599 U.S. at 740 (summarizing 1988 FAA amendment, as codified at 9 U.S.C. § 16(a), providing that "when a district court denies a party's motion to compel arbitration, that party may take an interlocutory appeal," thereby "create[ing] a ***rare statutory exception*** to the usual rule that parties may not appeal before final judgment.") (emphasis added).[26] In any event, both the *Lee* and *Islam* decisions cited by Plaintiffs are distinguishable on their facts.

In *Lee v. Postmates Inc.* the court focused on putative class members in both the "controlling question of law" and "advancement of termination of litigation" analyses.[27] *See* 2019 WL 1864442, at *3, 4. But that district court's concern that "whatever rights absent class members might have to a judicial resolution of their claims—if this Court's interpretation of the FAA is incorrect—might never be vindicated," and its belief that "resolving all such potential plaintiffs' claims through a class action could be far more efficient than piecemeal litigation and arbitration of individual claims" improperly assumes a class action will be certified and also presumed that "Plaintiffs likely would not be required to arbitrate under California law." *Id*. Here, as already

---

[26] "Notably, Congress provided for immediate interlocutory appeals of orders denying–but not of orders granting–motions to compel arbitration." *Id*.

[27] Although the district court certified its order for interlocutory appeal, the Ninth Circuit denied the request for interlocutory appeal. *See Lee v. Postmates*, No. 19-80055, Dkt. 3 (9th Cir. July 30, 2019).

explained, the class action waiver applicable to both arbitration **_and litigation_** stands in the way of class treatment regardless of forum, and Maryland Uniform Arbitration Act applicability would still need to be decided by this Court.[28]

In *Islam*, the district court's conclusion to certify its order for interlocutory appeal was "bolstered by the fact that Lyft has already taken an appeal … in *Haider v. Lyft*," which involved "the same conclusion as [the *Islam*] Court on the issue of the Section One exemption." *Islam*, 2021 WL 2651653, at *6; *see also Flores*, 2024 WL 50238, at *6 n.9 (distinguishing *Islam* certification order because "a parallel interlocutory appeal regarding the identical issue was already pending before the Second Circuit"). However, in *Islam*, the plaintiffs did not file with the Second Circuit a timely request for interlocutory appeal and its subsequent motion that the district court re-certify its order for interlocutory appeal was denied, in large part, because the Second Circuit had held the *Haider* appeal in abeyance after the *Haider* district court compelled arbitration under state law and "a series of issues would have to become ripe for decision both at the district court and circuit levels" in both cases, "and each would have to be decided in such a way that would ultimately enable Islam to argue that no law requires him to arbitrate." *See Islam v. Lyft, Inc.*, 2021 WL 5762211, at *3 (S.D.N.Y. Dec. 3, 2021). Here, there is no other pending Second Circuit appeal on the business-to-business "contract of employment" issue decided by this Court and, even if the Second Circuit reversed this Court's order compelling arbitration, the Court would still need to address whether arbitration may be compelled under the Maryland Uniform Arbitration Act.

In their "Additional Considerations" argument, Plaintiffs contend that *Bissonnette*

---

[28] Plaintiffs would likely also have to show that there are at least 40 individuals who signed DAs in Connecticut during the relevant period in order to certify a class. *See Morrison v. Ocean State Jobbers, Inc.*, 290 F.R.D. 347, 353 (D. Conn. 2013) (Thompson, J.) ("Numerosity is presumed at a level of 40 members.") (quoting *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (internal quotation marks omitted).

"contains identical facts to the instant matter" and "[t]he question of whether these workers are exempt from the FAA is squarely before the Second Circuit" on remand from the Supreme Court. (Pls.' Mot. 17.) Thus, they assert "with the <u>Bissonnette</u> appeal already pending, 'if the Second Circuit decides to hear the interlocutory appeal certified today, it may be appropriate and a preservation of judicial resources to consolidate the two cases on appeal, as they present identical questions.'" (*Id*. (quoting *Islam*, 2021 WL 2651653, at *6).) But as noted above, the *Islam* court's decision to certify an interlocutory appeal was driven largely by the existence of another case involving Lyft concerning the identical issue already pending before the Second Circuit.

