# EXHIBIT 1

## INDEPENDENT CONTRACTOR OPERATING AGREEMENT

THIS AGREEMENT is made and entered into this 31 day of May 2013, by and between NEW PRIME, INC. ("Prime") and ("Contractor" or "You").

Prime is a for-hire motor carrier and utilizes independent contractors to assist in its business. You are willing to lease the following-described tractor (the "Equipment") to Prime for the purpose of hauling freight pursuant to the terms and conditions of this Agreement:
Year  2012     Make  FRGHT               Serial No.  1FUJGLDR9CSBA3671
License No.  12AR5H                      State  MO

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, it is hereby agreed as follows:

1. LEASE. You hereby lease to Prime the Equipment from the date of this Agreement through December 31 of the same year. Thereafter, this Agreement shall continue from year to year unless otherwise terminated as provided herein. During the term of this Agreement, Prime shall have exclusive possession, control and use of the Equipment and complete responsibility for the operation of the Equipment. The provision in the preceding sentence is set forth solely to conform with federal regulations and is not to be used for any other purposes, including any attempt to classify You as an employee of Prime. 49 CFR 376.12 (c) (4) provides that nothing in the provisions required by 49 CFR 376.12 (c) (1) is intended to effect whether You or any driver provided by You is an independent contractor or an employee of the Carrier.

Prime shall retain the original of this Agreement, a signed copy shall be maintained in each piece of the Equipment, and one signed copy shall be maintained by You.

2. SERVICE. The parties agree that the intent of this Agreement is to establish an independent contractor relationship at all times. You agree to make the Equipment available to Prime, with qualified and Prime Certified drivers, to pick up loads and transport them to destinations designated by various shippers. You shall determine the means and methods of performance of all transportation services undertaken under the terms of this Agreement, including driving times and delivery routes. You may refuse to haul any load offered to You by Prime. You have the right to provide services for another carrier during the term of this Agreement, provided that (i) You remove all identification devices, licenses and base plates from the Equipment and return to Prime, and (ii) You provide Prime five (5) business days' notice of Your intent to provide services for another carrier.

3. PAYMENT. Prime shall pay You amounts as itemized on Schedule 1 within fifteen (15) days after You give Prime properly completed logs and all documents required by the shippers of loads You haul in order for Prime to be paid. All such payments shall be reflected in an operator's settlement which Prime shall produce both on a weekly basis and as a final statement following termination (the "Settlement"). Upon termination of this Agreement, Your final payment is contingent upon Your removal of all Prime identification devices. Prime will be entitled to recover from You those devices in the form of decals or placards on the Equipment and return of those devices to Prime in the manner specified in paragraph 7(d) hereof, unless they are painted directly on the Equipment, together with all of Your Comdata cards.

INITIAL _____
DATE  5-31-13

5/31/2013                        PAGE   1



CONFIDENTIAL                                    NEWPRIME_OLIVEIRA 000296

If an identification device has been lost or stolen, a letter certifying that fact shall suffice. Payment to You shall be made contingent upon submission of a bill of lading to which no exceptions shall be taken.

4. QUALCOMM. Your Equipment must contain a Qualcomm unit which will work in conjunction with Prime's Qualcomm system. You hereby authorize Prime to deduct amounts specified in Schedule 3 from Your Settlement to make such rental payments together with all monthly usage fees, including Excess message charges. You are responsible for the timely return of any rented Qualcomm device upon the termination of this Agreement. If you lease a Qualcomm unit from Prime, and if the unit is damaged or lost, You agree to reimburse Prime the entire cost incurred by Prime in repairing or replacing the unit. You hereby authorize Prime to deduct an amount equal to the cost from Your Settlement at such time as Prime chooses. If the unit is not returned upon termination, You agree to reimburse Prime its cost incurred in replacing the unit and You hereby authorize Prime to deduct such cost from Your final Settlement. If funds are not available to do so, You agree to pay Prime its cost of collection including reasonable attorney's fees.

5. ADVANCES. If You have secured advances from Prime, You hereby authorize Prime to deduct an amount equal to the advances from Your Settlement at such time as Prime chooses.

6. TRAILER INSPECTION. You agree to make a visual inspection prior to assuming control of trailers furnished by Prime and immediately report any existing damage or defects, and also to report any damage that occurs while the trailer is under Your control. If You fail to report any existing damage or defects prior to assuming control of the trailer, and the next driver following You who assumes control of that trailer reports damage or defects prior to his assuming control, then You agree to pay to Prime the actual cost of repairing such damage or defects. You hereby authorize Prime to deduct from Your Settlement an amount equal to the cost of repair.