Plaintiffs' insistence that *Bissonnette* presents "identical facts" and "identical legal questions" in its appeal is simply not true. (Pls.' Mot. 17, 18.) Rather, the Section 1 exemption questions currently before the Second Circuit in *Bissonnette* (*i.e.*, whether "[plaintiffs] are not transportation workers" and whether "[plaintiffs] are not 'engaged in foreign or interstate commerce' within the meaning of § 1 because they deliver baked goods only in Connecticut"). *See Bissonnette*, 601 U.S. at 252. Those issues are ***completely different*** than the question presented here. Further, it is clear from Judge Dooley's opinion that the question raised here has not yet been argued in the *Bissonnette* district court and thus is unlikely to be addressed by the Second Circuit on remand from the Supreme Court. *See Bissonette*, 460 F. Supp. 3d at 194 n.2 ("Neither the Plaintiffs nor the Defendants draw a distinction between the Plaintiffs and their respective companies and neither has argued the distinction has any bearing on the issues to be decided…. This Court need not take up the issue due to its conclusion that the Plaintiffs (whether individuals or corporate entities) are not transportation workers within the scope of the exemption)."). Accordingly, the *Bissonnette* case has no bearing on whether this Court should certify its order for interlocutory appeal.

Finally, as a Southern District of New York district court observed:

> it bears noting that whether an immediate appeal from the Court's order would 'materially advance the ultimate termination of the litigation' is dubious. Plaintiffs argue that they would appeal the issues they are currently seeking to certify following arbitration, and that a decision at the outset of arbitration is, therefore, more efficient. As Defendant points out, Plaintiffs' argument is only correct if the Second Circuit determines Plaintiffs should not have been compelled to arbitrate. Should the Second Circuit agree with this Court's determination … then an interlocutory appeal would not advance the ultimate resolution of the parties' dispute. A "mere possibility that a reversal of the Court's order would end the case is insufficient" to meet the third requirement to certify an appeal. *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10-CV-3461, 2014 WL 5002090, at *2 (S.D.N.Y. Oct. 7, 2014) (citation omitted).

*Davarci*, 2021 WL 5326412, at *3 (other citations omitted). Plaintiffs' "one-sided argument fails to take into account the (just as likely) possibility that certification will delay the action further." *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 5002090, at *2. It also ignores the obvious possibilities that Plaintiffs (1) could lose on the merits in arbitration; or (2) settle their claims on an individual basis during the arbitral process. In other words, Plaintiffs' argument that an appeal will eventually be taken is wholly speculative posturing in order to support their interlocutory appeal request. *See* Pls.' Mot. 17 ("And if interlocutory appeal is not permitted, following arbitration, Plaintiffs would ultimately seek to appeal the exact issues they now seek to certify.").

Further, courts within the Second Circuit have found that "certification of its order compelling arbitration might lead to unnecessary delays as: (i)'if the Second Circuit affirms the Court's decision, or rather yet, declines to hear Plaintiff's appeal, the result will be that this action will have been unnecessarily delayed by the interlocutory appeal,' and (ii) 'it is safe to assume that the appeal process will take longer than the arbitration, thereby extending the time in which a final decision on the merits is rendered.'" *Dill*, 2021 WL 3406192, at *8 (quoting *Murray*, 2014 WL 1316472, at *7); *accord James*, 2024 WL 446085, at *12 (Haight, J.).

Where a court has "confidence in its prior decision" and "certifying the issues for interlocutory appeal would only delay the adjudication of the merits of [an] action in the arbitral forum," certification of an order compelling arbitration for interlocutory appeal would not materially advance the termination of the action. *Dill*, 2021 WL 3406192, at *8 (quoting and following *Murray*, 2014 WL 1316472, at *7).

Finally, "allowing certification of the Court's order would be inconsistent with the 'national policy favoring arbitration,' *AT&T Mobility LLC v. Concepcion*, [563 U.S. 333, 346] (2011), and the Second Circuit's distaste for delaying 'the arbitral process through appellate review,' *Salim Oleochemicals* [*v. M/V Shropshire*, 278 F.3d 90, 93 (2d Cir. 2002), *abrogated on other grounds by Katz v. Cello P'ship*, 794 F.3d 341 (2d Cir. 2015)]." *Murray*, 2014 WL 1316472, at *8. Congress made clear in its 1988 amendment to the FAA that, by only allowing for appeals as of right for orders denying motions to compel arbitration, appeals of orders enforcing arbitration should be rare. In short, here, "[p]roceeding to arbitration, rather than certifying an interlocutory appeal, is the fastest way for [this case] to be decided on the merits." *In re Belton*, 2016 WL 164620, at *2.

**B.    The Court Should Not Certify The Question Of Whether There The Level Of Plaintiffs' Sophistication Is Relevant To The Analysis Of The Delegation Clause In The Distribution Agreements**

Plaintiffs' half-hearted and muddled request to certify the second question of "whether the sophistication of the parties affects whether a reference to a specific arbitration provider (in this case, JAMS) constitutes adoption of a specific set of rules requiring delegation of contract enforceability questions" should be dismissed out of hand. (*See* Pls.' Mot. 3.)