7. PERFORMANCE BOND.

(a) Amount and Set Off. You will deposit with Prime One Thousand Dollars ($1,000.00) as security for the full performance of Your financial obligations to Prime as set forth in this Agreement. Prime may set off any part of the Performance Bond against (i) cash advances made by Prime to You or for the benefit of Your drivers; (ii) all expenses specifically itemized in paragraphs 8, 9 and 10 hereof; (iii) all costs of Your insurance for coverages itemized in paragraph 11 hereof which Prime has advanced payment for; (iv) automobile liability, cargo and trailer damage claims for which You are liable to Prime as set forth in paragraph 12 hereof; (v) all amounts charged by Prime pursuant to paragraph 13 hereof; (vi) advances made to You or on Your behalf as specified in Schedule 2 hereof; (vii) all amounts charged You by Prime or paid on Your behalf by Prime as itemized on Schedule 3 hereof and accounted for in Your Weekly Settlement; (viii) advances set forth in paragraph 29; and (ix) all other obligations incurred by You which have been specified in this Agreement. If Performance Bond funds are set off, You shall provide additional money so that the Performance Bond equals One Thousand Dollars ($1,000.00). In the event You fail to replenish the Performance Bond as required, You hereby authorize Prime to deduct from Your Settlement amounts necessary to replenish the Performance Bond as required. If You do not deposit the full amount of the Performance Bond, You authorize Prime to deduct from Your Settlement the amounts

INITIAL _____
DATE    5-31-13

5/31/2013                            PAGE   2

CONFIDENTIAL                                                NEWPRIME_OLIVEIRA 000297

indicated in Schedule 3 in order to fulfill this obligation.

(b) **Interest.** Prime will pay You interest on the Performance Bond quarterly. This interest rate shall be equal to the average yield on Ninety-One (91) Day, Thirteen (13) Week Treasury Bills as established in the weekly auction by the Department of the Treasury.

(c) **Accounting.** Prime will provide You an accounting of the Performance Bond at any time requested by You. Prime shall also indicate on Your Settlement sheets the amounts and description of any deductions or additions made to the Performance Bond.

(d) **Return.** Upon termination of this Agreement, in order to have the Performance Bond returned to You, You must first return to Prime all of Prime's placards and other identification devices, other than those painted directly on the Equipment, Your Comdata card, all base plates, permits, licenses, pre-pass toll transponder, properly completed logs and documents necessary to receive payments for trips made under this Agreement. You may either bring these items to Prime's terminal or deliver them to Prime via mail or other form of conveyance of Your choice. If You bring the Equipment to Prime's terminal, Prime will remove all identification devices. If not, You shall be responsible for their removal. Prime shall provide a final accounting, itemizing all deductions, and return all amounts due You from the Performance Bond within forty-five (45) days of the termination.

8. **EXPENSES.** You shall pay all operating and maintenance expenses in connection with the operation of the Equipment, including but not limited to fuel, fuel taxes, Federal Highway Use Taxes, tolls, ferries, detention, accessorial services, tractor repairs and Seventy-Two percent (72%) of any agent or brokerage fees charged against line haul revenues received by Prime for any freight transported by You. At your request, Prime will make advances for the payment of such expenses, and You hereby authorize Prime to deduct from Your Settlement amounts equal to the advances. Except when a violation results from Your acts or omissions, Prime shall assume the risk and costs of fines for overweight and oversized trailers when the trailers are preloaded, sealed, or the load is containerized, or when the trailer or lading is otherwise outside Your control, and for improperly permitted over-dimensions and overweight loads. Prime shall reimburse You for any fines paid by You which are Prime's responsibility. You shall be responsible for loading and unloading of trailers.

9. **LICENSES, PERMITS AND AUTHORIZATIONS.**

(a) **Purchase.** You are required to obtain, at Your expense, a base plate under the International Registration Plan ("IRP") permitting the Equipment to be operated in all forty-eight (48) contiguous states. Alternatively, You may authorize Prime to obtain on Your behalf, but at Your expense, all licenses, permits, IRP base plates and authorizations required for operation of the Equipment. Upon such authorization, You agree to reimburse Prime for such expenses, and You hereby authorize Prime to make the deductions from Your Settlement amounts as set forth in Schedule 3.

(b) **Return.** During the term of this Agreement, as well as after termination, all licenses, permits, base plates, pre-pass toll transponder and authorizations, as well as all placards, provided to You by Prime shall be the

INITIAL _____
DATE  5-31-13-

5/31/2013                          PAGE   3

CONFIDENTIAL                                                        NEWPRIME_OLIVEIRA 000298

property of Prime, and upon termination of this Agreement, You shall, within seven (7) days, return all such licenses, permits, base plates, pre-pass toll transponder, placards and authorizations to Prime. All identification devices shall be returned in the manner specified in paragraph 7(d) hereof. Any unused portion of the base plate will be credited to You if Prime receives a refund or credit from the issuing authority or upon transfer to any other vehicle in Prime's fleet.

10. DRIVERS. You shall (i) drive the Equipment Yourself, (ii) employ, on Your own behalf, drivers for the Equipment, or (iii) lease drivers for the Equipment.

(a) Contractor's Employees. If You employ, on Your own behalf, drivers for the Equipment, You shall be solely responsible for payment of their wages, benefits, Social Security taxes, withholding taxes, unemployment insurance fees, and all other amounts required by government agencies to be paid by employers on behalf of or to employees. All drivers employed by You to operate the Equipment shall be qualified so as to meet requirements of all federal, state and local laws and the rules and regulations of the Department of Transportation. All such drivers must first be certified by Prime. You shall likewise employ on Your own behalf and at Your own expense all driver's helpers and other laborers required to carry out the purpose of this Agreement. At Your request, Prime shall make payments to Your employees and for their benefit and on their behalf. You shall reimburse Prime for all such expenses and hereby authorize Prime to deduct from Your Settlement amounts required to make such reimbursements. All such reimbursements shall be equal to payments made by Prime.