*First*, Plaintiffs' request appears to be predicated on the Court granting certification of the FAA Section 1 issue. (*Id*. ("Given that the FAA Section 1 issue should be certified for appeal …"). But there is no authority for the proposition that once a court certifies one question for interlocutory

35

appeal, it should pile on additional questions without satisfying the strict requirements for certification for each question.

*Second*, Plaintiffs fail to explain how the proposed question presents a "controlling question of law." Plaintiffs' "reframing" of the Court's ***alternative*** finding that their ***factual*** showing "is not sufficient to demonstrate that they are 'unsophisticated,'" *Silva*, 2024 WL 1932635 at *10 n.6, as a "holding" about the "***level*** of sophistication" of Plaintiffs (Pls.' Mot. 18), cannot obfuscate the obvious ***fact-based*** analysis undertaken by this Court (and required of the Second Circuit, were the question certified and accepted for interlocutory review) to determine whether Plaintiffs are sufficiently "unsophisticated" to escape delegation of arbitrability issues to an arbitrator. *See Flores*, 2024 WL 50238, at *3 ("Such mixed factual and legal analysis is not suitable for interlocutory appeal.") (collecting cases involving unconscionability analysis). This is simply not a "pure question of law" that raises an "abstract legal issue" suitable for interlocutory appeal. *Id.*; *see also Goldfarb*, 2021 WL 1392850, at *10 ("[D]isputes concerning the application of the law to the specific facts of a case typically are not appropriate for an interlocutory appeal.") (citations omitted).

*Third*, Plaintiffs only identify ***one*** decision that could possibly create the requisite intra-Circuit split in authority to satisfy the "substantial ground for difference of opinion" criterion. (*See* Pl.'s Mot. 18, citing *Vidal*, 2023 WL 2783251, at *10). In its Ruling, the Court has already distinguished *Vidal* on its facts, finding that here there is no "language [in the agreement] explicitly providing for judicial intervention on issues of enforceability." *Silva*, 2024 WL 1932635 at *10 n.5. But "[d]isagreement as to the interpretation of persuasive authority, or a claim that the district court's decision is incorrect," does not suffice to establish a substantial ground for a difference of opinion." *Harris*, 2019 WL 10945228. This Court's analysis of *Vidal* also further underscores that

interpretation of the parties' delegation clause is **necessarily fact-based** and unsuitable for certification for interlocutory appeal.[29]

*Fourth*, Plaintiffs' conclusory assertion that "the delegation issue could be determinative of whether the Court can consider issues regarding the scope and interpretation of the agreement" (*see* Pl.'s Mot. 18), cannot carry their burden of showing "an immediate appeal from the order may materially advance the ultimate termination of the litigation." *See* 28 U.S.C. § 1292(b). A determination now by the Second Circuit of whether the arbitrator or Court determines arbitrability issues has no bearing on advancing the time for trial or shortening the time required for trial since the underlying arbitrability determination must be made either way. *See Whyte*, 2020 WL 4383506, at *2. **It would at best merely shift who decides arbitrability issues**, and could still land Plaintiffs in arbitration.

## VI.     CONCLUSION

For the reasons stated above, the Court should deny Plaintiffs' request to certify its May 2, 2024 Ruling for interlocutory appeal.

---

[29] The Court also deftly distinguished the out-of-Circuit decision in *Stone v. Wells Fargo Bank, N.A.*, 361 F. Supp. 3d 539. *See id*.

June 17, 2024                          Respectfully submitted,

                                       /s/ William J. Anthony
                                       William J. Anthony (CT17865)
                                       wanthony@littler.com

                                       LITTLER MENDELSON, P.C.
                                       900 Third Avenue
                                       New York, NY 10022.3298
                                       Telephone:   212.583.9600
                                       Facsimile:   212.832.2719

                                       Joshua B. Waxman (*pro hac vice*)
                                       LITTLER MENDELSON, P.C.
                                       815 Connecticut Avenue, NW, Suite 400
                                       Washington, DC 20006
                                       Telephone: 202.789.3406
                                       Facsimile:  202.478.2623
                                       jwaxman@littler.com

                                       Michael McIntosh (*pro hac vice*)
                                       LITTLER MENDELSON, P.C.
                                       1800 Tysons Boulevard, Suite 500
                                       Tysons Corner, VA 22102
                                       Telephone: 703.286.3118
                                       Facsimile:  703.991.8016


                                       *Attorneys for Defendants*
                                       *Schmidt Baking Distribution, LLC and Schmidt*
                                       *Baking Company, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2024, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all counsel and pro se parties of record by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

Zachary L. Rubin, Esq.
SEPPINNI LAW, PLLC
40 Broad Street
Fl. 7
New York, NY 10004

*/s/ William J. Anthony*
William J. Anthony (CT17865)