(b) Leased Drivers. If You lease drivers for the Equipment, You hereby authorize Prime to make advances for all amounts required to reimburse the leasing entity with whom You contracted for services of the drivers. You shall reimburse Prime for all such expenses and hereby authorize Prime to deduct from your Settlement amounts required to make such reimbursements. All such reimbursements shall be equal to payments made by Prime. All Leased Drivers must first be certified by Prime.

11. INSURANCE

(a) Liability. Prime shall provide and maintain auto liability insurance for the protection of the public pursuant to FMCSA Regulations under 49 USC 13906. Said liability insurance may not necessarily insure You against loss.

(b) Non-Trucking Use Auto Liability Coverage. You shall provide and maintain at Your own expense non-trucking use auto liability insurance coverage. This coverage, whether referred to as "bob-tail", "unladened", "deadhead" or otherwise, shall provide coverage for all risks for movement of the Equipment when it is not under dispatch by Prime. Prime shall be named as an additional insured on the policy, which shall have limits of not less than $1 million per occurrence, CSL. This policy of insurance shall be primary to and without right of contribution from all other insurance available to Prime.

(c) Cargo Insurance. Prime shall secure and maintain Cargo Liability Insurance.

INITIAL [signature]
DATE 5-31-13

5/31/2013                PAGE    4

CONFIDENTIAL                                     NEWPRIME_OLIVEIRA 000299

(d) **Physical Damage Insurance.** Prime shall provide and maintain at its own expense physical damage insurance on its trailers.

(e) **Occupational Injuries.** You shall either (i) make an election to procure Workers' Compensation insurance protection against injuries sustained while in pursuit of Your business, for Yourself and Your drivers, and thereafter provide and maintain at Your own expense such insurance; or (ii) provide and maintain at Your expense a suitable alternative insurance, such as occupational accident insurance, for Yourself and Your drivers, which insurance must be approved by Prime.

(f) **Health and Life Insurance.** You may elect to purchase health and life insurance through Prime. If You do so, You hereby authorize Prime to deduct such cost from Your Settlement. Because such insurance may not go into effect at the time of the execution of this Agreement, and the premiums may change from time to time, You agree that the provisions of paragraph 18 of this Agreement apply to such deductions. The cost of this insurance shall be the actual premium charged by the insurance company. However, under some health policies of insurance which Prime purchases, a portion of the premium may be retained by Prime in a claims pool for the purpose of paying claims. If, at the end of the policy period, there are any funds remaining in the claims pool, Prime retains those funds.

(g) **Procuring of Insurance by Prime.** Upon Your request, an insurance broker working with Prime and knowledgeable of the requirements within this Agreement will provide You with coverage information and applications for insurance coverage required of You by this Agreement. If You elect to procure insurance through that insurance broker, You hereby authorize Prime to deduct the cost of such insurance from Your Settlement and forward those amounts to such insurance broker. The cost of all such insurance coverages shall be itemized on Schedule 3 of this Agreement. Prime, or the insurance broker, will furnish to You a certificate of insurance for each policy You purchase and a copy of each policy shall be furnished to You upon request. You shall remain financially responsible to the insurance broker and/or insurer for any insurance costs not paid due to an insufficiency of Settlement funds.

(h) **Proof of Insurance.** All insurance coverage provided by You as required by this Agreement shall be in form and substance, and issued by a company satisfactory to Prime. You shall continuously provide Prime with proof of such insurance either by current binders or certificates of insurance from the date of the execution of this Agreement until its termination.

12. **ACCIDENTS, CLAIMS, LOSSES AND EXPENSES.**

(a) **Auto Liability.** Prime and its auto liability insurer may settle any claim against Prime arising out of the maintenance, use or control of the Equipment. You shall pay Prime up to Five Hundred Dollars ($500.00) per occurrence for the settlement of any such claim and related expenses.

(b) **Cargo.** You shall pay Prime up to Five Hundred Dollars ($500.00) per occurrence toward the settlement of cargo losses directly caused by fire, collision, overturning of vehicle, collapse of bridges or

INITIAL _____
DATE  5-31-13

5/31/2013                    PAGE  5

CONFIDENTIAL                                        NEWPRIME_OLIVEIRA 000300

docks, rising navigable waters or river floods, perils of the seas, lakes, rivers or inland water while on ferries only, and cyclone, tornado or windstorm. If cargo losses are caused by any peril other than those itemized above, You will pay Prime that portion of such losses and expenses for which Prime does not receive payment from their insurance carrier.

(c) Damage to Trailers. You shall pay Prime up to Five Hundred Dollars ($500.00) per occurrence toward loss of, damage to, or liens for storage with respect to Prime's trailers which are used by You when such losses are covered by Prime's insurance. When the loss of, damage to, or liens for storage of Prime's trailers which are used by You are not covered by insurance, You shall pay for all such losses, including expenses and attorneys' fees.

(d) Authorization to Deduct. You hereby authorize Prime to deduct from Your Settlement all amounts due Prime under this paragraph 12. Prime shall provide You with a written explanation and itemization of any such deductions for cargo or property damage before such deductions are made.

(e) HOLD HARMLESS AND INDEMNIFICATION. YOU AGREE TO INDEMNIFY AND HOLD HARMLESS PRIME, ITS AFFILIATED COMPANIES AND THEIR RESPECTIVE OFFICERS, DIRECTOR, SHAREHOLDERS, EMPLOYEES, AGENTS, SUCCESSORS AND ASSIGNS, FROM AND AGAINST ANY AND ALL LIABILITIES AND EXPENSES WHATSOEVER, INCLUDING, WITHOUT LIMITATION, CLAIMS, DAMAGES, JUDGMENTS, AWARDS, SETTLEMENTS, INVESTIGATIONS, COSTS AND ATTORNEY'S FEES (COLLECTIVELY, "CLAIMS") WHICH ANY OF THEM MAY INCUR OR BECOME OBLIGATED TO PAY ARISING OUT OF YOUR ACTS OR OMISSION OR THOSE OF YOUR AGENTS AND EMPLOYEES (INCLUDING DRIVERS LEASED FROM PRIME). YOU FURTHER AGREE TO HOLD PRIME HARMLESS AND TO INDEMNIFY PRIME AGAINST ALL CLAIMS BY YOU AND YOUR AGENTS AND EMPLOYEES. I UNDERSTAND THAT THIS PARAGRAPH LIMITS MY RIGHTS AND I ACKNOWLEDGE MY OPTION TO SEEK INDEPENDENT LEGAL COUNSEL AND ADVICE.

13. OPERATING STATEMENT AND PAYROLL SERVICES. At your request, Prime may provide You with an operating statement, and You hereby authorize Prime to make a deduction from Your Settlement an amount as set forth in Schedule 3. In the event Prime provides services for Your co-drivers, You hereby authorize Prime to make a deduction from Your Settlement in amount as set forth in Schedule 3.

14. CITATIONS. At Your request, Prime shall provide You with administrative services in connection with citations You receive while operating under Prime's authority, and advance money for payment of them. You agree to pay and hereby authorize Prime to deduct from Your Settlement an amount equal to the fee as set forth in Schedule 3, as well as an amount equal to the payment made on Your behalf. You are under no obligation to submit Your citations to Prime for handling. However, You agree to report all citations to Prime.

15. FUEL CARD / EXPRESS CODES/TRIP EXPRESS CHARGE. You agree that, in in the event You utilize Prime's fuel card system and express code transaction system, You will pay to Prime and hereby authorize Prime to deduct from Your Settlement an amount as set forth in Schedule 3.

16. TRACTOR PAYMENT DEDUCTION (IF APPLICABLE). You are leasing __X__ or purchasing ____ (check one) Your tractor from __SUCCESS LEASING__.

INITIAL _[signature]_
DATE __5-31-13__

5/31/2013                    PAGE  6

CONFIDENTIAL                                              NEWPRIME_OLIVEIRA 000301

Your payments are itemized in Schedule 2 attached hereto and made a part hereof. In addition, You are required by Your lessor or lender to place certain sums in reserve accounts as itemized in Schedule 2. By initialing Schedule 2 You authorize and request Prime to deduct those sums itemized in Schedule 2 from Your Settlement and forward them to Your lessor or lender. If the agreement with Your lessor or lender authorizes Prime to make deductions from Prime's Settlement with You for rental or purchase payments, You must provide Prime with a copy of that agreement and it shall be attached to this Agreement and made a part hereof by this reference.

17. ADDITIONAL SETTLEMENT DEDUCTIONS. From time to time, You may purchase fuel, products or services, including repairs, which are charged to Prime. When You do so, You hereby authorize Prime to deduct from Your Settlement amounts equal to such charges. You are never required to charge any amounts to Prime's account nor to make purchases from any vendor recommended by Prime. Further, if You lease Your tractor, You may be required by Your lessor to indemnify Your lessor for claims arising out of Your acts and omissions as well as those of Your agents and employees, and to pay for portions of any loss or damage to Your tractor. When Your lease requires any such payments, You hereby authorize Prime to deduct from Your settlement amounts equal to such charges.

18. RATIFICATION OF DEDUCTIONS. In paragraphs 4, 5, 6, 7, 8, 9, 10, 11(f), 12, 14, 17 and 19 of this Agreement, Prime has agreed to make certain advances to You or on Your behalf. You have agreed to allow Prime to make deductions from Your Settlement as reimbursement for those advances. Because those advances are not capable of determination at the time of the execution of this Agreement, they shall be disclosed to You from time to time in Your Settlement. To the extent Prime is required to disclose deductions to You, that requirement regarding any such deductions shall be deemed fulfilled through Prime providing You with a Settlement. However, upon request, Prime will provide You copies of those documents which are necessary to determine the validity of the charge. Computation of each item shall be on the basis of the actual amount of each advance, charge or expense. If You have not objected to any such deduction in writing within ninety (90) days of the date of the Settlement, the deduction shall be deemed ratified by You.

19. NEGATIVE BALANCE. If You have a negative balance on Your Settlement after calculating all payments due, You, less all deductions authorized herein, and if Prime has not offset that negative amount against Your security deposit, You agree to pay to Prime interest on such negative balance at a rate equal to the average yield on Ninety-One-Day, Thirteen-Week Treasury Bills as established in the weekly auction by the Department of Treasury. Interest shall be paid on the average weekly amount of Your negative balance.

If You have a substantial negative balance so that Your cash flow is affected, and if Prime agrees, You may convert some or all of that negative balance to periodic payments to Prime (the "Advance"). In that event You and Prime shall agree on the frequency of payments and You agree to pay to Prime interest on the Advance at the rate of 12% per annum. Provided, however, in the event the Prime Rate (of U. S. money center commercial banks as published in The Wall Street Journal) shall equal or exceed 10%, You agree to pay to Prime interest on the Advance at the Prime Rate plus 2%.

INITIAL _____

DATE 5-31-13

5/31/2013                    PAGE    7

CONFIDENTIAL                                          NEWPRIME_OLIVEIRA 000302

20. **FREIGHT BILLS AND TARIFFS.** Prime shall provide You with a copy of Prime's rated freight bill or a computer-generated document containing the same information, and, upon request, You shall have the right to examine Prime's tariffs at all reasonable times, as well as documents from which contract rates and charges are computed. Mileage is based on the latest version of the Household Goods Carrier's Bureau Mileage Guide, unless otherwise specified by Prime's customers.

21. **PRIME'S SERVICES, PRODUCTS AND EQUIPMENT.** You shall not be required to purchase or rent any products, equipment or services from Prime as a condition of entering into this Agreement. In the event that You elect to purchase or rent any products, equipment or services from or through Prime, You agree that Prime may deduct amounts due for such products, equipment or services from the compensation due You. You and Prime agree that such amounts will include the cost of such products, equipment or services and may include amounts to cover Prime's administrative costs, either direct or indirect, of securing, offering and maintaining such products, equipment and services.

22. **TERMINATION.** Either party may terminate this Agreement by giving thirty (30) days' written notice of such intention to the other party. In the event either party commits a material breach of this Agreement, the other shall have the right to terminate this Agreement by giving five (5) days' written notice of such intention. Shipping requirements of Prime's customers are an essential part of Prime's business, and failure to adhere to such requirements may be deemed to be a material breach of this Agreement. The DOT has charged Prime with the duty of requiring You to observe safety standards while operating the Equipment under Prime's authority. It is agreed that Prime may terminate this Agreement immediately if it has information or knowledge or belief that the safety of the public is being endangered by You or Your agents or employees in the operation of the Equipment. In the event this Agreement is terminated by either party or upon the expiration of this Agreement, You shall, within forty-eight (48) hours, return all of Prime's property to Prime at a location specifically designated by Prime. If You shall fail to return Prime's property as provided herein, You shall be responsible for all expenses incurred by Prime in securing the proper return of said property. Such expenses may be charged back against any amounts owed You by Prime.

23. **NOTICES.** All notices, requests, instructions, consents and other communications to be given pursuant to this Agreement shall be in writing and shall be deemed received (i) on the same day if delivered in person, by same day courier or by telegraph, telex or facsimile transmission; (ii) on the next day if delivered by overnight mail or courier; or (iii) on the date indicated on the return receipt, or if there is no such receipt, on the third calendar day (excluding Sundays) if delivered by certified or registered mail, postage prepaid, to the party for whom intended to the following addresses:

If to Prime:

Manager, Contractor Relations
P.O. Box 4208
Springfield, MO 65808

If to Contractor:

HALLMARK TRUCKING LLC
40 DUGGAN DR
LEOMINSTER MA 01453

Each party may, by written notice given to the other in accordance with this

INITIAL _____
DATE 5-31-13

5/31/2013                PAGE   8

CONFIDENTIAL                                          NEWPRIME_OLIVEIRA 000303

Agreement, change the address to which notices to such party are to be delivered.

24. **RELATIONSHIP OF PARTIES.** The parties intend to create by this Agreement the relationship of Carrier and Independent Contractor and not an employer/employee relationship. You are and shall be deemed for all purposes to be an Independent Contractor, not an employee of Prime. Neither You, Your employees, agents or servants, if any, are to be considered employees of Prime at any time, under any circumstance or for any purpose.

25. **ASSIGNMENT.** You shall not assign this Agreement or any rights or obligations hereunder to anyone without the written consent of Prime.

26. **DESIGNATION OF PAYEE.** You agree that, in the event there is more than one (1) individual named as the Contractor on the face page of this Agreement, that those persons so named will designate in writing which one of them shall be entitled to receive the weekly Settlement check due under the terms of this Agreement. Any change in such designation must be in writing and must be executed by all individuals named as Contractor herein. The purpose of this paragraph is to allow Prime to make one (1) Settlement check payable to one (1) of the individuals named as Contractor without retaining any exposure whatsoever for payment to the other named Contractor.

The following named Co-Contractor is hereby designated as the individual to receive all weekly Settlement checks in this name only:

APPROVED: _____

_____

27. **MODIFICATION OF SCHEDULES.** From time to time during the term of this Agreement amounts required to purchase insurance from a Prime affiliate or through Prime, lease or purchase payments, reserve account requirements, Qualcomm user fees and other like items may be changed from those amounts set forth on the Schedules attached hereto by the person making such charges. In such event and upon receipt in writing of notice of such modification by Prime from the person making the modification, Prime shall notify You in writing of such change. Unless You instruct Prime in writing to the contrary within ten (10) days of the date of Prime's notice to You, the appropriate Schedule shall be deemed modified to reflect the new amount being charged and the Schedule shall be deemed by the parties as being amended accordingly.

28. **SET-OFF.** You hereby grant to Prime the right of immediate set off against Your weekly Settlement of all amounts due from You to Prime under the terms of this Agreement.

29. **LEASE EXPENSES ADVANCES.** If You lease Your Tractor from Success Leasing, Inc. ("Success"), Your Lease contains financial obligations in addition to Lease Charges, Excess Mileage Charge and Tire Replacement Reserve. Those additional obligations are found in paragraphs 10, 12, 14, 15, 17 and 19(d) of Your Lease. Those obligations may be advanced by Success or Prime on Your behalf. In the event they are, You hereby authorize Prime to deduct from Your

5/31/2013  PAGE 9  INITIAL [signature] DATE 5-31-13

Settlement or Your Performance Bond amounts equal to such advances and remit to the entity which made the advance. The amount deducted shall be the actual cost of each such obligation.

30. GOVERNING LAW AND ARBITRATION. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF MISSOURI. ANY DISPUTES ARISING UNDER, ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING AN ALLEGATION OF BREACH THEREOF, AND ANY DISPUTES ARISING OUT OF OR RELATING TO THE RELATIONSHIP CREATED BY THE AGREEMENT, AND ANY DISPUTES AS TO THE RIGHTS AND OBLIGATIONS OF THE PARTIES, INCLUDING THE ARBITRABILITY OF DISPUTES BETWEEN THE PARTIES, SHALL BE FULLY RESOLVED BY ARBITRATION IN ACCORDANCE WITH MISSOURI'S ARBITRATION ACT AND/OR THE FEDERAL ARBITRATION ACT. ANY ARBITRATION BETWEEN THE PARTIES WILL BE GOVERNED BY THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION (THE "RULES"). THE PARTIES SPECIFICALLY AGREE THAT NO DISPUTE MAY BE JOINED WITH THE DISPUTE OF ANOTHER AND AGREE THAT CLASS ACTIONS UNDER THIS ARBITRATION PROVISION ARE PROHIBITED. IN THE EVENT OF CONFLICT BETWEEN THE RULES AND THE PROVISIONS OF THIS AGREEMENT, THE PROVISIONS OF THIS AGREEMENT SHALL CONTROL. EXCEPTIONS/CLARIFICATIONS OF THE RULES INCLUDE: (i) THE PROCEEDINGS SHALL BE CONDUCTED BY A SINGLE, NEUTRAL ARBITRATOR TO BE SELECTED BY THE PARTIES, OR, FAILING THAT, APPOINTED IN ACCORDANCE WITH THE RULES, (ii) THE SUBSTANTIVE LAW OF THE STATE OF MISSOURI SHALL APPLY, AND (iii) THE AWARD SHALL BE CONCLUSIVE AND BINDING. A DEMAND FOR ARBITRATION SHALL BE FILED NOT LATER THAN ONE (1) YEAR AFTER THE DISPUTE ARISES OR THE CLAIM ACCRUES, AND FAILURE TO FILE SAID DEMAND WITH THE ONE (1) YEAR PERIOD SHALL BE DEEMED A FULL WAIVER OF THE CLAIM. THE PLACE OF THE ARBITRATION HEREIN SHALL BE SPRINGFIELD, MISSOURI. BOTH PARTIES AGREE TO BE FULLY AND FINALLY BOUND BY THE ARBITRATION AWARD, AND JUDGMENT MAY BE ENTERED ON THE AWARD IN ANY COURT HAVING JURISDICTION THEREOF. THE PARTIES AGREE THAT THE ARBITRATION FEES SHALL SPLIT BETWEEN THE PARTIES, UNLESS CONTRACTOR SHOWS THAT THE ARBITRATION FEES WILL IMPOSE A SUBSTANTIAL FINANCIAL HARDSHIP ON CONTRACTOR AS DETERMINED BY THE ARBITRATOR, IN WHICH EVENT PRIME WILL PAY THE ARBITRATION FEES.

31. ENTIRE AGREEMENT. This Agreement shall be comprised of this document executed below by You and Prime as well as all Schedules initialed by You (as amended from time to time as herein provided). Together they constitute the entire agreement between the parties hereto and may not be modified or amended except by written agreement executed by both parties or, in the case of the Schedules, as otherwise herein provided.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals on the day and year first written herein.

THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.

NEW PRIME, INC.

By: _____

"Prime"

INITIAL _____
DATE 5-31-13

5/31/2013                    PAGE 10

CONFIDENTIAL                                          NEWPRIME_OLIVEIRA 000305

By Your initials
on this page You
acknowledge receipt
of a copy of this
Agreement from Prime.

*[signature]* HALLMARK TRUCKING LLC
"Contractor"

_____
"Co-Contractor"

5/31/2013             PAGE 11              INITIAL *[initials]*
                                           DATE   5-31-13

CONFIDENTIAL                             NEWPRIME_OLIVEIRA 000306

# EXHIBIT 8

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| NATHANIEL SILVA and PHIL ROTHKUGEL, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>SCHMIDT BAKING DISTRIBUTION, LLC and SCHMIDT BAKING COMPANY, INC.,<br><br>      Defendants. | Civil Action No. 3:23-CV-01695-MPS |

**DECLARATION OF MARK TORRES
IN SUPPORT OF REPLY ON MOTION TO COMPEL ARBITRATION**

I, Mark Torres, hereby declare and state:

1.    I am an adult over the age of 18 and a resident of the state of Maryland. The information set forth herein is true and correct and of my own personal knowledge, and if asked to testify thereto, I would do so competently.

2.    I am currently employed by Schmidt Baking Company, Inc. as Director of IO Services. I have been employed by Schmidt Baking Company, Inc. in my current position for approximately 12 years. I am also an authorized representative of Schmidt Baking Distribution, LLC.

3.    Schmidt Baking Distribution, LLC enters into Distribution Agreements with independent operator companies to give them exclusive rights to distribute and sell various Schmidt fresh baked products to outlets within sales areas that receive products by certain distribution methods, in accordance with the terms of such agreements.

4. Plaintiff Phil Rothkugel is the principal of Trout Slayers Baked Breads Inc., and Plaintiff Nathaniel Silva is the principal of Silva's Baked Goods. Plaintiff Rothkugel and Plaintff Silva each entered into distribution agreements as the Presidents of their respective companies with Defendant Schmidt Baking Distribution, LLC.

5. In my position as Director of IO Services, I am familiar with the Distribution Agreements signed by Mr. Silva and Mr. Rothkugel in their capacities as President of Silva's Baked Goods and Trout Slayers Baked Breads Inc., respectively. I am also familiar with the process by which they signed the Distribution Agreements.

6. I am familiar with Plaintiffs' companies, the purchase and sale dates and prices for the distribution rights in their Sales Areas, the weekly margin (net cash payment) from their Sales Areas after various deductions (negative cash flows) and allowances (positive cash flows), and valuation of the distribution rights in any current Sales Areas still owned by Plaintiffs' companies.

7. I have access to business records setting forth the amounts that were deducted from payments made to Silva's Baked Goods and Trout Slavers Baked Breads Inc., for a variety of reasons, based upon the Distribution Agreements. I have reviewed various records kept in the ordinary course of business related to the information and data described in the paragraph immediately above.

8. I have reviewed the declarations submitted to the Court by Mr. Silva and Mr. Rothkugel on February 9, 2024.

**Plaintiffs' Allegations of W-2 Employment**

9. From Mr. Silva's and Mr. Rothkugel's declarations, I am aware that both claim to have worked for "Schmidt as a W-2 employee." This is not true.

2

10. Prior to executing their Distribution Agreements, both worked for Route Relievers, a third-party vendor that provides services to Schmidt Baking Distribution. No Schmidt entity has any ownership interest in Route Relievers, and no Schmidt entity ever issued Mr. Silva or Mr. Rothkugel an IRS W-2 form for any wages earned.

**Pre-Purchase Disclosures Process**

11. Prior to entering into the Distribution Agreements, Mr. Rothkugel and Mr. Silva were provided disclosure documents related to the purchase and potential financing of distribution rights.

12. **Exhibit 1-A** contains a true and correct copy of a two-page Receipt of a Franchise Disclosure Document, which was signed by Mr. Silva on June 6, 2020.

13. **Exhibit 1-B** contains a true and correct copy of a two-page Receipt of a Franchise Disclosure Document, which was signed by Mr. Silva on October 1, 2020.

14. **Exhibit 1-C** contains a true and correct copy of a two-page Receipt of a Franchise Disclosure Document, which was signed by Mr. Rothkugel on November 16, 2020.

15. The second page of **Exhibits 1-A through 1-C** each states, "I have received a Franchise Disclosure Document with an issuance date of April 24, 2020."

16. **Exhibit 1-D** contains the cover page for the transmission of the Franchise Disclosure Document with an issuance date of April 24, 2020.

17. **Exhibit 1-D** advises potential independent operators as follows: "Don't rely on the Disclosure Document alone to understand your contract. Read all of your contract carefully. Show your contract and this Disclosure Document to an advisor, like a lawyer or accountant."

**Trout Slayers Baked Breads Inc. – Sales Area #114**

3

18. Through Trout Slayers Baked Breads Inc., Mr. Rothkugel obtained the distribution rights for Sales Area #114 in Connecticut beginning December 16, 2020, for a purchase price of $35,038.00. Trout Slayers Baked Breads Inc. financed the entire purchase price through two loans, which included $757.00 in loan fees. In addition, Trout Slayers Baked Breads Inc. financed a $500 fee to incorporate. Thus, the total financed at the time of purchase was $36,295.00.

19. Through his company, Mr. Rothkugel continued to exercise its distribution rights in Sales Area #114 through January 5, 2022, when Trout Slayers Baked Breads Inc. sold those distribution rights for $67,040.00 to another independent operator.

20. During the course of its ownership of those distribution rights, Trout Slayers Baked Breads Inc. paid $3,500.32 in interest payments on its loans. This includes $56.14 in interest that accrued on its two loans between its last payment date of January 1, 2022, and the January 5, 2022 closing date.

21. At the time of the sale, Trout Slayers Baked Breads Inc. had paid $1,219.14 toward the principal of its loans. In addition, it incurred $1,341.00 in transfer fees as part of the sale.

22. Thus, Trout Slayers Baked Breads Inc.'s equity (*i.e.*, net cash payout) from the sale of its distribution rights for Sales Area #114 was **$30,567.00**. That number is reached as follows: $67,040.00 (sale price) + $1,219.14 (principal paid on loans) - $35,038.00 (purchase price) - $1,257.00 (loan and incorporation fees) - $1,341.00 (transfer fees) – $56.14 (accrued interest at closing).

23. Effectively, through his company, Mr. Rothkugel was able to put no money down in purchasing the distribution rights to Sales Area #114 and, 56 weeks later, received over $30,000 in equity proceeds upon selling those distribution rights. When looked at on a weekly basis, Trout Slayers Baked Bread Inc.'s equity gain was **$545.84 per week** [$30,567.00 / 56 weeks].

4

24.     As shown above, an independent operator such as Trout Slayers Baked Breads Inc. reaps the benefit of an increase in valuation of Sales Area over time.

25.     Of course, an independent operator also bears the risk of the value of the Sales Area decreasing over time. But for the first year, Schmidt Baking Distribution agrees to buy back the distribution rights to a Sales Area at any time for the original purchase price paid by the independent operator. This mitigates the risk to the independent operator during that first year.

26.     In Trout Slayers Baked Breads Inc.'s case, Sales Area #114 began with 16 customers and grew to 28 customers before the distribution rights were sold by Trout Slayers Baked Breads Inc. This not only increased the equity value of Sales Area #114, but also increased weekly revenue payments since more products were being sold within the Sales Area.

27.     Each week, an independent operator receives a payment based on sales revenue, cost of goods sold (*i.e.*, payment to Schmidt Baking Distribution for baked products), various deductions (loan payments, truck lease if applicable, computer fees, truck and general liability insurance, and scan based trading losses), and various positive allowances paid to them by Schmidt Baking Distribution (*i.e.*, advertising and market development).

28.     During the course of Trout Slayers Baked Breads Inc.'s ownership of the distribution rights to Sales Area #114, it received pre-tax net revenue payments of $99,689.32, or **$1,780.16 per week**. The independent operator is responsible for other business expenses, such as fuel and truck maintenance.

29.     Combining the equity and revenue payments, Trout Slayers Baked Breads Inc. received an average pre-tax payment of **$2,326.00 per week** ($545.84 + $1,780.16). Although Mr. Rothkugel's declaration does not state how much he was paid per week by Route Relievers, I

5

believe this is well in excess of what he would have earned with Route Relievers for servicing the same Sales Area.

30. **Exhibit 1-E** contains a summary of the equity analysis and revenue analysis for Trout Slayers Baked Breads Inc.

**Silva's Baked Goods – Sales Area #117**

31. Through Silva's Baked Goods, Mr. Silva first obtained the distribution rights to Sales Area #117 beginning June 24, 2020, for a purchase price of $43,358.00. Silva's Baked Goods financed the entire purchase price through two loans, which included $795.00 in loan fees. In addition, Silva's Baked Goods financed a $500 fee to incorporate. Thus, the total financed at the time of purchase was $44,653.00.

32. Between June 24, 2020 and November 29, 2023, Sales Area #117 grew from 5 customers to 32 customers.

33. Effective November 29, 2023, Silva's Baked Goods sold its distribution rights to 28 of the 37 customers in Sales Area #117 back to Schmidt Baking Distribution for $82,264.00. This is **1.84 times** the total financed at time of purchase.

34. As of February 1, 2024, Silva's Baked Goods has paid $8,465.25 toward the principal of its loans and made $14,560.41 in interest payments on those loans.

35. Silva's Baked Goods incurred $1,645.00 in transfers fees as part of the sale.

36. As of February 10, 2024, the value of the remaining portion of the Sales Area was $44.090.00. Given Silva Baked Goods's outstanding loan principal of $36,187.75, its net equity in the remainder of the Sales Area was $7,902.25.

37. During the course of Silva's Baked Goods's ownership of the distribution rights for Sales Area #117, as of February 17, 2024, it has received pre-tax net revenue payments of

6

$494,752.69, or **$2,598.10 per week**. The independent operator is responsible for other business expenses, such as fuel and truck maintenance.

38.     **Exhibit 1-F** contains a summary of the equity analysis and revenue analysis for Silva's Baked Goods.

**Silva's Baked Goods – Sales Area #115**

39.     Through Silva's Baked Goods, Mr. Silva also obtained the distribution rights to Sales Area #115 beginning October 28, 2020, for a purchase price of $33,952.00. Silva's Baked Goods financed the entire purchase price through two loans, which included $752.00 in loan fees. Thus, the total financed at the time of purchase was $34,704.00.

40.     Through his company, Mr. Silva continued to exercise its distribution rights in Sales Area #115 through June 7, 2023, when Silva's Baked Goods sold its distribution rights for Sales Area #115 for $83,408.00.

41.     At the time of purchase by Silva's Baked Goods, Sales Area #115 had five customers. At the time Silva's Baked Goods sold its distribution rights, Sales Area #115 had grown to 27 customers. Silva's Baked Goods sold the distribution rights to six customers to Schmidt Baking Distribution, and sold the distribution rights to the other 21 customers to another independent operator. As with Mr. Rothkugel, Mr. Silva benefitted financially from the addition of customers to his Sales Area.

42.     During the course of its ownership of those distribution rights, Silva's Baked Goods paid $8,434.84 in interest payments on its loans related to Sales Area #115. This includes $62.27 in interest that accrued on its two loans between its last payment date and the closing date of June 7, 2023.

7